**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x

In re:

NORTH SEA BRENT CRUDE OIL FUTURES                1:13-md-02475 (ALC)
LITIGATION

This document applies to:

1:13-cv-03473-ALC, 1:13-cv-03587-ALC,
1:13-cv-03944-ALC, 1:13-cv-04142-ALC,
1:13-cv-04553-ALC, 1:13-cv-04872-ALC,
1:13-cv-04938-ALC, 1:13-cv-05577-ALC,
1:13-cv-07089-ALC, 1:13-cv-08030-ALC,
1:13-cv-08151-ALC, 1:13-cv-08179-ALC,
1:13-cv-08240-ALC 1:13-cv-08270-ALC.

----------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR JOINT MOTION TO DISMISS**
**THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

July 28, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ...................................................................................5

    A.    The Parties ..............................................................................5

    B.    Brent Crude Oil.........................................................................6

    C.    Platts' Dated Brent Assessment And Real-Time Price Reporting.........7

    D.    Brent Crude Oil Futures And Derivatives Contracts .........................9

    E.    The Complaint ........................................................................10

ARGUMENT .......................................................................................................11

I.    THE COMPLAINT FAILS TO STATE CLAIMS UNDER THE CEA............11

    A.    Plaintiffs' CEA Claims Must Be Pled With Particularity....................12

    B.    The Complaint Does Not Properly Allege Any Elements Of A Market Manipulation Claim. ...............................................................13

        1.    Plaintiffs Do Not Adequately Allege Artificial Prices. ...........13

        2.    Plaintiffs Do Not Adequately Allege That Defendants Caused Artificial Prices. ..........................................................18

        3.    Plaintiffs Do Not Adequately Allege That Defendants Possessed The Ability To Influence Brent Futures Prices........................19

        4.    Plaintiffs Do Not Adequately Allege That Defendants Intended To Cause An Artificial Price. ...............................................21

    C.    The Complaint Does Not State A Claim For False Reporting Under The CEA.....................................................................................24

        1.    CEA Section 6(c)(1), As Amended, Does Not Apply Retroactively.........24

        2.    Plaintiffs Do Not Adequately Allege The Elements Of False Reporting For Conduct Occurring After The Effective Date Of Section 6(c)(1). .........................................................25

    D.    The Complaint Fails To State A Claim For Aiding And Abetting.........26

-i-

## TABLE OF CONTENTS
### (*Cont'd*)

**Page**

    E.    The Complaint Fails To State A Claim For Principal-Agent Liability ................ 28

    F.    The Complaint Fails To Plead Actual Damages. .................................... 28

II.    THE COMPLAINT FAILS ADEQUATELY TO ALLEGE A VIOLATION OF THE SHERMAN ACT ..................................................................... 30

    A.    Because Plaintiffs Cannot Demonstrate Antitrust Injury, The Complaint Fails To State A Claim Under Sections 1 And 2. ................................. 30

    B.    Because The Complaint Does Not Allege Concerted Conduct Or A Plausible Conspiracy, It Fails To State A Claim Under Section 1. ............ 33

    C.    The Complaint Fails To State A Claim For Monopolization Under Section 2 ............................................................................... 35

    D.    The Complaint Fails To State A Section 2 Claim For Conspiracy To Monopolize. ........................................................................... 38

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT OR RESTITUTION ................................................. 39

IV.    CLAIMS CONCERNING MOST OF THE CLASS PERIOD MUST BE DISMISSED AS ENTIRELY UNSUPPORTED BY FACTUAL ALLEGATIONS OR BECAUSE THEY ARE TIME BARRED. ................. 41

    A.    Because The Complaint Includes No Factual Allegations Relating To 2002 To May 2010, All Claims Concerning That Period Must Be Dismissed. ............................................................................... 41

    B.    Plaintiffs' CEA Claims Based On Conduct Before May 2011 Are Time Barred. .................................................................................. 41

    C.    Plaintiffs' Antitrust Claims, To The Extent They Seek Damages Pre-Dating May 2009, Are Time Barred. ........................................... 44

    D.    Plaintiffs' Unjust Enrichment Claims Based On Conduct Before May 2011 Are Time Barred. ............................................................. 44

CONCLUSION ............................................................................. 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT* v. *Associated Press*,
    181 F.3d 216 (2d Cir. 1999)................................................................37

*In re Amaranth Natural Gas Commodities Litig.*,
    730 F.3d 170 (2d Cir. 2013)................................................14, 25, 26, 28

*In re Amaranth Natural Gas Commodities Litig.* (*Amaranth I*),
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)......................................22, 42, 43

*In re Amaranth Natural Gas Commodities Litig.* (*Amaranth II*),
    612 F. Supp. 2d 376 (S.D.N.Y. 2009)................................24, 28, 29, 30

*In re Amaranth Natural Gas Commodities Litig.* (*Amaranth III*),
    269 F.R.D. 366 (S.D.N.Y. 2010) ...............................................28, 31

*Atlantic Richfield Co.* v. *USA Petroleum Co. (ARCO)*,
    495 U.S. 328 (1990)................................................................33

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007)...........................................................35, 36

*Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979)..................................................................35

*Broadcom Corp.* v. *Qualcomm Inc.*,
    501 F.3d 297 (3d. Cir. 2007)....................................................39

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)................................................................32

*Car Carriers* v. *Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ...................................................41

*CFTC* v. *Amaranth Advisors L.L.C.*,
    554 F. Supp. 2d 523 (S.D.N.Y. 2008)............................................24

*CFTC* v. *Atha*,
    420 F. Supp. 2d 1373 (N.D. Ga. 2006) ..........................................27

# TABLE OF AUTHORITIES
### (*Cont'd*)

**Page**

*CFTC* v. *Bradley*,
    408 F. Supp. 2d 1214 (N.D. Okla. 2005) ...............................................................27

*CFTC* v. *Parnon Energy, Inc.*,
    875 F. Supp. 2d 233 (S.D.N.Y. 2012) ..............................................17, 21, 23, 27

*Chambers* v. *Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ...................................................................................8

*Chapman* v. *N.Y. State Div. for Youth*,
    546 F.3d 230 (2d Cir. 2008) .................................................................................38

*In re Commodity Exchange, Inc. Silver Futures and Options Trading Litig.* (*Silver I*),
    No. 11-md-2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) .................... *passim*

*In re Commodity Exchange, Inc. Silver Futures and Options Trading Litig.* (*Silver II*),
    No. 11-md-2213, 2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) ...........................20

*In re Commodity Exchange Inc., Silver Futures and Options Trading Litig.* (*Silver III*),
    No. 13-cv-1416, 2014 WL 1243851 (2d Cir. Mar. 27, 2014) ......................14, 23, 25

*Corsello* v. *Verizon N.Y., Inc.*,
    18 N.Y. 3d 777 (2012) .........................................................................................43

*Crossword Magazine, Inc.* v. *Times Books*,
    No. 96-cv-4550, 1997 WL 227998 (E.D.N.Y. May 5, 1997) .................................21

*In re Crude Oil Commodity Litig.* (*In re Crude Oil*),
    No. 06-cv-6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ..................... *passim*

*In re DiPlacido*,
    Comm. Fut. L. Rep. (CCH) ¶ 30,970, 2008 WL 4831204 (CFTC Nov. 5, 2008) .................18

*Donahue* v. *Pendleton Woolen Mills, Inc.*,
    633 F. Supp. 1423 (S.D.N.Y. 1986) .....................................................................46

*Gatt Commc'ns, Inc.* v. *PMC Assoc., LLC*,
    711 F.3d 68 (2d Cir. 2013) ...................................................................................32

*Georgia Malone & Co.* v. *Rieder*,
    19 N.Y.3d 511 (2012) ..........................................................................................42

## TABLE OF AUTHORITIES
### *(Cont'd)*

**Page**

*Golden Gate Pharm. Servs.* v. *Pfizer, Inc.*,
    No. C-09-3854, 2010 WL 1541257 (N.D. Cal. April 16, 2010)..............................................38

*H.L. Hayden Co. of New York, Inc.* v. *Siemens Med. Sys., Inc.*,
    879 F.2d 1005 (2d Cir. 1989)..............................................................................................39

*Harris* v. *Mills*,
    572 F.3d 66 (2d Cir. 2009)..................................................................................................44

*Hinds Cnty* v. *Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)..................................................................................36

*Huss* v. *Gayden*,
    571 F.3d 442 (5th Cir. 2009) ..............................................................................................16

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................................24

*Knobel* v. *Shaw*,
    90 A.D.3d 493 (N.Y. App. Div. 2011) ................................................................................47

*Koch* v. *Christie's Int'l PLC*,
    699 F. 3d 141 (2d Cir. 2012)..............................................................................................44

*Krause* v. *Forex Exch. Mkt., Inc.*,
    356 F. Supp. 2d 332 (S.D.N.Y. 2005)..................................................................................28

*Landgraf* v. *USI Film Products*,
    511 U.S. 244 (1994)............................................................................................................26

*Laydon* v. *Mizuho Bank Ltd.*,
    No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)............................................34

*LePage's Inc.* v. *3M*,
    324 F.3d 141 (3d Cir. 2003) (en banc)................................................................................39

*Lerner* v. *Fleet Bank, N.A.*,
    459 F. 3d 273 (2nd Cir. 2006)............................................................................................22

*In re LIBOR-Based Financial Instruments Antitrust Litig.* (*LIBOR I*),
    935 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................................... *passim*

## TABLE OF AUTHORITIES
### (*Cont'd*)

**Page**

*In re LIBOR-Based Financial Instruments Antitrust Litig.* (*LIBOR II*),
   962 F. Supp. 2d 606 (S.D.N.Y. 2013)............................................................................30, 31

*In re Magnetic Audiotape Antitrust Litig.*,
   No. 99-cv-1580, 2002 WL 975678 (S.D.N.Y. May 9, 2002) ...................................47

*Malmsteen* v. *Berdon, LLP*,
   477 F. Supp. 2d 655 (S.D.N.Y. 2007)......................................................................47

*Mayor of Baltimore* v. *Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)......................................................................................36

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003)......................................................................45

*In re Merrill Lynch Ltd. Partnerships Litig.*,
   7 F. Supp. 2d 256 (S.D.N.Y. 1997)..........................................................................46

*In re Motel 6 Sec. Litig.*,
   Nos. 93-cv-2183, 92-cv-2866, 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997) .........................42

*Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*,
   861 F. Supp. 2d 344 (S.D.N.Y. 2012)......................................................................38

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004)......................................................................45

*In re Natural Gas Commodity Litig.*,
   358 F. Supp. 2d at 344 ..........................................................................14, 19, 24, 27

*Navarra* v. *Marlborough Gallery, Inc.*,
   820 F. Supp. 2d 477 (S.D.N.Y. 2011)......................................................................38

*Nichols* v. *Mahoney*,
   608 F. Supp. 2d 526 (S.D.N.Y. 2009)......................................................................33

*NYNEX Corp.* v. *Discon. Inc.*,
   525 U.S. 128 (1998)..................................................................................................33

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
   541 F. Supp. 2d 487 (D. Conn. 2008)......................................................................36

# TABLE OF AUTHORITIES
### *(Cont'd)*

**Page**

*Paycom Billing Serv., Inc.* v. *Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d. Cir. 2006)..................................................................................33

*In re Piasio*,
    Comm. Fut. L. Rep. (CCH) ¶ 28,276, 2000 WL 1466069 (CFTC Sep. 29, 2000)..................13

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)......................................................................28

*Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..................................................................................38

*Reudy* v. *Clear Channel Outdoors, Inc.*,
    693 F. Supp. 2d 1091 (N.D. Cal. 2010) ..................................................................39

*Rio Grande Royalty Co., Inc.* v. *Energy Transfer Partners, L.P.*,
    786 F. Supp. 2d 1202 (S.D. Tex. 2009) ..................................................................40

*Roistacher* v. *Bondi*,
    No. 11-cv-8200, 2014 WL 594176 (S.D.N.Y. Feb. 10, 2014) .............................................47

*In re Rough Rice Commodity Litig.*,
    No. 1-C-618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ...................................................17, 18

*RxUSA Wholesale, Inc.* v. *Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) .....................................................................39

*Salinger* v. *Projectavision, Inc.*,
    934 F. Supp. 1402 (S.D.N.Y. 1996)........................................................................46

*Schachar* v. *Am. Acad. of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ...............................................................................33, 34

*SEC* v. *Lee*,
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)......................................................................23

*Sheehan* v. *Daily Racing Form, Inc.*,
    104 F.3d 940 (7th Cir. 1997) (Posner, J.) ................................................................16

*Sperry* v. *Crompton Corp.*,
    8 N.Y. 3d 204 (2007).......................................................................................42

## TABLE OF AUTHORITIES
### *(Cont'd)*

**Page**

*In re Sumitomo Copper Litig.*,
  182 F.R.D. 85 (S.D.N.Y. 1998) ..........................................................................14

*Techreserves Inc.* v. *Delta Controls, Inc.*,
  No. 13-cv-752, 2014 WL 1325914 (S.D.N.Y. Mar. 31, 2014).............................40

*Telectronics Proprietary, Ltd.* v. *Medtronic, Inc.*,
  687 F. Supp. 832 (S.D.N.Y. 1988)......................................................................21

*In re Term Commodities Cotton Futures Litig. (In re Cotton Futures)*,
  No. 12-cv-5126, 2013 U.S. Dist. LEXIS 184374 (S.D.N.Y. Dec. 20, 2013) .................. *passim*

*Three Crown Ltd. Partnership* v. *Caxton Corp.*,
  817 F. Supp. 1033 (S.D.N.Y. 1993).......................................................................2

*In re: Ultrafem Inc. Sec. Litig.*,
  91 F. Supp. 2d 678 (S.D.N.Y. 2000)....................................................................45

*United Magazine Co.* v. *Murdoch Magazines Dist. Inc.*,
  146 F. Supp. 2d 385 (S.D.N.Y. 2001)..................................................................37

*Verizon Comms.* v. *Law Offices of Curtis* v. *Trinko, LLP*,
  540 U.S. 398 (2004)...................................................................................37, 40

*Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988)...............................................................................41

*Wellnx Life Sciences Inc.* v. *Iovate Health Sciences Research Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007).................................................................35

*Westchester Radiological Assoc. P.C.* v. *Empire Blue Cross and Blue Shield, Inc.*,
  659 F. Supp. 132 (S.D.N.Y. 1987)......................................................................36

*Williams* v. *WMX Technologies, Inc.*,
  112 F.3d 175 (5th Cir. 1997) ...............................................................................5

*Yiu Sing Chun* v. *Sava*,
  708 F.2d 869 (2d Cir. 1983)...............................................................................28

**Statutes, Rules, and Regulations**

7 U.S.C. § 2................................................................................................10, 29, 30

**TABLE OF AUTHORITIES**
*(Cont'd)*

**Page**

7 U.S.C. § 9 .......................................................................................4, 10, 12, 26

7 U.S.C. § 13 ...................................................................................10, 12, 14, 27

7 U.S.C. § 25 ...........................................................................................30, 31, 44

15 U.S.C. § 1 .................................................................................................. *passim*

15 U.S.C. § 2 .................................................................................................. *passim*

15 U.S.C. § 15 ........................................................................................................47

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    P.L. 111-203, 124 Stat. 1376 (2010) ............................................................26

Fed. R. Civ. P. 8(a) ....................................................................................... *passim*

Fed. R. Civ. P. 9(b) ....................................................................................... *passim*

N.Y. Civil Practice Law § 213 (McKinney 2004) ......................................47

17 C.F.R. 180.1 ..............................................................................................10, 26

## PRELIMINARY STATEMENT

Despite its length, Plaintiffs' 185-page, 598-paragraph corrected Consolidated Amended Class Action Complaint fails to allege a viable claim.  Plaintiffs assert that for twelve years, sixteen companies manipulated, monopolized and conspired to fix prices for over-the-counter (OTC) physical Brent crude oil and derivatives transactions (collectively, OTC Brent Transactions) in Europe, which allegedly caused price "ripples" in the exchange-traded futures and other derivatives in which Plaintiffs purportedly traded.  But Plaintiffs' ambitious theory relies entirely on routine market activity that was made public in real-time, and therefore has long been known.  The only "new" information is Plaintiffs' conclusory statements labeling this activity "uneconomic" or otherwise manipulative, and their purported correlation studies between physical and futures contract prices, all of which are wholly untethered to any Defendant's conduct.  (*See* Compl. ¶¶ 10, 18, 86, 121, 126-36, 224-50, 255, 257, 260-61, 266, 271, 277, 280, 299.)  Such threadbare allegations have long been found inadequate in this Circuit.  As discussed in detail below, the Complaint should be dismissed.

According to the Complaint, Plaintiffs are futures and derivatives traders, and Defendants are alleged to be participants in the physical oil business that engage in the production, refining, and distribution of crude oil and refined petroleum products, among other things.  Platts is a price reporting agency that reports prices for physical and some derivative oil markets and publishes its own oil price assessments.  Plaintiffs claim that Defendants' OTC Brent Transactions consisted of artificial bids, offers and trades from 2002 to the present (the Class Period).  However, the Complaint alleges no misconduct at all during the first eight years of this period, from 2002 to May 2010.  For the remainder of the Class Period, the Complaint only identifies activity in four specific months—June 2010, January and February 2011, and September 2012.  Some of these bids, offers, and trades were allegedly reported by Platts and incorporated into

Platts' oil price assessments, while others were ignored by Platts.  In turn, Platts' reports of trading activity and published price assessments allegedly affected Brent futures prices.  On this basis, Plaintiffs assert Commodity Exchange Act (CEA) claims for price manipulation (through Defendants' OTC Brent Transactions) and false reporting (through unidentified reports to Platts), as well as claims under the Sherman Antitrust Act and for common law unjust enrichment.

As Plaintiffs admit, the challenged trading activity was made public in real-time.  Thus the supposed basis for Plaintiffs' claims has been known for years.  Plaintiffs make these assertions now only because of public announcements that a few Defendants were subject to European Commission inspections in May 2013 concerning several oil and biofuel products. The first cases in this multidistrict litigation were filed eight days later.  But inquiries from a regulator are not a license to re-label twelve years of public market activity by sixteen Defendants as part of a massive conspiracy or otherwise as wrongful.[1]

None of Plaintiffs' claims has merit for several reasons.

*First*, the CEA claims for manipulation and false reporting, which are based on mostly untimely allegations, should be dismissed.

Plaintiffs' claim that Defendants' OTC Brent Transactions manipulated the market does not allege any of the required elements—artificial price, causation, ability to influence price, and intent—with the particularity required by Rule 9(b), or even under the less-exacting standard of

---

[1]    *See, e.g.*, *In re Crude Oil Commodity Litig.* (*In re Crude Oil*), No. 06-cv-6677, 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007) (dismissing plaintiffs' CEA claims and observing that plaintiffs' recitation of, among other things, governmental investigations and press articles reporting that regulatory agencies were investigating the defendant were "an insufficient substitute for factual allegations"); *cf. Three Crown Ltd. Partnership* v. *Caxton Corp.*, 817 F. Supp. 1033, 1040 n.11 (S.D.N.Y. 1993) ("Plaintiffs cannot be permitted to free ride off the press or the complaints of other parties filing similar lawsuits, rather they must prove to the court that their complaint is backed by specific facts supporting a 'strong inference' of fraud.").

Rule 8(a).  Plaintiffs' allegations of artificial prices for Defendants' OTC Brent Transactions are entirely conclusory.  Nothing other than Plaintiffs' labelling of Defendants' OTC activity suggests that Defendants' bids, offers, and trades were in any sense "artificial."  Moreover, the actions complained of occurred in OTC markets, not the futures markets, and while Plaintiffs claim that Platts' price assessments linked these OTC markets to the futures markets where Plaintiffs traded, those allegations too are inherently flawed.  For one, Plaintiffs fail to plead that Platts' price assessments would have been different absent the Defendants' alleged OTC activity, because, as Plaintiffs admit, Platts' assessments are subjective, and when particular activity is inconsistent with its view of broader market trends, Platts' assessments give such activity little or no weight.  (Compl. ¶¶ 260, 285, 326, 329, 389.)  At most, the Complaint alleges general correlations between Platts' assessments of Brent crude oil prices and the price of Brent crude oil futures contracts, which is hardly surprising for prices that are generally related to the same underlying commodity.  The Complaint thus fails to adequately allege price artificiality in any market, much less that Defendants caused artificial prices in the OTC and futures markets or had the ability to do so.

Plaintiffs also fail to plead that Defendants intended to engage in manipulation through their OTC Brent Transactions.  Plaintiffs allege that Defendants' OTC bids, offers, and trades for physical Brent crude oil and OTC derivatives were unexpected or "uneconomic" and caused spillover effects in the futures markets, but nothing suggests that these alleged effects (in only four months at the end of a twelve-year period) were Defendants' objective.  Plaintiffs resort to conclusory assertions that some Defendants must have had unspecified physical or futures positions that might have benefitted from their actions in the OTC market.  (Compl. ¶¶ 258, 319,

334, 337-38, 368, 378, 388.)  Courts in this circuit routinely hold such allegations insufficient.
*See In re Crude Oil*, 2007 WL 1946553, at *8.

Plaintiffs' CEA false-reporting claim is even more threadbare.  Plaintiffs do not allege a
single report by any Defendant, much less a false one, or any plausible intent to make
unidentified false reports.  *See* CEA § 6(c)(1), 7 U.S.C. § 9(1)(A).  The Complaint also fails to
allege secondary liability for any CEA claim.

*Second*, Plaintiffs' antitrust claims are, likewise, entirely conclusory, and fail to allege
*any* activity that violates Sections 1 or 2 of the Sherman Act.  Because Plaintiffs have not alleged
any conduct that reduced competition, they have not suffered antitrust injury.  Further, Plaintiffs'
Section 1 conspiracy claim lacks any well-pled allegations of concerted conduct among the
Defendants—it merely alleges a handful of bilateral arm's-length transactions, which, without
more, cannot be illegal agreements in restraint of trade.  The Complaint also does not allege the
required elements of a Section 2 claim, including monopoly power in a relevant market by any
Defendant or exclusionary conduct—or, for the conspiracy to monopolize claim, a "conspiracy"
or specific intent.

*Third*, the unjust enrichment claim should be dismissed because Plaintiffs and Defendants
have no direct relationship, an essential element of an unjust enrichment claim.  On that basis,
courts in this district have dismissed similar unjust enrichment claims in other commodities
cases.  *See, e.g.*, *In re LIBOR-Based Financial Instruments Antitrust Litig.* (*LIBOR I*), 935 F.
Supp. 2d 666, 737-38 (S.D.N.Y. 2013).

*Fourth*, Plaintiffs fail to make a *single* specific factual allegation concerning the period
2002 through May 2010.  On this basis alone, the Complaint fails to state any claims for which
relief can be granted concerning that period.  In addition, because Defendants' activity was made

public in real-time, most of Plaintiffs' claims are untimely under the two-year and four-year limitations periods of the CEA and Sherman Act, respectively.  In the face of the public information on which they base their claims, Plaintiffs' attempt to claim fraudulent concealment is unsupportable.  As a result, all CEA and unjust enrichment claims based on conduct before May 2011 (or later for certain Defendants) are untimely, as are all Sherman Act claims based on conduct before May 2009 (or later).

In short, the Complaint seeks to manufacture a lawsuit by taking ordinary market activity and labeling it as illegal.  But strain as Plaintiffs might over 185 pages, nothing about that activity supports a claim.  A "complaint can be long-winded, even prolix, without pleading with particularity," and "such a garrulous style is not an uncommon mask for an absence of detail." *Williams* v. *WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).  The Complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiffs are futures and derivatives traders who allegedly traded Brent crude oil futures contracts on either the New York Mercantile Exchange (NYMEX) or Intercontinental Exchange (ICE) Futures Europe (or both).  (Compl. ¶¶ 24-33.)  Plaintiffs seek to represent a class of "[a]ll persons, corporations and other legal entities that transacted in and/or held (a) ICE derivatives contracts tied to Brent Crude Oil (such as Brent futures) and/or (b) NYMEX derivatives contracts tied to Brent Crude Oil (such as Brent futures) during the Class Period," which spans 2002 to 2014.  (*Id.* ¶ 525.)

According to the Complaint, Defendants are a diverse group of participants in the oil business, with activities in oil production, refining, trading, investment banking, and/or distribution, along with several of their parent companies.  (*Id.* ¶¶ 35-50.)  Because Defendants

are diverse, at any given time their interests in having higher (or lower) prices likely diverge. For example, Plaintiffs allege that a producer generally favors higher prices, while a refiner may favor lower prices.  (*Id.* ¶ 537-38.)  Although the Complaint asserts that "Defendants" traded physical Brent crude oil in the North Sea at "uneconomic" prices and supposedly "report[ed] inaccurate, misleading, and false Brent Crude Oil trade information to Platts" (*id.* ¶ 9), Plaintiffs do not make a single specific allegation about conduct by Defendants Shell Trading US Company, BP America Inc., BP Corporation North America Inc., Statoil US Holdings Inc., Mercuria Energy Trading, Inc., or Vitol, Inc.

**B.    Brent Crude Oil**

"Brent crude oil" comes from four fields in the North Sea:  Brent, Forties, Oseberg, and Ekofisk (collectively, BFOE).  (*Id.* ¶ 55.)  Physical Brent crude oil trades OTC, *i.e.*, not on an exchange, but in private transactions between oil producers, traders, and refiners, often with brokers as intermediaries.  (*Id.* ¶¶ 68, 85.)  Brent crude oil can be traded as purchases or sales of the specific component grades, *e.g.*, a purchase of an Ekofisk cargo.  Alternatively, market participants can buy or sell "Cash BFOE" contracts.[2]  Cash BFOE contracts require delivery[3] of a BFOE grade at one of the North Sea loading points in a given month one to three months in the future but do not specify which grade or the particular delivery date.  Sellers declare the grade (typically the cheapest to deliver of the four BFOE grades at the time) and delivery date at least 25 days before delivery.  Spot cargoes with assigned, specific grades of crude oil and delivery dates, generally 10-25 days in the future, are described as "Dated Brent."  (*Id.* ¶ 61.)

---

[2]    Sometimes called "Forward Brent" or "25-day BFOE."

[3]    Cash BFOE trades in volumes of 100,000 barrels.  Only when a market participant has accumulated an open position of 600,000 barrels (a cargo) is physical delivery possible.

### C.    Platts' Dated Brent Assessment And Real-Time Price Reporting

Platts publishes various industry reports, news, and analyses, including the Platts Crude Oil Marketwire reports on which the Complaint relies.  Platts also publishes various end-of-day price assessments, including the Dated Brent Assessment, which assesses the price of specific "Dated" cargos of Brent, Forties, Oseberg, or Ekofisk that have been assigned loading dates for delivery in the next 10-25 days.  (*Id.* ¶¶ 6, 92.)  This is, in effect, a "spot" price for Dated Brent. (*Id.* ¶ 6.)

Platts assesses prices through its Market on Close (MOC) methodology, which consists of reviewing "various types of transactions for physical Brent Crude Oil or for derivatives of Brent Crude Oil," and then "connect[ing] the various markets together."  (*Id.* ¶ 7.)  Platts focuses on market activity from 4:00-4:30 p.m. London time, the "MOC window" (*id.* ¶ 66), but considers transactions occurring throughout the day.[4]  Platts "align[s]" its price assessments to the MOC window because this period "tends to be one of high activity," which Platts believes "provides a strong basis for assessing market value."  (*Id.* ¶ 93; *see also id.* ¶ 100 ("Platts aims to capture the price of oil closest to the market.").)  Importantly, "Platts does not require its editors to apply a rigid formula or model"; rather "the Platts editors must evaluate all of the relevant conditions and factors each day for the price assessment process."[5]  (Libow Decl. Ex. B (Letter

---

[4]    (Libow Decl. Ex. A (Platts, *An Introduction to Platts Market-On-Close Process In Petroleum*, *available at* http://www.platts.com/IM.Platts.Content/aboutplatts/mediacenter/PDF/ Platts_IntrooilMOC.pdf) at 2 ("The 'window' is not to be confused with the MOC process itself. It is just a part of the overall process, which involves surveying the market throughout the day as well as during the 'window,' which is typically the time when the market is most active.").) Citations to "Libow Decl. Ex. __" are to exhibits to the July 28, 2014 Declaration of Daryl A. Libow, filed herewith.

[5]    For example, "the previous day's assessment may have relevance to a following day's assessment where are no bids and offers," and "[o]n days where there is a scarcity of transactional data, Platts bases its price assessments on a range of factors, including:  the value of

from L. Neal, Platts President, to Y. Fujioka, IOSCO General Secretariat (Mar. 30, 2012), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD391.pdf) at 9.)[6]  As Plaintiffs recognize (Compl. ¶¶ 99, 260, 285, 326, 329, 389), Platts editors use their discretion to exclude aberrant market activity.  (Libow Decl. Ex. G (Platts, *Platts Oil Pricing and MOC Methodology Explained*, (2010), *available at* http://www.platts.com/IM.Platts.Content/InsightAnalysis/ IndustrySolution Papers/ moc.pdf) at 4.)  As Platts explains on its website, "[i]f, for instance, a market participant were to want to overpay or undersell, by lifting high and unreasonable offers or selling into low and unreasonable bids, such activity would be disregarded."  (*Id.*)

Platts disseminates other Brent crude oil information in real time, including firm bids, offers, and trades for Brent crude oil.  Plaintiffs allege (without stating a factual basis for the allegation) that some futures traders rely upon this information "for price discovery and for assessing price risks in the Brent Crude Oil market."  (Compl. ¶ 125; *see also id.* ¶¶ 5, 126.) Significantly, however, Plaintiffs admit that they "did not have access to the MOC trades, *i.e.*, the data that Platts reported" in real time, because they did not pay for it.  (*Id.* ¶ 503.)  Instead, they relied "upon the *results* of the MOC process."  (*Id.* (emphasis in original))  In other words, Plaintiffs allege that they relied on Platts' subjective price assessments—not the underlying data.

---

related products and in other geographic regions, trading in derivatives on futures exchanges such as ICE, and general macro-economic factors."  (Libow Decl. Ex. B at 9.)

[6]      The Complaint quotes from, among other sources:  IOSCO's October 2012 report to which Platts' March 30, 2012 comment letter is attached (Libow Decl. Ex. B) (quoted at Compl. ¶ 12), Platts' website, *available at* http://www.platts.com/products/market-data-oil) (Libow Decl. Ex. C) (quoted at Compl. ¶ 86 n.2); and numerous editions of Platts' daily Crude Oil Marketwire reports, *see, e.g.*, Platts' Sept. 26, 2012 Crude Oil Marketwire (Libow Decl. Ex. D) (quoted at Compl. ¶ 402); Platts' Sept. 14, 2012 Crude Oil Marketwire (Libow Decl. Ex. E) (quoted at Compl. ¶ 394); Platts' Sept. 13, 2012 Crude Oil Marketwire (Libow Decl. Ex. F) (quoted at Compl. ¶ 391).  A court may take judicial notice of the content of documents incorporated into the complaint by reference.  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

### D.    Brent Crude Oil Futures And Derivatives Contracts

A futures contract is a standardized agreement to buy or sell a commodity at a date in the future.  (*Id.* ¶ 122.)  Futures markets may be used for price discovery, to hedge price exposure of physical commodities, and to trade for profit.  (*See id.* ¶¶ 126, 420.)

ICE Brent futures contracts stop trading (or "expire") approximately two weeks before the delivery month.  An ICE Brent futures contract for delivery in February, for example, will stop trading and expire in the middle of January.  If a holder of an ICE Brent futures contract does not offset (close out) its position before trading in that particular contract expires, the position is cash settled not against the Platts Dated Brent Assessment, but against the ICE Brent Index.  The two benchmarks, however, measure Brent prices during different time periods.  As noted, the Dated Brent Assessment is Platts' spot price (*id.* ¶ 6), while the ICE Brent Index is a calculation used by ICE Futures Europe (not Platts) to value unspecified BFOE cargos—not Dated cargos—for delivery beyond the current spot month based on trading in the Cash BFOE market "as reported and confirmed by the industry media."  (*Id.* ¶¶ 128 n.3, 176, 179.)[7]  As Plaintiffs allege, such prices for forward months may be higher or lower than Dated Brent prices.  (*Id.* ¶ 53, 57 (describing "contango" and "backwardation").)  Thus, although Plaintiffs assert in conclusory fashion that "Brent Crude Oil futures and other derivatives contract prices are directly linked to Platts's and other PRAs' pricing assessment of market participants' transactions" (*Id.* ¶ 127), the Complaint does not plausibly allege any *causal* link between Platts'

---

[7]    On all days other than expiration, ICE and NYMEX Brent futures contracts settle daily, not against any Platts pricing benchmark, but against the weighted average price of futures trades during the two-minute settlement period, from 7:28-7:30 p.m. London time.  (*See* Libow Decl. Ex. H (Brent Crude Futures Contract Specifications, *available at* https://www.theice.com/ products/219).)

Dated Brent Assessment and the futures prices, which settle to a completely different
benchmark.

### E.    The Complaint

The Complaint, filed July 3, 2014, alleges in conclusory fashion that, beginning in 2002
and continuing to the present, all of the named Defendants violated (i) CEA prohibitions on
market manipulation and false reporting, 7 U.S.C. §§ 9(1)(A), 13(a)(2); 17 C.F.R. 180.1, and
provisions governing aiding and abetting and principal-agent liability, 7 U.S.C. § 2(a)(1)(B);
(ii) Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; and (iii) common law principles of
unjust enrichment.  (Compl. ¶¶ 1-2.)

The majority of the Complaint consists of generalized allegations, unconnected to
particular Defendants, concerning the alleged mechanics of Brent crude oil trading.  (*See, e.g.*,
*id.* ¶¶ 5-7, 53-250.)  Plaintiffs also dedicate a significant portion of the Complaint to two
"[s]tatistical studies" covering the period January 2010 to the present, one that allegedly shows a
"connection" between physical and futures prices for Brent, and the other that allegedly shows
that futures prices tended to move in opposite directions during and outside the MOC window—
allegations that also are not tied to any Defendants.  (*Id.* ¶¶ 11, 129-32, 229-47; C.E. 1-20.)

Plaintiffs' only allegations as to any specific conduct by Defendants consist of recaps
from Platts market reports during four months out of an alleged twelve-year Class Period, all
after May 2010.  To these, Plaintiffs add conclusory allegations that the market activity
summarized in those reports was "uneconomic," manipulative or collusive.

Plaintiffs offer two theories of manipulation.  First, the Complaint alleges that
Defendants' OTC bids, offers and trades themselves caused Brent crude oil prices to be artificial,
sometimes moving them upwards and sometimes downwards, without adequately describing
whether that artificially existed in the OTC or futures markets or both.  (*See* Compl. ¶¶ 8, 70, 73,

259, 261, 264-65, 280, 283, 288, 310, 337, 340, 369, 384, 399, 404, 501-02, 553.)  In total, Plaintiffs identify a mere seven days out of a twelve-year period on which futures prices were supposedly affected during the MOC window by the alleged OTC manipulation—two days in 2010, three days in 2011, and two days in 2012.  (*Id.* ¶¶ 261 (June 10, 2010), 269, 276 (June 15, 2010), 282 (January 14, 2011), 316 (January 28, 2011), 343 (February 21, 2011), 406 (September 27 and 28, 2012).)  Yet the Complaint alleges only that a single plaintiff, Atlantic Trading, traded Brent futures on any of those days—and does not claim that this trading occurred during the MOC window when futures prices were allegedly affected.  (*Id.* ¶ 436.)  Plaintiffs' second theory of manipulation is that "Defendants" violated the CEA's prohibition on false reporting, 7 U.S.C. § 9(1)(A), by "making untrue or misleading statements to Platts during the MOC window" (Compl. ¶ 553)—but the Complaint does not identify a single such report by anyone.  These same allegations also serve as the basis for Plaintiffs' Sherman Act and unjust enrichment claims.

## ARGUMENT

Plaintiffs have attempted to cobble together causes of action based on a handful of publicly reported trades, superficial and irrelevant market-wide statistical analyses, and conclusory assertions not supported by any specific allegations—many of which are inconsistent with the facts they have actually alleged.  Because the Complaint falls short of satisfying pleading standards under the CEA, the Sherman Act or principles of unjust enrichment, Plaintiffs' effort to convert public trading information and market commentary into a massive and far-fetched scheme of intentional wrongdoing should be rejected.

## I.    THE COMPLAINT FAILS TO STATE CLAIMS UNDER THE CEA.

Plaintiffs' two substantive theories of CEA liability—that Defendants' Brent crude oil transactions manipulated the market, and that Defendants made false reports to Platts, 7 U.S.C.

§§ 9(1)(A), 13(a)(2)—sound in fraud.  Under any pleading standard, these theories are

unsupported, implausible, and therefore should be dismissed.  The theories of secondary liability

fail without any primary liability.

### A.    Plaintiffs' CEA Claims Must Be Pled With Particularity.

Although they do not even meet the requirements of Rule 8(a), Plaintiffs' claims here

must satisfy Rule 9(b) because they involve allegations of "disseminating false or misleading

information in the market."  *In re Term Commodities Cotton Futures Litig. (In re Cotton

Futures)*, No. 12-cv-5126, 2013 U.S. Dist. LEXIS 184374, at *34-35 (S.D.N.Y. Dec. 20, 2013).

Plaintiffs base their market-manipulation claim on allegations that Defendants sought to mislead

market participants about the value of Brent crude oil by engaging in "uneconomic" trades,

including purported "spoof" orders (*id.* ¶¶ 8, 337, 369, 404, 501) and "wash"[8] and "sham" trades

(*id.* ¶¶ 8, 259, 261, 264-65, 280, 283, 285, 288, 310, 340, 369, 384, 399).  The false reporting

claim rests on the theory that Defendants "deliberately reported inaccurate, misleading and false

information regarding Brent crude oil prices and transactions to Platts."  (*Id.* ¶ 8.)

These allegations "sound in fraud" and are subject to Rule 9(b).  For example, in *In re

Crude Oil*, where the defendant "misled the market," created a "*false impression*" and

"conceal[ed]" information, Rule 9(b) required dismissal because plaintiffs failed to adequately

plead fraud.  2007 WL 1946553, at *5-7 (emphasis in original).  Likewise, in *In re Natural Gas*

---

[8]    "The factors that show a wash result are (1) the purchase and sale (2) of the same
delivery month of the same futures contract (3) at the same (or a similar) price."  *In re Piasio*,
Comm. Fut. L. Rep. (CCH) ¶ 28,276, 2000 WL 1466069, *7 (CFTC Sep. 29, 2000).  Plaintiffs
fail to allege a single trade that meets the CFTC's definition of "wash trade."  Instead, Plaintiffs
acknowledge that some of the alleged wash trades resulted in cargoes being bought and  sold at
*different* prices (*see* Compl. ¶¶ 259, 280-85), and for other alleged wash trades, Plaintiffs merely
allege that offers or trades were made without providing any other information indicating that it
was a "wash" (*see, e.g., id.* ¶¶ 340, 399).

*Commodity Litigation*, the court concluded that the plaintiffs must satisfy Rule 9(b) because the complaint "allege[d] a scheme that is 'classically associated with fraud,':  the dissemination of inaccurate, misleading and false trading information."  358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005).  Here, too, Plaintiffs were required to satisfy Rule 9(b).

### B.   The Complaint Does Not Properly Allege Any Elements Of A Market Manipulation Claim.

The elements of market manipulation under CEA Section 9(a)(2), 7 U.S.C. § 13(a)(2), are that (i) the defendant was able to influence prices; (ii) artificial prices existed; (iii) the defendant actually caused the artificial prices; and (iv) the defendant specifically intended to cause the artificial prices.  *In re Commodity Exchange Inc., Silver Futures and Options Trading Litig.* (*Silver III*), No. 13-cv-1416, 2014 WL 1243851, at *1-2 (2d Cir. Mar. 27, 2014); *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013).  Plaintiffs claim that they were "deprived of trading in a lawful, competitive market for Brent crude oil futures and derivatives contracts" (Compl. ¶ 3) because Defendants engaged in "uneconomic" OTC Brent Transactions that impacted exchange-traded futures prices.  Therefore, Plaintiffs must adequately allege each of these elements as to both OTC Brent crude oil and futures prices.  The Complaint fails to do so under either Rule 9(b) or Rule 8(a).

### 1.   Plaintiffs Do Not Adequately Allege Artificial Prices.

Artificial prices are those that do not reflect the forces of supply and demand.  *See In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998).  Plaintiffs allege that prices of the ICE Brent Futures contracts that Plaintiffs traded were artificial because they are "inextricably linked to . . . Platts pricing" (Compl. ¶ 9), in particular the Dated Brent Assessment and the individual OTC Brent Transaction prices, both of which Plaintiffs assert were artificial.

Neither of these theories (which Plaintiffs allege only for the last few years of the purported twelve-year Class Period) is plausible or supported by well-pled factual allegations.

*First*, Plaintiffs' claim that the Dated Brent Assessment was artificial is unsupported. The Dated Brent Assessment is the product of Platts' proprietary methodology. (*Id.* ¶ 92.) It is not a simple arithmetic computation based on the prices of purchases and sales of one or more of the crude streams that comprise BFOE. Instead, as Plaintiffs acknowledge, Platts uses editorial discretion and "judgment" to "ignor[e]" or "discount" particular trading activity from its Dated Brent Assessment. (*See id.* ¶ 94, 97-99, 260, 285, 326, 329, 389.)[9] Platts "evaluate[s] all of the relevant conditions and factors each day for the price assessment process," not just trading activity during the MOC window. (Libow Decl. Ex. B at 9; *see supra* Background Section C.) Nor is Platts constrained to consider only trading activity by Defendants; as the Complaint admits, there are at least 13 other, non-Defendant market participants active in trading physical Brent crude oil. (Compl. ¶ 254 (Total), *id.* ¶ 273 (Lukoil and Chevron), *id.* ¶ 283 (Litasco), *id.* ¶ 289 (Arcadia), *id.* ¶ 290 (Glencore), *id.* ¶ 293 (Sempra), *id.* ¶ 309 (Phillips 66, Koch, ConocoPhillips, and Noble), *id.* ¶ 326 (Nexen).) In other words, Platts determines its assessment based on information it chooses to consider, and the Complaint provides no basis to conclude that the assessment would have differed had the alleged manipulative OTC Brent Transactions occurred at different prices or not at all, as required by Rule 9(b).[10] There is simply no plausible

---

[9]    The Complaint's allegations demonstrate the importance of Platts' judgment in determining the assessment. For example, Platts "ignored" an alleged manipulative June 2010 transaction between BP and Vitol "and maintained the Forties differential unchanged." (Compl. ¶ 260.)

[10]    Plaintiffs allege in conclusory terms that various trades between February 21 and February 24, 2011 "set the Dated Brent quotation" or otherwise "controlled the pricing for the entire Platts reporting structure of Brent Crude Oil" on February 24. (Compl. ¶¶ 344-45; *see*

allegation supporting the proposition that the few isolated trades, bids, and offers alleged to have been transacted during the MOC window affected Platts' Dated Brent Assessment on particular days.

  *Second*, Plaintiffs do not plausibly allege that Platts' Dated Brent Assessment caused any price movements for ICE Brent Futures contracts, such that the pricing of *those* contracts was artificial. The Complaint merely alleges a "correlation" between Dated Brent and ICE Brent Futures prices. (*Id.* ¶¶ 128-32; C.E. 1-3.) But a "*correlation* is not *causation*." *Huss* v. *Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (emphasis added); *see Sheehan* v. *Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (Posner, J.) ("[E]quating a simple statistical correlation to a causal relation . . . indicates a failure to exercise the degree of care that a statistician would use in his scientific work.").

  There are no plausible facts supporting causation. Near-month ICE Brent Futures contracts cash settle on expiration each month against the ICE Brent Index, not Platts' Dated Brent Assessment. The ICE Brent Index is a calculation used by ICE Futures Europe (not Platts) to assess the value of unspecified BFOE cargos (not Dated Brent) for delivery beyond the current spot month. The ICE Brent Index thus looks to forward month pricing to determine value, not to the nearby values defined by Platts' Dated Brent Assessment—and Plaintiffs allege that forward month pricing often differs from current month pricing. (Compl. ¶¶ 128 n.3, 179.)[11] ICE Brent

---

*also id.* ¶¶ 352-57.) But the Complaint contains no plausible factual allegations supporting these assertions, especially given its allegation that Platts exercised judgment in its assessments.

[11]  The fundamental difference between Dated Brent and Cash BFOE contracts underscores this point. Dated Brent contracts represent the spot market for Brent crude oil on a particular day. However, Cash BFOE represents the forward market, *i.e.*, up to three months out. Further, Cash BFOE forward contracts price based on the value of all four grades of oil because the buyer of such contract does not know which grade will be delivered or when during the delivery month such cargo will be delivered, whereas Dated Brent contracts typically reflect the value of the

Futures contracts settle daily, not against any Platts pricing benchmark (or even the ICE Brent Index), but against the weighted average price of futures traded on ICE Futures Europe during the two-minute settlement period at the end of each day.  (*See* Libow Decl. Ex. H.)  Moreover, ICE Brent futures trade over multiple, forward months, but the Complaint does not explain how these contracts' pricing for delivery periods months and years in the future is supposedly controlled by Dated Brent, which is designed to reflect spot prices.  (Compl. ¶¶ 61, 128 n.3, 179.)  Plaintiffs' claims of artificiality are therefore implausible.

  *Third*, relying mainly on their "statistical study" showing that ICE Brent Futures prices generally moved in opposite directions during and outside the MOC window on any given day, Plaintiffs allege that on a few days between January 2010 and March 2014, ICE Brent Futures prices and related spreads experienced "unusual" price movements during the MOC window. (*See* Compl. ¶ 232-250; *see also id.* ¶¶ 148-49, 261, 276, 282, 316, 406.)  But "proof of artificiality is not found solely in comparing one day's price to another."  *CFTC* v. *Parnon Energy, Inc.*, 875 F. Supp. 2d 233, 247 (S.D.N.Y. 2012) (quotations omitted).  Indeed, "the allegation of unusual market prices, without more, is insufficient to establish artificial prices, as a matter of law."  *In re Rough Rice Commodity Litig.*, No. 1-C-618, 2012 WL 473091, at *6 (N.D. Ill. Feb. 9, 2012); *In re Commodity Exchange, Inc. Silver Futures and Options Trading Litig.* (*Silver I*), No. 11-md-2213, 2012 WL 6700236, at *16 (S.D.N.Y. Dec. 21, 2012) ("The allegation that large unspecified and 'uneconomic' trades were taking place on the COMEX during the more than two-and-a-half year Class period is too general to plead the existence of artificial prices."); *In re DiPlacido*, Comm. Fut. L. Rep. (CCH) ¶ 30,970, 2008 WL 4831204, at

---

cheapest of the four grades of Brent, Forties, Oseberg, or Ekofisk cargoes that have been assigned loading dates for delivery in the next 10-25 days.  (Compl. ¶ 106, 114-15.)

*30 (CFTC Nov. 5, 2008) ("[A] statistically unusual high (or low) price will not on that basis alone be deemed artificial."), *aff'd* 364 Fed. App'x 657, 661-62 (2d Cir. 2009).

*Fourth*, Plaintiffs allege that futures prices were artificial because they were tied in real-time to manipulated physical trades of Brent crude oil during the MOC window in June 2010, January-February 2011 and September 2012. (*See, e.g.*, Compl. ¶¶ 9, 11, 261; 316, 343, 406.) But Plaintiffs concede they "did not have access to the MOC trades that Platts reported as they were only available at significant cost with licensing restrictions to certain market participants." (*Id.* ¶ 503.) Thus, those real-time events could not have influenced concurrent futures trading.[12] Moreover, as with Plaintiffs' assertions concerning price trends, the claim that individual OTC Brent Transactions were "unusual" in their size or delivery dates, "uneconomic" compared to market commentary, or "out of whack" with other transactions or the Dated Brent Assessment (*see, e.g., id.* ¶¶ 262, 271, 277, 287, 342, 365, 384, 387, 409) is inadequate to allege that the transactions were artificial, *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *6; *In re DiPlacido*, 2008 WL 4831204, at *30. That is especially true regarding trades for physical Brent crude oil, which Plaintiffs allege "reflect grade, delivery location, processing or refining improvements, or other costs." (Compl. ¶ 106.)

Plaintiffs do not plausibly allege that an artificial price existed at any time—much less over the entire course of twelve years—for any Brent futures contract. The CEA manipulation claims therefore should be dismissed.

---

[12]    The Complaint's allegation that other futures traders relied on real-time information is conclusory, and Plaintiffs do not identify even one trader who considered that information in his/her trading. (Compl. ¶ 125.)

### 2.    Plaintiffs Do Not Adequately Allege That Defendants Caused Artificial Prices.

"The causation element requires that a defendant be the proximate cause of the price artificiality." *Silver I*, 2012 WL 6700236, at *16.  To satisfy Rule 9(b), plaintiffs "must specify . . . 'what effect the scheme had on the market for the securities at issue'"—that is, how the alleged manipulation caused the alleged artificiality. *In re Crude Oil*, 2007 WL 1946553, at *6 (citing *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d at 344).  Here, Plaintiffs' theory appears to be that Defendants caused artificial prices of physical Brent crude oil and OTC derivatives, and of the Platts' Dated Brent Assessment, and that these artificial prices in turn had the "ripple" effect of causing artificial prices for Brent futures.

Because Plaintiffs fail to adequately allege that Brent futures prices were artificial at all, (*supra* Argument Section I.B.1), their theory of causation likewise fails.  Plaintiffs' causation allegations also are inadequate because they are premised on a protracted and speculative chain that depends on the independent actions of several market participants.[13]

Moreover, Plaintiffs' own allegations refute causation in several respects.  The Complaint seemingly alleges that futures prices throughout the day were affected by physical trades, bids, and offers that did not occur until the end of that same day.  (Compl. ¶¶ 254-55, 260, 262-65, 280, 284, 289, 293, 322-23, 335, 384, 389, 397-98, 404.)  This, of course, is practically and economically impossible—not just implausible.  To the extent the Complaint seeks to allege that futures prices outside the MOC window were artificial at any point, it likewise fails.  The Complaint alleges so-called "double reversals" reflecting a non-artificial futures price before the

---

[13]    The lengthy and speculative chain of causation underpinning Plaintiffs' claims is discussed in Section I.B of Defendants' Brief in Support of Their Motion to Dismiss the Complaint As Exceeding the Extraterritorial Reach of U.S. Law.

MOC window, followed by an artificial price during the MOC window, and then a non-artificial price after the MOC window.  (Compl. ¶¶ 261, 276, 282, 316, 343, 406.)  The Complaint thus alleges that Defendants *did not* cause an artificial futures price before or after the MOC window, which is inconsistent with Plaintiffs' attempt to allege manipulation during the entire time that futures traded.  This internal inconsistency alone requires dismissal for failure to allege causation adequately and plausibly.  *See In re Commodity Exchange, Inc. Silver Futures and Options Trading Litig.* (*Silver II*), No. 11-md-2213, 2013 WL 1100770, at *4 (S.D.N.Y. Mar. 18, 2013) (absent plausible factual allegations showing causal connection between Defendants' actions and silver futures prices, complaint failed to allege causation).

Stripped of these inadequate and implausible allegations, all that is left are conclusory assertions that Defendants "controlled" or "set" pricing on various dates.  (*See, e.g.*, Compl. ¶¶ 344-45.)  Such allegations—that "price fluctuations" occurred and Defendants "'must have' caused [them]"—do not support a manipulation claim under the CEA as a matter of law.  *Silver I*, 2012 WL 6700236, at *16.

### 3. Plaintiffs Do Not Adequately Allege That Defendants Possessed The Ability To Influence Brent Futures Prices.

The Complaint purports to allege misconduct in, or relating to, trading activity by Defendants during the Platts MOC window.  The Complaint alleges that Defendants (generally—and not individually as required by Rule 9(b)) had the ability to influence prices because they were "major producers" or purchasers or sellers of Brent crude oil.  Such "bare and conclusory" assertions of market power are insufficient under Rule 8(a) or 9(b) to allege the ability to influence Brent crude oil prices.  *Parnon Energy Inc.*, 875 F. Supp. 2d at 245 (citing *Crossword Magazine, Inc.* v. *Times Books*, No. 96-cv-4550, 1997 WL 227998, at *2 (E.D.N.Y. May 5, 1997); *Telectronics Proprietary, Ltd.* v. *Medtronic, Inc.*, 687 F. Supp. 832, 838

(S.D.N.Y. 1988)).  Were it otherwise, this element of a CEA manipulation claim would be meaningless:  any buyer or seller of crude oil would be deemed to have the ability to influence price.

Even a cursory review of the Complaint demonstrates that Brent crude oil cargoes and BFOE cash cargoes are bought and sold by multiple, sophisticated market participants other than Defendants that often compete with one another based on independent needs.  Such non-Defendant traders include Litasco, a subsidiary of Russian oil company, Lukoil; Chevron, the U.S. integrated oil company; ConocoPhillips, the U.S. oil company that operates the Ekofisk fields; and Total, the French integrated oil company.  (Compl. ¶¶ 254, 273, 283, 309.)  Each of those entities and others had the ability, and, according to the Complaint, did buy or sell Brent crude oil during the MOC window.  Those transactions carried the same weight and were subject to the same Platts editorial discretion as the purchases or sales of Defendants.  Such bids and offers by other market participants render implausible Plaintiffs' allegations that each Defendant had the ability to influence price for purposes of a claim under Section 9(a)(2) of the CEA through its sales of single cargoes or unfilled offers or bids.

Furthermore, the Complaint demonstrates that Defendants did not possess the ability to influence price.  The Complaint does so by describing multiple instances when Platts explicitly discounted or ignored certain trades (*see, e.g.*, *id.* ¶¶ 260, 285, 326, 389), or the market did not move in tandem with Defendants' trades (*see, e.g.*, *id* ¶¶ 265-67 (alleging that on June 14, 2010, Shell and Statoil continued placing orders at low prices in the MOC, but Platts nevertheless assessed the Forties differential *higher* by $0.17)).  Lastly, Plaintiffs do not adequately allege that Defendants had the ability to influence Brent futures prices for the same reasons that they do not establish price artificiality and causation:  the Complaint does not support the theory that

-20-

Defendants could affect Platts' independent judgment-based Dated Brent Assessment, or that the Dated Brent Assessment or a few dozen OTC Brent Transactions interspersed over two-and-a-half years could affect futures prices.  (*See supra* Argument Sections II.B.1 & 2.)

In short, the Complaint does not allege facts showing that Defendants, individually or collectively, had the ability to influence prices, a defect that requires dismissal.

### 4.    Plaintiffs Do Not Adequately Allege That Defendants Intended To Cause An Artificial Price.

Market manipulation under the CEA requires a specific intent.  *Silver I*, 2012 WL 6700236, at *10.  Rule 9(b) requires Plaintiffs to "do more than merely allege that a transaction that appears legitimate was intended to manipulate the market"; rather, the factual allegations in the complaint must give rise to a 'strong inference' . . . that manipulation was the dominant purpose of the transaction."  *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth I*), 587 F. Supp. 2d 513, 535-36 (S.D.N.Y. 2008).  To plead a "strong inference of scienter," Plaintiffs must allege either facts showing that defendants had both motive and opportunity to commit fraud, or facts constituting 'strong circumstantial evidence of conscious misbehavior or recklessness.'"  *In re Crude Oil*, 2007 WL 1946553, at *8 (citing *Lerner* v. *Fleet Bank, N.A.*, 459 F. 3d 273, 290-91 (2nd Cir. 2006)).  Even under Rule 8(a), Plaintiffs must go beyond "vague allegations of 'uneconomic conduct.'"  *Silver III*, 2014 WL 1243851, at *2.  They must allege that causing an artificial price was "the purpose or conscious object" of the act.  *In re Cotton Futures*, 2013 U.S. Dist. LEXIS 184374, at *54 (quoting *In re Ind. Farm Bureau Coop. Ass'n*, Comm. Fut. L. Rep. (CCH), ¶ 21,796, 1982 WL 30249, at *7 (CFTC Dec. 17, 1982)); *see also Parnon Energy Inc.*, 875 F. Supp. 2d at 249 (same).  In particular, to state a claim under the CEA, a plaintiff must allege that each defendant intended to manipulate either futures contract prices or the price of the commodity underlying the futures contract.  *See LIBOR I*, 935 F. Supp.

2d at 715; *see also SEC* v. *Lee*, 720 F. Supp. 2d 305, 321 (S.D.N.Y. 2010) (under Rule 9(b), requiring "a factual basis for scienter . . . for each defendant").

Far from meeting that standard, the Complaint alleges only that all Defendants intended to manipulate the Brent crude oil market because "[s]uch manipulation: (a) enhances the value of Defendants' financial or derivative or physical positions, and (b) improves the price of purchase or sale obligations." (Compl. ¶ 533; *see also id.* ¶¶ 537-38 (alleging "a net exporter of crude oil" will "prefer higher prices," but "middle-men and traders" will "force prices to the benefit of their trading books," and "refiners" are motivated "based on their structural business").) These allegations make no economic sense. A net exporter, as the word "net" conveys, sometimes will benefit from lower prices. Middle-men generally earn a spread between offers to buy or sell, not based on whether prices rise or fall. Referring to refiners' "structural business" is a phrase with no clear meaning: refiners may trade for many different reasons and have correspondingly different trading interests. The allegation that certain Defendants held physical or futures positions—positions established for many legitimate business purposes—that would "benefit" from price movements both up and down, does not in any way suggest that those Defendants intended to create an artificial price.[14]

Moreover, such assertions, that a defendant "stood to gain large profits from their dealings in crude oil by manipulating prices of crude oil to obtain trading profits," merely allege

---

[14]    *See, e.g.*, Compl. ¶ 258 (short position provided "economic interest" to prevent increase in prices); *id.* ¶ 319 (defendant suppressed prices "to advantage its trading positions"); *id.* ¶ 334 (defendant "stood to profit from depressed prices"); *id.* ¶ 337-38 (defendant offered cargoes to obtain "profitable price" on its short position); *id.* ¶ 344 (defendant had "plans to advantage" its short position"); *id.* ¶ 368 (defendant acted to "advantage its short CFD positions and likely other derivatives positions, including futures positions"); *id.* ¶ 378 (defendant "deliberately pressured the market downward" because of its "huge short position"); *id.* ¶ 388 (defendants were motivated by their "significant physical and derivative Brent Crude Oil positions").

a "generalized motive, one which could be imputed to any corporation with a large market presence in any commodity market," and are "insufficient to show intent." *In re Crude Oil*, 2007 WL 1946553, at *8 (quotations omitted).[15] Certainly they do not satisfy Rule 9(b), under which "'plaintiffs must assert a concrete and personal benefit to the individual Defendants resulting from the fraud.'" *Amaranth II*, 612 F. Supp. 2d at 383 (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). Nor do they satisfy Rule 8(a). In *Silver I*, 2012 WL 6700236, at *15, for example, the court held that allegations that the defendant was "a large holder of COMEX silver futures contracts, short puts, and options" that would increase in value if silver prices dropped were insufficient to plead manipulative intent. *See also Silver III*, 2014 WL 1243851, at *1-2 (2d Cir. 2014); *In re Cotton Futures*, 2013 U.S. Dist. LEXIS 184374, at *44-45 (S.D.N.Y. Dec. 20, 2013) ("the fact that defendants held large long positions . . . does not establish market manipulation"). As the Second Circuit explained, a trader may "acquire a large position in the belief that the price of the future will, for reasons other than the trader's own activity, move in a favorable direction." *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d at 184. Acquiring positions is what traders do; it is not evidence of manipulative intent.

---

[15] Plaintiffs' allegations are far from those found sufficiently pled in other CEA manipulation cases. *See, e.g.*, *In re Cotton Futures*, 2013 U.S. Dist. LEXIS 184374, at *55 (finding sufficient allegations that defendants "intentionally exhausted the *deliverable* supply [of cotton] with knowledge that additional certificated cotton could not be procured" and "added to [their long] positions and stopped almost 100% of all deliveries for that settlement period"); *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth II*), 612 F. Supp. 2d 376, 387-388 (S.D.N.Y. 2009) (finding intent adequately pleaded based on numerous instant message and other communications between defendants); *CFTC* v. *Amaranth Advisors L.L.C.*, 554 F. Supp. 2d 523, 532-33 (S.D.N.Y. 2008) (alleging specific instant message conversations that showed intent to affect prices); *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 344-45 n.7 (S.D.N.Y. 2005) (finding sufficient allegations based on CFTC order, which noted that the defendant "promptly uncovered the nature and extent of the misconduct and brought it to the attention of DOE [the Division of Enforcement]," and "terminated the staff who directed the false reporting and attempted manipulation").

Moreover, allegations that a Defendant held a substantial short position do not suggest that the Defendant would have benefitted *overall* from a manipulation aimed at improving that position. As Plaintiffs acknowledge, each Defendant has multiple and divergent interests based on its diverse businesses. For example, BP p.l.c. is a "major international energy company," Statoil ASA "engages in the exploration, production, transportation, refining and marketing of petroleum and petroleum-derived products," and Morgan Stanley is a "financial services firm." (Compl. ¶¶ 37, 40, 42, 537-38.) It is therefore insufficient for Plaintiffs to assert simply and without specificity that a Defendant had *a position* that would "benefit" from price movements and therefore intended to cause those price movements, without regard for the Defendant's overall business.

C.     **The Complaint Does Not State A Claim For False Reporting Under The CEA.**

1.     **CEA Section 6(c)(1), As Amended, Does Not Apply Retroactively.**

A cause of action for false reporting under Section 6(c)(1) of the CEA, 7 U.S.C. § 9, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, did not exist until August 15, 2011. *See* Dodd-Frank Act, P.L. 111-203, § 753(d), 124 Stat. 1376, 1754 (2010) (amendments to CEA Section 6(c)(1) effective when CFTC promulgated implementing rule); 17 C.F.R. § 180.1(a) (CFTC Rule 180.1(a) implementing CEA 6(c)(1) effective August 15, 2011). Nothing within the plain language of this statute or its implementing rule suggests that Congress intended for the provision to apply retroactively. *See Landgraf* v. *USI Film Products*, 511 U.S. 244, 265 (1994) (general presumption against retroactive legislation "embodies a legal doctrine centuries older than the Republic"). Under well-settled law, therefore, the provision does not apply retroactively and Plaintiffs have no claim based on any reports transmitted to Platts before August 15, 2011. *See In Amaranth Natural Gas Commodities Litig.*, 730 F.3d at

173 n.1 (noting that CFTC Rule 180.1 "does not impact the present appeal, however, given the regulation's effective date of August 15, 2011").

**2.      Plaintiffs Do Not Adequately Allege The Elements Of False Reporting For Conduct Occurring After The Effective Date Of Section 6(c)(1).**

The false reporting claim also fails on its merits.  Such a claim requires:  the intentional or reckless (i) delivery for transmission, (ii) of a "a false or misleading or inaccurate report" tending to "affect the price of any commodity in interstate commerce," (iii) with knowledge or reckless disregard for the false, misleading or inaccurate nature of the report.  CEA § 6(c) U.S.C. § 9(1)(A); *see* CFTC Rule 180.01, 17 C.F.R. § 180.1.  Plaintiffs were required to plead this claim with particularity.  *See In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (false reporting claim that sounded in fraud must satisfy Rule 9(b)).  "Defendants" allegedly violated this provision by "making untrue or misleading statements to Platts during the MOC window regarding their BFOE transactions," by failing to disclose their purported "wash transactions," manipulation, and conspiracy, and by otherwise "engaging in the acts alleged" in the Complaint.  (Compl. ¶ 553.)

The Complaint does not even attempt to allege the necessary facts, because it does not identify a single false or fraudulent report by any Defendant to Platts.  Instead, Plaintiffs simply repeat Platts' market summaries of what was reported to it by unidentified market participants and intermediaries.  (*Id*. ¶ 255 ("Platts reported the following in its MOC recap"); *see also id.* ¶¶ 257, 259, 267, 270, 287, 315.)  Without identifying a report, there is no false reporting claim.

Moreover, Plaintiffs do not allege that any report to Platts by anyone misstated actual transaction details, or if so, in what way.  In contrast, courts have found false reporting claims to be adequately pled where they allege either that the reported trades never occurred, or trades where defendants "were fabricating price and volume reports."  *CFTC* v. *Atha*, 420 F. Supp. 2d

-25-

1373, 1377-78, 1381 (N.D. Ga. 2006); *CFTC* v. *Bradley*, 408 F. Supp. 2d 1214, 1217-18 (N.D.

Okla. 2005) (false reporting claim sustained based on both alleged "fictitious trades" and actual

trades, the reporting of which "altered the prices or volumes of those transactions").[16]

In summary, the Complaint again fails to allege fraud with the particularity required by

Rule 9(b)—and also fails under Rule 8(a) to allege facts sufficient to show that there even was a

report *by a single Defendant*, much less one that was intentionally false, misleading, or

inaccurate.  Plaintiffs' false reporting claim must be dismissed.

### D.    The Complaint Fails To State A Claim For Aiding And Abetting.

The elements of a claim for aiding and abetting CEA manipulation are that a defendant

"(1) had knowledge of a principal's intent to manipulate the market and intended to assist to

further that manipulation; and (2) performed an act in furtherance of the manipulation."

*Amaranth II*, 612 F. Supp. 2d at 389.  These elements must be pled with particularity under Rule

9(b), *Krause* v. *Forex Exch. Mkt., Inc*., 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005), but Plaintiffs'

claim fails under any standard.

*First,* there can be no aiding and abetting liability where, as here, Plaintiffs fail

adequately to plead the underlying claims.  *In re Platinum & Palladium Commodities Litig*., 828

F. Supp. 2d 588, 599 (S.D.N.Y. 2011) (where complaint "fails to allege the requisite intent of

any primary actor, there can be no aiding and abetting liability as a matter of law").

---

[16]    Plaintiffs only claim false reporting under CEA Section 6(c)(1).  CEA Section 9(a)(2), 7 U.S.C. § 13(a)(2), also makes unlawful the delivery for transmission of a false or misleading or inaccurate report tending to affect the price of any commodity in interstate commerce.  Cases interpreting this element of CEA Section 9(a)(2) are therefore informative as to the proper reading of CEA Section 6(c)(1).  *See Parnon Energy Inc*., 875 F. Supp. 2d at 243 ("[I]t is this Court's duty 'to give harmonious operation and effect to all statutory provisions if possible, absent some explicit indication of legislative intent derived from either the words of the statute or its legislative history'") (quoting *Yiu Sing Chun* v. *Sava*, 708 F.2d 869, 874 (2d Cir. 1983)).

*Second*, because aiding and abetting claims must be pled under Rule 9(b), *see Krause*, 356 F. Supp. 2d at 338, they require individual particularized allegations that *each defendant* was aware of the manipulative trading strategy of any other defendant it allegedly assisted and that each defendant intended to assist that manipulation. *In re Cotton Futures*, 2013 U.S. Dist. LEXIS 184374, at *65 (quoting *Amaranth III*, 730 F.3d at 183) ("aiding and abetting requires knowledge of the primary violation and an intent to assist it"). Here, Plaintiffs fail to allege facts, much less particularized ones, that any Defendant knew of another Defendant's purported manipulative intent and sought to assist.

Instead, in conclusory fashion, Plaintiffs allege generally that "[e]ach and every defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants." (Compl. ¶ 562, *see id.* ¶¶ 561-67.) Such conclusory assertions do not come close to satisfying the *In re Cotton Futures* standard for pleading aiding and abetting. To the extent the Complaint identifies particular transactions, it merely alleges that the transactions occurred, and asserts in conclusory terms that the transactions assisted manipulation. The mere fact that a party bought from or sold to another party does not allege an intentional act to further manipulation.[17]  *See Silver I*, 2012 WL 6700236, at *19 (dismissing aiding and abetting claim where complaint alleged nothing more than market activity). If the law were otherwise, then any party that bought or sold a cargo of Brent crude oil during the last twelve years could potentially be joined to this case.

---

[17] At times the Complaint alleges even less detail, asserting, for example, that "[t]hroughout [February], Morgan Stanley followed Shell's trading and helped Shell set the price in the MOC window." (Compl. ¶ 335.) But these allegations do not explain how "Morgan Stanley followed Shell's trading." Such conclusory pleading fails under Rule 9(b).

### E.    The Complaint Fails To State A Claim For Principal-Agent Liability.

The CEA codifies a variant of the common law principle of *respondeat superior*, making liable any individual or entity for the acts or omissions of those acting within the scope of the individual's or entity's employment.  *Amaranth II*, 612 F. Supp. 2d at 385 (quoting 7 U.S.C. § 2(a)(1)(B)).  This requires "(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent."  *Id*. (internal citation omitted)  "In addition, the principal must maintain control over key aspects of the undertaking," *id.* (internal citation omitted), and the agent must be acting "within the scope of his employment," 7 U.S.C. § 2(a)(1)(B).

As with the aiding and abetting claim, there can be no secondary liability where primary liability is not adequately alleged.  *See id.*  In addition, because Plaintiffs do not allege any facts suggesting that any Defendant was employed as an agent or controlled by any other Defendant, this claim must be dismissed.  *See Amaranth II*, 612 F. Supp. 2d at 394 (dismissing principal-agent claim "in the absence of any allegations that [defendant holding company] granted [majority-owned subsidiary] the authority to act on its behalf, [subsidiary] agreed, and [holding company] controlled [subsidiary]").

### F.    The Complaint Fails To Plead Actual Damages.

The CEA provides a private right of action only to individuals who have suffered actual damages from a violation of its provisions.  7 U.S.C. § 25(a); *see In re LIBOR-Based Financial Instruments Antitrust Litig.* (*LIBOR II*), 962 F. Supp. 2d 606, 620-24 (S.D.N.Y. 2013).  As a threshold matter, four Plaintiffs (Taylor, Laurens, White Oak Fund LP, and Prime International Trading, Ltd.) do not allege *any* dates on which they traded (*see* Compl. ¶¶ 27, 29, 32, 33, 429-38), and they therefore have not plausibly alleged that they were injured.

Actual damages are not alleged for the six remaining Plaintiffs McDonnell, Schindler, Michiels, Insinga, Atlantic Trading, and Port 22, because the Complaint does not claim that those

Plaintiffs traded futures when futures prices were supposedly artificial.  Putting aside clearly

unsupported allegations that futures prices remained artificial throughout the course of a dozen

years (*see supra* Argument Section I.B) Plaintiffs identify just seven days (out of twelve years)

when, they assert (albeit inadequately) that "the futures market was affected" by manipulation

*during the MOC window*:  June 10 and 15, 2010, January 14 and 28, 2011, February 21, 2011,

and September 27 and 28, 2012.  (Compl. ¶¶ 261, 269, 276, 282, 316, 343, 406; *see supra*

Background Section E.)  But these Plaintiffs do not allege that they traded futures during the

MOC window on those dates.  Instead, with one exception, the Complaint lists *different* dates on

which the six Plaintiffs traded.  (*Id.* ¶¶ 430-37.)  The exception is Plaintiff Atlantic Trading,

which allegedly traded on September 28, 2011—but which does not claim that it traded during

the MOC window that day, only that it "engaged in a series of trades."  (*Id.* ¶ 436.)  Plaintiffs'

theory is that prices were artificial during the MOC window, and that prices were not artificial

before or after that time, leading to the so-called "double-reversals."  (*Id.* ¶¶ 237, 261, 276, 282,

316, 343, 406.)  Because they do not purport to have traded during the MOC window on any of

the seven days when futures prices were allegedly artificial, Plaintiffs cannot possibly have

alleged actual damages.

Even if Plaintiffs could allege damages despite the disconnect between their trading dates

and the dates when futures prices were allegedly artificial (they cannot), Plaintiffs must also

allege a "*net loss*."  *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth III*), 269 F.R.D.

366, 379 (S.D.N.Y. 2010) (emphasis added); *see LIBOR I*, 935 F. Supp. 2d at 714 (observing that

"courts have understood [Section 25] to require a 'net loss'" and citing *Amaranth III*).  Where, as

here, a complaint alleges "day-to-day" manipulation that is "episodic and varying in direction,"

this requires "allegations that make plausible . . . that their positions were such that they were

injured." *LIBOR II*, 962 F. Supp. 2d at 620-24 (distinguishing *LIBOR I* and holding that where there allegedly is "isolated (though repeated) manipulative activity" plaintiffs must allege (i) "that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct"; and (ii) "that the artificiality was adverse to their position"). Yet, despite alleging both upward and downward manipulation that could have benefitted unidentified positions to the same extent as it could have harmed other positions (*see supra* Background Section E), Plaintiffs do not allege anything about their overall positions during the Class Period to show net losses. (Compl. ¶¶ 430-37.) Instead, the six Plaintiffs who allege trade dates identify particular losing transactions without providing their overall positions (*id.*)—while the four Plaintiffs who do not allege *any* trades of course allege no losses at all, much less net losses.

## II.    THE COMPLAINT FAILS ADEQUATELY TO ALLEGE A VIOLATION OF THE SHERMAN ACT

### A.    Because Plaintiffs Cannot Demonstrate Antitrust Injury, The Complaint Fails To State A Claim Under Sections 1 And 2.

Plaintiffs' claims under the Sherman Act also should be dismissed for multiple independent reasons. As a threshold matter, Plaintiffs lack standing to assert those claims because they have not suffered antitrust injury. *See LIBOR I*, 935 F. Supp. 2d at 686 ("Plaintiffs have not plausibly alleged that they suffered antitrust injury, thus, on that basis alone, they lack standing.").

In the Second Circuit, to demonstrate antitrust standing, a plaintiff must identify an anticompetitive practice and an injury; then demonstrate that the injury flows from the anticompetitive nature of that practice. *Gatt Commc'ns, Inc.* v. *PMC Assoc., LLC*, 711 F.3d 68, 76 (2d Cir. 2013); *see Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (an antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that

flows from that which makes defendants' acts unlawful").  All antitrust plaintiffs must prove antitrust injury, including those that allege per se violations of the antitrust laws.  *Atlantic Richfield Co.* v. *USA Petroleum Co. (ARCO)*, 495 U.S. 328, 341-42 (1990).  Because they do not allege an antitrust injury, Plaintiffs lack standing to sue under the antitrust laws.

As courts in this district have recognized, "injury to competition . . . is the type of injury the antitrust laws are intended to prevent."  *Nichols* v. *Mahoney*, 608 F. Supp. 2d 526, 544 (S.D.N.Y. 2009).  Accordingly, to bring an antitrust claim, a plaintiff must show that its loss stems from "a competition-reducing aspect or effect of the defendant's behavior."  *Paycom Billing Serv., Inc.* v. *Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d. Cir. 2006) (citing *ARCO*, 495 U.S. at 344).  Otherwise put:  "unless one group of suppliers diminishes another's ability to peddle its wares . . . there is not even the beginnings of an antitrust case."  *Schachar* v. *Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989); *see also NYNEX Corp.* v. *Discon. Inc.*, 525 U.S. 128, 139 (1998) (rejecting antitrust claim where there was no evidence that alleged deceitful scheme "harmed the competitive process").

Here, Plaintiffs' antitrust claims fail because they have nothing to do with competition, much less the reduction of competition.  As discussed, Plaintiffs allege that prices for a commodity and associated futures and derivatives were distorted as a result of "uneconomic" transactions in Brent crude oil, the reporting of those transactions by Platts, and Platts' setting of the Dated Brent Assessment.  But the wrongful conduct Plaintiffs allege was not accomplished through any purported restraint of competition.  Platts' setting of the Dated Brent Assessment is simply a voluntary survey of various market players (*see* Compl. ¶ 5), not a competitive process or a market where goods are bought, sold, or traded with customers.  And there is no allegation that Defendants' conduct reduced competition in the underlying markets.  None of the alleged

uneconomic transactions underlying Plaintiffs' claims—"banging the close," "spoof trades," or "wash trades" (*id.* ¶¶ 54, 70, 73)—subvert competition among rivals for sales of Brent crude oil physical cargoes (or financial derivatives) or limit any Defendant's ability to "peddle its wares." *Schachar*, 870 F.2d at 399.

Courts in this district have rejected similar attempts by plaintiffs to dress up manipulation allegations as antitrust claims. *See LIBOR I*, 935 F. Supp. 2d at 688-89 (finding benchmark manipulation allegations insufficient for antitrust injury because benchmarking process is not competitive); *Laydon* v. *Mizuho Bank Ltd.,* No. 12-cv-3419, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014) (same). In both *LIBOR I* and *Laydon*, the courts rejected the notion that alleged manipulation of an industry benchmark is anticompetitive. *Id.*

Like the plaintiffs in *Laydon* and *LIBOR I*, Plaintiffs here have "allege[d] that prices were distorted . . . [but have] not alleged that this was a result of a reduction in competition." *Laydon*, 2014 WL 1280464 at *8. "It is not sufficient that the plaintiffs [allegedly] paid [artificial] prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants[] to compete where they otherwise would have." *Id.* at *8 (quoting *LIBOR I*, 925 F. Supp. 2d at 688-89); *see also LIBOR I*, 935 F. Supp. 2d at 688 (Plaintiffs argued that "defendants violated the antitrust laws by conspiring to set LIBOR at an artificial level . . . . Although these allegations might suggest that defendants fixed prices and thereby harmed plaintiffs, they do not suggest that the harm Plaintiffs suffered resulted from any anticompetitive aspect of defendants' conduct."). Nor have Plaintiffs alleged that competition was harmed in any market for Brent Crude oil futures, *i.e.*, that output was reduced or prices were increased. *See Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979) (explaining that the inquiry into whether conduct constitutes price-fixing focuses on "whether the practice

facially appears to be one that would always or almost always tend to restrict competition and decrease output"); *Wellnx Life Sciences Inc.* v. *Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007) (without any allegations as to how market-wide competition will be affected, such as reduced output, increased prices, or decreased quality, the complaint fails to state a claim on which relief can be granted).  Accordingly, Plaintiffs' Sherman Act claims should be dismissed for lack of antitrust injury.

### B.    Because The Complaint Does Not Allege Concerted Conduct Or A Plausible Conspiracy, It Fails To State A Claim Under Section 1.

Section 1 of the Sherman Act prohibits "unreasonable restraints of trade . . . effected by a contract, combination, or conspiracy."  *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 553 (2007) (internal quotation marks omitted); *see* 15 U.S.C. § 1.  The "crucial question" is whether the "challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553 (internal quotation marks omitted).  Here, the Complaint lacks any factual allegations showing an illegal agreement or concerted conduct. Indeed, given Defendants' diverse positions and financial incentives, the alleged conspiracy would make no sense.

Without any factual support, Plaintiffs assert in conclusory fashion that all sixteen Defendants "colluded" or "entered into unlawful combinations, agreements and conspiracies" or "illegally combin[ed]."  (*See, e.g.*, Compl. ¶¶ 283-84, 288, 339).  Missing are any allegations of an actual *overarching* agreement—tacit or express—on anything.  All the Complaint contains are allegations about a handful of arm's-length trades among some of the Defendants, but no allegations tying any particular Defendant to the supposed conspiracy—much less the specific

time, places, or persons involved—which is a sufficient reason alone to dismiss this claim.[18]

*Hinds Cnty* v. *Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 512-16 (S.D.N.Y. 2009) (requiring

"specific factual averment of involvement" for each defendant); *In re Parcel Tanker Shipping*

*Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008) ("[The] lack of specifics

with respect to the acts of a particular defendant . . . renders the complaint inadequate"); *see also*

*Twombly*, 550 U.S. at 565 n.10 (requiring allegation of "specific time, place or person involved

in the alleged conspirac[y]").

This lack of specifics is not surprising because the "conspiracy" alleged is plainly

implausible.  As explained in Plaintiffs' own pleading, Defendants had divergent business

interests and goals.  (Compl. ¶¶ 537-38.)  For example, Plaintiffs allege that producers naturally

want higher prices, while buyers naturally want lower prices.[19]  Accordingly, Defendants could

---

[18]    Plaintiffs' conclusory allegations that certain sales transactions involving some of the
Defendants were part of a conspiracy (Compl. ¶¶ 283-84, 288, 339) are entitled to no weight,
because "[t]he ultimate existence of an agreement under antitrust law . . . is a legal conclusion,
not a factual allegation." *Mayor of Baltimore* v. *Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir.
2013).  Moreover, assertions that Brent crude oil traders bought and sold Brent crude oil
"show[s] only that [a defendant] was engaged in some level of ordinary market activity[,]" which
is plainly insufficient to state a claim under Section 1.  *Silver I*, 2012 WL 6700236, at *20.
Indeed, "a contract that set the price for services between a buyer . . . and a seller . . . is neither
*per se* illegal nor an unreasonable restraint of trade under Section 1."  *Westchester Radiological
Assoc. P.C.* v. *Empire Blue Cross and Blue Shield, Inc.*, 659 F. Supp. 132, 135 (S.D.N.Y. 1987).

[19]    Plaintiffs allege, for example, that the trading activity of refiners, such as Shell and BP, is
motivated by their "structural business" (Compl. ¶ 538), whereas other Defendants supposedly
have entirely different goals:

> "A net exporter of crude oil, for example like Statoil, may often generally prefer higher
> prices, but on certain days of a trading cycle, however, it will be in a position necessary
> to hedge existing short positions with long positions that are prices lower.  The reverse
> situation with regard to market direction can also occur as physical and trading positions
> dictate.  For Defendants operating as middlemen and traders, such as Vitol, Mercuria,
> Phibro and Trafigura, their motivation as to where they require absolute or relative prices
> to move is much more opportunistic."

not have any rational economic motive to conspire to manipulate the price of Brent crude oil

derivatives in the same direction (up or down) over the course of a twelve-year period. *See*

*AD/SAT* v. *Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999) (conspiracy allegations

inadequate where there was no "rational economic motive to conspire"); *United Magazine Co.* v.

*Murdoch Magazines Dist. Inc.*, 146 F. Supp. 2d 385, 402 (S.D.N.Y. 2001) (dismissing Section 1

claim "[s]ince, under any theory, plaintiffs' alleged conspiracy . . . makes no economic sense").

Indeed, Plaintiffs have alleged that each Defendant's supposed conduct was designed to "benefit

[its] Brent Crude Oil derivatives positions" (*see, e.g.*, Compl. ¶ 10), which necessarily was an

independent exercise. Because Defendants' conduct was therefore "consistent with normal

commercial incentives facing defendants," it provides no basis on which to allege a Section 1

conspiracy. *LIBOR I*, 935 F. Supp. 2d at 690-91.

### C.    The Complaint Fails To State A Claim For Monopolization Under Section 2.

A Section 2 monopolization claim fails absent plausible allegations that a defendant

(i) possesses monopoly power in a relevant market, and (ii) has maintained, acquired or

enhanced that power through exclusionary conduct. *Verizon Comms.* v. *Law Offices of Curtis* v.

*Trinko, LLP*, 540 U.S. 398, 407 (2004). These elements are absent here.

*First,* Plaintiffs have not adequately alleged a relevant geographic or product market. As

to the former, they have alleged no geographic boundaries for their purported "Brent Crude Oil"

market. *See Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 374

(S.D.N.Y. 2012) (dismissing antitrust claims where plaintiff "said nothing about the geographic

boundaries of the product market"). As to the latter, their proposed "product market"—"which

---

(*Id.* ¶ 537.) As such, any allegation that these diverse Defendants shared the same economic
incentives to fix prices is simply unsupported.

comprises: (1) the Brent Crude Oil physical cargo market, including all cargoes priced as a differential to Brent Crude Oil; (2) NYMEX Brent Futures, ICE Brent Futures and other Brent Crude Oil derivatives; and (3) the Platts MOC market for various types of Brent Crude Oil physical cargoes and derivatives thereon" (Compl. ¶ 523)—is patently defective.

Relevant markets must be defined by "reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Chapman* v. *N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).  On its face, the market that Plaintiffs posit is implausible because it includes products that clearly are not substitutes or reasonably interchangeable for one another—*e.g.*, physical crude oil and cash-settled derivatives—and purports to exclude products—*e.g.*, non-Brent physical crude oil—that may be substitutable without alleging any basis to do so.  *See Navarra* v. *Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 486-87 (S.D.N.Y. 2011) (dismissing plaintiff's Section 2 claim because "the alleged market [was] not plausible" where the products were not "reasonably interchangeable"); *see also Golden Gate Pharm. Servs.* v. *Pfizer, Inc.*, No. C-09-3854, 2010 WL 1541257, at *3 (N.D. Cal. April 16, 2010) (granting motion to dismiss where plaintiffs' market definition of "all pharmaceutical products" included products, *e.g.*, depression therapies and renal cell carcinoma drugs, that were not substitutes).

*Second*, Plaintiffs do not adequately allege that any particular Defendant has monopoly power in the purported Brent crude oil market (or any other market).  Instead, they assert, without supporting facts, that, collectively, "Defendants' unlawful price control of the Brent Crude Oil Market during the Class Period reflects monopoly power."  (Compl. ¶ 53; *see also id.* ¶ 2 ("Defendants monopolized"), *id.* ¶ 8 ("Defendants . . . had . . . market power")).  But allegations that Defendants "aggregated" or "shared" monopoly power cannot support a Section

2 monopolization claim.  Instead, a complaint must allege that a *single Defendant* possessed

monopoly power for a monopolization claim to survive.  *See H.L. Hayden Co. of New York, Inc.*

v. *Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989); *see also RxUSA Wholesale, Inc.*

v. *Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009) ("The Second Circuit has

specifically rejected monopolization claims under Section 2 based on a shared monopoly theory

of liability").[20]

Moreover, Plaintiffs do not supply a single allegation about any Defendant's market

share, and they do not plausibly allege any other facts suggesting that any Defendant had

monopoly power.  On the contrary, Plaintiffs admit that at least thirteen other firms, besides the

sixteen Defendants, trade in physical Brent crude oil and related derivative instruments.  (*See*

Compl. ¶ 254 (Total), ¶ 273 (Lukoil and Chevron), ¶ 279 (PetroCanada), ¶ 283 (Litasco), ¶ 289

(Arcadia), ¶ 290 (Glencore), ¶ 293(Sempra), ¶ 309 (Phillips 66, Koch, ConocoPhillips and

Noble), ¶ 326 (Nexen)).  This failure to allege market share (or market power) for any Defendant

makes implausible Plaintiffs' monopolization claim.  *See Techreserves Inc.* v. *Delta Controls,*

*Inc.*, No. 13-cv-752, 2014 WL 1325914, at *6 (S.D.N.Y. Mar. 31, 2014) (no antitrust claim

where plaintiffs "fail[ed] to allege any facts in connection with Defendants' market share").

---

[20]    At certain points throughout the Complaint, Plaintiffs assert in conclusory terms that one
Defendant or another possesses monopoly power or has a dominant position in some market.
(*See, e.g.*, Compl. ¶¶ 330, 359, 369).  In paragraph 8 of the Complaint, however, Plaintiffs
contend that "BP, Statoil and Shell each alone had the market power and ability to manipulate
Dated Brent prices and price trends . . . ." (*Id.* ¶ 8.)  This allegation undercuts Plaintiffs allegation
of monopoly.  If, in fact, three of the Defendants had market power, none possibly could be a
monopolist.  *See Reudy* v. *Clear Channel Outdoors, Inc.*, 693 F. Supp. 2d 1091, 1127 (N.D. Cal.
2010) (allegations that each defendant had a 47.5% share of the market alleged an oligopoly, and
"Section 2 of the Sherman Act does not punish behavior aimed at creating or maintaining
oligopolies"); *Broadcom Corp.* v. *Qualcomm Inc.*, 501 F.3d 297, 306-07 (3d. Cir. 2007) (Section
2 is "'the provision of the antitrust laws designed to curb the excesses of monopolists and near-
monopolists.'") (quoting *LePage's Inc.* v. *3M*, 324 F.3d 141, 169 (3d Cir. 2003) (en banc)).

*Third*, Plaintiffs do not allege that any Defendant engaged in exclusionary conduct—*i.e.*, acquired monopoly power by unlawfully foreclosing rivals from competing—an absolute prerequisite for a Section 2 claim. *Trinko,* 540 U.S. at 407 ("The mere possession of monopoly power and the concomitant charging of monopoly prices . . . is not unlawful" in the absence of anticompetitive conduct.).

The conduct about which Plaintiffs complain simply has nothing to do with  excluding rivals from competing in a market for physical Brent crude oil (or any other market).  Plaintiffs fail to allege that anyone was foreclosed from trading Brent crude oil or any related derivatives. Instead, they assert, albeit conclusorily, that Defendants used deceptive conduct to influence price assessments and thereby indirectly manipulate "markets."  But manipulation involving deception is not actionable exclusionary conduct under Section 2.  *See Rio Grande Royalty Co., Inc.* v. *Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1202, 1211-12 (S.D. Tex. 2009) (allegations that defendants intentionally suppressed natural gas prices were insufficient to allege a Section 2 claim because plaintiffs did not allege "predatory pricing or other actionable exclusionary conduct").  Accordingly, Plaintiffs have failed to adequately allege a monopolization claim.

> **D.    The Complaint Fails To State A Section 2 Claim For Conspiracy To Monopolize.**

A conspiracy to monopolize claim under Section 2 requires facts giving rise to a plausible inference of (i) a combination or conspiracy among defendants, (ii) an overt act in furtherance of the conspiracy, and (iii) specific intent to monopolize. *Volvo N. Am. Corp.* v. *Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988).  Plaintiffs' boilerplate allegation that "Defendants conspired to monopolize the Brent Crude Oil Market" (Compl. ¶ 581), suffers from the same deficiencies as the Section 1 conspiracy claim.  In addition to the Complaint's basic

failure plausibly to allege concerted action, it also fails to include any facts suggesting that

Defendants conspired with the specific intent to monopolize.  *See Volvo North America Corp.* v.

*Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) (specific intent is an element of

a conspiracy to monopolize claim).  Indeed, it is hard to conceive of any theory of specific intent

that could be plausible.  Defendants are all alleged to be buyers and sellers of physical Brent

crude oil.  If one of them were to achieve monopoly power in the supply or purchase of Brent

crude oil, all of the others that buy cargoes from or sell cargoes to that Defendant would suffer

inflated or depressed prices—which would be antithetical to their self-interest.  *See Car Carriers*

v. *Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) (holding on a motion to dismiss that it is

"inherently implausible" that a defendant "conspired to injure itself").  Because their theory is

facially implausible, Plaintiffs have not stated a valid conspiracy to monopolize claim.

## III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT OR RESTITUTION

The Complaint also fails to state a claim for unjust enrichment.[21]  To sufficiently plead

unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at that

party's expense, and (3) that it is against equity and good conscience to permit the other party to

retain what is sought to be recovered."  *Georgia Malone & Co.* v. *Rieder*, 19 N.Y.3d 511, 516

(2012).  Unjust enrichment requires "some type of direct dealing, or actual, substantive

relationship" between the plaintiff and defendant, *In re Motel 6 Sec. Litig.*, Nos. 93-cv-2183, 92-

cv-2866, 1997 WL 154011, at *7 (S.D.N.Y. Apr. 2, 1997), that is not "too attenuated," *Sperry* v.

*Crompton Corp.*, 8 N.Y. 3d 204, 215-16 (2007).

---

[21]    Plaintiffs' unjust enrichment claim fails to identify which state's common law it seeks to
apply.  (Compl. ¶¶ 590-98.)  For purposes of this motion, Defendants assume that the claim is
asserted under New York law.

The relationship between Defendants' alleged manipulation of physical Brent crude oil and OTC derivatives and Plaintiffs' alleged injuries in trading Brent futures is far "too attenuated" to support an unjust enrichment claim.  *See Georgia Malone*, 19 N.Y.S.3d at 516-519; *see also LIBOR I*, 935 F. Supp. 2d at 737; *Amaranth*, 587 F. Supp. 2d at 547.  Plaintiffs do not allege, for example, that they had a contractual or business relationship with any Defendant. Indeed, Plaintiffs fail to allege any "direct dealing[s]" with any Defendant.  Put simply, allegations such as those here—that Plaintiffs "purchased . . . futures contracts" and that Defendants "manipulated and directly inflated [those] futures contract prices to artificially high levels" through transactions in something different, *i.e.*, physical Brent crude oil and OTC derivatives—are insufficient to demonstrate the type of relationship necessary to support an unjust enrichment claim.  *LIBOR I*, 935 F. Supp. 2d at 737-38 (dismissing unjust enrichment claim because plaintiffs did not purchase contracts from the defendants, nor did they have any other relationship with the defendants); *Amaranth*, 587 F. Supp. 2d at 547 (dismissing unjust enrichment claim predicated on the alleged manipulation of NYMEX natural gas contracts).

Plaintiffs' unjust enrichment claim (Compl. ¶¶ 590-98) simply duplicates the allegations that Plaintiffs assert in support of their CEA and Sherman Act claims.  But unjust enrichment "is not a catchall cause of action to be used when others fail."  *Corsello* v. *Verizon N.Y., Inc.*, 18 N.Y. 3d 777, 790 (2012) (citations omitted).  If Plaintiffs' statutory claims "are defective, an unjust enrichment claim cannot remedy the defects." *Corsello*, 18 N.Y. 3d at 791.  Because Plaintiffs' unjust enrichment claim is duplicative of, and as defective as, their inadequate CEA and Sherman Act claims, this Court should also dismiss the unjust enrichment claim.

IV.    **CLAIMS CONCERNING MOST OF THE CLASS PERIOD MUST BE DISMISSED AS ENTIRELY UNSUPPORTED BY FACTUAL ALLEGATIONS OR BECAUSE THEY ARE TIME BARRED.**

A.    **Because The Complaint Includes No Factual Allegations Relating To 2002 To May 2010, All Claims Concerning That Period Must Be Dismissed.**

Plaintiffs do not make a *single* factual allegation of manipulation or collusion by any Defendant from 2002, when Platts allegedly began employing its MOC methodology (Compl. ¶ 66), through May 31, 2010, the first eight and one-half years of the more than twelve-year putative Class Period,  Nor do their "statistical studies" address this period at all (other than from January to May 2010).  Rather, Plaintiffs rely entirely on a conclusory assertion that manipulation "occurred with regular frequency during the Class Period."  (*Id.* ¶ 250.)  Such "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice,"  *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks omitted), and all claims concerning the 2002 to May 2010 period should be dismissed.

B.    **Plaintiffs' CEA Claims Based On Conduct Before May 2011 Are Time Barred.**

A private action under the CEA must be brought within "two years after the date the cause of action arises," 7 U.S.C. § 25(c), *i.e.*, when the circumstances would suggest to a person of "'ordinary intelligence the probability that she has been defrauded,'" or "'if some inquiry is made . . . from the date such inquiry should have revealed the fraud.'"  *LIBOR I*, 935 F.Supp. 2d at 699 (quoting *Koch* v. *Christie's Int'l PLC*, 699 F. 3d 141, 151 (2d Cir. 2012)).  Because Plaintiffs' allegations are based entirely on public information that was available in real time, their CEA claims for actions prior to May 22, 2011—two years before the first complaint in this litigation was filed, *Prime Int'l Trading, Ltd.* v. *BP p.l.c., et al.*, No. 13-cv-3475 (S.D.N.Y. May 22, 2013)—are time-barred.

The Complaint relies exclusively on (i) "statistical studies" analyzing publicly available information about ICE Brent Futures prices and the Dated Brent Assessment (Compl. ¶¶ 128-32; C.E. 1-3), and (ii) contemporaneous Platts Crude Oil Marketwire reports concerning trading activity and trader commentary (*see e.g. id*. ¶¶ 255, 257, 259, 262, 267, 279, 284, 290, 310-311, 333, 335, 380, 382, 391, 394, 402).  Platts' reports of market activity beginning at least as early as June 2010 (which could have been used at any time to create Plaintiffs' "statistical studies"), coupled with trader commentary regarding various transactions, provided notice sufficient to trigger the running of the limitations period.[22]  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 389 (S.D.N.Y. 2003) (share price movements give rise to inquiry notice).  Plaintiffs' repeated allegations that the manipulative nature of alleged trades was "obvious" and "evident" conclusively demonstrates that they were on inquiry notice.  (*See* Compl. ¶¶ 259 ("The sham nature of the Vitol's sale to BP on June 9 became *all the more evident* on June 10, 2010. . . ."); *id.* ¶ 320 ("The vagaries and manipulability of the Platts reporting system *was evident* early in the month."); *id.* ¶ 415 ("The bogus trades of the September 25 and September 28 described above *are particularly obvious* here.") (emphasis added)).  This allegedly open and obvious manipulative conduct was reflected in information that was at Plaintiffs' disposal at the time the trades were made.  Plaintiffs identify no steps or actions they took to exercise due diligence.  (*Id.* ¶ 497; *see also id.* ¶ 498.)  They are thus "deemed to have knowledge of their injury at the point at which the duty to inquire arose, and the period of limitations starts to run on that date."  *LIBOR*, 935 F. Supp. 2d at 697.

---

[22]    Where published articles discuss the general subject matter that forms the basis of Plaintiffs' claim—"plaintiffs need not be able to learn the precise details of the fraud"—inquiry notice is triggered and the statute of limitations clock starts to run.  *In re: Ultrafem Inc. Sec. Litig.,* 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000).

Plaintiffs' attempt to circumvent the statute of limitations by alleging fraudulent concealment (Compl. ¶¶ 497-522) fails. Fraudulent concealment requires that (i) Defendants "concealed the existence of the CEA violation" (or their conduct was self-concealing), and (ii) Plaintiffs' "continuing ignorance as to the claim was not a result of a lack of due diligence." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004). Plaintiffs have not identified any false statements by Defendants designed to conceal the alleged conduct, and despite their claim that Defendants' conduct was "self-concealing" (Compl. ¶ 497), Plaintiffs acknowledge that the details of Defendants' trades that form the basis of their claims were a matter of public record. (*Id.* ¶¶ 125, 255, 257, 259, 262, 267, 279, 284, 290, 310-11, 333, 335, 380, 382, 391, 394, 402.) While the Plaintiffs assert that "Defendants at all times remained silent about their intentions" (*id.* ¶ 514), it is well-settled that "[s]ilence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure"—which was not the case here. *Donahue* v. *Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986) (internal quotation marks omitted).[23] Finally, as set forth above, any ignorance on the part of Plaintiffs resulted from their "lack of diligence," as they took no steps to uncover the scheme alleged in the Complaint. *In re Merrill Lynch Ltd. Partnerships Litig.*, 7 F. Supp. 2d 256, 274-75 (S.D.N.Y. 1997) (plaintiffs failed to adequately allege due diligence where plaintiffs did "not even allege that they made any specific inquiries . . . let alone detail" of the inquiries), *aff'd*, 154 F.3d 56 (2d Cir. 1998).

---

[23]     To the extent Plaintiffs' allegations are intended to suggest that the statute of limitations begins to run only after an injured party learns the defendant "intended to manipulate," they are wrong. As the Court in *LIBOR I* made clear, the CEA simply requires "discovery of the injury alone." *LIBOR I*, 935 F. Supp. 2d at 697-700 (finding CEA claims time-barred where publicly available information triggered inquiry notice).

Where, as here, "the facts from which knowledge may be imputed are clear from the pleadings and from the public disclosures themselves," dismissal of time-barred claims is appropriate.  *Salinger* v. *Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996).

### C.    Plaintiffs' Antitrust Claims, To The Extent They Seek Damages Pre-Dating May 2009, Are Time Barred.

An antitrust claimant has four years in which to bring a claim.  *See* 15 U.S.C. § 15(b).  As a result, Plaintiffs' claims for damages based on allegedly anticompetitive conduct that occurred prior to May 22, 2009—four years before the filing of the first complaint in this consolidated putative class action, *Prime Int'l Trading, Ltd.* v. *BP plc*, C.A. No. 13-cv-03473-KMK, Dkt. No. 1 (S.D.N.Y.)—are time-barred.  *In re Magnetic Audiotape Antitrust Litig.*, No. 99-cv-1580, 2002 WL 975678, at *2-3 (S.D.N.Y. May 9, 2002) (dismissing antitrust claims based on acts outside the four year statute of limitations as time-barred where plaintiffs failed to adequately allege fraudulent concealment).  As noted above, Plaintiffs' allegations of fraudulent concealment are insufficient to toll the limitations period.

### D.    Plaintiffs' Unjust Enrichment Claims Based On Conduct Before May 2011 Are Time Barred.

Under New York law, the statute of limitations for an unjust enrichment claim is six years.  *See*  N.Y. Civil Practice Law § 213 (McKinney 2004); *see also Roistacher* v. *Bondi*, No. 11-cv-8200, 2014 WL 594176, at *5 n.11 (S.D.N.Y. Feb. 10, 2014); *Knobel* v. *Shaw*, 90 A.D.3d 493, 495 (N.Y. App. Div. 2011).  However, "if an unjust enrichment claim is merely incidental to or duplicative of another claim with a shorter limitations period," the shorter period applies. *Malmsteen* v. *Berdon, LLP*, 477 F. Supp. 2d 655, 667-68 (S.D.N.Y. 2007) (applying three-year limitations period to unjust enrichment claim that restated a breach of fiduciary duty claim, which was itself not "premised on a well-pled fraud or contract claim").  Here, as noted above,

Plaintiffs' unjust enrichment claim duplicates their CEA claims.  It is therefore time barred to the extent it is based on conduct occurring before May 22, 2011.[24]

---

[24]    With regard to Defendants not added until one of the two later-filed complaints, (i) the CEA and unjust enrichment claims based on conduct before October 4, 2011 or April 28, 2012 are time barred, and (ii) the Sherman Act claims based on conduct before October 4, 2009 or April 28, 2010 are time barred.  This issue is addressed in more detail in the separate briefs submitted by those Defendants.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety.

Dated: July 28, 2014

Respectfully Submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: /s/ Steven A. Reed
Steven A. Reed
R. Brendan Fee

1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5603
Facsimile: (215) 963-5001
sreed@morganlewis.com
bfee@morganlewis.com

*Attorney for Royal Dutch Shell plc and Shell
Trading US Company*

**VINSON & ELKINS LLP**

By: /s/ Karl S. Stern
Karl S. Stern

1001 Fannin Street
Suite 2500
Houston, TX 77002-6760
Telephone: (713) 758-3828
Facsimile: (713) 615-5603
kstern@velaw.com

*Attorney for Phibro Trading LLC*

**SULLIVAN & CROMWELL LLP**

By: /s/ Daryl A. Libow
Daryl A. Libow
Amanda F. Davidoff
Brooke Mickelson

1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 956-6973
libowd@sullcrom.com
davidoffa@sullcrom.com

*Attorneys for BP p.l.c., BP America Inc. and
BP Corporation North America Inc.*

**CADWALADER, WICKERSHAM &
TAFT**

By: /s/ Gregory A. Markel
Gregory A. Markel

One World Financial Center
New York, New York 10281
Telephone: (212) 504-6112
Facsimile: (212) 504-6666
gregmarkel@cwt.com

*Attorney for Morgan Stanley*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

By: /s/ William A. Burck
William A. Burck

777 6th Street, N.W., 11th Floor
Washington, D.C. 20001
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
williamburck@quinnemanuel.com

*Attorney for Trafigura AG and Trafigura Beheer B.V.*

**ALLEN & OVERY LLP**

By: /s/ John F. Terzaken
John F. Terzaken
Molly A. Kelley

1101 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 683-3884
Facsimile: (202) 683-3999
john.terzaken@allenovery.com

M. Elaine Johnston

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6388
Facsimile: (212) 610-6399
elaine.johnston@allenovery.com

*Attorneys for Mercuria Energy Trading, Inc.*

**STROOCK & STROOCK & LAVAN**

By: /s/ Melvin A. Brosterman
Melvin A. Brosterman

180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-2632
mbrosterman@stroock.com

*Attorney for Hess Energy Trading Company, LLC*

**SKADDEN ARPS SLATE MEAGHER & FLOM**

By: /s/ Shepard Goldfein
Shepard Goldfein
Mark D. Young (pro hac vice forthcoming)
Karen Hoffman Lent
Peter S. Julian

4 Times Square
New York, New York 10036
Telephone: (212) 735-3276
Facsimile: (917) 777-3276
shepard.goldfein@skadden.com
karen.lent@skadden.com

*Attorneys for Vitol, Inc. and Vitol, S.A.*

**WILMER CUTLER PICKERING
HALE AND DORR LLP**

By: /s/  Douglas F. Curtis
Douglas F. Curtis
Robert W. Trenchard

7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone:  (212) 230-8802
Facsimile:  (212) 230-8800
douglas.curtis@wilmerhale.com
robert.trenchard@wilmerhale.com

Leon B. Greenfield
Perry A. Lange

1875 Pennsylvania Avenue, NW
Washington, DC  20006
Telephone: (202) 663-6972
Facsimile:  (202) 663-6363
leon.greenfield@wilmerhale.com

*Attorneys for Statoil ASA and Statoil US
Holdings Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2014, I filed the foregoing Defendants' Memorandum of

Law in Support of Their Joint Motion to Dismiss the Amended Consolidated Class Action

Complaint via the Court's CM/ECF system, which shall transmit notice to all counsel of record.

/s/  Daryl A. Libow
<br>
Daryl A. Libow