**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------------x

In re:

NORTH SEA BRENT CRUDE OIL FUTURES LITIGATION   1:13-md-02475
(ALC)

This document applies to:  ALL CASES

-----------------------------------------------------------------------------x

**DEFENDANTS' JOINT REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION TO DISMISS THE COMPLAINTS AS EXCEEDING THE
<u>EXTRATERRITORIAL REACH OF U.S. LAW</u>**

**PRELIMINARY STATEMENT**

Defendants' moving brief ("Mem.") shows that Plaintiffs improperly seek to apply U.S. law to trading in the market for Brent North Sea crude oil, a foreign marketplace. Plaintiffs respond primarily by relying on theories now fully discredited, such as the idea that U.S. law applies anytime plaintiffs can posit a domestic effect from foreign conduct. Nothing supports such an overreaching view of U.S. jurisdiction.

For instance, as Defendants showed in their motion, *Morrison v. Nat'l Australian Bank Ltd.*, 561 U.S. 247 (2010), overruled the "conduct or effects" test for the extraterritorial reach of statutes like the Commodity Exchange Act (CEA), and replaced it with a strong presumption against any extraterritorial reach. Since Defendants' motion, the Second Circuit confirmed that *Morrison* applies to the CEA in *Loginovskaya v. Baratchenko*, 764 F.3d 266 (2d Cir. 2014). And in *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014), the Second Circuit held that *Morrison* precludes claims just like those here—where U.S. derivatives traders allege that their contracts were affected by the manipulation of an underlying foreign-traded asset. Small wonder that the Trader Plaintiffs barely mention *Parkcentral* in their opposition brief ("Opp'n"), much less try to distinguish it. The analysis of the *Parkcentral* court on strikingly similar facts dooms their claims.

Defendants likewise showed that the Trader Plaintiffs' Sherman Act claims should be dismissed under the Foreign Trade Antitrust Improvement Act of 1982 (FTAIA), which permits antitrust claims only if there is a "direct" effect on the plaintiffs in the United States. In response, the Trader Plaintiffs mainly argue that the FTAIA does not apply because the United States imports Brent crude oil. But the claims here have nothing to do with U.S. imports. Because the FTAIA does apply, the Trader Plaintiffs can assert an antitrust claim only if their

particular claims arise from a direct U.S. effect, which they do not.  As they do not dispute, they posit a causal chain that starts in a foreign market, wends through a foreign reporting service and foreign futures exchange, and then ends in diverse futures and derivatives markets.

Finally, the Landowner Plaintiff fails even to argue that the FTAIA permits their Sherman Act claim.  He likewise fails to say how his State law claims could be consistent with federal authority over foreign relations.

The Court should dismiss the Complaints.

## ARGUMENT

**I.      The Trader Complaint's Claims Exceed the Reach of U.S. Law Abroad**

Plaintiffs do not dispute certain key facts subject to judicial notice. (Mem. at 6.)  Brent crude contracts call for delivery at terminals in the North Sea, and Platts assesses and reports on the Brent crude market from Canary Wharf, London.  (Opp'n at 13; Mem. at 6-8.)  The Complaints' only allegedly manipulative acts involve supposedly uneconomic Brent crude physical or closely-related OTC orders and trades.  (Opp'n at 13-14; Mem. 9-10.)  In other words, all of the allegedly manipulative conduct was in a foreign delivery market and all the assessments and reports were by Platts in London.

### A.      *Morrison* Bars the Traders' CEA Claims

As Defendants' moving brief shows, *Morrison* requires statutes like the CEA to be read presuming they apply only domestically.  That rule defeats the Trader Plaintiffs' effort to apply the CEA to Brent crude trading; but even if it did not, it would bar claims by traders on ICE Europe, a U.K. market.

#### 1.      Brent Crude Trading is Beyond the CEA's Scope

The Trader Plaintiffs concede that *Morrison* applies to the CEA under *Loginovskaya*. (Opp'n at 3-4.)  But they nonetheless argue that their claims should proceed.  They contend that,

2

under *Loginovskaya*, the CEA applies anytime a plaintiff claims losses on a contract entered in the United States. *Loginavskaya* says no such thing.

In *Loginovskaya*, the court dismissed claims under the CEA's anti-fraud provisions because the plaintiff failed to allege a domestic commodities transaction. 764 F.3d at 275. Thus, the case holds that a domestic transaction is *necessary* for a private claim, but not that such a transaction is *sufficient*. Indeed, *Loginovskaya* analyzed only the CEA section that creates a private cause of action, Section 22. The court expressly declined to analyze whether the underlying anti-fraud provisions could reach the foreign conduct alleged. *Loginovskaya*, 764 F.3d at 275. Here, the CEA's substantive anti-manipulation provisions are at issue. (*See* Mem. at 12 (arguing that Sections 6(c)(1) and 9(a)(2), 7 U.S.C. §§ 9, 13(a)(2), do not reach Brent crude oil).) Those provisions apply only domestically, not to foreign markets like Brent.

*Parkcentral* confirms that conclusion. There, plaintiffs traded U.S. swap contracts indexed to German-listed securities prices. Like the Trader Plaintiffs here, the *Parkcentral* plaintiffs argued that the foreign-traded asset underlying their derivatives had been artificially manipulated. Also like the Trader Plaintiffs here, the *Parkcentral* plaintiffs maintained that U.S. law applied because the derivative contracts traded in the U.S. 763 F.3d at 213.

The Second Circuit disagreed. While *Morrison* "unmistakably made a domestic … transaction … *necessary* to a properly domestic invocation of" the securities laws, "such a transaction alone is *not sufficient* to state a properly domestic claim under the statute." *Id*. at 215 (emphasis added). Such a rule "would seriously undermine *Morrison*'s insistence that" the securities laws have "no extraterritorial application." *Id.* As the Second Circuit elaborated, if a U.S. transaction were alone sufficient, then "[i]t would require courts to apply the [U.S.] statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a

3

plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it." *Id.*

Put differently, allowing U.S. derivatives traders to sue based on conduct involving the underlying foreign-traded assets would effectively re-institute the very effects test that *Morrison* over-turned.  The Supreme Court rejected that test due to its unpredictability and potential for inconsistency with foreign law.  *Morrison*, 561 U.S. at 269-70.  Exactly such consequences would follow if these claims were allowed.  Brent crude traders would always be at risk that trades perfectly legal under the English law governing such contracts might be attacked under U.S. law.  *Parkcentral* prohibits that result.

To be sure, *Parkcentral* is a securities and not a CEA case.  But *Loginovskaya* holds that *Morrison* applies the same way to the securities and commodities laws.  764 F.3d at 273-74 (given "the parallels between [the] CEA and the [securities laws] and [there is] no reason why" formulation of the *Morrison* test to SEA claims "should not apply" to claims under the CEA). Applying *Parkcentral* is especially apt here, where the statutes' language is so similar. *Parkcentral* construed securities law provisions applicable to trades on "national securities exchange" or otherwise in "interstate commerce."  *See Parkcentral*, 763 F.3d at 209 (quoting 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5).  The CEA provisions here apply to "a contract of sale of" or "price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."  7 U.S.C. §§ 9, 13(a)(2).  A CEA "registered entity" is a CFTC-registered domestic futures exchange under CEA Section 5.  *See* CEA § 1a(40)(A) & (C). Thus, like the securities provisions at issue in *Parkcentral* and *Morrison*, the CEA anti-manipulation provisions are focused on domestic exchanges or domestic interstate commerce.

*See LIBOR*, 935 F. Supp. 2d at 696 ("[Section 13(a)(2)] clearly focuses on commodities in interstate commerce and futures contracts traded on domestic exchanges.").

The Trader Plaintiffs, however, argue that Brent oil is in "interstate commerce," because it is imported into the United States. But the Trader Plaintiffs do not dispute that the transactions here were for delivery to one of the market's four North Sea terminals. That some Brent oil might later be shipped to the U.S. after delivery at a North Sea terminal does not render the initial delivery in "interstate commerce." *Morrison* holds that general terms like "interstate commerce" cannot be read to confer such broad-ranging extraterritorial jurisdiction. *Morrison*, 561 U.S. at 262-63.

Unable to circumvent *Parkcentral*, the Trader Plaintiffs largely ignore it, citing it only twice and never truly discussing it. The Trader Plaintiffs instead tout *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013). (Opp'n at 1, 15.) *LIBOR* allowed CEA claims based on allegedly false predictions of inter-bank lending rates by the British Bankers' Association, which allegedly affected currency futures settlement values in the U.S. Such claims are likely no longer valid under *Parkcentral*.

In any event, *LIBOR* dealt with a different situation. *LIBOR* involved interest rates expressly incorporated into U.S. futures prices. *LIBOR* did not involve allegedly manipulative transactions in an underlying commodity. While the Trader Plaintiffs say this is a "distinction without a difference" (Opp'n at 15), the distinction is in fact central.

*LIBOR* extensively analyzed the difference between the allegedly manipulated interest rate and the foreign currency commodity underlying U.S. futures, and relied on that difference in holding that the CEA could reach the alleged conduct. *Libor*, 935 F. Supp. 2d at 695-97. Because U.S. futures *expressly* incorporated the allegedly manipulated interest rate into prices,

5

manipulating that rate necessarily manipulated U.S. futures directly. *Id.* Not so here, where the Trader Plaintiffs exclusively allege manipulation of a foreign-traded physical commodity not tied directly to U.S. futures at all. The Trader Plaintiffs' theory thus requires a far more aggressive expansion of U.S. legal jurisdiction abroad, contrary to *Morrison*'s strong presumption against such jurisdiction.

The Trader Plaintiffs try also to argue that Brent crude oil transactions should be deemed "domestic" trades, and not within the *Morrison* framework at all. To support this argument, Plaintiffs cite *Transnor (Bermuda), Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1476-77 (S.D.N.Y. 1990), a 24-year old district court opinion deeming the Brent crude market a "U.S. market" for purposes of Sherman Act and CEA jurisdiction. (Opp'n at 13.) But *Transnor* far predates *Morrison* and is no longer good law.

Under *Morrison*, the Second Circuit now looks to where the parties incur "irrevocable liability" or to where "title passes" to assess whether transactions are domestic (and thus subject to U.S. law) or foreign (and thus beyond the reach of U.S. law). *Absolute Activist v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). The Trader Plaintiffs do not dispute that irrevocable liability for and title to Brent crude oil pass exclusively at one of four loading terminals in the North Sea. (Opp'n at 13.) Nor could they. After *Transnor* was decided, the CFTC ruled that Brent oil agreements are "forward" physical delivery contracts. CFTC, Statutory Interpretation Concerning Forward Transactions, 55 FR 39188-03 (Sept. 25, 1990). Physical delivery is central to these agreements, and it occurs in the North Sea. The market for Brent crude oil is thus indisputably foreign.

In contrast, *Transnor* applied a standard inconsistent with *Morrison*. According to the *Transnor* court, "[w]here the market in question has even *slight* direct ties to U.S. commerce, that market is not an exclusively foreign market and is therefore deemed a U.S. market"—the

opposite of *Morrison*'s strong presumption against extraterritoriality (738 F. Supp. at 1476) (emphasis added). The *Transnor* court thus gave the market's "delivery point"—the point here where liability becomes irrevocable and title passes—short shrift compared to the location of the market's traders. But as the Second Circuit has since made clear, traders' locations do not determine whether transactions or markets are domestic or foreign. *See City of Pontiac Policeman's and Fireman's Ret. Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014) (facts that plaintiff was a U.S. entity and placed a buy order for a security traded on a foreign exchange did not overcome presumption against extraterritoriality). *Transnor* thus does not apply here.

### 2.     ICE Europe is a Foreign, Not a U.S., Exchange

Even if the CEA could apply to physical Brent crude trading, ICE Europe traders still could not bring CEA claims. *Morrison* permits only domestic exchange users to make claims.

The Trader Plaintiffs do not dispute that ICE Europe is a U.K.-regulated market headquartered in London, which the CFTC treats exclusively as a "foreign board of trade" under the CEA. (Mem. at 9, 16.) The Trader Plaintiffs nonetheless contend that ICE Europe traders can still assert CEA manipulation claims. The Trader Plaintiffs label the CFTC's view of ICE Europe as a foreign board of trade "inapt" (Opp'n at 6), and argue that ICE Europe should be deemed a domestic exchange under *Morrison*. The Trader Plaintiffs point to various ICE Europe connections to the United States. (Opp'n at 6-9.) But those connections are irrelevant.

ICE Europe is called "ICE *Europe*" for a reason. The exchange indisputably is not a CEA Section 5 registered domestic exchange. The CEA anti-manipulation provisions here apply only to such "registered" exchanges. (*Supra*. at 4.) That alone defeats the claims of ICE Europe traders. *Morrison* and its progeny in this Circuit—especially *Loginovskaya*—make clear that the presumption against extraterritoriality must be assessed based on the particular statutory

7

language in question.  *See, e.g.*, *Loginovskaya*, 764 F.3d at 272; *LIBOR*, 935 F. Supp. 2d at 696 (looking to the language of CEA Section 9(a)(2) to determine whether the plaintiffs' claims were extraterritorial in focus); *Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473-74 (S.D.N.Y. 2010) (looking to the language of the Racketeer Influenced and Corrupt Organizations Act to determine whether the plaintiffs' claims were extraterritorial in focus).  The language here makes clear that the CEA does not apply.

In *City of Pontiac*, the Second Circuit ruled that U.S. connections similar to those the Trader Plaintiffs tout were insufficient to trigger the application of U.S. law under *Morrison*. There, that a U.S. plaintiff purchased a security through an order placed in the United States did not make the transaction a domestic one because the order was "then executed on a foreign exchange."  *City of Pontiac*, 752 F.3d at 181.  Contrary to the Trader Plaintiffs' assertion, nothing in that case suggests that the location where an exchange performs its back-end computer functions transforms trades on a foreign futures exchange into domestic transactions. *Id.*  To the contrary, the Second Circuit specifically observed that it had *not* held that domestic placement of purchase orders, or even formation of the contract, creates irrevocable liability in the United States when the transactions take place on a foreign exchange.  *Id.* at 181 n.33.

Recognizing that turning ICE Europe into a U.S. exchange is without merit, the Trader Plaintiffs alternatively argue trades on the exchange should not be subject to *Morrison*'s "location of the exchange" test at all.  Instead, the Trader Plaintiffs say that the test for assessing *off-exchange* transactions in *Ficeto* should control, and that, because ICE Europe trades are "matched" by computers located in Chicago, ICE Europe trades are in fact U.S. transactions. (Opp'n at 10-12, 17.)  This argument is nonsense.  *Ficeto* applies only to off-exchange trades; ICE Europe trades are on-exchange.  *Morrison*'s "location of the exchange" test thus controls.

To hold otherwise would undermine the certainty *Morrison* seeks to promote. In rejecting the "conduct" and "effect" tests, *Morrison* found these tests to be "complex in formulation and unpredictable in application." 561 U.S. at 256. Using an exchange's technical and complex rules about where a contract is deemed "completed," or where a computer is located, to determine whether an exchange is domestic would simply result in yet another unpredictable test that is "not easy to administer." *Id.* at 258. In contrast, using the location of the exchange as the determinative factor provides the certainty *Morrison* sought to establish.[1]

### B.   The FTAIA Bars the Traders' Sherman Act Claims

The FTAIA requires a Sherman Act plaintiff to show that conduct involving foreign commerce has a "direct" effect on the United States that gives rise to the plaintiff's claim. The Trader Plaintiffs' theory is anything but direct. They first must show that Brent crude prices were affected; that those prices affected Platts' assessments; and then that those assessments affected the Trader Plaintiffs' futures trades. The Trader Plaintiffs first try to avoid the FTAIA entirely, arguing it does not apply because Brent crude oil is imported into the United States. They then contend that they meet the "direct" effects test anyway. Neither argument has merit.

### 1.   The FTAIA Applies Here

The FTAIA "import exclusion" applies only if the accused conduct "involves" import commerce—*i.e.* is "directed at an import market." (Opp'n at 19, quoting *Animal Sci Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 470 (3d Cir. 2011) ("directed at" means "targeting import goods and services").) The conduct here has nothing to do with import commerce.

---

[1]   As an example of the uncertainty the Trader Plaintiffs' approach would engender, ICE Europe deems different transactions "completed" at different points in time. While some are complete upon matching, so-called "block transactions" are complete before being entered into the ICE Europe systems. *ICE Clear Europe, Clearing Rules*, Part 4 Clearing Mechanism, Rule 401 Formation of Contracts (a)(iii) ("[I]n the case of any … ICE Futures Europe Block Transaction, [a contract shall arise automatically … at the moment that] … ICE Futures Europe … receives and has recorded on its system complete data in respect of the Transaction . . .").

Defendants allegedly inflated the price of Brent crude for delivery entirely overseas. (*See* Mem. at 5-7; Trader Compl. ¶ 104.) Where the buyer eventually ships the oil has nothing to do with the conduct alleged, and Plaintiffs do not identify a single allegedly manipulated trade for Brent crude shipped to the United States. (Trader Compl. ¶¶ 251-419.) In other words, "while some of the [crude oil] purchased in those [transactions] may ultimately have been imported … the object of the conspiracy" was for delivery of Brent Crude oil in the North Sea, "not an import market." *Kruman v. Christie's Int'l, Plc.*, 284 F.3d 384, 395-96 (2d Cir. 2002) (price fixing targeted foreign auctions not imports of the purchased goods) (abrogated on other grounds); *see also Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 303-04 (3d Cir. 2002) (fixing foreign travel agent commissions did not "directly increase or reduce [U.S.] imports").

The Trader Plaintiffs' effort to distinguish *Empagran I* (Opp'n at 21-22) misses the point. The location of the *plaintiffs*' conduct or alleged injury is irrelevant. The FTAIA's application depends on whether *defendants*' allegedly anticompetitive conduct involved U.S. import commerce. *F. Hoffmann-La Roche Ltd v. Empagran S.A. (Empagran I)*, 542 U.S. 155, 159, 163 (2004). Here, that conduct did not. *Id.*; *see also* Mem. at 23, fn 9 (collecting cases); *Den Norske Stats Oljeselskap AS v. HeereMac Vof*, 241 F.3d 420, 426 (5th Cir. 2001) (North Sea heavy lift barge services among Norwegian, English, and Dutch companies in wholly foreign commerce).

But even if the alleged conduct had partly involved import commerce, the Trader Plaintiffs' claims here are not based on that conduct. The Trader Plaintiffs traded futures and derivatives on NYMEX or ICE Europe, not physical Brent crude (much less imported Brent crude). (Trader Compl. ¶¶ 420-38.) The Trader Plaintiffs thus cannot escape the FTAIA. (Opp'n at 21); *see, e.g., Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 858-59 (7th Cir. 2012) (claims based on conduct not involving import commerce subject to FTAIA even though other

conduct involved import commerce); *Den Norske*, 241 F.3d at 428 n.26 (denying claim based on foreign conduct even though "the conspiracy had the effect of raising crude oil prices in the United States, [because plaintiff] alleges no injuries to itself occurring in the market for crude oil or arising from this domestic effect").

### 2. The Trader Plaintiffs Allege Only Indirect Effects on the United States

In arguing that they meet the FTAIA's requirements, the Trader Plaintiffs try to depict the FTAIA as setting only a low bar extraterritorial application of U.S. antitrust law. But the Trader Plaintiffs cannot escape the consequences of their own indirect theory of causation, which winds from a foreign market, through a foreign reporting service, into diverse U.S. markets. Where "activity in a foreign country filters through many layers" to affect the United States as it does here, the FTAIA "definitely blocks liability." *Motorola Mobility LLC, Inc. v. AU Optronics Corp.*, No. 14-8003, Slip Op. at 6 (7th Cir. Nov. 26, 2014) (internal quotations omitted).

The Trader Plaintiffs first try to argue that the U.S. link to the conduct alleged is purely a matter of proximate cause for trial. (Opp'n at 23.) Not true. The issue here is whether the Complaint alleges a sufficient connection. Nothing in *Glidepath Holding B.V. v. Spherion*, 590 F. Supp. 2d 435 (S.D.N.Y. 2007)—not an FTAIA case—is to the contrary. Plaintiffs identify not one case in which a multi-step chain of causation, dependent on the actions of third parties and other variables, has been found to be "direct" under the FTAIA. There is none. There instead are many cases dismissing allegations like these for failure to adequately show direct effects. (*See* Mem. at 19-10 (discussing cases)). Plaintiffs fail to distinguish these cases.

The Trader Plaintiffs next argue that they need only plead a correlation between physical Brent and futures prices to surmount the FTAIA. But a correlation only suggests a price relationship, not that one has a "direct" effect on the other. *Dover v. British Airways, PLC (UK)*,

11

No. 12-cv-5567, 2013 WL 5970688, at *4 (E.D.N.Y. Nov. 8, 2013), is not on point because it involved competing statistical analyses on a merits issue, which the court declined to resolve at the 12(b)(6) stage, not an effort to use mere correlation to show causation.

Indeed, the Trader Plaintiffs' allegations about "cash futures convergence" and "exchange for physical" transactions demonstrate why any causation between spot and futures is not direct. (Opp'n at 25-26.) As Plaintiffs allege, some futures contracts settle by physical delivery. This prompts arbitrage between futures and spot contracts that can cause their prices to converge over time. (*See, e.g.,* Trader Compl. ¶¶ 64, 126, 238.) The fact that arbitrage—a market force independent from defendants—drives the relationship between futures and spot prices shows that the relationship is indirect, as courts applying the FTAIA have held. *See, e.g., Empagran S.A. v. F. Hoffman-LaRoche, Ltd. (Empagran II),* 417 F.3d 1267, 1270-71 (D.C. Cir. 2005) (allegation that U.S. effects of global price fixing prevented arbitrage from undermining European effects states only indirect connection between U.S. and European prices); *In re Hydrogen Peroxide Antitrust Litig.,* 702 F. Supp 2d 548, 555 (E.D. Pa. 2010) ("[p]roximate cause requires more than establishing the conditions to make something possible").

Contrary to the Trader Plaintiffs' argument (Opp'n at 25), *Metallgesellschaft AG v. Sumitomo Corp. of Am.*, 325 F.3d 836 (7th Cir. 2003), does not help them either. Unlike here, the defendants there were accused of conspiring to raise prices in the same copper futures market in which plaintiffs traded. *Id.* at 837, 840-41; *see also Loeb Indus. v. Sumitomo*, 306 F.3d 469, 477-78 (7th Cir. 2002) (providing background). The Seventh Circuit specifically distinguished cases like this one in which plaintiffs traded in a futures market different than the foreign physical market in which defendants' participated. *Metalgesellschaft*, 325 F.3d at 841. Nothing like the direct connection in *Metallgesellschaft* exists here.

The Trader Plaintiffs also argue that the Sherman Act applies because Dated Brent is a component of some U.S. futures contracts. (Opp'n at 26-27.) But that fact creates no direct relationship. Platts in London, not Defendants, sets Dated Brent. In other words, the independent editorial judgment of a third party breaks any connection between Defendants' alleged conduct and the Trader Plaintiffs in the United States.

Finally, the Trader Plaintiffs argue at some length that Defendants' foreign conduct would have a foreseeable effect on U.S. commerce. (Opp'n at 28-30.) Foreseeability is a separate requirement for the U.S. effects under the FTAIA, besides "direct" and "substantial." 15 U.S.C. 6a ("direct substantial, and reasonably foreseeable effect"); *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 411 (2014) ("direct" is distinct from "foreseeable"). Whether or not a U.S. effect was a foreseeable outcome of Defendants' alleged conduct, it was not a direct effect, and Plaintiffs' Sherman Act claims must therefore be dismissed.

## II. The Landowner Claims Exceed the Reach of U.S. Law Abroad

The Landowner Plaintiff purports to incorporate the Trader Plaintiffs' opposition to dismissal of the Landowner Sherman Act claim under the FTAIA. (Landowner's Opp'n at 1.) But as shown in the Defendants' moving brief (Mem. at 24-25), the Landowner Plaintiff posits an even less direct chain of cause-and-effect than the Trader Plaintiffs. Relying on the Trader Plaintiffs' arguments fails to address the additional steps applicable to the Landowner Plaintiff's theory. The Landowner Plaintiffs thus fail to substantively respond to the Defendants' FTAIA motion, and their Sherman Act claims should therefore be dismissed.

The same is true regarding the Landowner Plaintiff's state law claims, which contradict federal authority over foreign relations. (Mem. at 25-28.) The Landowner Plaintiff does not dispute that conclusion. The Landowner's state law claims therefore should be dismissed too.

Dated:  November 26, 2014

                                Respectfully submitted,

**WILMER CUTLER PICKERING
  HALE AND DORR LLP**

By: /s/ Doug F. Curtis_____
    Douglas F. Curtis
    Robert W. Trenchard
    7 World Trade Center
    250 Greenwich Street
    New York, NY  10007
    Telephone:  (212) 230-8802
    Facsimile:  (212) 230-8800
    douglas.curtis@wilmerhale.com
    robert.trenchard@wilmerhale.com

    Leon B. Greenfield
    Perry A. Lange
    1875 Pennsylvania Avenue, NW
    Washington, DC  20006
    Telephone:  (202) 663-6972
    Facsimile:  (202) 663-6363
    leon.greenfield@wilmerhale.com
    perry.lange@wilmerhale.com

    *Attorneys for Statoil ASA and Statoil US
    Holdings Inc.*

| **SULLIVAN & CROMWELL LLP** | **MORGAN, LEWIS & BOCKIUS LLP** |
|---|---|
| By: */s/ Daryl A. Libow (with permission)* | By: */s/ Steven A. Reed (with permission)* |
|     Daryl A. Libow |     Steven A. Reed |
|     Amanda F. Davidoff |     R. Brendan Fee |
|     Brooke Mickelson |     Dana E. Becker |
|     1700 New York Avenue, NW, Suite 700 |     1701 Market Street |
|     Washington, DC  20006 |     Philadelphia, PA  19103-2921 |
|     Telephone:  (202) 956-7500 |     Telephone:  (215) 963-5603 |
|     Facsimile:  (202) 956-6973 |     Facsimile:  (215) 963-5001 |
|     libowd@sullcrom.com |     sreed@morganlewis.com |
|     davidoffa@sullcrom.com |     bfee@morganlewis.com |
|     mickelsonb@sullcrom.com |     dana.becker@morganlewis.com |
|     *Attorneys for BP p.l.c., BP America Inc. and BP Corporation North America, Inc.* |     *Attorneys for Royal Dutch Shell plc and Shell Trading US Company* |

| | |
|---|---|
| **VINSON & ELKINS LLP** | **CADWALADER, WICKERSHAM & TAFT** |
| By: */s/ Karl S. Stern (with permission)*<br>    Karl S. Stern<br>    1001 Fannin Street<br>    Suite 2500<br>    Houston, TX  77002-6760<br>    Telephone:  (713) 758-3828<br>    Facsimile:  (713) 615-5603<br>    kstern@velaw.com | By: */s/ Gregory A. Markel (with permission)*<br>    Gregory A. Markel<br>    One World Financial Center<br>    New York, NY  10281<br>    Telephone:  (212) 504-6112<br>    Facsimile:  (212) 504-6666<br>    gregmarkel@cwt.com |
|     *Attorney for Phibro Trading LLC* |     *Attorney for Morgan Stanley* |

| | |
|---|---|
| **QUINN EMANUEL URQUHART & SULLIVAN LLP** | **STROOCK & STROOCK & LAVAN** |

By: */s/ William A. Burck (with permission)*
   William A. Burck

   777 6th Street, NW, 11th Floor
   Washington, DC  20001
   Telephone:  (202) 538-8000
   Facsimile:  (202) 538-8100

   51 Madison Avenue, 22nd Floor
   New York, NY  10010
   Telephone:  (212) 849-7000
   Facsimile:  (212) 849-7100
   williamburck@quinnemanuel.com

   *Attorneys for Trafigura AG and Trafigura Beheer B.V.*

By: */s/ Melvin A. Brosterman (with permission)*
   Melvin A. Brosterman
   180 Maiden Lane
   New York, NY  10038
   Telephone:  (212) 806-5400
   Facsimile:  (212) 806-2632
   mbrosterman@stroock.com

   *Attorney for Hess Energy Trading Company, LLC*

**ALLEN & OVERY LLP**

By: */s/ John F. Terzaken (with permission)*
   John F. Terzaken
   Molly A. Kelley
   1101 New York Avenue, NW
   Washington, DC  20005
   Telephone:  (202) 683-3884
   Facsimile:  (202) 683-3999
   john.terzaken@allenovery.com

   M. Elaine Johnston
   1221 Avenue of the Americas
   New York, NY  10020
   Telephone:  (212) 610-6388
   Facsimile:  (212) 610-6399
   elaine.johnston@allenovery.com

   *Attorneys for Mercuria Energy Trading, Inc. and Mercuria Energy Trading, S.A.*

**SKADDEN ARPS SLATE MEAGHER & FLOM**

By: */s/ Shepard Goldfein (with permission)*
   Shepard Goldfein
   Mark D. Young (*pro hac vice* forthcoming)
   Karen Hoffman Lent
   Peter S. Julian
   4 Times Square
   New York, NY  10036
   Telephone:  (212) 735-3276
   Facsimile:  (917) 777-3276
   karen.lent@skadden.com
   shepard.goldfein@skadden.com

   *Attorneys for Vitol, Inc. and Vitol, S.A.*

**CERTIFICATE OF SERVICE**

I certify that on November 26, 2014, I filed the foregoing Defendants' Joint Reply Memorandum in Support of Their Joint Motion to Dismiss the Complaints as Exceeding the Extraterritorial Reach of U.S. Law via the Court's CM/ECF system, which shall transmit notice to all counsel of record.

/s/ Doug F. Curtis_____
*Counsel for Statoil ASA and Statoil US Holdings Inc.*