**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:
NORTH SEA BRENT CRUDE OIL FUTURES              1:13-md-02475 (ALC)
LITIGATION

This document applies to:

1:13-cv-03473-ALC, 1:13-cv-03587-ALC,
1:13-cv-03944-ALC, 1:13-cv-04142-ALC,
1:13-cv-04553-ALC, 1:13-cv-04872-ALC,
1:13-cv-04938-ALC, 1:13-cv-05577-ALC,
1:13-cv-07089-ALC, 1:13-cv-08030-ALC,
1:13-cv-08151-ALC, 1:13-cv-08179-ALC,
1:13-cv-08240-ALC, 1:13-cv-08270-ALC.
-----------------------------------------------------------x

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
THEIR JOINT MOTION TO DISMISS
THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

November 26, 2014

# TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................................................2

I.     PLAINTIFFS CONCEDE THAT THE ALLEGATIONS UNDERLYING THEIR
       CLAIMS SOUND IN FRAUD. ...........................................................................2

II.    THE OPPOSITION MAKES CLEAR THAT UNDER ANY STANDARD, THE
       COMPLAINT'S ALLEGATIONS DO NOT STATE A MANIPULATION
       CLAIM UNDER THE CEA. ..................................................................................4

       A.     Plaintiffs Identify No Plausible Allegations Of Scienter. ........................4

       B.     Plaintiffs' Allegations of "Unusual" Price Patterns Are Insufficient To
              Allege Artificial Prices. ..........................................................................8

              1.     Plaintiffs Do Not Adequately Allege That Defendants Caused
                     Artificial Prices. ...........................................................................11

              2.     Plaintiffs Do Not Adequately Allege That Defendants Possessed
                     The Ability To Influence Brent Futures Prices. .............................12

       C.     The Opposition Makes Clear That Plaintiffs Did Not Adequately Allege
              False Reporting. .......................................................................................13

       D.     Plaintiffs Do Not Identify Allegations From The Complaint Sufficient To
              Plead Actual Damages. .............................................................................14

       E.     The Opposition Fails To Identify Any Allegations Of Price Manipulation
              Between 2002 And May 31, 2010. ...........................................................16

III.   THE OPPOSITION MAKES CLEAR THAT PLAINTIFFS DO NOT STATE
       AN ANTITRUST CLAIM. ..................................................................................16

       A.     Plaintiffs Do Not Dispute That They Have Not Alleged Any Reduction In
              Competition And Thus Cannot Establish Antitrust Injury. ......................17

       B.     Plaintiffs' Opposition Identifies No Plausible Allegations Of Any
              Agreement Amongst Defendants. ..............................................................18

       C.     The Complaint Fails To Adequately Allege A Monopolization Claim. .............19

       D.     Plaintiffs Effectively Admit That They Have Not Alleged Specific Intent
              In Support Of Their Conspiracy To Monopolize Claim. ..........................21

IV.    PLAINTIFFS DO NOT REBUT THAT THE COMPLAINT FAILS TO STATE
       A CLAIM FOR UNJUST ENRICHMENT OR RESTITUTION. .........................21

V.      PLAINTIFFS' CLAIMS CONCERNING MOST OF THE CLASS PERIOD ARE
        ENTIRELY UNSUPPORTED BY FACTUAL ALLEGATIONS OR ARE TIME
        BARRED. ....................................................................................................................22

CONCLUSION....................................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Amaranth Natural Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008).............................................................. *passim*

*Anderson News, L.L.C.* v. *Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).............................................................................18

*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)........................................................................................20

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F. 3d 87 (2d Cir. 2007).............................................................................12

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007)...................................................................................16, 18

*CFTC* v. *Parnon Energy, Inc.*,
  875 F. Supp. 2d. 233 (S.D.N.Y. 2012)........................................................8, 9, 11

*Chapman* v. *N.Y. State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008).............................................................................19

*In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.*,
  No. 11-md-2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012)...................4, 5, 11

*In re Cox*,
  CFTC No. 75-16, 1987 WL 106879 (CFTC July 15, 1987)..............................8

*In re Crude Oil Commodity Litig.*,
  No. 06-cv-6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ....................4, 5, 13

*In re Energy Transfer Partners Natural Gas Litig.*,
  No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) ........................14

*Georgia Malone & Co.* v. *Rieder*,
  19 N.Y. 3d 511 (2012)......................................................................................22

*Heerwagen* v. *Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006)..............................................................................19

*Huss* v. *Gayden*,
  571 F.3d 442 (5th Cir. 2009) ............................................................................11

*In re Ind. Farm Bureau Coop. Ass'n, Inc.*,
    CFTC No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982) .........................................5

*Koch* v. *Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012) ....................................................................................23

*Laydon* v. *Mizuho Bank, Ltd.*,
    No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) .............................17

*Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*,
    551 U.S. 877 (2007) ................................................................................................17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013) ..............................................15, 17, 22, 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    962 F. Supp. 2d 606 (S.D.N.Y. 2013) ......................................................14, 15, 16

*Merck & Co.* v. *Reynolds*,
    559 U.S. 633 (2010) ................................................................................................23

*Miller* v. *Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007) .....................................................................4

*In re Motel 6 Sec. Litig.*,
    Nos. 93-cv-2183, 93-cv-2866, 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997) ..........21

*In re Natural Gas Commodity Litig.*,
    337 F. Supp. 2d 498 (S.D.N.Y. 2004) ................................................................3, 24

*Paycom Billing Serv., Inc.* v. *Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006) ....................................................................................18

*Pepsico, Inc.* v. *The Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2003) ....................................................................................20

*In re Piasio*,
    CFTC No. 97-9, 2000 WL 1466069 (CFTC Sept. 29, 2000) ....................................8

*In re Rough Rice Commodity Litig.*,
    No. 11 C 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ...................................8, 10

*Santana Prods.* v. *Sylvester & Assocs.*,
    121 F. Supp. 2d 729 (E.D.N.Y. 2000) ....................................................................21

*Shah* v. *Meeker*,
    435 F.3d 244 (2d Cir. 2006) ....................................................................................24

*Sheehan* v. *Daily Racing Form, Inc.*,
    104 F.3d 940 (7th Cir. 1997) ................................................................11

*Southwick Clothing LLC* v. *GFT (USA) Corp.*,
    No. 99-cv-10452, 2004 WL 2914093 (S.D.N.Y. Dec. 15, 2004) ...........14

*Sperry* v. *Crompton Corp.*,
    8 N.Y. 3d 204 (2007) ..........................................................................22

*Starr* v. *Sony BMG Music Entertainment*,
    592 F.3d 314 (2d Cir. 2010).................................................................18

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*,
    No. 05-cv-1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) ...........24

*In re Term Commodities Cotton Futures Litig.*,
    No. 12-cv-5126, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ...........3, 21

*Wood ex rel. U.S.* v. *Applied Research Assocs., Inc.*,
    328 F. App'x 744 (2d Cir. 2009) ..........................................................3

*UBS Asset Mgmt. (New York) Inc.* v. *Wood Gundy Corp.*,
    914 F. Supp. 66 (S.D.N.Y. 1996) ........................................................3

*United States* v. *Eppolito*,
    543 F.3d 25 (3d Cir. 2008)...................................................................18

*United States* v. *Gabriel*,
    920 F. Supp. 498 (S.D.N.Y. 1996) ......................................................18

*United States* v. *Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ...............................................................20

*United States* v. *Radley*,
    659 F. Supp. 2d 803 (S.D. Tex. 2009) .................................................13

*WeyerHaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co. Inc.*,
    549 U.S. 312 (2007).............................................................................20

**Statutes & Rules**

7 U.S.C. § 9(1)(A).......................................................................................14

7 U.S.C. § 13(a)(2).....................................................................................14

Fed. R. Civ. P. 9(b) ....................................................................................4

Plaintiffs' Opposition makes clear that this case boils down to applying conclusory labels to ordinary market transactions occurring months or years apart between varied combinations of buyers and sellers.  But labels are not sufficient to plead a complaint, much less claims that are subject to Rule 9(b).  Calling trades "uneconomic" or "illegitimate" or "spoofs" is not enough to make them so, or to show that nine groups of unaffiliated Defendants—with differing commercial operations and incentives—conspired to manipulate commodities markets over a 12-year period.  This is especially so in light of the fact that Plaintiffs now concede that none of the trader commentary upon which they relied in their Complaint "indicate[s] a probability of manipulation, especially manipulation by specific market participants."  (Opp'n at 46 n.40.)[1] Simply, Plaintiffs do not adequately allege all the elements of their CEA manipulation claims.

Plaintiffs' Opposition reveals that their antitrust claims are similarly flawed.  Despite Plaintiffs' conclusory assertions that Defendants' alleged wrongdoing deprived them of "fair" and "true" prices (Opp'n at 52), there is nothing in Plaintiffs' Complaint plausibly suggesting that competition was ever diminished, which is critical to the validity of all their antitrust claims. Nor do Plaintiffs allege facts establishing the requisite conscious commitment to a common scheme by Defendants, and Plaintiffs' conspiracy theory is not plausible given Defendants' divergent commercial interests and the fact that Defendants are both buyers and sellers of Brent Crude Oil.  These defects, among others, permeate Plaintiffs' antitrust claims.

Likewise, Plaintiffs' unjust enrichment and restitution claims fail because they do not allege *any* direct dealing or relationship with Defendants.

---

[1] Citations to "Opp'n" refer to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint, No. 13-md-2475 ALC, Dkt. No. 253.

Finally, Plaintiffs' Opposition makes clear that all claims for the majority of the putative Class Period must be dismissed—either because there are no factual allegations supporting those claims or because the claims are time barred.

## ARGUMENT

## I.   PLAINTIFFS CONCEDE THAT THE ALLEGATIONS UNDERLYING THEIR CLAIMS SOUND IN FRAUD.

When addressing Defendants' statute of limitations argument, Plaintiffs call the conduct they have alleged "fraud." (Opp'n at 46.) They also concede that their "false reporting" claim "may sound in fraud" because it is based on allegations that Defendants engaged in "spoof" and "sham" transactions and other "inherently illegitimate conduct, reported to Platts." (Opp'n at 20-21.) Plaintiffs argue, however, that their manipulation claim—which is based on the same alleged "inherently illegitimate conduct"—somehow does not sound in fraud. (*Id.*) In short, Plaintiffs characterize Defendants' conduct as fraudulent when it suits their purpose and reject the characterization when it does not. That is not how courts determine what pleading standards apply.[2]

---

[2] Plaintiffs now argue that their manipulation claim is based on allegations that Defendants engaged in the "particular trading strategy" of "us[ing] market power" to "bang the close" of the MOC window. (Opp'n at 20-21.) In doing so, Plaintiffs ignore the allegations in their Complaint concerning Defendants' actual trading activity and instead refer the Court to a single vague allegation calling "'banging the MOC' . . . an appropriate term." (Opp'n at 20 (citing Compl. ¶ 54).) This comparison is inapt. The CFTC has defined "banging the close" as the buying or selling of a "large number" of futures contracts during the closing period in order to benefit an even larger derivative position that is cash settled "based on the futures settlement price that day." (Nov. 26, 2014 Davidoff Decl. Ex. A (CFTC Glossary, http://www.cftc.gov/consumerprotection/educationcenter/cftcglossary/glossary_b (last visited on Nov. 25, 2014).) (Citations to "Nov. 26, 2014 Davidoff Decl. Ex. ___" are to exhibits to the November 26, 2014 Declaration of Amanda F. Davidoff, filed herewith.)

"Where claims of fraud are asserted, claims alleged to arise out of the same conduct are considered to sound in fraud and are subject to the same pleading requirements under Rule 9(b)." *UBS Asset Mgmt. (New York) Inc.* v. *Wood Gundy Corp.*, 914 F. Supp. 66, 71 (S.D.N.Y. 1996); *see In re Term Commodities Cotton Futures Litig.* (*Cotton*), No. 12-cv-5126, 2013 WL 9815198, at *10 (S.D.N.Y. Dec. 20, 2013) (analyzing "the allegations in the [complaint] to determine whether they sound in fraud").  Plaintiffs' CEA manipulation claim here is based on the same alleged "inherently illegitimate conduct" and alleged manipulative scheme that underlie the false reporting claim.  (*See* Compl. ¶¶ 251-419.)[3]  Thus, Plaintiffs' admission that Rule 9(b) applies to their false reporting claim, and that the underlying conduct was a "fraud," is a concession that their CEA manipulation claim likewise sounds in fraud.[4]

Recognizing that Rule 9(b) applies to their claims, Plaintiffs urge the Court to apply a "flexible"—*i.e.* "relaxed"—Rule 9(b) standard because "manipulation claims often involve facts solely within the Defendants' possession."[5]  (Opp'n at 21-22.)  But Plaintiffs' Complaint still "must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard."  *Wood ex rel. U.S.* v. *Applied Research Assocs., Inc.*, 328 F. App'x

---

[3] Citations to "Compl." refer to Plaintiffs' Amended Consolidated Class Action Complaint, No. 13-md-2475 ALC, Dkt. No. 164.

[4] Independently, Plaintiffs plainly ground their CEA manipulation claim in fraud by asserting that Defendants' alleged market power manipulation was "misleading."  (Opp'n at 21.)

[5] Plaintiffs rely primarily on *In re Natural Gas Commodity Litig.* (*Natural Gas*), 337 F. Supp. 2d 498, 509 (S.D.N.Y. 2004), which is a unique case in which the court found the defendants' motions to dismiss contained an "element of disingenuousness" because the defendants had "already paid multimillion dollar fines to the CFTC to settle investigations into the very same misbehavior underlying Plaintiffs' suit."  Moreover, unlike in *Natural Gas*, the facts here are not solely within Defendants' possession, as Plaintiffs base their Complaint on public information. (*See* Compl. ¶¶ 3, 13-17, 251-419.)

744, 747 n.1 (2d Cir. 2009) (internal quotation marks and citation omitted). Plaintiffs have failed to allege any facts supporting a strong inference of manipulation.

## II. THE OPPOSITION MAKES CLEAR THAT UNDER ANY STANDARD, THE COMPLAINT'S ALLEGATIONS DO NOT STATE A MANIPULATION CLAIM UNDER THE CEA.

Plaintiffs' failure to adequately allege any of the four elements of a CEA manipulation claim dooms their claim. *See In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.* (*Silver I*), No. 11-md-2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012), *aff'd*, 560 F. App'x 84 (2d Cir. 2014).[6]

### A. Plaintiffs Identify No Plausible Allegations Of Scienter.

Under Rule 9(b), the Complaint must allege facts supporting a "strong inference" of scienter for each Defendant.[7] *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth I*), 587 F. Supp. 2d 513, 535-36 (S.D.N.Y. 2008). Plaintiffs argue that they adequately pled scienter by showing that Defendants engaged in: (i) trades that were motivated by potential gains from price movements (Opp'n at 33-34), (ii) "uneconomic" transactions (Opp'n at 33-35), and (iii) "inherently illegitimate" conduct (Opp'n at 26, 35-36). These arguments confirm that Plaintiffs' scienter allegations are wholly conclusory.

---

[6] Plaintiffs do not dispute that if their primary claims fail, there is no claim for aiding and abetting or vicarious liability.

[7] Although under Rule 9(b) intent may be "averred generally," Fed. R. Civ. P. 9(b), this does not grant Plaintiffs "a license to base claims of fraud on speculation and conclusory allegations." *In re Crude Oil Commodity Litig.* (*In re Crude Oil*), No. 06-cv-6677, 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007) (internal quotation marks and citation omitted); *Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571, 588 (S.D.N.Y. 2007) ("Rule 9(b) requires that Plaintiffs put forth more than conclusory allegations to satisfy the scienter pleading requirement"). Plaintiffs are still required to allege facts showing "that defendants had both motive and opportunity" or "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Crude Oil*, 2007 WL 1946553, at *8 (internal quotation marks and citation omitted).

<u>Motive and Opportunity</u>.  Plaintiffs do not dispute the principle that the desire to "gain from trading positions" is a generalized motive that is insufficient to plead intent, even calling that rule a "legal commonplace."  (Opp'n at 33.)  Plaintiffs assert that they have done more by alleging "particularized motives . . . at specific points in time" (Opp'n at 33-34), but they cite only to generalized allegations that each Defendant would sometimes gain from higher prices and sometimes from lower prices.  For example, Plaintiffs assert that (i) a net exporter like Statoil "may generally prefer higher prices," but "on certain days" will "benefit from lower prices"; (ii) the motivation of middlemen and traders like Vitol, Mercuria, Phibro and Trafigura is "opportunistic" and "can change dramatically from day to day"; and (iii) refiners such as "Shell" and "BP" are motivated "based on their structural business" to cover "natural short positions."  (Opp'n at 14 (citing Compl. ¶¶ 537-38).)

Obvious observations that market participants could profit at certain times based on their general business interests amount to no more than alleging a profit motive, which courts have routinely held insufficient to allege scienter.  *See, e.g., In re Crude Oil*, 2007 WL 1946553, at *8 (allegations that defendants "had a large market presence" and "stood to gain" insufficient); *Silver I*, 2012 WL 6700236, at *5, 10-12 (allegations that defendant was a "large holder" of futures, had engaged in "unusual" conduct, and stood to profit, insufficient); *In re Ind. Farm Bureau Coop. Ass'n, Inc.*, CFTC No. 75-14, 1982 WL 30249, at *6 (CFTC Dec. 17, 1982) (alleging "profit motive" alone insufficient).  Plaintiffs' allegations of generalized motives are plainly inadequate to support a plausible inference of scienter as to each Defendant, let alone a strong one, particularly in light of the Complaint's theory that changing sets of buyers and sellers had temporarily aligning motives and carried out brief episodes of alleged manipulation over a

dozen years.  (*See* Opp'n at 55 (Complaint alleges "agreement between certain Defendants at certain times").)

Where, as here, "motive is not apparent . . . the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." *Amaranth I*, 587 F. Supp. 2d at 529.  But Plaintiffs' additional allegations here are wholly conclusory.

"Uneconomic" Transactions.  Plaintiffs label it "uneconomic" to trade during the MOC window, to offer to sell oil for delivery 10 to 13 days in the future, and to trade physical oil near the time when futures contracts were expiring.  (Opp'n at 34-35.)  Plaintiffs' apparent theory is that trades falling into these three categories are, in every instance, so obviously against the trader's interest that they demonstrate manipulative intent.  (*Id.*)  The Complaint not only contains no plausible basis for this theory, but actually alleges facts that undermine such a theory.  *First*, Plaintiffs themselves allege that Platts is the world's leading energy price reporting agency and that it selected the 4:00-4:30 p.m. window to focus its assessment due to high activity during that period (Compl. ¶¶ 84, 92-93); it necessarily follows that trading during the MOC window must occur with some regularity, and cannot be used to show that the trader intended manipulation.  In fact, documents incorporated by reference into the Complaint make clear that, contrary to Plaintiffs' allegations, the MOC window is one of the most liquid times of the day. (*See* Mem. at 7 n.8 (citing document incorporated by reference in Compl. ¶ 93, which states that the MOC window "is typically the time when the market is most active").)  *Second*, Plaintiffs allege that the Dated Brent price is based on cargoes of Brent, Forties, Oseberg or Ekofisk with

---

[8]     Citations to "Mem." refer to Defendants' Memorandum of Law in Support of Their Joint Motion to Dismiss the Amended Consolidated Class Action Complaint, No. 13-md-2475 ALC, Dkt. No. 211.

actual loading dates between 10 and 25 days in the future and serves as a benchmark for a majority of the world's crude oil.  (Compl. ¶¶ 6, 89.)  Trading in what Plaintiffs allege is a commodity "in high demand" (*id.* ¶ 4)—which includes trading for delivery 10 to 13 days in the future—simply cannot plausibly demonstrate an intent to manipulate prices.  Indeed, transactions for delivery in the 10- to 13-day forward period are economically rational for those seeking to sell or buy oil more quickly.  *Third*, trading physical oil on the day of futures expiry is as economically rational as it is on any other day, and at any other time, when market participants have a reason to buy or sell oil.  Where, as here, "a trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the CEA."  *Amaranth I*, 587 F. Supp. 2d at 534.

"Inherently Illegitimate" Conduct.  Plaintiffs argue that Defendants engaged in "inherently illegitimate," "spoof" or "wash" transactions,[9] which Plaintiffs assert obviate the need to plead any improper motive.  (Opp'n at 21, 35-36.)  Plaintiffs correctly define "spoof trades" as those trades in which parties "submit bids and offers and withdraw them without any intent to execute them."  (*Id.* at 35.)  But the Complaint does not identify a single transaction that meets that definition because Plaintiffs do not allege that any of the purported "spoof" offers were cancelled.  (*See* Compl. ¶¶ 337-38, 404.)  Plaintiffs incorrectly define a "wash trade" as one in which parties enter into "offsetting transactions" where "a defendant sells or buys a cargo of oil only to sell or buy it back again from the same party."  (Opp'n at 35; Compl. ¶ 73.)  If that were, in fact, the definition of an illegal "wash trade," commercial parties would have to avoid selling cargoes of oil to anyone from whom they purchased oil days, weeks or even months

---

[9]         Plaintiffs define "sham" and "wash" to mean the same thing.  (*See* Opp'n at 15 n.9.)

earlier.  However, it is well-settled that a "wash trade" involves "(1) the purchase and sale (2) of the same delivery month of the same [commodity] contract (3) at the same or similar price." *In re Piasio*, CFTC No. 97-9, 2000 WL 1466069, at *3 (CFTC Sept. 29, 2000) *aff'd sub nom. Piasio* v. *CFTC*, 54 F. App'x 702 (2d Cir. 2002).  Plaintiffs have not identified a single transaction that meets that definition or any cargo of oil that was bought and sold by the same Defendant for the same price.  (Compl. ¶¶ 259, 280-85, 340, 399.)  There is nothing "inherently illegitimate" about oil traders making offers at prices Plaintiffs consider too low or buying cargo and then selling it at a different price.

> **B.      Plaintiffs' Allegations of "Unusual" Price Patterns Are Insufficient To Allege Artificial Prices.**

"An artificial price is one that does not reflect the market or economic forces of supply and demand." *In re Cox*, CFTC No. 75-16, 1987 WL 106879, at *8 (CFTC July 15, 1987).  Plaintiffs argue that their "examples" of manipulation are sufficient to show the existence of artificial prices because:  (i) between January 2010 and March 2014, Dated Brent and Brent futures prices followed unusual patterns; and (ii) alleged differentials between the different Brent grades, EFPs and cracking margins indicate manipulation.  (Opp'n at 26, 29-30.)  These theories fail as a matter of law.

"Unusual" Prices.  "[T]he allegation of unusual market prices, without more, is insufficient to establish artificial prices, as a matter of law." *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091, at *6 (N.D. Ill. Feb. 9, 2012).  Plaintiffs attempt a way around this black-letter law by relying on *CFTC* v. *Parnon Energy, Inc.*, 875 F. Supp. 2d. 233, 247 (S.D.N.Y. 2012), for the proposition that highly irregular market movements can be sufficient to allege artificiality.  (Opp'n at 29-30.)  But the facts of *Parnon*, a Rule 8(a) case, underscore the deficiencies of the Complaint in this action.  In *Parnon*, plaintiffs alleged that on a single day,

defendants "dumped" millions of physical contracts—92 percent of the physical supply available—"at a considerable loss," causing the market to immediately "lurch[] from backwardation to contango."  875 F. Supp. 2d at 239-40.

In stark contrast, the allegations here—that over a 12-year period, "price movements during the MOC often reverse the price trends during the trading day up to that point," and later often move in the other direction (Opp'n at 29)—do not come close to alleging a plausible inference that price movements were so unusual that prices must have been artificial.  Nor do allegations of a handful of transactions by nine unaffiliated Defendants (transactions not alleged to affect a meaningful portion of physical supply, much less the 92 percent in *Parnon*) plausibly allege artificiality merely because those transactions allegedly moved Brent physical and futures prices in different directions at different times during *only four months* out of a putative 12-year Class Period.  Moreover, as noted above, the Opposition concedes that none of the "trader commentary quoted in the Complaint and taken from Platts reports"—one basis in the Complaint for Plaintiff's assertion that prices became artificial as a result of particular trades (*See* Compl. ¶¶ 251-419)—"indicate[s] a probability of manipulation, especially manipulation by specific market participants."  (Opp'n at 46 n.40.)

With respect to the futures market, Plaintiffs merely argue that futures prices were artificial because physical prices were artificial.  (*Id.* at 29.)  Plaintiffs cite *Parnon* for the proposition that "determining artificiality involves an analysis of the suspected price in context of the aggregate supply and demand factors" (*id.*), but the Complaint fails to identify a single "suspected" futures price or any "supply and demand factors" for the Court to analyze.  Thus, even if the Complaint adequately connected the two markets (it does not (*see* Mem. at 14-17)), as shown above, there are not adequate allegations of artificiality in the physical market.

Price Differentials and Refining Margins.  Plaintiffs claim that their allegations of unusual market patterns in futures prices are buttressed by three other supposedly unusual patterns:  (i) price differentials between the four Brent grades during June 2010; (ii) a large difference between futures and physical prices on January 14, 2011, a single day during the 12-year class period; and (iii) a decrease in refining margins in January 2011 that was allegedly "unnatural" because it occurred while crude prices were rising.  (Opp'n at 30 (citing Compl. ¶¶ 251-77, 300, 303); *see also* Compl. ¶¶ 299, 305.)  These are more of the same conclusory allegations of unusual price.  But differentials in price between the Brent grades are to be expected in light of Plaintiffs' acknowledgement that the grades come from different fields and have different qualities.  (Compl. ¶ 96.)  As to an allegedly "remarkable" price difference between futures and physical oil on a single day and allegedly "unnatural" January 2011 refining margins (*see id.* ¶¶ 299, 305), Plaintiffs provide no basis, beyond their conclusory assertions, for the proposition that such patterns are "remarkable" or "unnatural" when they occur on a single day or over a short period.[10]  Moreover, "unusual" prices are insufficient to allege that physical Brent Crude oil prices were artificial, let alone that Brent Crude oil futures were artificial.  *See In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *6.

Plaintiffs cannot adequately allege artificial prices merely by identifying market patterns over long periods, or differentials from arbitrary benchmarks, then asserting in conclusory terms that those patterns and differentials mean that prices are artificial.  Plaintiffs cite no case for that

---

[10]    In fact, it would not necessarily be surprising to see refining margins decrease as Brent Crude Oil prices increase.  As the Complaint alleges, when Brent Crude Oil prices rise "relative to the prices of [its] refined product outputs," the refining margin will decline.  (Compl. ¶ 304.)  Thus, if the price of the refined oil outputs (*e.g.* gasoline, diesel, jet fuel, *see id.* ¶ 76) stays constant or decreases (say, for example, because of a decline in demand due to an unusually warm winter), then refining margins will decrease as Brent Crude Oil prices increase.

proposition, and indeed *Silver I* rejected a similar attempt to plead artificiality by alleging that prices deviated from arbitrary benchmarks.  *See* 2012 WL 6700236, at *13.

       1.       **Plaintiffs Do Not Adequately Allege That Defendants Caused Artificial Prices.**

"The causation element requires that a defendant be the proximate cause of the price artificiality."  *Silver I*, 2012 WL 6700236, at *16.  Plaintiffs identify no allegations that Defendants caused the "double reversals" in futures prices that their "statistical studies" purportedly show (nor do they so much as identify a single trade by any Defendant for 47 of the 51 months that these statistical studies allegedly cover).  (Opp'n at 31.)  Nor does the Opposition identify any adequate allegations of artificial price during the four-month period for which Plaintiffs have identified trades by Defendants, *supra* pp. 8-10.[11]

Even if some artificial physical prices had been adequately alleged (they have not), Plaintiffs merely allege correlation between the physical and futures markets, which as a matter of law says nothing about whether causation exists or in what direction, if any, effects flow.  *See, e.g.*, *Huss* v. *Gayden*, 571 F.3d 442, 459 (5th Cir. 2009); *Sheehan* v. *Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).  Indeed, the CFTC has indicated that it is the futures market that serves a "price discovery" tool for the cash markets and not the other way around.[12]  (*See*

---

[11]     At a fundamental level, Plaintiffs cannot allege the required causation.  Any causal linkage would, necessarily, require a demonstration that Platts' reported pricing would have been different *but for* the allegedly artificial prices complained of.  *See Parnon*, 875 F. Supp. 2d at 248 (finding causation where "*but for* Defendants' withholding of its physical position, the market would have taken account of the derivative supply, and the spread price would not have been artificially elevated" (emphasis added)).  But Plaintiffs never allege that the Dated Brent Assessment would have been different but for Defendants' alleged activity.  Nor could they.  Any such averment would be inherently speculative.

[12]     The Opposition identifies no plausible allegations that Defendants' physical trades affected the futures market.  For example, Plaintiffs do not dispute that factors other than

Nov. 26, 2014 Davidoff Decl. Ex. C (ITF Interim Report on Crude Oil (July 2008),

http://www.cftc.gov/ucm/groups/public/@newsroom/documents/file/itfinterimreportoncrudeoil0

708.pdf (last visited on Nov. 24, 2014) at 17 ("prices are often said to be 'discovered' in futures

markets and then communicated to participants in certain cash markets").)

<strong>2.      Plaintiffs Do Not Adequately Allege That Defendants Possessed The Ability To Influence Brent Futures Prices.</strong>

Plaintiffs assert that Defendants possessed the ability to influence Brent futures prices

because (i) Platts examines deals, bids and offers made by Defendants to determine its Dated

Brent Assessment; (ii) Defendants are large futures traders; and (iii) the alleged price reversals

demonstrate Defendants' ability to influence prices.  (Opp'n at 23-26.)  This theory fails.

Plaintiffs do not plausibly allege Defendants' ability to impact Platts' Dated Brent Assessment,

much less futures prices.  (Mem. at 20-21.)  Plaintiffs do not allege any futures trades by

Defendants, much less any that affected futures prices, and Plaintiffs do not connect any of the

so-called "double reversals" to any particular Defendant.  *See ATSI Commc'ns, Inc.* v. *Shaar*

*Fund, Ltd.*, 493 F. 3d 87, 102 (2d Cir. 2007) ("General allegations not tied to the defendants or

resting upon speculation are insufficient.").

---

Defendants' trades, including Platts' editorial discretion, affected futures prices; they claim that
traders did not have access to Platts' prices; and they do not identify any futures trades by
Defendants that influenced futures directly.  (*See* Opp'n at 5, 27.)  Plaintiffs also assert that
Platts' Dated Brent Assessment is one of the media reports from which the ICE Brent Index,
against which Brent futures settle, is derived (*id.* at 28 (citing Compl. ¶¶ 179-80)), but documents
incorporated by reference into the Complaint contradict that assertion (Nov. 26, 2014 Davidoff
Decl. Ex. B (Platts, Crude Oil Methodology and Specifications Guide,
http://www.platts.com/IM.Platts.Content/MethodologyReferences/MethodologySpecs/Crude-oil-
methodology.pdf (last visited on Nov. 24, 2014)) at 12 ("The industry media publish *25-day
BFOE price assessments* throughout the trading day." (emphasis added))).

### C.   The Opposition Makes Clear That Plaintiffs Did Not Adequately Allege False Reporting.

Plaintiffs do not dispute that reports of actual transactions that are not alleged to be "wash" or "spoof" trades are not actionable false reports.  (*See* Mem. at 25-26.)  Instead, Plaintiffs argue that their theory of false reporting is that the reported trades described in the Complaint as "spoof" or "wash" trades were "inherently misleading."  (Opp'n at 33.)  But trades, bids and offers that actually occurred in the marketplace and were provided to a price reporting agency for dissemination cannot support a false reporting claim regardless of whether manipulation or other wrongdoing resulted.  *See United States* v. *Radley*, 659 F. Supp. 2d 803, 810, 815 (S.D. Tex. 2009) (defendants' reporting of actual trading activity was not misleading or false reporting), *aff'd* 632 F.3d 177 (5th Cir. 2011).  Plaintiffs cite no authority to the contrary.

In response to Defendants' showing that Plaintiffs did not identify even a single instance of false reporting by any Defendant, Plaintiffs assert that it is "unnecessary to specify who made the reports" because Platts requires that transaction information come from market participants.  (Opp'n at 32.)  However, under Rule 9(b), which Plaintiffs concede applies to this claim, Plaintiffs must plead which Defendant made each alleged false statement, what it was, and when it occurred.  *In re Crude Oil*, 2007 WL 1946553, at *6.  They cannot evade that requirement by asking the Court to assume that someone—one of two trading partners, who may not both be defendants in this action—made a false report.

Finally, Plaintiffs do not respond to Defendants' argument that the cause of action for false reporting under CEA Section 6(c)(1) is not retroactive, arguing only that "Section 6(c)(1) only makes explicit what was already the law before its adoption in 2011," referring to Section 9(a)(2).  (Opp'n at 32.)  But Plaintiffs did not plead a false reporting cause of action under Section 9(a)(2) (*see* Compl. ¶¶ 540, 549-550), and the standards applicable to the two claims

differ with respect to their scienter requirements.  *Compare* 7 U.S.C. § 13(a)(2) (Section 9(a)(2),

knowing) *with* 7 U.S.C. § 9(1)(A) (Section 6(c)(1), knowing or reckless disregard).

**D.    Plaintiffs Do Not Identify Allegations From The Complaint Sufficient To Plead Actual Damages.**

To adequately allege actual damages, Plaintiffs must plead facts showing that they

"engaged in a transaction at a time during which prices were [allegedly] artificial as a result of

defendants' alleged trader-based manipulative conduct, and that the artificiality was adverse to

their position."[13]  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR II*), 962 F. Supp.

2d. 606, 622 (S.D.N.Y. 2013).  Apparently recognizing their failure to adequately plead these

facts, Plaintiffs attempt to introduce new allegations concerning their damages by identifying

whether seven Plaintiffs were "net buyers" or "net sellers" on various days in a declaration

attached to their Opposition.  (*See* Kovel Decl. ¶ 5, Dkt. No. 257.)  But "[a] complaint cannot be

amended . . . by raising new facts and theories in plaintiffs' opposition papers[;] . . . such new

allegations and claims should not be considered in resolving the motion."  *Southwick Clothing*

*LLC* v. *GFT (USA) Corp.*, No. 99-cv-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004).

Even if permitted, Plaintiffs inadequately describe what it means to be a "net buyer" or

"net seller."  If this is intended to mean that on a specific day a Plaintiff bought more than he

sold, or sold more than he bought, the Kovel Declaration still says nothing about whether those

transactions occurred at adverse, artificial prices or whether pre-existing positions were harmed

---

[13]     Plaintiffs attempt to distract from their pleading's shortcomings by quibbling over the terms "loss causation" and "net loss."  (*See* Opp'n at 37.)  But, the basic concepts of loss and causation are straightforward and always have been part of the required showing for actual damages under CEA Section 22.  *See, e.g.*, *LIBOR II*, 962 F. Supp. 2d at 621 n.18; *Amaranth I*, 587 F. Supp. 2d at 530 n.104; *In re Energy Transfer Partners Natural Gas Litig.*, No. 4:07-cv-3349, 2009 WL 2633781, at *10 (S.D. Tex. Aug. 26, 2009).

or benefited by the alleged price artificiality, and is "devoid of any references to [the] particular" Brent futures contracts those Plaintiffs bought or sold.[14]  *LIBOR II*, 962 F. Supp. 2d at 621 (plaintiffs failed to allege their "positions were such that they were injured").[15]

Moreover, Plaintiffs' Opposition argues that the effect of the Defendants' trading activity was persistent because on some days, "prices [did not] fully reverse[] back to some norm." (Opp'n at 18.)  Thus, Plaintiffs' own characterization of their claims requires this Court to apply the stricter pleading standard for damages in "persistent suppression" cases described in "*LIBOR I*" (*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d. 666, 718 (S.D.N.Y. 2013) (explaining that where plaintiffs allege that prices were "at an artificial level for the duration of the Class Period," one cannot assume that the effects of any manipulation dissipate)). In such cases, plaintiffs must plead when they established and liquidated their futures positions, when the prices of those positions were artificial, and whether that artificiality represented inflated or deflated prices when they established their long or short position.  *See id.* at 717-19. In any event, Plaintiffs cannot even meet the less strict pleading standard under *Libor II*,

---

[14]     Monthly Brent futures contracts *spanning over five years* are actively traded on ICE at any one time.  For example, the current ICE Brent futures contract series includes the "consecutive months up to and including March 2020."  (July 28, 2014 Libow Decl. Ex. H at 3, Dkt. No. 212-8.)  Plaintiffs also make repeated references to other ICE futures contracts which, unlike the NYMEX or ICE Brent futures contracts at issue here, price directly to the Platts Dated Brent Assessment.  (Kovel Decl. ¶ 6; Opp'n at 8, 11-12.)  Those contracts have no relevance here as no Plaintiff has alleged that they traded or held any positions in such contracts.

[15]     Plaintiffs' oversimplified assertion of harm ignores the fundamental principle that price artificiality affects long and short positions equally:  if the price of a long position is 10% higher when established due to alleged manipulative conduct, then the price of the offsetting short position also could be 10% higher.  It follows that a long position established prior to the artificial price increase could be offset with a short position executed at a higher artificial price.

requiring Plaintiffs to allege that they traded at a time when prices were artificial and that the artificiality harmed them.  962 F. Supp. 2d at 622.

> ### E.     The Opposition Fails To Identify Any Allegations Of Price Manipulation Between 2002 And May 31, 2010.

Plaintiffs respond to Defendants' showing that the Complaint does not make a single factual allegation of price manipulation between 2002 and May 31, 2010 by claiming that they pled just "examples" of manipulation, buttressed by "'the statistical analysis.'"  (Opp'n at 30 (quoting Compl. ¶ 250).)   But there is no exception to the requirement that a complaint must present a claim that is "plausible on its face" and contain "more than labels and conclusions," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 570 (2007), where it pleads by "examples." Here, Plaintiffs' "examples," even if they suggest anything about the period after May 31, 2010 (they do not), do not plausibly plead any facts supporting claims before that date.

Plaintiffs also point to a *Financial Times* article's assertion that on the same day the European Commission raided Statoil's offices, "Statoil" said that the "'suspected violations' were related to the way prices for crude oil, refined oil products and biofuels are assessed by Platts in a process known as 'market-on-close,' and 'may have been going on since 2002.'" (Opp'n at 30 (quoting Compl. ¶ 17); *see also* Nov. 26, 2014 Davidoff Decl. Ex. D (A. Makan & J. Blas, *European Commission Raids Oil Groups Over Price Benchmarks*, Ft.com (May 14, 2013)).)  Plaintiffs' assertion is disingenuous.  This unattributed statement clearly refers to the fact, alleged in Plaintiffs' Complaint, that the market-on-close methodology has been "employed by Platts since 2002."  (Compl. ¶ 66.)

## III.     THE OPPOSITION MAKES CLEAR THAT PLAINTIFFS DO NOT STATE AN ANTITRUST CLAIM.

Plaintiffs' Opposition also fails to address the critical flaws in their Sherman Act claims.

**A.      Plaintiffs Do Not Dispute That They Have Not Alleged Any Reduction In Competition And Thus Cannot Establish Antitrust Injury.**

Plaintiffs do not dispute that the alleged reporting of misleading trading information to Platts did not reduce competition.  (Mem. at 32-33.)  Thus, Plaintiffs do not allege antitrust injury.  *LIBOR I*, 935 F. Supp. 2d at 688-89 (finding that plaintiffs failed to allege an antitrust injury where "the process of setting LIBOR was never intended to be competitive"); *see also Laydon* v. *Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *12 (S.D.N.Y. Mar. 28, 2014) (dismissing Section 1 claim where plaintiff alleged "prices may have been different" without alleging reduction in competition).  Plaintiffs attempt to distinguish *LIBOR I* on the basis that the Platts MOC process captures actual transaction information, not estimates (Opp'n at 52-53), but that is a distinction without a difference.  As in *LIBOR I*, Defendants here do not compete with one another in reporting prices, bids or offers to Platts, and therefore the alleged conduct Plaintiffs challenge could not have reduced competition.[16]  (Mem. at 31-33.)  Nor, contrary to their assertion (Opp'n at 52), have Plaintiffs remotely alleged "price-fixing" in this case.  Price-fixing in the antitrust sense means competitors agreeing to eliminate price competition (horizontal price fixing), or companies at different levels of distribution agreeing on resale prices (vertical price fixing); neither sort of agreement is alleged here.  *See, e.g.*, *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 886-87 (2007).  Because no competition-reducing conduct has been alleged, Plaintiffs cannot establish antitrust injury.  *See*

---

[16]      Plaintiffs likewise have failed to plead antitrust injury with respect to any alleged collusion in the sale of physical Brent itself.  Plaintiffs do not allege that they compete with Defendants in the sale of physical crude, that they are consumers of physical Brent Crude Oil or that Defendants reduced supply or caused the quality of physical Brent Crude to diminish.

*Paycom Billing Serv., Inc.* v. *Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006); Mem. at

30-31 (citing Supreme Court and appellate cases).

      **B.**     **Plaintiffs' Opposition Identifies No Plausible Allegations Of Any Agreement Amongst Defendants.**

      Plaintiffs assert a single Section 1 claim, based on a single 12-year purported "continuing

agreement" among *all* nine groups of unaffiliated Defendants (with differing commercial

operations and incentives) to sometimes manipulate upward and sometimes manipulate

downward the prices of Brent Crude Oil and related derivatives.  (Compl. ¶¶ 569-72 ("the

conspiracy consisted of a continuing agreement, understanding, or concerted action between and

among Defendants and their co-conspirators . . .").)  In their Opposition, Plaintiffs admit they

have not plead any facts to show "a single unitary conspiracy" among any (much less all)

Defendants, and simply assert they do not need to do so "at this stage" of the litigation.  (Opp'n

at 54.)  Plaintiffs are incorrect.[17]  In the absence of facts plausibly demonstrating that all

Defendants shared "a conscious commitment to a common scheme designed to achieve an

unlawful objective," there can be no Section 1 claim.  *See Anderson News, L.L.C.* v. *Am. Media,

Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (internal quotation marks and citation omitted).[18]

---

[17]     To support this argument, Plaintiffs cite inapposite criminal cases that do not involve any alleged antitrust violation.  (Opp'n at 54 (citing *United States* v. *Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996) and *United States* v. *Eppolito*, 543 F.3d 25 (3d Cir. 2008)).)

[18]     Plaintiffs attempt to avoid this burden by arguing that (i) pursuant to *Starr* v. *Sony BMG Music Entertainment,* 592 F.3d 314 (2d Cir. 2010), they need not allege "detailed facts" linking each Defendant to the supposed conspiracy, and (ii) they may plead circumstantial, rather than direct, evidence of a conspiracy.  (Opp'n at 54-55.)  *First*, Plaintiffs' reliance on *Starr* is misplaced, because there—unlike here—plaintiffs alleged parallel conduct among defendants "in a context that raise[d] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Starr*, 592 F.3d at 323-24 (citing *Twombly*, 550 U.S. at 557).  *Second*, the Complaint here alleges *neither* direct nor circumstantial evidence; instead, it contains allegations about a handful of arm's-length trades among some of the Defendants, with

Although Plaintiffs argue that certain of Defendants' transactions were "inexplicable to traders" and that "each of the Defendants had a rational motive to behave collectively" (Opp'n at 55-56), assertions such as these cannot substitute for well pleaded factual allegations.  (*See* Mem. at 33-35.)

### C.  The Complaint Fails To Adequately Allege A Monopolization Claim.

Alleging a proper relevant product market, which must reference interchangeability and cross-elasticity of demand, is an indispensable element of a Section 2 monopolization claim. (*See* Mem. at 36.)  Plaintiffs contend that physical Brent Crude Oil and cash-settled derivatives may be lumped together in a single product market because their prices "converge" under "certain circumstances."  (Opp'n at 59.)  But there are no facts alleged in the Complaint plausibly suggesting that, in the eyes of Brent Crude Oil consumers, physical Brent Crude Oil and cash-settled derivatives are "equivalent to one another for the use to which [they are] put." *Chapman* v. *N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (internal quotation marks and citation omitted).

Plaintiffs try to avoid this defect, as well as their failure to allege any particular Defendant's market share, by asserting that they have pleaded "direct evidence" of monopoly power based on the supposed ability of multiple Defendants as sellers to "control prices" in the context of individual transactions.[19]  (Opp'n at 63.)  Plaintiffs are wrong.  If a company could be

---

no allegations linking any particular Defendant to the supposed conspiracy.  (*See* Mem. at 33-34.)

[19]    Plaintiffs are wrong that pursuing a "direct evidence" theory excuses them from alleging a properly defined product market.  *See Heerwagen* v. *Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) (a "plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices").

deemed a monopolist simply because other market participants or price reporting agencies like Platts react to the price at which it buys or sells goods on a particular day—without any showing that, on a market-wide basis, it has "the ability to raise price by restricting output"—the reach of Sherman Act Section 2 would be virtually unlimited.  *Pepsico, Inc.* v. *The Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2003).  In addition, this argument cannot be squared with Plaintiffs' main theory that Defendants as buyers and sellers in bilateral transactions conspired to manipulate the price of Dated Brent.  If any one Defendant was a monopolist with pricing power, there would be no reason for that Defendant to conspire with any other Defendant to manipulate the price of Dated Brent.

Moreover, because Plaintiffs' Complaint identifies no harm to competition, it cannot establish the exclusionary conduct element of their monopolization claim.  (*See* Mem. at 31, 32, 38.)  Plaintiffs are simply incorrect that conduct, such as "spoofing and sham trades" (Opp'n at 64), can be exclusionary without at least one rival being foreclosed from competing—that is what "exclusionary" conduct is.  *See Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("attempting to exclude rivals on some basis other than efficiency" is exclusionary conduct for purposes of Section 2 provided it also "impair[s] competition in an unnecessarily restrictive way").  Notably, Plaintiffs do not identify a single case in which "spoofing and sham trades" were deemed exclusionary conduct.[20]  In short, the conduct alleged will not be "exclusionary" within the meaning of Section 2 absent allegations of competition-reducing conduct by a single firm with market power in a proper relevant market.

---

[20]    Plaintiffs take *United States* v. *Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) and *WeyerHaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co. Inc.*, 549 U.S. 312 (2007) out of context.  The cited material merely states that a competitor cannot state an antitrust claim based solely on injury to itself without showing harm to competition generally.

**D.** **Plaintiffs Effectively Admit That They Have Not Alleged Specific Intent In Support Of Their Conspiracy To Monopolize Claim.**

Finally, despite admitting that a Section 2 conspiracy to monopolize claim requires the additional element of "specific intent to achieve an unlawful monopoly," Plaintiffs contend—citing 27-year-old authority—that Section 2 conspiracy to monopolize claims are in essence the same as claims under Section 1 of the Sherman Act. (Opp'n at 66.) As more recent authority makes clear, Plaintiffs are wrong. In addition to alleging intentional concerted action, which Plaintiffs cannot do, they must also allege a specific purpose that "one firm" obtain a monopoly. *Santana Prods.* v. *Sylvester & Assocs.*, 121 F. Supp. 2d 729, 741 (E.D.N.Y. 2000). Because Plaintiffs have not pleaded that Defendants specifically intended that one of them achieve monopoly power, and any attempt to do so would be plainly implausible, their Section 2 conspiracy claim should be dismissed. (*See* Mem. at 38-39.)

**IV.** **PLAINTIFFS DO NOT REBUT THAT THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT OR RESTITUTION.**

Plaintiffs' claim for unjust enrichment fails because they allege *no* relationship with Defendants, instead merely alleging that Defendants conspired to influence Brent prices, thereby harming Plaintiffs. (Opp'n at 49.) According to Plaintiffs, they are not required to allege "direct dealings" with Defendants.[21] (Opp'n at 50.) That is wrong. Unjust enrichment requires "some type of direct dealing, or an actual, substantive relationship" between the parties. *In re Motel 6*

---

[21] Plaintiffs misrepresent *Amaranth I* as holding that "allegations of a relationship between members of a class and defendant's 'entity or trader' arising from NYMEX trades may establish the requisite relationship." (Opp'n at 50.) In *Amaranth I*, the court *dismissed* the plaintiffs' unjust enrichment claim for failure to allege any direct relationship where plaintiffs' theory was that defendants manipulated the natural gas futures market, in which plaintiffs traded. 587 F. Supp. 2d. at 547; *see also Cotton*, 2013 WL 9815198, at *28 (no unjust enrichment where there was "only a strained connection" between futures traders an defendants).

*Sec. Litig.*, Nos. 93-cv-2183, 93-cv-2866, 1997 WL 154011, at *7 (S.D.N.Y. Apr. 2, 1997).  In

other words, Plaintiffs must demonstrate a sufficiently close relationship with Defendants.

*Georgia Malone & Co.* v. *Rieder*, 19 N.Y. 3d 511, 516 (2012); *Sperry* v. *Crompton Corp.*, 8

N.Y. 3d 204, 209-212 (2007).  Where, as here, the parties "simply had no dealings," there can be

no unjust enrichment claim.  *LIBOR I*, 935 F. Supp. at 737 (quoting *Georgia Malone,* 19 N.Y. 3d

at 517-518).

## V.  PLAINTIFFS' CLAIMS CONCERNING MOST OF THE CLASS PERIOD ARE ENTIRELY UNSUPPORTED BY FACTUAL ALLEGATIONS OR ARE TIME BARRED.

Though Plaintiffs do not dispute that their claims based on trades prior to May 2011 are

beyond the CEA's two-year time limitation, they argue that they were not on "inquiry notice" of

Defendants' "illegal conduct" until after May 14, 2013, when the European Commission raided a

number of market participants.  (Opp'n at 42-43.)  Despite their own admissions that the alleged

manipulative nature of Defendants' trades was "obvious," "evident" and "can be seen" from the

contemporaneous Platts reports quoted in the Complaint (*see* Compl. ¶¶ 259, 301, 311, 320, 415)

and contemporaneous futures prices (*id.* ¶¶ 235-37, 261, 276, 282, 316, 343, 406), Plaintiffs

argue that the "Platts reports do not constitute readily accessible public information sufficient to

place a person on inquiry notice" (Opp'n at 44).

Yet, absent is any assertion that Plaintiffs *themselves* did not subscribe to or have

contemporaneous access to the Platts reports cited in their Complaint.[22]  In fact, Plaintiffs admit

they "absolutely relied upon the *results* of the MOC process" that were published by Platts.

(Opp'n at 46; Compl. ¶ 503 (emphasis in original).)  This is a clear admission that Plaintiffs *did*

---

[22]     Plaintiffs allege at the most that "futures and derivative traders, including Plaintiffs, *generally* do not have access to these costly market reports." (Opp'n at 5 (emphasis added).)

*have access* to the quoted Platts reports when they were published.  Because the limitations

period for a CEA claim begins to run "once the plaintiff did discover or a reasonably diligent

plaintiff 'would have discover[ed] the facts constituting the violation'—whichever comes first,"

*Merck & Co.* v. *Reynolds*, 559 U.S. 633, 653 (2010) (alteration in original), Plaintiffs' claims

based on transactions prior to May 2011 are barred.

Even if no Plaintiff subscribed to Platts, Plaintiffs were on "inquiry notice" of the

information the Platts reports contained.  *See Koch* v. *Christie's Int'l PLC*, 699 F.3d 141, 148-49

(2d Cir. 2012) ("Inquiry notice . . . gives rise to a duty of inquiry when the circumstances would

suggest to an investor of ordinary intelligence the probability that she has been defrauded."

(internal quotation marks and citation omitted)).  The Complaint describes Platts as the "premier

source of benchmark price assessments for the underlying physical price for Brent Crude Oil"

which "serve as the basis for pricing physical Brent Crude Oil cargoes as well as Brent Crude Oil

futures and other derivatives contracts."  (Compl. ¶ 5.)  Because the facts underlying Plaintiffs'

claims admittedly were widely reported in the "premier" industry publication, the limitations

period began to run on the dates Platts published such reports.  *LIBOR I*, 935 F. Supp. 2d at 697-

98 (plaintiffs "deemed to be have knowledge of their injury at the point at which the duty to

inquire arose").[23]

Moreover, Plaintiffs admit that they were aware of the physical prices reported by Platts,

the basis for their claims.  Plaintiffs allege that physical transactions "plausibly impacted Brent

futures in real-time as they were visible to market participants that subscribed to Platts."  (Opp'n

---

[23]        Plaintiffs' reliance on *Koch* is misplaced.  There, the Second Circuit held that the plaintiff
was on inquiry notice "[a]t least by October 16, 2000" because, *by then*, he was aware of facts
showing that defendants were engaged in fraud.  699 F.3d at 153 (emphasis added).  The Court
had no need to determine whether the plaintiff was on inquiry notice *prior to* October 2000.

at 29.)  The Complaint thus alleges that reasonable investors in Brent-related futures and derivative contracts, including Plaintiffs, were at a minimum on inquiry notice of the "benchmark" Brent price assessments and market reports published by Platts.  *See LC Capital Partners, LP*, 318 F.3d at 155 (affirming dismissal of claim as untimely where an article from a subscription-based industry publication contributed to plaintiff's duty to inquire).  There can be no dispute that the Platts prices are the specific facts at the "heart of" Plaintiffs' claims—and those prices were sufficient to have put them on inquiry notice.  *See Shah* v. *Meeker*, 435 F.3d 244, 251 (2d Cir. 2006) (dismissing action as time barred where single news article described with sufficient detail the allegations "at the heart of" plaintiff's complaint).[24]

Plaintiffs' attempt to toll the statute of limitations under the doctrine of fraudulent concealment fails for the same reasons.  Because Plaintiffs admit that detailed facts relating to the very transactions that form the basis of their claims were published by Platts in the "premier source of benchmark price assessments" relied on by traders of Brent-related contracts, Defendants could not have "concealed the existence of the CEA violation."  *Natural Gas*, 337 F. Supp. at 513.  Nor could Defendants' alleged misconduct be considered "self-concealing" because the gravamen of Plaintiffs' entire claim is that Defendants reported "false, inaccurate or misleading trades . . . during the MOC process," which Plaintiffs characterize as "highly public." (Compl. ¶ 7; Opp'n at 47).

## CONCLUSION

The Complaint should be dismissed with prejudice in its entirety.

---

[24]    Plaintiffs' theory of manipulation relies heavily (and for some time periods completely) on allegedly anomalous futures prices, further demonstrating that they were on inquiry notice. *See Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*, No. 05-cv-1898, 2005 WL 2148919, at *8 (S.D.N.Y. Sept. 6, 2005).

Dated: November 26, 2014

Respectfully Submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By: /s/ Steven A. Reed
    Steven A. Reed
    R. Brendan Fee

    1701 Market Street
    Philadelphia, PA 19103-2921
    Telephone: (215) 963-5603
    Facsimile:  (215) 963-5001
    sreed@morganlewis.com
    bfee@morganlewis.com

    *Attorney for Royal Dutch Shell plc and*
    *Shell Trading US Company*

**SULLIVAN & CROMWELL LLP**

By: /s/ Daryl A. Libow
    Daryl A. Libow
    Amanda F. Davidoff
    Brooke Mickelson

    1700 New York Avenue, N.W., Suite 700
    Washington, D.C.  20006
    Telephone: (202) 956-7500
    Facsimile:  (202) 956-6973
    libowd@sullcrom.com
    davidoffa@sullcrom.com

    *Attorneys for BP p.l.c., BP America Inc.*
    *and BP Corporation North America Inc.*

**VINSON & ELKINS LLP**

By: /s/ Karl S. Stern
    Karl S. Stern

    1001 Fannin Street
    Suite 2500
    Houston, TX  77002-6760
    Telephone:  (713) 758-3828
    Facsimile:  (713) 615-5603
    kstern@velaw.com

    *Attorney for Phibro Trading LLC*

**CADWALADER, WICKERSHAM & TAFT**

By: /s/ Gregory A. Markel
    Gregory A. Markel

    One World Financial Center
    New York, New York 10281
    Telephone:  (212) 504-6112
    Facsimile:  (212) 504-6666
    gregmarkel@cwt.com

    *Attorney for Morgan Stanley*

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

By:   /s/  William A. Burck
    William A. Burck

777 6th Street, N.W., 11th Floor
Washington, D.C.  20001
Telephone:  (202) 538-8000
Facsimile:  (202) 538-8100

51 Madison Avenue, 22nd Floor
New York, NY  10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
williamburck@quinnemanuel.com

*Attorney for Trafigura AG and Trafigura
Beheer B.V.*

**STROOCK & STROOCK & LAVAN**

By:   /s/  Melvin A. Brosterman
    Melvin A. Brosterman

180 Maiden Lane
New York, New York 10038
Telephone:  (212) 806-5400
Facsimile:  (212) 806-2632
mbrosterman@stroock.com

*Attorney for Hess Energy Trading
Company, LLC*

**ALLEN & OVERY LLP**

By:   /s/  John F. Terzaken
    John F. Terzaken
    Molly A. Kelley

1101 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 683-3884
Facsimile:  (202) 683-3999
john.terzaken@allenovery.com

M. Elaine Johnston

1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 610-6388
Facsimile:  (212) 610-6399
elaine.johnston@allenovery.com

*Attorneys for Mercuria Energy Trading,
Inc. and Mercuria Energy Trading S.A.*

**SKADDEN ARPS SLATE MEAGHER &
FLOM**

By:   /s/  Shepard Goldfein
    Shepard Goldfein
    Mark D. Young (pro hac vice
    forthcoming)
    Karen Hoffman Lent
    Peter S. Julian

4 Times Square
New York, New York 10036
Telephone:  (212) 735-3276
Facsimile:  (917) 777-3276
shepard.goldfein@skadden.com
karen.lent@skadden.com

*Attorneys for Vitol, Inc. and Vitol, S.A.*

**WILMER CUTLER PICKERING
HALE AND DORR LLP**

By: /s/  Douglas F. Curtis
     Douglas F. Curtis
     Robert W. Trenchard

     7 World Trade Center
     250 Greenwich Street
     New York, NY  10007
     Telephone:  (212) 230-8802
     Facsimile:  (212) 230-8800
     douglas.curtis@wilmerhale.com
     robert.trenchard@wilmerhale.com

     Leon B. Greenfield
     Perry A. Lange

     1875 Pennsylvania Avenue, NW
     Washington, DC  20006
     Telephone: (202) 663-6972
     Facsimile:  (202) 663-6363
     leon.greenfield@wilmerhale.com

     *Attorneys for Statoil ASA and Statoil US
     Holdings Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 26, 2014, I filed the foregoing Defendants' Reply Memorandum of Law in Support of Their Joint Motion to Dismiss the Amended Consolidated Class Action Complaint via the Court's CM/ECF system, which shall transmit notice to all counsel of record.

/s/  Daryl A. Libow
Daryl A. Libow