# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: NORTH SEA BRENT CRUDE OIL FUTURES LITIGATION | 1:13-md-02475-ALC |
| This document applies to: | |
| Case Nos. 13-cv-03473-ALC, 13-cv-03587-ALC, 13-cv-03944-ALC, 13-cv-04142-ALC, 13-cv-04553-ALC, 13-cv-04872-ALC, 13-cv-04938-ALC, 13-cv-05577-ALC, 13-cv-07089-ALC, 13-cv-08030-ALC, 13-cv-08151-ALC, 13-cv-08179-ALC, 13-cv-08240-ALC and 13-cv-08270-ALC. | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

KEVIN McDONNELL, ANTHONY INSINGA, ROBERT MICHIELS, NEIL TAYLOR, XAVIER LAURENS, ATLANTIC TRADING USA, LLC, PORT 22, LLC, AARON SCHINDLER, WHITE OAK FUND LP and PRIME INTERNATIONAL TRADING, LTD., on behalf of themselves and all others similarly situated,

<div align="center">Plaintiffs,</div>

<div align="center">v.</div>

SHELL INTERNATIONAL TRADING AND SHIPPING COMPANY LIMITED, SHELL TRADING US COMPANY, BP PLC, BP AMERICA, INC., BP CORPORATION NORTH AMERICA INC., STATOIL ASA, STATOIL US HOLDINGS INC., MORGAN STANLEY CAPITAL GROUP, INC., TRAFIGURA BEHEER B.V., TRAFIGURA AG, PHIBRO TRADING LLC, PHIBRO COMMODITIES LIMITED, VITOL, S.A., VITOL, INC., MERCURIA ENERGY TRADING S.A., MERCURIA ENERGY TRADING, INC., HESS ENERGY TRADING COMPANY, LLC and JOHN DOES 1-50,

<div align="center">Defendants.</div>

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ...............................................................................1

II.    JURISDICTION AND VENUE ........................................................................7

III.   PARTIES .............................................................................................................9

     A.    Plaintiffs ..................................................................................................9

     B.    Defendants ............................................................................................13

     C.    John Doe Defendants Nos. 1-50 ..........................................................17

     D.    Agents and Unnamed Co-Conspirators ...............................................18

IV.   SUBSTANTIVE ALLEGATIONS ..................................................................18

     A.    Glossary of Key Terms ........................................................................18

     B.    Brent Crude Oil....................................................................................23

     C.    Price Reporting Services/Platts............................................................25

     D.    The Brent Benchmark ..........................................................................28

          1.    Contracts for Difference ...........................................................33

          2.    Cash BFOE ...............................................................................34

          3.    North Sea Dated Strip ...............................................................35

          4.    Interrelationship Among the Various Platts Prices....................35

     E.    By Manipulating Dated Brent and Brent Crude Oil Prices Defendants Also Manipulated Brent Crude Oil Futures Prices and Other Exchange-Based Contracts (and Non-Exchange-Based Contracts) Tied to Brent Crude Oil .........................35

          1.    Brent Crude Oil Derivatives On NYMEX................................41

          2.    Brent Crude Oil Derivatives On ICE .......................................43

     F.    Defendants Manipulated Brent Crude Oil Futures Prices Through the MOC Process ................................................................................................60

     G.    The June 2010 Manipulation ...............................................................86

H.     The January and February 2011 Manipulations ..................................................95

     1.     January 2011 .........................................................................................95

     2.     February 2011 .....................................................................................111

I.     The September 2012 Manipulation .................................................................123

     1.     Early Month Suppression ....................................................................125

     2.     Mid-month Inflation ...........................................................................129

     3.     Late Month Suppression .....................................................................132

J.     The Dubai/Brent Manipulation ......................................................................137

K.     The Urals Benchmark Manipulation ...............................................................140

L.     Plaintiffs' Injuries .........................................................................................141

     1.     Plaintiffs and Class Members Have Been Injured by Defendants' Manipulation and Anticompetitive Conduct ...........................................141

     2.     Defendants' Manipulative Conduct Suppressed the Price Received And/Or Inflated the Price Paid by Plaintiffs and Members of the Class for Brent Crude Oil Futures and Other Derivative Contracts .................................143

     3.     Plaintiffs Incurred Irrevocable Liability in the U.S. in Connection With Their Trading ....................................................................................146

M.     Regulatory and Enforcement Actions Involving Defendants ..............................148

N.     Defendants Compete in the Market for and Trade Brent Crude Oil Futures and Derivative Contracts .....................................................................................152

     1.     BP ......................................................................................................152

     2.     MSCGI ...............................................................................................154

     3.     Phibro and Phibro Commodities ..........................................................155

     4.     STASCO and STUSCO ......................................................................155

     5.     Statoil ................................................................................................156

     6.     Trafigura ............................................................................................158

|        | 7.  | Vitol ................................................................................................159 |
|        | 8.  | HETCO ...........................................................................................161 |
|        | 9.  | Mercuria ........................................................................................162 |

V.    DEFENDANTS' MANIPULATIONS OF IMPORT COMMERCE ............................162

VI.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ...........................169

    A.   An Ordinary Person Would Not Have Known that Brent had Probably Been
        Manipulated ..........................................................................................................169

    B.   Plaintiffs Could Not have Known or Reasonably Discovered Facts Suggesting
        Defendants' Manipulation of Dated Brent ..........................................................172

VII.  RELEVANT MARKET ...................................................................................................173

VIII. CLASS ALLEGATIONS .................................................................................................173

IX.   CLAIMS FOR RELIEF ...................................................................................................175

FIRST CLAIM FOR RELIEF ......................................................................................................175

SECOND CLAIM FOR RELIEF ..................................................................................................179

THIRD CLAIM FOR RELIEF .....................................................................................................181

FOURTH CLAIM FOR RELIEF ..................................................................................................182

FIFTH CLAIM FOR RELIEF .......................................................................................................183

SIXTH CLAIM FOR RELIEF ......................................................................................................185

SEVENTH CLAIM FOR RELIEF ................................................................................................186

X.    PRAYER FOR RELIEF ...................................................................................................187

DEMAND FOR JURY TRIAL .....................................................................................................188

iii

I.      **NATURE OF THE ACTION**

1.      This action arises from manipulations of North Sea Brent Crude Oil Market (defined herein) by Defendants Shell International Trading and Shipping Company Limited ("STASCO"), Shell Trading US Company, BP plc ("BP"), BP America, Inc., BP Corporation North America Inc., Statoil ASA ("Statoil"), Statoil US Holdings Inc. ("Statoil US"), Morgan Stanley Capital Group, Inc. ("MSCGI"), Trafigura Beheer B.V., Trafigura AG, Phibro Trading LLC ("Phibro"), Phibro Commodities Limited, Vitol, S.A. ("Vitol"), Vitol, Inc., Hess Energy Trading Company, LLC ("HETCO"), Mercuria Energy Trading S.A., Mercuria Energy Trading, Inc.,  (collectively, "Defendants") since at least 2002 through the present (the "Class Period").

2.      During the Class Period, Defendants monopolized the Brent Crude Oil market and entered into unlawful combinations, agreements, and conspiracies to fix and restrain trade in, and intentionally manipulate Brent Crude Oil prices and the prices of Brent Crude Oil futures and derivative contracts on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE") in violation of the Commodity Exchange Act, as amended 7 U.S.C. § 1, *et seq.* (the "CEA"), the Sherman Act, 15 U.S.C. §§ 1 and 2, and common law. Plaintiffs (as defined herein), individually and on behalf of a class of similarly situated derivatives traders, bring this action for damages, and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injuries that Plaintiffs and all other Class members suffered as a result of the Defendants' violations of these laws.

3.      Plaintiffs and other members of the Class were deprived of trading in a lawful, competitive market for Brent Crude Oil futures and derivatives contracts during the Class Period (as defined herein) and have been injured in their businesses and property.  Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are made on personal knowledge) based on the investigation conducted by

and under the supervision of Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Defendants and Brent Crude Oil, which Plaintiffs (through their counsel) obtained from, among other sources: (1) reports on the physical North Sea Brent Crude Oil market by Platts, a price reporting agency ("PRA"); (2) pricing data for Brent futures and other crude oil futures markets; (3) pricing data for the physical Brent and other crude oil physical markets; (4) crude oil import data and other statistics and reports from the U.S. Energy Information Administration, the International Energy Agency, the International Energy Forum, the Organization of Petroleum Exporting Countries and the International Organization of Securities Commissions ("IOSCO"); (5) analyses by consulting experts engaged by Plaintiffs; (6) publicly available press releases, news articles, and other media reports related to the European Commission's and other investigations into violations of the Platts Market-On-Close price assessment process; and (7) filings Defendants made to the U.S. Securities and Exchange Commission and other public reports about Defendants.

4.      Brent Crude Oil is a light sweet crude oil that is pulled from the North Sea region of Europe.  Types of crude oil vary depending on the geographic location from which the oil is pulled, with end users generally preferring light, sweet oil like Brent Crude Oil, which has a relatively low sulfur content and requires less processing to remove impurities.  In part because of its preferred qualities, Brent Crude Oil is in high demand and serves as a benchmark for two-thirds of the world's internationally-traded crude oil supplies.  Brent Crude Oil has become the predominant crude oil benchmark despite accounting for only a small fraction of the trade in worldwide crude oil.  The mechanism through which Brent Crude Oil acts as the worldwide price benchmark is Platts, a unit of McGraw Hill Financial, Inc. in New York.

5.      Trading in physical commodities like Brent Crude Oil occurs predominantly

2

through private transactions.  Therefore, to bring transparency to crude oil pricing, large market participants like Defendants voluntarily provide competitive, real-time market information to Platts.  Platts operates an energy information and global price reporting service and is a world leader in publishing energy-price benchmarks.  As the premier source of benchmark price assessments for the underlying physical price for Brent Crude Oil, Platts's price assessments serve as the basis for pricing physical Brent Crude Oil cargoes as well as Brent Crude Oil futures and other derivatives contracts.

6.      Platts conducts and publishes an assessment known as "Dated Brent."  The term "Dated Brent" refers to physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates.  Dated Brent is a price based on cargo sizes of Brent Crude Oil (*e.g.,* 600,000 barrels) with actual loading times roughly 10 to 25 days away (sometimes referred to as the "Dated Brent Window").  Dated Brent is therefore intended to reflect actual physical market prices and is widely regarded as reflecting the 'spot' price (i.e., the current price) for Brent Crude Oil.

7.      Platts uses a "Market on Close" or "MOC" methodology to arrive at various Brent Crude Oil price benchmarks.  Brent Crude Oil futures and derivative contract prices are also dependent on this methodology.  The MOC methodology is designed to capture the price of oil closest to the market, but the designated period when Platts assesses prices during the MOC (sometimes referred to as the "MOC Window") is only thirty minutes in duration and generally involves very few market players.  If there are no trades, Platts uses bids or offers as an indicator of where market participants were willing to buy or sell.  To arrive at the Dated Brent price, Platts reviews various types of transactions for physical Brent Crude Oil or for derivatives of Brent Crude Oil, but only during the MOC process.  Platts then connects the various markets

together to obtain the Dated Brent price.  Platts's MOC method can be easily gamed by market participants that make false, inaccurate or misleading trades (or provide false bids and offers) during the MOC process.

8.     Defendants are major producers and market participants in the Brent Crude Oil Market (as defined herein) and during the Class Period had (and continue to have) market power and the ability to influence prices in the Brent Crude Oil market and related markets, including the futures and other derivative markets.  Almost all Defendants have imported into the U.S. large quantities of Brent Crude Oil and crude oil priced to Brent.  As large market participants, Defendants have the market power and ability to push Dated Brent prices in a particular direction by purposefully and selectively reporting false and misleading data for transactions.  BP, Statoil and Shell each alone had the market power and ability to manipulate Dated Brent prices and price trends, and when acting with other Defendants their collusive market power and ability to manipulate Dated Brent prices was even greater and more disruptive to the market.  During the Class Period, Defendants deliberately reported inaccurate, misleading, and false information regarding Brent Crude Oil prices and transactions to Platts.  Defendants selectively reported bids, offers, "spoof" orders and transactions with aberrant pricing during the designated thirty-minute MOC Window.  Among other things, Defendants participated in or accommodated prohibited wash sale transactions with one another, which they initiated with the intent to avoid taking a bona fide market position exposed to market risk.

9.     By purposefully reporting inaccurate, misleading, and false Brent Crude Oil trade information to Platts and manipulating the MOC process during the Class Period, Defendants manipulated prices and restrained trade in both the physical Brent Crude Oil market and the Brent Crude Oil futures and derivatives market.  The Brent Crude Oil futures and derivatives

4

market is inextricably linked to, and associated with, the physical market for Brent Crude Oil, and Platts pricing.  Consequently, a manipulation of the Platts Brent Crude Oil benchmarks has effects that flow through the Brent Crude Oil market.

10.     Plaintiffs detail herein concrete evidence of manipulation by all Defendants of prices during the Platts MOC Window, including through significant transactions that caused artificial prices and artificial pricing trends during several specific periods – June 2010, the first two months of 2011, and September 2012.   During these periods, Defendants engaged in disruptive and manipulative trading during the Platts MOC Window at least in part to benefit their Brent Crude Oil derivatives positions.

11.     Statistical studies by Plaintiffs' consulting experts show that (1) the conduct of Defendants in the MOC Window directly affects prices of Brent related derivatives including futures contracts, and (2) Brent futures prices during the MOC Window demonstrate anomalous behavior highly corroborative of manipulation.   Indeed, as discussed herein, the anomalous behavior of the futures markets ties to the periods of manipulation alleged.

12.     IOSCO, an umbrella of global securities regulators, issued a report in October 2012 after examining, among other things, a number of PRA assessment methodologies, including how oil spot market prices are assessed by Platts.  IOSCO's express focus was on the IOSCO members' responsibilities with respect to derivatives that are subject to their jurisdiction. IOSCO concluded that the PRA system "creates opportunity to manipulate the commodity market" and warned that the potential for misconduct in the oil market "is not mere conjecture." Specifically, IOSCO reported that:

> Situations susceptible to manipulation include those in which the volume of cash market transactions and/or the number of participants determining the cash-settlement prices are relatively low.  Under such circumstances there could be the potential to

> manipulate or artificially influence the data from which the cash-settled price is derived or to exert undue influence on the cash-settlement price's computation in order to profit on a derivatives contract position in that commodity.

13.     Defendants' conduct has drawn complaints from other market participants and caught the attention of the European Commission.  In August 2012, Total Oil Trading S.A. ("Total Oil"), the Swiss trading unit of France's Total S.A., one of the world's largest oil companies, reported to regulators that "several times a year, estimates of market prices on key [energy] indices … are out of line with our experience of the day," warning of "inaccurate pricing."

14.     Seven months later, on May 14, 2013, the European Commission carried out unannounced inspections of several companies in connection with concerns that "the companies may have colluded in reporting distorted prices to a price reporting agency to manipulate the published prices for a number of oil and biofuel products."  In confirming the raids to the media, the EC commented that:

> The prices assessed and published by the Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally.  Even small distortions of assessed prices may have a huge impact on the prices of crude oil … potentially harming financial consumers.

15.     After the EC confirmed on May 14, 2013, that it had carried out unannounced inspections of several companies acting in and providing services to the crude oil, refined oil products, and biofuels sectors, on May 17, 2013, the U.K. Serious Fraud Office announced that it was "urgently reviewing" the EC's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation."  Then, on June 24, 2013, the media reported that the U.S. Federal Trade Commission "("FTC") opened a formal investigation into

how prices of crude oil and petroleum- derived products are set.  The FTC investigation reportedly mirrors the EC inquiry into the pricing practices of energy markets.

16.     The European Commission undertook the inspections on concerns that: (i) the companies may have colluded in reporting distorted prices to a PRA to manipulate the published prices for a number of oil and biofuel products; and (ii) the companies may have prevented others from participating in the price assessment process, to facilitate the monopoly over price setting and to distort published prices.

17.     BP, Shell and Statoil have confirmed that they are subjects of the European Commission investigation.  In particular, Defendant Statoil confirmed that the inspection was carried out at the request of the European Commission, assisted by the Norwegian Competition Authority, and confirmed that the scope of the investigation was related to the Platts MOC price assessment process, used to report prices for crude and refined oil products.  Defendant Statoil has acknowledged that "suspected violations" of the MOC "may have been going on since 2002."[1]

18.     Plaintiffs have been injured by paying artificial and anticompetitive prices for Brent Crude Oil futures and derivatives contracts as a direct and proximate result of Defendants' unlawful conduct alleged herein.

## II.    JURISDICTION AND VENUE

19.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

---

[1] Ajay Makan and Javier Blas, "European Commission Raids Oil Groups Over Price Benchmarks," Ft.com, May, 14, 2013, http://www.ft.com/cms/s/0/f1574eb6-bca2-11e2-b344-00144feab7de.html#axzz308zZsY00, last visited April 25, 2014.

20.     Brent Crude Oil is a "commodity" and is the "commodity underlying" Brent Crude Oil futures and other derivative contracts traded on ICE and NYMEX, as those terms are defined and used in Sections 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.

21.     This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. § 25 and 28 U.S.C. §§ 1331 and 1337.

22.     Venue is proper in the Southern District of New York, pursuant to 15 U.S.C. § 15(a), Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d).  Defendants transacted business in the Southern District of New York, the claims arose in this District, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.  Platts is a division of McGraw Hill Financial, Inc., which also has its headquarters in this District.

23.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the U.S. Mail in connection with the unlawful acts and practices and courses of business alleged in this Complaint. Brent Crude Oil and related futures and other derivatives contracts are commodities that trade in interstate commerce in the U.S.  Defendants are all sophisticated Brent Crude Oil market participants that knew that Platts's and other PRAs' price assessments for Dated Brent and Brent Crude Oil are disseminated in the U.S. and are incorporated into the trading and settlement prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the U.S.

8

### III.     PARTIES

#### A.     Plaintiffs

24.     Plaintiff Kevin McDonnell ("McDonnell") is an individual residing in the State of New York.  During the Class Period, McDonnell operated as an independent floor trader on NYMEX, trading for his own account, and served as a director of NYMEX Holdings, Inc. McDonnell also served as a member of the Executive Committee of NYMEX and has held various executive and committee positions, including Treasurer and Chairman of the NYMEX crude oil advisory committee, and he served on the membership, finance, floor and settlement committees.  McDonnell repeatedly traded in Brent Crude Oil futures and derivative contracts, both on NYMEX and ICE, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  McDonnell also traded on multiple occasions on the NYMEX in open outcry trading pits in New York, as well as on electronic platforms.  According to NYMEX, McDonnell was "crucial to bringing the Brent crude oil futures contract to the trading floor as chairman of the crude oil advisory committee." McDonnell traded large positions over a number of years throughout the Class Period.  By paying artificial and anticompetitive prices for these Brent Crude Oil derivative contracts, McDonnell was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

25.     Plaintiff Anthony Insinga ("Insinga") is an individual residing in the State of New York.  During the Class Period, Insinga operated as an independent floor trader on NYMEX, trading for his own account.  Insinga served on the NYMEX Floor Committee and Adjudication Committee.  Insinga repeatedly traded in Brent Crude Oil futures contracts, both on NYMEX and ICE, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Insinga also traded on multiple occasions

on the NYMEX in open outcry trading pits in New York, as well as on electronic platforms. By paying artificial and anticompetitive prices for these Brent Crude Oil futures contracts, Insinga was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

26.    Plaintiff Robert Michiels ("Michiels") is an individual residing in the State of New Jersey.  During the Class Period, Michiels operated as an independent floor trader on NYMEX, trading for his own account.  Michiels repeatedly traded in Brent Crude Oil futures contracts, both on NYMEX and ICE, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Michiels also traded on multiple occasions on the NYMEX in open outcry trading pits in New York, as well as on electronic platforms. By paying artificial and anticompetitive prices for these Brent Crude Oil futures contracts, Michiels was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

27.    Plaintiff Neil Taylor ("Taylor") is an individual currently residing in the U.K., and he also resided in New York, New York at certain times during the Class Period.  During the Class Period, Taylor repeatedly traded Brent Crude Oil futures contracts on NYMEX and ICE during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Taylor also traded on multiple occasions on the NYMEX in open outcry trading pits in New York.  During the Class Period, Taylor worked with Plaintiff McDonnell and other traders under NYMEX guidance, including the guidance of top-level NYMEX executives, to transition trading in Brent futures contracts to an electronic platform on NYMEX. Taylor traded large positions over a number of years and

therefore had enormous economic interests in trading in a non-manipulated, competitive market. By paying artificial and anticompetitive prices for these Brent Crude Oil futures and derivative contracts, Taylor was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

28.     Plaintiff Aaron Schindler ("Schindler") is an individual residing in the State of Wisconsin.   During the Class Period, Schindler repeatedly traded Brent Crude Oil futures contracts on ICE during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.   By paying artificial and anticompetitive prices for these crude oil futures contracts, Schindler was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

29.     Plaintiff Xavier Laurens ("Laurens") resides in the State of Illinois. Laurens traded Brent Crude Oil futures on ICE during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. By paying artificial and anticompetitive prices for Brent Crude Oil futures contracts, Laurens was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

30.     Plaintiff Atlantic Trading USA, LLC ("Atlantic Trading") is an Illinois limited liability company with its principal place of business in Chicago, Illinois.   Atlantic Trading traded Brent Crude Oil futures and options on NYMEX and ICE during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. By paying artificial and anticompetitive prices for Brent Crude Oil futures contracts, Atlantic Trading was deprived of transacting in a lawful, non-manipulated,

11

competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

31.    Plaintiff Port 22, LLC ("Port 22") is an Illinois limited liability company with its principal place of business in Chicago, Illinois.  Port 22 traded Brent Crude Oil futures on ICE during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. By paying artificial and anticompetitive prices for Brent Crude Oil futures contracts, Port 22 was deprived of transacting in a lawful, non-manipulated, competitive market and was injured in his business or property as a result of Defendants' unlawful conduct.

32.    Plaintiff Prime International Trading, Ltd. ("Prime Int'l"), is a proprietary commodity trading company headquartered in Chicago, Illinois.  Prime Int'l is a member of the Chicago Board of Trade, Chicago Mercantile Exchange, NYMEX and ICE, and it traded hundreds of thousands of NYMEX and ICE Brent Crude futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  By paying artificial and anticompetitive prices for these crude oil futures contracts, Prime Int'l was deprived of transacting in a lawful, non-manipulated, competitive market in Brent Crude oil futures, and otherwise suffered legal injury as a direct and proximate result of Defendants' unlawful conduct.

33.    Plaintiff White Oak Fund LP ("White Oak") is a private placement fund headquartered in Burr Ridge, Illinois.  White Oak is a member of the Chicago Board of Trade, Chicago Mercantile Exchange, NYMEX, and ICE.  White Oak traded Brent Futures contracts on multiple occasions on the NYMEX and ICE during the class period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged

12

herein.  White Oak was deprived of transacting in a lawful non-manipulated competitive market in Brent Crude Oil futures contracts and was deprived of transacting in a lawful, non-manipulated, competitive market in Brent Crude oil futures, and otherwise suffered legal injury as a direct and proximate result of Defendants' unlawful conduct.

34.     Plaintiffs McDonnell, Insinga, Michiels, Taylor, Schindler, Laurens, Atlantic Trading, Port 22, Prime Int'l and White Oak, collectively, are referred to herein as "Plaintiffs".

### B.     Defendants

35.     Defendant Shell International Trading and Shipping Company Ltd. (previously defined as  "STASCO") is the trading and shipping arm of a multinational group of energy and petrochemical companies affiliated with Royal Dutch Shell plc ("Shell") which is headquartered in The Hague, Netherlands.   STASCO operates in the U.S., including in Houston, Texas. STASCO imports Brent Crude Oil into the U.S., as reflected by data compiled on Bloomberg from U.S. Customs Bulk Commodity bills of lading for shipping vessels entering the country with cargo.  Shell is organized as a public company under the laws of the U.K.  The shares of Shell are traded on the New York Stock Exchange.  As referred to herein, "Shell" sometimes includes wholly-owned or closely held subsidiaries of Royal Dutch Shell plc.

36.     Shell Trading US Company ("STUSCO") is a Delaware corporation with its principal place of business in Houston, Texas.  STUSCO's ultimate parent company is Shell. STUSCO is a member of NYMEX and conducts a substantial trading-for-profit business, which includes the buying, selling and transport of various grades of crude oil as well as trading oil futures contracts.  STUSCO executes and makes markets for Brent Crude Oil product derivatives, including futures, swaps and options through futures markets, OTC markets and electronic trading platforms in the U.S. and in the international marketplace.  STUSCO also serves as the supply and trading unit for Shell's affiliates, Shell Oil Products US and Motiva Enterprises LLC.

13

37.     Defendant BP p.l.c. (previously defined as "BP") is a major international energy company which is headquartered in London, U.K.  BP also maintains offices in the U.S., including in Houston, Texas, Naperville, Illinois and Anchorage, Alaska.  BP is organized as a private limited company under the laws of U.K.  The shares of BP are traded on the London Stock Exchange and the New York Stock Exchange.

38.     Defendant BP America, Inc. ("BP America") at all relevant times was a wholly-owned subsidiary of BP plc. BP America operated as a holding company incorporated under the laws of the State of Delaware with its headquarters in Warrenville, Illinois.  Defendant BP America operated through a number of U.S. subsidiaries and regional business units such as the Integrated Supply & Trading ("IST") group.

39.     Defendant BP Corporation North America Inc. ("BP Corporation") is incorporated in the state of Indiana and is a subsidiary of BP America with its principal place of business in Warrenville, Illinois.  Defendant BP Corporation operated through a number of regional business units such as the Integrated Supply & Trading ("IST") group at all times relevant herein.

40.     Defendant Statoil ASA (previously defined as "Statoil") is a Norwegian oil and gas company that engages in the exploration, production, transportation, refining and marketing of petroleum and petroleum-derived products.  Statoil is a public limited company organized under the laws of Norway.  Statoil is headquartered in Stavenger, Norway and also maintains offices in the U.S., including in Stamford, Connecticut, Washington D.C. and Houston, Texas. Shares of Statoil ASA are traded on the New York Stock Exchange.

41.     Defendant Statoil US Holdings Inc. f/k/a/ Statoil US Holding Inc. (previously defined as "Statoil US") is a Delaware corporation with offices in Stamford, Connecticut.  Statoil

US is responsible for trading Brent Crude Oil to North American markets.

42.     Defendant Morgan Stanley Capital Group, Inc. ( previously defined herein as "MSCGI") is a global financial services firm.  During the Class Period, MSCGI operated as a market leader in energy and metals trading worldwide and actively traded physical commodities, as well as associated derivatives and futures.  MSCGI is a corporation organized under the laws of the State of Delaware with its principal place of business located in New York, New York.  Shares of MSCGI's parent, Morgan Stanley, are traded on the New York Stock Exchange.

43.     Defendant Trafigura Beheer B.V. ("Trafigura Beheer") engages in the sourcing and trading of crude oil, petroleum products and other products for industrial consumers worldwide and holds itself out as one of the world's leading commodity traders.  Trafigura Beheer is the parent company of the Trafigura Group, which is incorporated in the Netherlands and is subject to Dutch law.   Trafigura is managed and controlled from Amsterdam and maintains 81 offices in 56 countries, including offices in the U.S. located in Houston, Texas, and in Stamford, Connecticut.

44.     Defendant Trafigura AG is a wholly-owned subsidiary of Trafigura Beheer and is organized under the laws of Switzerland.  In the U.S., Trafigura Beheer's operations are owned and managed by Trafigura AG, which operates oil and petroleum product trading out of Houston, Texas.  Trafigura Beheer and Trafigura AG are together referred to herein as "Trafigura."

45.     Defendant Phibro Trading LLC ("Phibro") is an international commodities trading firm that is headquartered in Westport, Connecticut and engages in energy trading primarily in liquid markets over exchanges, in addition to over-the-counter physical, swaps and options markets.  Phibro is a limited liability company organized under the laws of the State of Delaware and is a subsidiary of Occidental Petroleum Corporation, a publicly traded Delaware

corporation, whose shares trade on the New York Stock Exchange.   Defendant Phibro Commodities Limited ("Phibro Commodities") is a United Kingdom private limited company and a subsidiary of Defendant Phibro that was formed in December 2009.  Defendants Phibro and Phibro Commodities share employees and are sometimes referred to together herein as "Phibro".

46.     Defendant Vitol, S.A. (previously defined as "Vitol") is a privately owned international energy and commodities firm that maintains headquarters in Geneva, Switzerland. Vitol is part of an independent group of companies that collectively, is referred to as the "Vitol Group."  Vitol S.A. is an indirect subsidiary of Vitol Holding B.V.  Vitol and its affiliates hold themselves out as the world's largest independent energy trading companies. As described on its website, "trading is the engine of [Vitol's] business," and Vitol trades various grades of crude oil, including Brent Crude Oil, on a global basis.

47.     Defendant Vitol, Inc. is incorporated in Delaware and has its principal place of business in Houston, Texas.  Vitol Inc. operates as the trading arm of Vitol and its affiliates to managed Defendant Vitol's and its affiliates' financial risks.  Vitol, Inc. operates as a conduit through which Vitol S.A. and other Vitol Group companies receive and share vital market information.  According to an interview give to the Futures Industry Association ("FIA") and published in November 2013, the Vitol Group's CEO, Ian Taylor, Vitol's expertise is in geographic arbitrage for oil prices, and the company is a "massive user of the commodity futures markets to hedge its price risks."  Vitol, Inc. actively trades energy commodities, including crude oil futures and options on exchanges such as NYMEX and ICE.

48.     Defendant Hess Energy Trading Company, LLC (previously defined as "HETCO") is an international commodities trading firm with its principal place of business in

New York, New York that is primarily a trading firm that generally focuses on profiting from arbitrage opportunities in the physical market for refined fuels, natural gas, and crude oil, including Brent Crude Oil.  HETCO is registered to do business in New York, Massachusetts and Texas.  HETCO is a limited liability company organized under the laws of the State of Delaware.  The company was founded in 1997 as a joint venture between Hess Corporation ("Hess") and HETCO's founding managing directors, with Hess holding a fifty-percent interest in HETCO.  Through various affiliates, Hess has a significant stake in the physical market for Brent Crude Oil, and during the Class Period, Hess operated oil fields in the North Sea.  Through HETCO, Hess participates in the physical and derivative crude oil markets.

49.    Defendant Mercuria Energy Trading S.A. ("Mercuria") is one of the world's largest independent traders of crude oil.  Mercuria is part of the Mercuria Energy Group Ltd., a privately-held trading house founded by two former Wall Street oil traders.  Mercuria's headquarters are located in Geneva, Switzerland, and with revenues exceeding $100 billion in 2013, Mercuria currently is positioned as the world's fourth-largest commodity trader.  A central part of Mercuria's core business is trading derivatives using insights gained from its physical trading.

50.    Defendant Mercuria Energy Trading, Inc. ("Mercuria Energy") is a Delaware corporation with its principal place of business in Chicago, Illinois.  Mercuria Energy operates as a subsidiary of Mercuria Energy Group Holding S.A.

### C.    John Doe Defendants Nos. 1-49

51.    Defendants colluded with others to submit a contrived picture of Defendants' prices and transactions.  The John Doe Defendants are other persons or entities whose identities are currently unknown to Plaintiff.   The John Doe Defendants themselves independently performed or participated in, combined, conspired and/or agreed with others to perform the

unlawful acts alleged herein, including the manipulation of the prices of Brent Crude oil and Brent Crude Oil futures and related derivatives contracts, and illegal restraint of trade.

### D. Agents and Unnamed Co-Conspirators

52. Various other persons, firms, corporations, or joint ventures not named as Defendants in this lawsuit, the identities of which are presently unknown, participated as co-conspirators with each of the Defendants in their illegal activities alleged in this Complaint and have performed acts and made statements in furtherance of the illegal combination and conspiracy.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Glossary of Key Terms

53. "Backwardation" refers to market conditions in which the price of a commodity for nearby delivery is higher than for the more deferred deliveries. *See infra* ¶ 103, 390-392, 402, 411.

54. "Banging the Close" refers to the manipulative or disruptive trading practice whereby a trader buys or sells a large number of futures contracts during the closing period of a futures contract (that is, the period during which the futures settlement price is determined) in order to benefit an even larger position in an option, swap, or other derivative that is cash settled based on the futures settlement price on that day. In terms of the Brent market 'banging the MOC' would also be an appropriate term. *See* ¶¶ 202.

55. "Brent Crude Oil" refers to oil that originates in the North Sea and includes the four crude oil grade blends deriving from different North Sea oil fields: "Brent", "Forties", "Oseberg" and "Ekofisk" (collectively, "BFOE"). Defendant BP operates the Forties field; Shell operates the Brent field; and Defendant Statoil operates the Oseberg field. *See* ¶¶ 4, 8, 82.

56. "Cash BFOE" refers to forward contracts for nominally 100,000 barrels that

involve over-the-counter ("OTC") trades for future months beyond the Dated Brent 10 to 25 day window.  Cash BFOE trades theoretically represent the value of BFOE in a forward month beyond the current month.  Cash BFOE trades technically can be converted into physical cargo, but typically are cash settled.  *See* ¶¶ 114-116.

57.     "Contango" refers to market conditions where the price of a commodity for nearby delivery is lower than for more deferred deliveries.  *See* ¶ 103.

58.     Contracts for Differences ("CFD") is a relatively short–term swap, quoted by Platts for each of eight weeks ahead of the current date at any one time.  A CFD is a swap for theoretically 100,000 barrels of Brent Crude Oil, but which settles on a cash basis as a differential to Cash BFOE.  CFDs are traded for weekly, bi-monthly and monthly periods in the marketplace.  *See* ¶¶ 108-114.  The average price of CFDs during the 10 to 25 (or 21) Dated Brent window is the North Sea Dated Strip.

59.     "Cracking Margins" or "Crack Spreads" are differences between wholesale petroleum product prices and crude oil prices.  These spreads are often used to estimate refining margins. Crack spreads are a simple measure based on one or two products produced in a refinery (usually gasoline and distillate fuel).  They do not take into consideration all refinery product revenues and exclude refining costs other than the cost of crude oil.  *See* ¶¶ 142, 194-199, 301, 303, 305-306, 311.

60.     "Daisy Chain" here refers to the practice of passing the same Brent cargo related uniquely to a single set of cargo dates through a paper chain involving a sequence of transactions among various sellers and buyers.  *See* ¶ 366, 376.

61.     "Dated Brent" is a benchmark assessment of the price of physical, light North Sea crude oil that is published by Platts.  The term "Dated Brent" refers to the physical cargoes of

crude oil in the North Sea that have been assigned specific delivery dates 10 to 25 (formerly 21) days in the future.  *See* ¶¶ 6-8, 89-107.  Platts's Dated Brent benchmark, which acts as a pricing guide for most of the world's crude oil, is determined by Platts using prices for Cash BFOE, CFDs and the North Sea Dated Strip.

62.   "Differential" refers to the discount or premium between a given Brent market price and the flat price.  Differential prices off of the benchmark Cash BFOE for Brent Crude Oil are affected by the quality and demand for a particular blend of BFOE product.  As discussed below, Dated Brent is priced based on the most competitive (i.e., the lowest) price reported by Platts of the BFOE North Sea product streams, measured as a differential from the North Sea Dated Strip.  *See* ¶¶ 91, 106, 108-112.

63.   "Dubai Crude" refers to Dubai Crude Oil, which is also known as Fateh, is a grade of crude oil that is used as a benchmark in oil pricing.  *See* ¶ 79, 402-403, 410-415.  Dubai is theoretically priced based on its own pricing mechanism although in practice its price is a directly measureable relationship to Dated Brent.

64.   "Exchange of Futures for Physical" or "EFP" refers an alternative mechanism that is used to price physical crude oil.  This mechanism enables participants to exchange their futures positions for a physical position thus separating the pricing from the physical supply.  The EFP trades as a differential between the futures market and the underlying physical market.  The value of the differential will reflect the relative value of physical versus the futures at any given time.  *See* ¶¶ 176, 178, 289-290, 298-300.

65.   "Flat Price" refers to the total price of a particular commodity.  As discussed below, Cash BFOE acts as the flat price benchmark to the CFDs.  *See* ¶ 67, 116-117, 120.  The average of the CFD prices during the Dated Brent 10 to 25 day window will determine the base

flat price that becomes the North Sea Dated Strip, which serves as the flat price that is used to calculate Dated Brent. *See* ¶ 120.

66.     "Market-on-Close" or "MOC" is the methodology employed by Platts since 2002 that limits the analysis of pricing data to transactions that occur during a half an hour of the trading day.   Each trading day, Platts calculates Dated Brent by analyzing trades occurring between 4:00 p.m. and 4:30 p.m. London time.   This window is referred to as the "MOC Window." *See* ¶¶ 7, 92-93, 96, 100-102.

67.     "North Sea Dated Strip" is defined as a flat price measure of the average price of CFDs during the 10 to 25 (or 21) "Dated Brent Window."  North Sea Dated Strip is calculated to reflect the flat price value of a physical cargo of one of the BFOE streams of crude oil, without the specification of which of the four streams, prevailing in the Platts MOC assessment period for that date.  The flat price North Sea Dated Strip is calculated form the flat price Cash BFOE price which represents a calendar month assessment of BFOE (unspecified grade) adjusted to reflect the specific dates of the subject Platts assessment period by use of the CFD differential quotes which are assessed as a differential to Cash BFOE. There are 3 forward month Cash BFOE assessments published by Platts.  There are 8 CFD calendar weeks published by Platts. From specified cargo trades in the MOC, or from Platts estimation of values, a differential to North Sea Dated Strip is applied to each of the grades BFO and E.   These differentials are applied to North Sea Dated Strip to calculate a flat price for each of the grades B, F, O and E the lowest of which becomes the Dated Brent quotation for that date. *See* ¶¶ 105, 117, 342, 366-368.

68.     "Over-the-Counter" or "OTC" refer to derivative products that were traditionally not cleared on exchanges, including un-cleared, physically-delivered contracts and derivative contracts. *See* ¶¶ 85, 138, 213-214, 216, 219, 268, 473.

69.    Price Reporting Agencies ("PRAs") refer to publishers and information providers who report oil prices transacted in physical and some derivative oil markets, and give an informed assessment of oil price levels at distinct points in time. PRAs also report news stories relevant to the oil market.

70.    "Spoofing" refers to the disruptive trading practice of bidding or offering with the intent to cancel the bid prior to executing the trade. *See* ¶¶ 369, 499.

71.    "Urals" is a grade of crude oil that is used as a benchmark in oil pricing. *See* ¶¶ 416-417. Urals are priced as a differential to Dated Brent.

72.    "Very Large Crude Carriers" ("VLCCs") refers to oil tankers that are capable of transporting between one and two million barrels of crude oil. *See* ¶¶ 331-333, 342, 391-394, 410-411.

73.    "Wash Trades" refers to the disruptive trading practice of entering into offsetting transactions, designed to give the appearance that bona fide purchases and sales have been made, without incurring market risk or changing the trader's market position. *See* ¶¶ 264-265, 280, 340, 369, 399, 500.

74.    "WTI" refers to West Texas Intermediate crude oil, which is also known as Texas light sweet, is a grade of crude oil that is used as a benchmark in crude oil pricing. *See* ¶¶ 79, 136, 142, 185-188, 238, 241, 247, 407, 431, 436, 522. A common hedging trade is the arbitrage between the price of Brent and the price of WTI. *See* ¶¶ 238-239, 241, 247-248, 391, 394, 402-403, 405, 408, 410, 412-413, 416.

75.    "Wet Contracts" refers to those Brent contracts that turn into specific Dated Brent delivery contracts with respect to the contract delivery month in question. *See* ¶ 177.

### B.   Brent Crude Oil

76.   Crude oil is refined into products like gasoline, diesel, jet fuel and more.  "Brent Crude Oil" is oil originating in the North Sea and includes the four North Sea crude oil grade blends: Brent, Forties, Oseberg and Ekofisk.  Collectively, these blends are referred to as Brent Crude Oil.

77.   The Brent Crude Oil physical market consists primarily of trades in cargoes of the four BFOE North Sea streams of crude oil.

78.   Brent Crude Oil is the leading global price benchmark for Atlantic basin crude oils.  Moreover, Brent Crude Oil is used to price at least two-thirds of the world's internationally traded crude oil supplies.

79.   The other well-known classifications (also called references or benchmarks) are the OPEC Reference Basket, Dubai Crude, Oman Crude, Urals and WTI.

80.   But Brent Crude Oil is by far the largest price benchmark.  Large quantities of crude oil priced as a differential to Brent Crude Oil are imported into the U.S. for processing from countries around the globe on an annual basis.

| Total Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| County of Origin | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Totals |
| Algeria | 79,585 | 83,359 | 132,718 | 161,728 | 113,257 | 101,959 | 119,279 | 64,366 | 43,141 | 10,461 | 909,853 |
| Angola | 118,880 | 169,662 | 190,083 | 180,190 | 185,464 | 161,213 | 145,590 | 122,110 | 79,992 | 73,864 | 1,427,048 |
| Australia | 7,855 | 3,507 | 1,819 | 739 | 11,139 | 4,032 | 3,706 | 3,333 | 2,210 | 523 | 38,863 |
| Azerbaijan | - | - | 9,744 | 32,880 | 38,686 | 32,549 | 24,400 | 20,235 | 9,577 | 10,414 | 178,485 |
| Belarus | - | - | 774 | - | - | - | - | - | - | - | 774 |
| Cameroon | 6,756 | 1,224 | 1,234 | 9,492 | 3,813 | 13,629 | 18,397 | 13,118 | 10,846 | 10 | 78,519 |
| Canada | 58,776 | 58,397 | 52,453 | 63,628 | 51,793 | 53,146 | 61,583 | 65,522 | 45,240 | 46,853 | 557,391 |
| Chad | 20,805 | 26,948 | 34,661 | 28,026 | 36,839 | 23,598 | 6,694 | 17,978 | 10,410 | 23,926 | 229,885 |
| China | 5,273 | 8,597 | 6,841 | 2,361 | 4,201 | 2,803 | 1,455 | 615 | 458 | 489 | 33,093 |
| Congo, Dem. Rep. of | 3,603 | 9,216 | 11,449 | 23,476 | 24,149 | 22,800 | 25,694 | 18,742 | 10,410 | 6,532 | 156,071 |
| Congo, Rep. of | 5,101 | 688 | - | - | - | 3,412 | 3,225 | 3,999 | 137 | 1 | 16,563 |
| Cote D'Ivoire | 3,679 | 8,181 | 3,177 | 361 | 819 | 347 | 2,830 | 1,303 | 994 | - | 21,691 |
| Denmark | 821 | - | - | - | - | - | - | - | - | - | 821 |
| Egypt | - | 1,363 | 147 | 403 | 2,650 | 2,972 | 2,618 | 1,543 | 11,338 | 1,553 | 24,587 |
| Equatorial Guinea | 24,212 | 24,734 | 20,894 | 20,547 | 33,620 | 40,820 | 26,300 | 7,985 | 14,900 | 6,072 | 220,084 |
| Gabon | 73,336 | 71,229 | 53,059 | 48,485 | 46,679 | 54,102 | 44,127 | 42,394 | 14,662 | 8,759 | 456,832 |
| Ghana | - | - | - | - | - | - | - | 2,954 | - | 993 | 3,947 |
| Indonesia | - | 6,816 | 5,939 | 5,505 | 6,021 | 4,678 | 11,602 | 7,168 | 2,022 | 6,646 | 56,397 |
| Kazakhstan | 3,228 | 4,451 | 1,573 | 3,357 | 1,231 | 6,116 | 6,720 | 2,571 | - | - | 29,247 |
| Libya | 7,340 | 22,399 | 32,901 | 34,600 | 24,806 | 21,724 | 15,608 | 3,328 | 20,108 | 15,864 | 198,678 |
| Malaysia | 6,551 | 3,648 | 2,551 | 331 | 626 | 2,187 | 959 | - | - | - | 16,853 |
| Mauritania | - | - | 942 | 950 | 995 | 959 | 670 | - | - | 1,245 | 5,761 |
| Mexico | 585,023 | 567,026 | 575,501 | 514,074 | 432,080 | 397,592 | 418,667 | 401,602 | 353,615 | 309,402 | 4,554,582 |
| Netherlands | - | - | - | - | - | - | 949 | - | - | 717 | 1,666 |
| Nigeria | 404,809 | 404,925 | 400,371 | 431,243 | 355,973 | 289,196 | 368,420 | 280,575 | 145,482 | 86,859 | 3,167,853 |
| Norway | 76,599 | 54,613 | 37,533 | 20,278 | 10,729 | 20,431 | 8,901 | 19,470 | 9,123 | 6,092 | 263,769 |
| Peru | 383 | 1,862 | 1,325 | 1,841 | 3,733 | 5,691 | 4,962 | 4,078 | 2,928 | 4,135 | 30,938 |
| Russia | 58,604 | 72,084 | 38,753 | 40,135 | 42,430 | 84,048 | 98,122 | 81,512 | 35,803 | 16,278 | 567,769 |
| South Africa | - | - | 1,093 | 2,458 | - | 517 | - | - | - | - | 4,068 |
| Syria | 501 | - | 1,734 | 627 | - | 539 | - | 1,076 | - | - | 4,477 |
| Tunisia | - | 1,853 | 4,791 | 2,018 | 985 | - | - | - | - | - | 9,647 |
| United Kingdom | 93,602 | 87,043 | 48,488 | 36,905 | 28,021 | 38,568 | 44,913 | 13,316 | 6,445 | 7,696 | 404,997 |
| Vietnam | 9,256 | 11,400 | 15,178 | 11,156 | 10,628 | 9,160 | 4,471 | 3,583 | 3,594 | 4,586 | 83,012 |
| Yemen | 1,365 | 4,269 | 7,283 | 4,198 | - | - | - | 2,077 | - | - | 19,192 |
| *Total* | 1,655,943 | 1,709,494 | 1,695,009 | 1,681,992 | 1,471,367 | 1,398,788 | 1,470,862 | 1,206,553 | 833,435 | 649,970 | 13,773,413 |
| | | | | | | | | | | | |
| Thousand of Barrels per Day | 4,524 | 4,684 | 4,644 | 4,608 | 4,020 | 3,832 | 4,030 | 3,306 | 2,277 | 1,781 | |
| US Refinery Input (kbd) | 15,783 | 15,578 | 15,602 | 15,450 | 15,027 | 14,659 | 15,177 | 15,289 | 15,373 | 15,734 | |
| Brent as % of Refinery Input | 28.67% | 30.07% | 29.76% | 29.83% | 26.75% | 26.14% | 26.55% | 21.62% | 14.81% | 11.32% | |

Source:  U.S. Energy Information Administration; Expert

81.    A sizeable amount of Brent (i.e., North Sea) Crude Oil itself is imported into the U.S. on an annual basis.

| Dated-Brent Priced Oil Imports from the United Kingdom and Norway into the United States (in millions of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Country of Origin | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Norway | 76.6 | 54.6 | 37.5 | 20.3 | 10.7 | 20.4 | 8.9 | 19.5 | 9.1 | 6.1 |
| United Kingdom | 93.6 | 87.0 | 48.5 | 36.9 | 28.0 | 38.6 | 44.9 | 13.3 | 6.4 | 7.7 |
| *Total* | 170.2 | 141.6 | 86.0 | 57.2 | 38.7 | 59.0 | 53.8 | 32.8 | 15.5 | 13.8 |
| Source:  U.S. Energy Information Administration; Expert | | | | | | | | | | |

82.    Shell, BP, and Statoil are each individually among the largest producers of BFOE. Defendants control the sales points for three of these four crude oil streams used for Brent pricing. Shell operates the Brent field; Defendant BP operates the Forties field; and Defendant

24

Statoil operates the Oseberg field.

83.     The average North Sea crude oil output is currently around two million barrels per day ("bpd") and the BFOE basket comprises an approximate one million bpd (around 700,000 bpd during the 2012 summer maintenance period).   This is a fraction of the world output of crude oil and a fraction of the amount of crude oil priced directly to Brent.   Nonetheless, Platts itself notes that its Dated Brent benchmark reaches around the world.   Below is a slide from a presentation that Platts made in May 2012:



---

C.     **Price Reporting Services/Platts**

84.     Price reporting agencies (previously defined herein as "PRAs") publish benchmark prices that are used globally to determine the price refiners pay for crude oil.   As much as 80% of all crude and oil product transactions are estimated to be linked to reference

benchmark prices published by Platts, which is the world's leading energy price reporting company and the premier source of benchmark price assessments for commodity markets, including the physical Brent Crude Oil market.

85.     Transactions in the Brent Crude Oil physical markets are based on OTC contracts between oil producers, traders and refiners, often using private brokers as intermediaries. Therefore, oil prices are not directly visible to the public, but rather are assessed and reported by PRAs.   To obtain data, Platts and other PRAs rely upon reports of transactions by Defendants and others in the opaque OTC market.   PRAs collect and disseminate the reported data to participants in the physical and futures market for crude oil commodities.   When publishing MOC trade data, Platts refers generically to companies that trade the MOC; thus, it refers to Shell, Morgan Stanley and Phibro, instead of naming the exact affiliated company that is trading in the market.   Plaintiffs are informed and believe that for the specific trades alleged herein, when Platts refers to Shell, Morgan Stanley and Phibro, Platts generally is referring to trades by STASCO, MSCGI and Phibro (or Phibro Commodities after July 1, 2010), respectively.   The exact entities engaging in MOC trades is known only to Defendants, and as discovery or Plaintiffs' ongoing investigation reveals that the alleged manipulative trades were engaged in by other Shell, Morgan Stanley or Phibro affiliated entities, Plaintiffs intend to further amend their allegations accordingly.

86.     Platts has enormous financial incentives to include the trades of Defendants, especially of BP and Shell and its affiliates, including STASCO, since they are significant sources of revenue to Platts, as is the assessment of the BFOE complex itself.   Were Platts to determine that any of the Shell affiliates or BP were engaged in manipulative activity: a) Platts would have to exclude BP and Shell affiliates, including STASCO, from the BFOE assessment

process (MOC) for some considerable period of time which would, given the dominance of BP and Shell trades in the MOC, as reported by Platts (which generally refers to Shell affiliates' trades as "Shell" trades), render their quotations for that period hollow, and b) if excluded, then BP and Shell and its affiliates, including STASCO, might logically react to a Platts ban by withdrawing from the MOC at which point the very existence of the Platts Crude Oil Marketwire, Platts's flagship and highly lucrative publication, would itself be called into question.[2]  Platts has enormous incentive to ignore the implications of any manipulative trades it sees and instead to attempt to justify them.

87.    In fact, Platts markets Brent as a "Brand."   In May 2012, Dave Ernsberger, Platts's "Global Editorial Director, Oil" made a presentation to the  London Crude Methodology Forum in which he claimed that, "Brent is more than an oil – it's a brand."   It is thus Platts's view that the brand of Brent needs to be protected.   Any concession that the MOC could be manipulated would harm Platts's Brent "brand."

_____

[2] On its website, www.platts.com (last accessed April 25, 2014) Platts writes:  "Platts Market Data is the most efficient and reliable way to receive Platts benchmark price assessments. With Market Data, you get access to the latest, most accurate oil price data. This service provides you with our end-of-day assessments, corrections, third-party data, and a rolling 45-day historical database. Complete and custom historical data sets and are also available. Platts unbiased price reports are produced by the industry's largest editorial team dedicated to oil market reporting. Located around the globe, Platts' unrivalled resources ensure comprehensive coverage, the most reliable data and the most accurate prices available.

**Features**

Market Data is the most efficient and reliable way to receive Platts' industry-standard benchmark assessments in data-point format., Term and spot price assessments, Futures and derivatives, ICE, NYMEX, DME, API, Bunkers, crudes, products, racks, shipping, spot to rack, Yields and netbacks, Platts benchmark price assessments cover the world's major markets and include:

- Crudes, Products, Lubes, Postings, Feedstocks and Blendstocks, Bunkers, Tankers, Netbacks and Yields, Propane & LPG
- European Petroleum Swaps, North American Petroleum Swaps, Asian Petroleum Swaps

**Who Should Buy**

Platts oil price data is essential market intelligence for traders, risk managers, analysts and other energy professionals who need unbiased price assessments for short- and long-term action and analysis.

**Benefits**

Platts Market Data provides the comprehensive price data you need to help reduce risk when making important trading decisions, valuing positions and analyzing data."

### D.     The Brent Benchmark

88.     Platts reports prices for various submarkets in the overall Brent Crude Oil market. These include the submarkets termed: "Brent," "Dated Brent," "Cash BFOE" or "Forward Dated Brent," "North Sea Dated Strip," and CFDs.  Platts's Dated Brent is a benchmark assessment of the price of physical, light North Sea crude oil.  The term "Dated Brent" refers to wet, physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates.

89.     The primary benchmark for Brent Crude Oil is Dated Brent.  As discussed more fully below, Platts incorporates a complex pricing methodology incorporating the different prices – Cash BFOE, North Sea Dated Strip, and CFDs, to arrive at the Dated Brent benchmark price. The Dated Brent benchmark that Platts publishes sets the price of a majority of the world's crude oil, from Canada to Australia.

90.     For pricing the Dated Brent, Platts will only consider the prices of BFOE cargoes in its dated assessment window that are for lifting dates between 10 and 25 days forward of the assessment date.  Prior to January 2012, this assessment window was for lifting dates between 10 and 21 days forward. Thus, the benchmark is at least theoretically derived from the value of crude oil in forward dates (i.e., physical cargoes of crude oil in the North Sea that have been assigned a specific date to be loaded onto a tanker) and these forward dates are within a close time proximity from the time of the execution of the contract.  Typically, Dated Brent requires a loading of a cargo within a 3-day period.

91.     Platts assesses Brent Crude Oil contracts based on the price of any four grades of crude oil, B, F, O or E.

92.     To arrive at its assessments of the various pricing pieces for Dated Brent (Cash BFOE, North Sea Dated Strip and CFDs), Platts uses a market-on-close or MOC methodology, which limits its analysis of market pricing data to transactions that occur during a half-hour

window at the end of the trading day (commonly referred to as the "MOC Window"). Platts first introduced the MOC methodology in 2002, and price assessments are based on bids, offers and transactions during a half-hour period at the end of each trading day, which, for Brent Crude Oil, is between 4:00 p.m. and 4:30 p.m. London time. The MOC is time stamped at 4:30 pm and is supposed to lead, through bids and offers and done deals, to a price.

93.     Platts utilizes the MOC process because, according to Platts, the time period considered in the MOC process tends to be one of high activity, and aligning its price assessments to periods of greater market activity provides a strong basis for assessing market value.

94.     The Platts MOC system seeks to reflect transaction values prevailing in the market close on a normal working day. Platts derives values by tracking market evolution during the assessment window and by assessing value based on supposedly arms-length, open market transactions occurring during the MOC Window and additionally by taking into consideration the bid and offer information for arms-length transactions during this period.

95.     Significantly, Platts's Brent assessments incorporate the values of Brent, Forties, Oseberg, and Ekofisk with the most competitive grade setting the price at the margin. The most competitive grade at the margin in the market will be the one reflected in the benchmark assessment.

96.     That is, Platts does not average the price of Brent, Oseberg, Forties and Ekofisk to set its benchmark rate. The most competitive grade at the margin will determine the price for the Dated Brent – as a differential to Platts's North Sea Dated Strip assessment. For the most part, due to quality differences, the Forties stream is typically the most competitive of the four grades.

97.     The transaction data Platts analyzes is meant to be genuine: genuine trades,

genuine prices at which a participant is willing to sell, and genuine prices a participant is willing to pay.

98.     Indeed, in a 2013 letter to The Financial Times, Larry Neal, the President of Platts, explained that "Platts price assessment process . . . rel[ies] on concrete transactional data including deals, bids, and offers."

99.     Mr. Neal further contrasted the Platts pricing methodology with other rate setting processes such as Libor, stating that "Platts carefully analyses transactional data to determine its fitness for an assessment of market value.  Yes, Platts applies judgment to the data it gathers, but that judgment is tied strictly to the underlying market[.]"

100.     Although Platts aims to capture the price of oil closest to the market, Platts's MOC method can be easily gamed by market participants who can make false, inaccurate or misleading trades (or provide false bids and offers) during the MOC.  If there are no trades, bids or offers are used as an indicator of where market participants were willing to buy or sell.  Large market participants have had the market power and ability to push Dated Brent prices in a particular direction by purposefully and selectively reporting false and misleading data for transactions during the last seconds before the 4:30 p.m. close of the MOC Window.

101.     The economic logic for trading during the MOC Window is problematic.  The reality of the market is that trades of Brent Crude Oil occur throughout the course of the day.  Therefore, it makes little sense for a trader with a position, let alone a large position (either long or short), to use the stylized MOC process to offset the position.  This is because there are fewer players involved in the MOC process and less time to make bids and offers.  To try to buy or sell large positions during the MOC generally is uncommon because to do so telegraphs that the trader holds a large position and wants or needs to offload it.  A more economically-rational

strategy for a trader with a large position would be to unload it slowly over a longer period, not quickly in the narrow MOC Window.

102.    In addition, the Platts assessment for the MOC for Dated Brent is only for the circumscribed 10 to 21 (now 25) day forward window.  This means that trades outside this range do not factor into the price calculation that Platts uses.  And because it is sometimes hard to obtain ocean freight on short notice, if the market for Dated Brent for loading in the 10 to 13 day forward period is offered at very low levels, it may still be impossible for buyers to capitalize on the lower prices.  For this reason, the MOC window is easy to manipulate downward, particularly in situations of tight freight supply.

103.    Platts factors into the assessment process for Dated Brent backwardation, which occurs when nearby prices are greater than expected prices in the future, and contango in the future, which occurs when expected prices in the future are greater than expected nearby prices. If a company offers a cheap cargo loading 10 days forward, the offer only influences, at the most, the Platts assessment for cargoes loading 10 days forward.  Platts still needs to assess days 11 through 25 and publish an assessment that is inclusive of market value from 10 to 25 days forward.  (The range stretches to 27 days for Friday assessments.)  If Platts assesses the market in contango, then the price of Dated Brent will be higher later in the period.  If it assesses Dated Brent in backwardation, then later in the period the price of Dated Brent will be lower than in the earlier period.  Platts will average the price of Dated Brent when the market is in contango or backwardation to come up with a single benchmark price for the two-week window.  By pushing the nearby, 10-day forward loading window upward or downward, a trader can manipulate the market into backwardation, or contango.

104.    As discussed above, the Platts's Dated Brent assessments are set from supposedly genuine transactions, as well as bids and offers for Brent Crude Oil.  Dated Brent is based on cargo sizes of BFOE (*e.g.*, 600,000 barrels) with actual loading times, and therefore it is intended to reflect actual physical market prices.  Dated Brent cargoes are for crude oil, loaded free on board ("FOB") from one of the BFOE terminals and may include stored material at each location. The buyer of a FOB Brent Crude Oil cargo must supply its own freight to transport the cargo from the North Sea to its ultimate location – which could be the U.S., Northern Europe, the Mediterranean, Asia, or elsewhere.

105.    The loading schedule for cargoes in the BFOE blends is limited by capacity constraints.  For example, it would not be possible for many cargoes of the Forties blend to be loaded during the same three-day Dated Brent window from the same of the four North Sea sources. In part to address these capacity constraints, the Platts system permits ship-to-ship loading in addition to loading at the BFOE points.  As discussed below, ship-to-ship loading can also be used as a way to manipulate the market.

106.    Most of the Brent Crude Oil trades use a reference source to determine the price, rather than a so-called flat price.  For example, rather than using a flat price of $90.00 per barrel for Brent Crude Oil, purchase and sale contracts reference Cash BFOE as a benchmark price "plus" or "minus" a further amount in order to reflect grade, delivery location, processing or refining improvements, or other costs.  For Brent Crude Oil pricing, such as CFD pricing (as discussed below), this difference between a given Brent market price and the benchmark price is known as a differential.  These differential prices for the Brent Crude Oil physical markets are supposed to represent the more narrow supply and demand dynamics of that submarket, while the flat benchmark price usually reflects the broader forces that influence prices generally.  Thus,

32

for example, the benchmark price could rise greatly because of some geopolitical issue, while the differentials for Dated Brent might decrease because an oversupply of one of the BFOE products coupled with a reduction in demand for that particular blend.

### 1.    Contracts for Difference

107.    To arrive at the Dated Brent price, Platts reviews various types of transactions for physical Brent Crude Oil or for derivatives of Brent Crude Oil, but only during the MOC process. Platts then connects the various markets together to obtain the Dated Brent price.

108.    Brent CFDs are relatively short–term swaps, quoted by Platts for each of eight weeks ahead of the current date at any one time.  They also are traded for bi-monthly and monthly periods in the marketplace.  They represent the market differential in price between the Dated Brent (BFOE) assessment and a forward month cash contract (i.e., forward month BFOE cash contract, over the period of the swap).

109.    The first weekly balance is on a forward week basis on Thursday and Friday, and becomes a balance week quotation between Monday and Wednesday.  It is rolled forward every Thursday.  Second week onward assessments are all forward week assessments.  Assessments are quoted as a differential to the second Cash BFOE contract month.  For example, on July 23rd, the assessment is against September Cash BFOE.  The relevant cash month rolls on the first day of each month.  For example, June will become the basis month on April 1.

110.    CFDs are a means for holders of long or short BFOE cash positions to hedge against or speculate in movements in the Dated Brent market.  The CFD swap is between the uncertain or "floating" price of the dated Brent differential and a certain or "fixed" differential price, which generally is Platts's daily dated Brent crude assessment.  CFDs are priced using averages of a particular week's worth of daily price assessments as quoted by Platts.

111.    Each trade is an exchange of a fixed for a floating risk in the Dated to BFOE cash

33

differential.  CFDs' role in pricing Dated Brent is described more fully below.

112.    CFDs are generally traded in clips of 100 lots (i.e., 100,000 barrels).  In addition to Dated Brent, CFDs are also used to price crudes which are sold at a differential to Dated Brent.

113.    CFDs are used by traders to approximate the Brent Crude Oil physical market. However, the CFD product is not actually physical crude oil, like the product in the futures market, but rather it is a derivative instrument that is priced based on the Platts benchmark prices. Traders with information about market movements can leverage their knowledge by trading larger volumes in the CFD market and the futures market.  The settlement of CFDs is purely for cash.  Platts reports CFD trades and prices in the MOC assessment.  The Brent Crude Oil on-exchange market is inextricably linked to the spot market for Brent Crude Oil, and consequently to Platts pricing.  Therefore, price movements in the spot market cause price movements in the on-exchange market for products tied to Brent Crude Oil like Brent futures and other derivatives contracts.

### 2.    Cash BFOE

114.    Although the nomenclature is not always employed consistently, the Cash BFOE market is also reported by Platts in the MOC window.  This market consists of trades of BFOE in 100,000 barrel units.  Cash BFOE trades as a forward contract for future months beyond the Dated Brent 10 to 21 (now 25) day window.

115.    Cash BFOE is theoretically the price of BFOE in a forward month beyond the current month.  Like CFDs, trades in Cash BFOE are a derivative, quasi-physical market in the sense that the trades are normally cash settled.  Cash BFOE trades can be accumulated, however, and under certain circumstances, may be converted into a cargo if a 600,000 barrel amount is accumulated with the same counterparty.

34

116.    As discussed above, CFDs are priced as a differential to the Cash BFOE market. The Cash BFOE acts as the flat price benchmark to the CFDs.

### 3.    North Sea Dated Strip

117.    The North Sea Dated Strip is not a traded instrument.  Rather North Sea Dated Strip is the average of the CFD prices, expressed as a flat price, not a differential, during the 10 to 21 (or 25) day MOC Dated Brent window.  The four prices of BFOE are measures as a differential against the single North Sea Dated Strip price.  As discussed below, that North Sea Dated Strip flat price is determined by the CFD market.

118.    The Dated Brent on a given day is the lowest price reported by Platts of the four North Sea product streams, measured as a differential from the North Sea Dated Strip.

### 4.    Interrelationship Among the Various Platts Prices

119.    Platts uses the pricing relationships between Cash BFOE and CFDs solely from the MOC process to arrive at the final Dated Brent benchmark price, which affects the majority of crude oil transactions worldwide.

120.    The average of the CFD prices during the Dated Brent 10 to 21 (now 10 to 25) day window will determine the base flat price that becomes the North Sea Dated Strip.  Then, the most competitive (i.e., lowest) North Sea Dated Strip product stream will determine the differential which becomes Dated Brent.

### E.    By Manipulating Dated Brent and Brent Crude Oil Prices Defendants Also Manipulated Brent Crude Oil Futures Prices and Other Exchange-Based Contracts (and Non-Exchange-Based Contracts) Tied to Brent Crude Oil

121.    As discussed herein at paragraphs 224 to 251, Defendants engaged in various forms of manipulation of the MOC process, which resulted in artificial Dated Brent prices. Manipulations of the MOC Window are also manipulations of the markets for derivatives that trade to Brent, the most common of which is Brent futures.  These manipulations harmed traders

35

in those markets.

122.    A commodity futures contract is a standardized agreement to buy or sell a commodity, such as Brent Crude Oil, at a date in the future.  Futures contracts have two sides: The "long" side is the buyer of the contract who is obligated to take delivery and pay for the commodity if the buyer holds the contract until the specified delivery date.  The "short" side is the seller of the contract who is obligated to make delivery of the commodity on the delivery date.

123.    The Brent Crude Oil futures market can be thought of as a clearinghouse for trades among buyers and sellers of Brent Crude Oil futures contracts, which are standardized contracts used to price Brent Crude Oil at various maturities.  As discussed below, Brent ICE futures use media reports to derive the price of the Brent futures contract, and Platts is the primary media source for Brent pricing.  NYMEX Brent futures settle to ICE Brent futures.

124.    Other exchange-based (and non-exchange-based derivatives) contracts also are related directly to Brent in that they have Brent futures as part of their structure or because they are otherwise tied to the Brent Crude Oil physical market.  Several examples are described in paragraphs 137 and 175 to 211 below.

125.    Brent Crude Oil futures and exchange-based derivatives traders, like Plaintiffs, rely on the prices published by Platts and the other PRAs for price discovery and for assessing price risks in the Brent Crude Oil market.  An increase in the price published by Platts signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the supply/demand balance when conducting their futures trading. Brent Crude Oil futures and exchange-based derivatives are a reflection of the conditions and expected conditions of the Brent Crude Oil spot market.  Generally and including during the

Class Period, Brent Crude Oil futures and exchange-based derivatives prices derive their valuation from observable transactions.

126.    Brent Crude Oil spot and futures prices move in the same direction.  That is why futures markets are used to hedge price exposure.  Pricing trends in the Brent Crude Oil spot market directly affect Brent Crude Oil futures.  The expiration (or conversion) of a Brent Crude Oil futures contract into a physical position also results in the convergence of price.  The physical delivery mechanism ensures price convergence between the spot and futures markets.  When these high correlations or conversions are disrupted by the manipulation of prices (creating false values/prices, *i.e.*, a manipulation of the Platts Brent Crude Oil benchmarks), it has effects that ripple throughout the Brent Crude Oil and futures market, impacting a wide variety of derivative and futures contracts on NYMEX and ICE.

127.    Brent Crude Oil futures and other derivatives contract prices are directly linked to Platts's and other PRAs' pricing assessments of market participants' transactions.  Therefore, reporting inaccurate or misleading Dated Brent and Brent Crude Oil transactional prices also results in artificial prices for the Brent Crude Oil futures contracts and other related derivative contracts.

128.    Plaintiffs' consulting experts herein provide statistical support for the connection between the Platts MOC Brent Crude Oil prices and Brent Crude Oil futures prices.  First, ICE Brent Futures are inseparably linked to Platts prices by construction of the futures contracts' terms.  On the final settlement date, ICE Brent futures contracts settle on the Brent Index.[3]  A

---

[3] Brent Index is designed to capture the physical oil prices.  It is defined by ICE as follows:  "The cash settlement price for the ICE Brent and ICE Brent NX Future is based on the ICE Brent Index at their respective expiries. The index represents the average price of trading in the 25-day BFOE market in the relevant delivery month as reported and confirmed by the industry media. Only published cargo size (600,000 barrels) trades and assessments are taken into consideration. CALCULATION: The index is calculated as an average of the following elements: 1. A

critical component of the Brent Index is the Platts prices.  The settlement price for the Brent futures therefore is determined by the Platts Brent Crude Oil prices.  Therefore, by using ICE Brent Crude Oil futures contracts, any trader can lock in a purchase or sale price of Brent Crude Oil at the Brent Index price, which in turn is determined by Platts's prices.  Any time prior to final settlement date, Brent futures prices will anticipate the present value of this final payoff at the final settlement date and reflect these discounted payoffs.  Hence, by construction of their contract terms, ICE Brent Crude Oil futures prices are inseparably linked to Platts prices.

129.    To empirically establish the relation between Platts physical crude oil prices and ICE Brent Crude futures prices, Plaintiffs' consulting experts analyzed the correlations between the daily returns to Platts's Dated Brent Crude Oil prices and daily returns to ICE Brent Crude Oil futures prices.  These relations are shown in the following graph titled Consulting Expert ("C.E.") 1.  As can be seen, correlations between Platts's Dated Brent prices and ICE Brent Crude Oil futures vary between 85% to 100%.  Most of the time, the correlations are above 90%.

---

weighted average of first month cargo trades in the 25-day BFOE market. 2. A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months. 3. A straight average of designated assessments published in media reports."  *See* https://www.theice.com/publicdocs/futures/ICE_Futures_Europe_Brent_Index.pdf, last accessed April 27, 2014.



130.   Furthermore, Plaintiffs' consulting experts also examined the slope coefficients between the daily returns to Platts' prices and daily returns to ICE Brent Crude prices.  These relations are shown in the following graph titled C.E. 2.  These slope coefficients typically remain between 0.90 and 0.95.  These high and positive correlations and high and positive slope coefficients indicate that any shocks from Platts Dated Brent prices are transmitted directly to ICE Brent Crude Oil futures prices almost one for one.  An immediate implication of this finding is that Platts's Dated Brent prices will not only transfer information about the fundamental supply and demand conditions, but also that the results of any manipulative activity that distorted Platts's prices during the MOC Window will be passed directly to Brent Crude Futures.



131.    As an additional test of the relation between Platts Dated Brent prices and Brent

futures prices, Plaintiffs' consulting experts examined the ratio of these two prices around the

contract expiry and settlement dates.  Plaintiffs' consulting experts compared the Dated Brent

price on the expiry date to Brent Crude Oil futures price both on expiry date as well as the

settlement date.  On the settlement date, Brent Crude Oil futures prices simply settle on the Brent

Index Price.  These relations are shown on the following graph titled C.E. 3.  As can be seen,

Platts Dated Brent prices and Brent Crude Oil futures prices do not deviate from each other more

than 1% most of the time.



132.    These studies by Plaintiffs' consulting experts further corroborate the inseparable link between Platts Dated Brent prices and ICE Brent futures prices.

### 1.    Brent Crude Oil Derivatives On NYMEX

133.    NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. § 7(a-1).   NYMEX is the world's largest physical commodity futures exchange and the preeminent forum for energy.   There are a number of futures and derivatives contracts based on the Brent Crude Oil benchmark that can be purchased or sold on NYMEX.

134.    These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms.   Globex is an electronic trading platform owned by the CME Group, the parent company of NYMEX.

135.    In addition to trading on electronic platforms, many futures contracts such as the

Brent Crude Oil Last Day Futures (BZ) and the Brent Financial Futures (CY) trade through open outcry at the NYMEX in New York.  Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange.

136.    NYMEX futures and other derivatives contracts priced, settled or benchmarked to Brent Crude Oil include:

- Brent Crude Oil Last Day Financial Futures (BZ):  Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price is equal to the ICE Brent Crude Oil Index price as published one day after the final trading day for the delivery month.

- Brent Financial Futures (CY):  Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price for each contract month is equal to the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement prices for each business day that it is determined during the contract month.

- Brent Crude Oil Penultimate Financial Futures (BB):  Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price is equal to the ICE Brent Crude Oil Futures' first nearby contract settlement price on the penultimate trading day for the delivery month.

- Brent Crude Oil vs. Dubai Crude Oil (Platts) Futures (DB):  Final settlement, following termination of trading for a contract month, is based on the Floating Price. The Floating Price for each contract month is the arithmetic average of the ICE Brent Crude Oil Futures first nearby contract settlement price minus the mid-point between the high and low quotations from Platts Crude Oil Marketwire for the Dubai front month price for each business day during the contract month.

- WTI-Brent Financial Futures (BK):  Final settlement, following termination of trading for a contract month, is based on the Floating Price.  The Floating Price for each contract month is the arithmetic average of the Light Sweet Crude Oil first nearby contract settlement price for each business day that it is determined minus the ICE Brent Crude Oil Futures first nearby contract settlement price for each business day that it is determined during the contract month.

- Brent CFD: Dated Brent (Platts) vs. Brent Front Month (Platts) Daily Futures (1C): Final Settlement of this contract is by cash settlement, which is based on the Floating Price that is calculated as the daily mid-point between the high and low quotations from the Platts Crude Oil Marketwire for the CFD assessment which is based on Dated Brent minus the first month Brent (also referred to BFOE) cash price for the contract day. The contract trades in 1,000 barrel increments with prices quoted in U.S.

42

dollars and cents per barrel. These contracts trade in 1,000 barrel increments with prices quoted in U.S. dollars and cents per barrel.

- <u>Brent EFS</u>: Refers to an "Exchange of Futures for Swap" transaction.  EFS is a mechanism that allows a bilaterally negotiated swap to be submitted to the Clearing House for clearing as a cleared futures contract.  Brent-linked products are among the products that traders submitted for clearing as EFSs on the CME and NYMEX and commonly were used to spread two different products.

### 2. Brent Crude Oil Derivatives On ICE

137.    Intercontinental Exchange Group, Inc. ("ICE Group") is a Delaware corporation with a principal place of business in Atlanta, Georgia.  ICE Group operates a global network of exchanges and clearing houses.

138.    In 2000, BP, MSCGI, Shell and other large participants in the OTC energy market including Goldman Sachs, Total, Deutsche Bank and Société Générale, were among the initial investors in ICE.  These investors sought to establish an integrated electronic platform for side-by-side trading of energy products in both futures and OTC markets.  Through ICE, these investors sought to profit from the fees that otherwise would have been paid to brokers and to develop the energy markets for their own strategic purposes.

139.    In 2001, ICE Group acquired the International Petroleum Exchange ("IPE"), one of the world's largest energy futures and derivative contract exchanges.  The IPE's flagship commodity, Brent Crude Oil, was a world benchmark for oil prices.

140.    Up until 2001, most oil derivative contracts were traded on the IPE. Brent Crude Oil futures contracts were traded via open outcry on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures Europe and all trading in Brent Crude Oil futures on ICE was shifted onto an electronic trading platform.  ICE is the second largest regulated energy futures exchange in the world.

141.    ICE Futures Europe is a purely electronic derivatives exchange that is wholly owned by ICE Group.  ICE Futures Europe's headquarters is located at Milton Gate, 5th Floor, 60 Chiswell Street, London EC1Y 4SA, U.K.  ICE Group and ICE Futures Europe also conduct business out of several U.S. offices in Atlanta, GA, New York, NY, Chicago, IL, Houston, TX, and Washington D.C.

### a)  ICE Futures Europe's Operations in the U.S.

142.    To trade on ICE Futures Europe one must be a member of ICE Futures Europe. Ice Futures Europe allows U.S. investors to trade a number of globally-traded derivatives (futures, options, and swaps contracts) including Brent contracts through ICE Futures Europe members.  ICE Futures Europe also offers derivatives involving a variety of U.S. benchmark energy prices including WTI crude, New York Harbor Heating Oil, and RBOB Gasoline futures. Many of ICE Futures Europe's derivative contracts involve the purchase of contracts tied to U.S. energy products (*e.g.*, the popular Brent-WTI Futures Spread and certain crack spreads described below).

143.    U.S. investors' access to ICE Futures Europe has been permitted pursuant to publicly filed requests for no-action relief by ICE Futures Europe (f/k/a IPE).  This no-action relief grants ICE Futures Europe an exemption from the portion of the CEA that requires contract markets to seek designation from the CFTC.  To obtain this grant of no-action relief, ICE Futures Europe certified that all U.S. trading activity would consist of: (i) ICE Futures Europe members trading for their proprietary accounts through electronic trading systems in the U.S.; (ii) ICE Futures Europe members who are registered with the CFTC as futures commission merchants ("FCM") pursuant to the CEA or who are Rule 30.10 firms (essentially, those firms who are granted a special exemption from the FCM rule) to submit orders from U.S. customers

for transmission to the electronic trading system; and/or (iii) ICE Futures members who are registered with the CFTC as FCMs or who are Rule 30.10 firms accept orders through U.S. automated order routing systems from U.S. customers for submission to the electronic trading system.

144.    In the original November 12, 1999, CFTC No-Action Letter No. 99-69 that allowed U.S. customers to trade on IPE, the CFTC made clear that:

> The scope of the Division's no-action position is restricted to providing relief from the requirement that IPE obtain contract market designation pursuant to Sections 5 and 5a of the CEA and regulatory requirements that flow specifically from the contract market designation requirement in the event that the above-referenced contracts are made available in the United States through ETS [electronic trading systems], in the manner set forth herein. *The Division's no-action position does not extend to any other provision of the CEA, any other Commission regulations, nor to any NFA rules, and does not excuse IPE or its members from compliance with any applicable requirement thereunder.* (emphasis added)

145.    The CFTC also noted that, "The Division's no-action position does not affect the Commission's ability to bring appropriate action for fraud or manipulation."

146.    Further, the CFTC conditioned its no-action position on dozens of requirements including: (a) that all orders for U.S. customers be intermediated by IPE members that are registered with the CFTC; (b) that IPE and its members who conduct trades on behalf of U.S. customers designate an agent for service of process in the U.S.; (c) that IPE provide certain trade data and other information to the CFTC on at least a quarterly basis and at any time promptly upon the request of the CFTC; (d) that IPE provide information to the CFTC on U.S. customers who trade on IPE; and (e) that IPE continue to comply with the terms and conditions of the no-action relief so that the CFTC could carry out its duties under the CEA and the CFTC's regulations.

45

147.   On April 14, 2003, the CFTC granted IPE further no-action relief in No-Action Letter No. 03-17 allowing IPE "to make all of its contracts, including Brent Crude futures and options contracts . . . available in the U.S. on the ICE Platform during the course of the entire trading day." But again the CFTC cautioned that, "its no-action position *does not relieve the IPE from compliance with the terms and conditions set forth in the November 12, 1999 letter.*" (emphasis added).

148.   On June 17, 2008 and August 20, 2009, the CFTC issued No-Action Letter No. 08-09 and No-Action Letter 09-37 adding additional requirements to ICE Future Europe's no-action relief including that ICE Futures Europe must:

- Provide CFTC staff with trade execution and audit trail data for the CFTC's Trade Surveillance System for all of ICE Futures Europe's linked contracts;

- Provide for CFTC staff on-site visits for the purpose of overseeing ICE Futures Europe's ongoing compliance with its no-action relief;

- Provide to CFTC staff advance copies of all rules, rule amendments, circulars and other notices published by the exchange;

- Provide to CFTC staff copies of all Disciplinary Notices involving ICE Futures Europe's linked contracts upon closure of the action; and

- In the event that the CFTC, pursuant to its Commodity Exchange Act Section 8a(9) emergency powers authority, directs the NYMEX to take emergency action with respect to a linked contract, ICE Futures Europe will promptly take similar action with respect to the linked contract at ICE Futures Europe.

149.   Thus, since 1999, pursuant to the CFTC no-action relief described above, U.S. investors have been allowed to trade derivatives on ICE Futures Europe. The CFTC maintains regulatory power of ICE Futures Europe and is free to revoke ICE Futures Europe's no-action relief at any point in time if ICE Futures Europe does not continue to comply with the requirements set forth by the CFTC.

### b)  How Trades are Executed on ICE Futures Europe

150.    ICE Futures Europe trades are not executed by the customer on ICE Futures Europe (unless a member of ICE Futures Europe is trading for their proprietary account).  This is because only members of ICE Futures Europe may trade on ICE Futures Europe.  ICE Futures Europe establishes criteria for membership under the oversight of various global financial authorities including the CFTC.

151.    ICE Futures Europe has approximately 185 members.  At least 62 of those members are based in the U.S.  Almost all of these U.S. members that accept U.S. customer trades are designated by the CFTC as FCMs pursuant to the CEA.  FCMs are organizations that (1) solicit and accept orders to buy or sell futures, options, or swaps and (2) accept money or other assets from customers to support such orders.

152.    U.S. customers trade through ICE Futures Europe's U.S. members. These U.S. customers must be accepted by the ICE Futures Europe member pursuant to that member's rules and the CFTC's oversight of FCMs:



153.    Thus, ICE Futures Europe explains to aspiring customers that, "Once accepted by a clearing firm or other licensed futures brokerage, it is possible to participate in the markets [ICE Futures Europe]."

154.    ICE Futures Europe has three membership categories: (1) General Participants; (2) Trade Participants; and (3) Individual Participants.

155.    General participants may trade their own business and their clients' business. They may also do "give ups" (i.e., trades for another member).  If the General Participant is also

a clearing member then they may clear their own business, their clients' business or clear for any other member of the exchange who is not a member of the clearing house.

156.   Trade participants may only trade their own business.   Likewise, if a trade participant is a clearing member then he may only clear his own business.

157.   Individual Participants are sole traders and may trade their own business only.

158.   General Participants and trade participants must either be clearing members or, as non-clearing members, must enter into a clearing agreement with a General Participant who is a clearing member.   An Individual Participant must enter into a clearing agreement with a General Participant who is a clearing member.

159.   Thus, a U.S. customer who is not a member of ICE Futures Europe actually enters her order through an FCM who is a member of ICE Futures Europe and receives a trading confirmation from that FCM.   The FCM then carries out the transaction on behalf of the customer.

160.   ICE Futures Europe's U.S. members are connected to ICE Futures Europe through: (1) active screens at participant financial firms in the U.S. and abroad, (2) ICE Group's telecommunications hubs in the U.S. and abroad, (3) ICE Group's electronic trading platform WebICE, and (4) application programming interfaces.

161.   In 2013, ICE Futures Europe hosted approximately 55% of the world's crude and refined oil futures contract volume and cleared oil swaps on ICE Futures Europe comprised approximately 6% of ICE Futures Europe's average daily volume.   All of this activity was cleared through ICE Clear Europe via its clearing members.

### c)   How Trades are Cleared on ICE Futures Europe

162.   Placing a trade is just one aspect of the commodities trading process.   Clearing

consists of all activities from the time the trade is made until the trade is settled.  Every commodities exchange, including ICE Futures Europe, has its own clearinghouse.  ICE Futures Europe's clearinghouse is ICE Clear Europe.

163.    ICE Clear Europe is a global clearinghouse that is wholly owned by ICE Group. ICE Clear Europe clears an average of more than 3 million energy contracts every day.

164.    ICE Clear Europe is a CFTC-registered Derivatives Clearing Organization ("DCO") under the CEA and is regulated by the CFTC.  DCOs are clearinghouses that mutualize or transfer credit risk among participants in an exchange (in the case of ICE Clear Europe the exchanges are ICE Futures Europe and certain energy transactions from ICE Futures U.S.).  The CFTC requires that any clearinghouse that seeks to provide clearing services with respect to futures, options, or swaps must register with the CFTC as a DCO and comply with CFTC regulations regarding DCOs.

165.    All members of ICE Futures Europe are required to clear their trades through ICE Clear Europe.  According to ICE Group, "ICE Clear Europe performs the clearing and settlement for every futures and options contract traded through ICE Futures Europe[.]"

166.    ICE Clear Europe also has members (these are also referred to as "clearing members" of ICE Clear Europe and ICE Futures Europe).  ICE Clear Europe clearing members maintain collateral with ICE Clear Europe and are jointly responsible with ICE Clear Europe for fulfillment of trading contracts from ICE Futures Europe.

167.    Clearing members play a critical role in trades on ICE Futures Europe.  Clearing members are highly capitalized companies that guarantee all trades made through ICE Futures Europe.  Clearing members are typically well-known major financial institutions.

168.    ICE Clear Europe maintains a system for the performance of financial obligations

49

based on trades made on ICE Futures Europe.  These financial obligations are between (1) the clearing members and their customers and (2) the clearing members and ICE Clear Europe.  As the central counterparty to every futures contract traded on ICE Futures Europe, ICE Clear Europe matches long and short positions anonymously and guarantees financial performance.

169.    The full relationship between customers, members, and ICE Futures Europe/ICE Clear Europe looks something like this:



170.    Clearing members assume full financial and performance responsibility to ICE Clear Europe for all transactions on ICE Futures Europe executed through the clearing member.  Clearing members are responsible and accountable for every position they carry, whether it is for the account of a member, non-member customer, the clearing member's affiliates or its own proprietary account.

171.    For example, if a non-member U.S. customer wishes to enter a trade then she must do so through a U.S. FCM (usually a clearing member) of ICE Futures Europe.  At the time that the FCM accepts the trade, the customer is locked into the trade.  The customer receives confirmation of the trade from the FCM and the FCM assumes responsibility for the trade.  The trader and the counterparty to the trade must post initial or original collateral to the FCM.

172.    If the market moves in favor of the customer then funds in the trader's account (held by the FCM) increase.  The customer may withdraw these funds down to the initial margin level depending on the customer's agreement with the FCM.

50

173.   If the market moves adversely then the customer will be required to post additional collateral to the FCM.  These so called "margin calls" assure the FCM of performance of the trade.  However, if the customer cannot meet its margin call then it is up to the FCM to deal with the customer.  Further, if the customer is unable to meet its obligations under the trade then the FCM will be obligated to pay the losses on the trade.

174.   ICE Futures Europe General Participant clearing members include the U.S. offices of large financial institutions such as Citigroup Global Markets, Inc., Goldman Sachs & Co., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co. LLC, and Wells Fargo Securities, LLC.  All of these ICE Futures Europe and ICE Clear Europe U.S. members are also specifically identified by ICE as being "Active in Oil Markets (Brent Crude & Gas Oil)."

### d)  Popular Brent Crude Products Traded on ICE Futures Europe

### i.   ICE Brent Futures Contract

175.   ICE Futures Europe is the world's largest host of crude and refined oil futures trading.  The ICE Brent futures contract is traded on ICE Futures Europe and executed on the WebICE trading platform, which is distributed in more than 70 countries, including the U.S.  The ICE Brent futures contract is relied upon to price two-thirds of the world's physical crude oil.

176.   The ICE Brent futures contract is a deliverable contract based on "exchange for physical" or "EFP" delivery with an option to cash settle, using the ICE Brent Index price for the day following the last trading day of the futures contract.  Prices of ICE Brent Crude Oil Futures contracts are quoted in U.S. dollars and cents per barrel.  Trading in ICE Brent Crude Oil Futures contract terminates at the end of the designated settlement period on the Business Day immediately preceding: (i) either the 15th day before the first day of the contract month, if such

15th day is a Business Day; or (ii) if such 15th day is not a Business Day, the next preceding Business Day.

177.    The ICE Brent Crude Oil futures contract was developed in 1988 when the Brent crude oil physical market was trading on a 15-day basis.  The expiry calendar established at that point, which continues today for existing ICE Brent Crude Oil futures, reflected the 15-day timetable.  Existing ICE Brent Crude Oil futures therefore currently expire 10 days after BFOE contracts have started to go "wet," i.e., to turn into specific Dated Brent contracts with respect to the contract delivery month in question.

178.    According to ICE, the "ICE Brent futures contract is based on the underlying physical BFOE market," and the "ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the [EFP] mechanism.  The contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract.  At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day.  The Index is also calculated by the exchange every day."

179.    Further, ICE's corporate website states that "[t]he cash settlement price for ICE Brent . . . is based on the ICE Brent Index at their respective expiries.  The index represents the average price of trading in the 25-day "cash" BFOE market in the relevant delivery month as reported and confirmed by the industry media [e.g., Platts]. . . . The index is calculated by the Exchange as an average of the following elements:

    a.      A weighted average of first month cargo trades in the 25-day BFOE market;

    b.      A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months; and

<div align="center">52</div>

c.    A straight average of designated assessments published in media reports [*e.g.*, Platts]."

180.    In response to Platts extending its assessment period to a 10 to 25 day period, ICE launched the ICE Brent NX Brent futures contract, which has an expiry calendar based on the 25-Day BFOE market, which aligns the futures expiry calendar with the physical BFOE market.

### ii.    Brent-WTI Futures Spread

181.    A large part of crude oil trading is focused around spread trading.

182.    The spread is simply the difference between two benchmarks, derivatives, commodities, etc.

183.    A spread trade is typically the simultaneous sale and purchase of one or more offsetting futures and/or options contracts (the "legs").  Spread trades are executed to yield an overall net position whose value, called the spread, depends on the price of the legs.

184.    Common spread trades are priced and traded as a single unit on futures exchanges rather than as individual legs, thus ensuring simultaneous execution and eliminating the risk that one leg executes but the other fails.

185.    According to ICE, one of the most well-known and traded spreads is the Brent-WTI spread, which is the difference in price of WTI minus Brent and commonly is referred to as the "Arb" by traders.

186.    As discussed above, WTI stands for West Texas Intermediate and is also known as Texas light sweet.  WTI is another grade of crude oil that is also used as a benchmark in oil pricing.  Cushing, Oklahoma is the major trading hub for WTI oil.  WTI is the leading U.S. benchmark for oil prices.

187.    Trading a position in Brent-WTI Spread results in two separate futures contracts in the underlying futures legs (i.e., a long position in ICE Brent Futures and a short position in

ICE WTI Futures).  Thus, buying 1 ICE Brent WTI Spread results in a 1,000 barrel buy of WTI and 1,000 barrel sell of Brent.  The WTI futures contract is settled against the prevailing U.S. light sweet crude market price based on the settlement price for WTI crude futures as made public by the New York Mercantile Exchange ("NYMEX").

188.    The Brent-WTI spread is traded on ICE Futures Europe under ICE Brent/WTI Futures Spread ("Brent WTI Spr").  The contract price for Brent WTI Spr is in U.S. dollars.  The Brent WTI Spr is traded at least 22 hours a day, 7 days a week in New York.  The unit of trading is 1,000 barrels of Brent.

### iii.    Calendar Spreads

189.    Another popular spread on ICE Futures Europe is the calendar spread.  Calendar spreads are bets on the price relationship between two futures contract months, rather than on the price of the underlying commodity itself.  Calendar spreads are bets on the market expectation of supply and demand at one point in time relative to another point in time.

190.    Calendar spreads are established by simultaneously entering a long and short position on the same underlying asset but with different delivery months.  An example of a calendar spread would be going long on a crude oil futures contract with delivery next month and going short on a crude oil futures contract with delivery in six months.

191.    Calendar spreads can be effective hedges to the physical market.  For example, if the physical market seller expects prices of a commodity to rise or fall in the future then that seller can hedge their physical assets with calendar spreads.

192.    ICE Futures Europe has a variety of Brent calendar spreads based on different periods of time (*e.g.*, Brent Calendar Spread Options for 1-month ("BRM"), 6-month ("BRX"), and 12-month ("BRZ")).

193.    Each of the Brent calendar spreads is traded in U.S. dollars.  The Brent calendar spreads are traded at least 22 hours a day, 7 days a week in New York.  The unit of trading is 1,000 barrels of Brent.

### iv.    Crack Spreads

194.    Another popular spread on ICE Futures Europe is the crack spread.  Crack spread is a trading strategy.  The name of this strategy is derived from the fact that breaking or "cracking" oil produces gasoline and heating oil.

195.    In a crack spread a trader purchases oil futures and offsets this position by selling gasoline and heating oil futures.  This investment alignment allows the trader to hedge risk.

196.    Many popular crack spreads on ICE Futures Europe are based on U.S. gasoline and heating oil prices.  For example, the ICE Fuel Oil Crack – New York 1% Fuel Oil vs Brent 1st Line Future allow traders to trade the spread between the Platts daily assessment price for New York 1% fuel oil and ICE Brent futures.  Trading this position results in two separate positions in the underlying futures legs (i.e., one position in New York 1% fuel oil and one position in ICE Brent futures).

197.    Other examples of ICE Futures Europe crack spreads based on U.S. metrics include the Diesel Crack – Gulf Coast ULSD vs Brent 1st Line Future and the Jet Fuel Crack – Gulf Coast Jet Fuel vs Brent 1st Line Future.

198.    Crack spreads are effective hedges to the physical market.  For example, oil refiners which purchase crude oil and sell refined products face significant price risk.  Thus, an oil refinery may trade a crack spread to hedge the price risk of their operations.  ICE describes certain of its crack spreads as "designed to provide users with an effective hedging instrument." ICE also states that such crack spreads are "essential for pricing and hedging refinery

economics[.]"

199.   The contract price for most crack spread contracts is in U.S. dollars.  Most crack spread contracts are traded at least 22 hours a day, seven days a week in New York.

### v.   Minute Markers

200.   Another popular contract variation on ICE Futures Europe is the minute marker.

201.   The minute marker is based on a style of commodities trading known as trade at settlement ("TAS").  In TAS trading, the parties to a futures contract agree that the price of the trade will be that day's settlement price or the settlement price plus or minus a specified differential.

202.   TAS has attracted some controversy due to its use in market manipulation techniques such as "Banging the Close."  However, TAS can also be an effective tool for those who wish to trade at certain market close prices.  For example, ICE describes one of its minute market products as "designed with the needs of the cash market hedger in mind[.]"

203.   For example, the Brent Crude Futures Minute Marker ("IPE e-Brent") is calculated using a weighted average of trades done during a one minute period from 4:29pm to 4:30pm GMT.  This specific minute is important because it coincides with the Platts MOC window.

204.   The IPE e-Brent is traded at least 15 hours a day, 7 days a week in New York. The unit of trading is 1,000 barrels of Brent.

### vi.   Dated-to-Frontline

205.   Another popular contract variation is trading the difference between Platts Dated Brent assessments and ICE frontline (or 1st line) futures contracts.  This contract is known as dated-to-frontline.

206.    As discussed above, Platts Dated Brent is a benchmark assessment of the price of physical, light North Sea (i.e., Brent) crude oil.  The term "Dated Brent" refers to physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates.  Each cargo of crude oil is often traded more than once as it makes its way to delivery to refineries – where crude oil is transformed into products like gasoline, diesel, jet fuel, and more.  Thus, Platts Dated Brent is essentially an estimate of the price of Brent oil currently on ships.

207.    A frontline future is a short term (e.g., 1 month) futures contract.

208.    The dated-to-frontline contract thus hedges the price of Brent oil currently on ships against the price of short term Brent oil futures.

209.    For example, one dated-to-frontline contract offered on ICE Futures Europe is the Dated Brent vs Brent 1st Line Future ("DBF").  This contract is based on the difference on the Platts daily assessment price for Dated Brent and the ICE daily settlement price for Brent 1st Line Future.

210.    The contract price for DBF is in U.S. dollars.  The DBF is traded at least 22 hours a day, 7 days a week in New York.  The unit of trading is 1,000 barrels of Brent.

### vii.    Brent Options

211.    The ICE exchange also trades various options contracts concerning Brent, including Brent 6 and 12-Month Calendar Spread Options; Brent Crude-American Style Options; Brent Crude Diff contracts, which are Daily Brent 1-Month Calendar Spread Options; the Crude Futures Brent 1-Month Calendar Spread Options; and Crude Outright, which is the Dated Brent (Platts) average price option.

### viii.    Dodd-Frank and the Creation of ICE Swap Trade

212.    In October 2013, ICE Group launched ICE Swap Trade LLC ("ICE Swap Trade").

57

ICE Swap Trade is a Delaware limited liability company with a principal place of business at 55 East 52nd Street, 39th Floor, New York, New York 10055.  ICE Swap Trade is registered with the CFTC as a swap execution facility ("SEF") pursuant to the CEA.  SEFs are new a form of exchange created by the Dodd Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank").

213.    To understand what a SEF is it is necessary to give some background on how SEFs came to be.  Title VII of Dodd-Frank targeted OTC credit default swaps and other derivatives that were the subject of several bank failures during the Great Recession. Historically, such OTC derivatives were not subject to government regulation, but Dodd Frank changes that.  Under Title VII, all OTC derivatives are subject to oversight by the CFTC.  Title VII mandates that most standardized derivatives must be cleared through a registered DCO. Most of Dodd-Frank Title VII's requirements came into effect in 2013.

214.    When Dodd-Frank was being drafted, regulators and lawmakers wanted to move the trading of *all* OTC derivatives to transparent and centrally cleared exchanges (such as ICE Futures Europe), but OTC market participants convinced regulators and lawmakers that such a market structure was not viable for certain swaps.  Thus, although Dodd-Frank mandates that *most* OTC derivatives had to be standardized and moved to formalized exchanges. Dodd-Frank also created the SEF.

215.    A SEF is essentially an exchange that has a lot less rules.  Whereas members of ICE Futures Europe must abide by many rules governing all aspects of transactions on the exchange, submit all transactions for clearing through ICE Clear Europe, and only list standardized products for trading, SEFs allow for much more flexibility in structuring transactions.

216.    In October 2012, in response to Dodd-Frank and prior to most of Dodd-Frank's provisions became effective in 2013, ICE Group: "transitioned our cleared OTC energy swaps business to energy futures listed on . . . ICE Futures Europe, for our global oil and refined products, fright, iron ore and natural gas liquid products."  ICE Group's 10-k for the year ending December 31, 2012 states the reasons that this transition was made:

> Transitioning our cleared energy business to futures requires us to comply with the highest level of regulation in the United States and United Kingdom.  The transition to futures relieves our energy market participants of many of the Dodd-Frank obligations for trading swaps products and provides a legally certain regulatory regime in which to operate.

217.    However, ICE Group did not move every derivative to ICE Futures Europe and also sought approval from the CFTC to create a SEF.

218.    In October 2013, the CFTC granted ICE Swap Trade, temporary registration as a SEF.

219.    ICE Swap Trade "provides execution for OTC markets."  To trade on ICE Swap Trade, one must a member of ICE Swap Trade.  ICE Swap Trade lays out detailed criteria for membership in the ICE Swap Trade Rule Book.

220.    Contracts on ICE Swap Trade are semi-standardized but also allow parties to set their own terms.

221.    Various Brent based swaps are available on ICE Swap Trade.

222.    Contracts on ICE Swap Trade are traded in U.S. dollars pursuant to the trading terms of the individual contract in addition to the terms as agreed to by the parties.  The ICE Swap Trade Rule Book lays out general descriptions of the contracts available on ICE Swap Trade.

223.    A popular contract variation on ICE Swap Trade is the CFD.  For example, one

such contract is the Daily CFD – Brent CFD vs Second Month Swap – 1,000 bbl.  This contract is governed by Rule 1370 of ICE Swap Trade.  This is a cash settled swap based on the difference between Platts Dated Brent and the second listed Platts BFOE month.  The contract is traded in units of 1,000 barrels and is subject to the other terms.  However, the parties to this CFD are also free to set their own terms in the full form of the contract and, "The terms reflected in such contracts shall be controlling."

F.    **Defendants Manipulated Brent Crude Oil Futures Prices Through the MOC Process**

224.    Defendants purposefully manipulated prices of Brent Crude Oil and Brent Crude Oil futures and derivatives contracts through their deliberate and systematic submission of false Brent Crude Oil trade information to Platts.  Plaintiffs have retained consulting experts who have analyzed the MOC process and its effect on futures prices.  The premise that the experts start with is that the Brent Crude Oil Market (as defined in section VII, *infra*) should be "informationally efficient."

225.    That is, in a competitive market, prices reflect the aggregate judgment and information of tens or hundreds of thousands of independent, competitive and profit-seeking traders, who trade on their information and thereby incorporate their information into the asset prices.  A market is defined as competitive and *informationally efficient* if the prices of securities or assets traded in that market fully reflect all material, publicly available information.  The term "fully reflect" means that the prices of assets, such as common stocks, preferred stocks, bonds, and options, or commodities such as oil prices react rapidly to new information. Thus, market efficiency indicates that an investor, using only publicly available information, will not be able to systematically realize an abnormal or excess return by buying and selling an asset or a security or commodity.

60

226.    Finance literature characterizes three forms of market efficiency, weak-form, semi-strong form and strong form.  The weak form market efficiency states that asset markets reflect all information in the history of prices.  That is, it is not possible to construct profitable trading strategies using past price- or past return-patterns.  Semi-strong form of market efficiency states that prices in asset markets reflect all publicly available information.  Strong form of market efficiency states that prices in asset markets reflect all information, public or non-public.

227.    The notion behind the weak form of efficient markets is that if the asset's prices do not reflect the information in the past history of prices and returns, then investors can form trading rules by first recognizing and then trading on these patterns in past returns and past prices. The notion behind the semi-strong form of efficient markets is that if the asset's prices do not quickly reflect publicly disclosed material information, then investors can profit from this lack of response by buying the asset if it is underpriced, or by selling the asset if it is overpriced. Economists generally observe that competition among investors to discover new profit opportunities pushes security prices to fully reflect all material, publicly available information. Consequently, in an efficient market, investors can rely on market prices of the security to reflect all publicly available, material, information.

228.    The evidence in the finance literature generally supports the concept of the both weak-form and semi-strong form of market efficiency, which also includes the weak-form. [4] A popular finance textbook by Brealey, Myers and Allen writes that in competitive markets,

---

[4] Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance*, 46 (1991), p. 1576.  Although some recent studies have uncovered some evidence of anomalous price behavior, numerous peer-reviewed academic studies by leading financial economists have largely concluded that these anomalies have alternative explanations that are consistent with and support market efficiency. There are a number of such surveys. *See*: Eugene F. Fama, "Market Efficiency, Long-Term Returns, and Behavioral Finance," *Journal of Financial Economics* 49 (1998), pp. 283-306; G. William Schwert, "Anomalies and Market Efficiency," in *Handbook of the Economics of Finance*. G. Constantinides et al., eds. (Amsterdam: North Holland, 2001); and Burton G. Malkiel, "The Efficient Market Hypothesis and Its Critics," *Journal of Economic Perspectives*, Vol. 17, No. 1 (Winter 2003), pp. 59-82.

consistent, predictable price patters will not endure:

> You should see now why prices in competitive markets must follow a random walk. If past price changes could be used to predict future price changes, investors could make easy profits. But in competitive markets easy profits don't last. As investors try to take advantage of the information in past prices, prices adjust immediately until the superior profits from studying past price movements disappear.  As a result, all the information in past prices will be reflected in today's stock price, not tomorrow's. Patterns in prices will no longer exist and price changes in one period will be independent of changes in the next. In other words, the share price will follow a random walk.[5]

229.    As alleged herein, Defendants manipulated physical oil prices which were set in a manipulative fashion during the MOC Window between 4PM and 4:30PM London time. Plaintiffs consulting experts first investigated the MOC-period manipulation by engaging in the following decomposition exercise.  What would have happened to ICE Brent Crude oil futures prices if the MOC Window simply did not exist?  That is, what would happen if one simply ignored the return to oil prices during the narrow window between 4PM and 4:30PM each day? As a comparison point, what would have happened to ICE Brent Crude Oil futures prices, if oil pricing took place only during the MOC Window?  That is, what would have happened to prices if one ignored the Brent Crude Oil price returns from yesterday's 4:30PM to today's 4PM each day?  The intention here is to decompose the actual Brent Crude Oil futures prices into two parts; one that is caused by price changes during the MOC Window, and the other caused by price changes during non-MOC Window.  The objective is to simply understand what the oil pricing the MOC Window looks like and how it compares to non-MOC periods.  Do the MOC periods look like any other period during the day except that it is shorter, that is only a half-hour, or is the MOC period somehow special?  Furthermore, if the MOC-period is special, how is it special?

---

[5] Richard Brealey, Stewart Myers, Franklin Allen, Principles of Corporate Finance, McGraw-Hill, 2003, Chapter 13, p. 351.

230.    In a competitive market, these two decompositions of Brent Crude Oil prices should track each other closely.  If the predominant fundamental shock on a given day is positive, oil prices should increase in both periods on that day.  If the predominant fundamental shock on a given day is negative, oil prices should decrease in both periods on that day.  The MOC period changes should be similar but smaller than the non-MOC period changes, since the MOC-Window is only half hour, whereas the non-MOC window is 23.5 hours.

231.    In the following graph titled C.E. 4, the actual 1-month ICE Brent futures contract was priced at $79.5761 at 4:30PM the first trading day of 2010, which is January 4, 2010.  To compute the MOC-window decomposition of prices, Plaintiffs' experts adjusted this price only by the return from 4PM to 4:30PM each day.  For instance, the actual return during the MOC-Window on January 5, 2010 was 0.0099%.  Using this return, the MOC-Window-decomposition price becomes $79.584.  Similarly, to construct the non-MOC-Window decomposition of prices, Plaintiffs' consulting experts use the actual non-MOC returns.  The actual return during the non MOC-Window on January 5, 2010 was 0.828% (from 4:30PM on January 4, 2010 to 4PM on January 5, 2010).  Using this return of 0.828%, our non-MOC-decomposition price becomes $80.235.  The analysis continues this way for each day between January 4, 2010 and March 24, 2014.

232.    The results of this decomposition exercise are shown in the following three graphs titled C.E. 4 through 6, for 1-3 months to maturity for ICE Brent Crude Oil futures, respectively.  These simple pictures are illustrative.  Instead of showing that both MOC and non-MOC periods reflect the same shocks to the fundamentals, these graphs indicate that MOC decomposition prices actually tend to go in opposite direction to the non-MOC decomposition prices.  If non-MOC prices increase, MOC prices decrease.  If non-MOC prices decrease, MOC prices tend to

increase.   This type of opposite movement is most unusual, it goes completely against competitive markets and it is consistent with massive manipulation of oil prices during the MOC Window.

233.   Most shocking, however, is the cumulative effect of these MOC-Window manipulations.   While market fundamentals would have increased oil prices from $79.58 on January 4, 2010 to a hypothetical value of $130.64 on March 24, 2014; during the MOC-window the Defendants have consistently and continually pushed prices down to $64.94.   Put another way, during the non-MOC window, over 4.3 years, oil prices have increased by 64.6%.   During the same time period, using only the MOC-window price changes, Defendant have actually pushed oil prices down by an incredible 18.4%.   The actual closing price of Brent Crude Oil futures at $106.87 at 4:30PM on March 24, 2014 reflects the combined effect both of these influences.[6]

---

[6] To check the math for the decomposition, notice that the actual one month Brent Crude Oil Futures price has increased by 34.3%, while non-MOC price component has increased by 64.2%, while the MOC Window price component has decreased by 18.4%.  Using compound returns, the cumulative returns across the two decomposed priced equals the return to the actual Brent Crude Oil Futures, namely (1+0.6417)*(1-0.184)-1=34.0%.  The slight difference is due to rounding error.



**C.E. 4:  ICE Brent futures price decomposed into changes outside MOC window and changes during the MOC window, 1 month contract**





234.   These strong divergences underscore the fact that the Defendants' power to effect prices is substantial and was used mostly uni-directionally.  The manipulation mostly pushed oil prices down in the MOC Window against rising market conditions.  In part, this conduct can be explained by the fact that certain Defendants, primarily BP, and also Shell, are significant refiners whose refining margins are benefited from lower crude oil prices.  The most active refiner in the MOC is Shell and its trading arm STASCO.  Aside from its trading activities, Shell produces approximately 1.5 million barrels per day but refines approximately 2.8 million barrels per day.  Shell and STASCO thus have a natural "short" position, accumulating every single day 1.3 million barrels which it must cover in the export market.  BP has a similar, although smaller, structural shortfall between proprietary production and proprietary refining at approximately

300,000 barrels per day.   The lower prices for Brent Crude Oil improve these Defendants' overall refining margins.

235.   To formally quantify the visual evidence in above graphs C.E. 4 through 6 Plaintiffs' consulting experts calculated the correlation coefficients of Brent Crude Oil futures prices during morning and early afternoon hours to the MOC Window, as well as the MOC Window to post-MOC window, once again for ICE Brent Crude Oil futures (CO), separately for 1 month, 2-months, and 3-months remaining to maturity.   A correlation coefficient is a simple statistical tool to determine whether two variables tend to go in the same direction (positively correlated), or whether they tend go in opposite direction (negatively correlated), or whether movement in one variables does not tell us anything about the movement of the other variable (uncorrelated).   Plaintiffs' experts also determined whether the observed correlations are genuine or whether they could arise by chance by examining the statistical significance of these correlations.   In a competitive market, where shocks are random, one would not expect to see any patterns or correlations here.

236.   These correlations are shown in the following three graphs titled C.E. 7 through 9. These exhibits now show particular patterns that are consistent across maturity months.   First of all, most correlation coefficients tend to be negative.   This indicates that price changes during the pre-MOC Window were reversed to some extent in the MOC Window.   Take for instance the correlation at 6AM in the first graph below.   This correlation is about -0.05 (or -5%).   This means that the Brent Crude Oil future price change from 6AM to 4PM London time is reversed to some extent between 4PM to 4:30PM window, London Time.   This correlation has a p-value near 0.05.   This means that the -5% correlation is statistically reliably negative at the traditional

95% confidence level.[7]   Another way of expressing these negative correlations is as follows:  If

the ICE Brent Crude Oil futures price increases from 6AM to 4PM, then it tends to decline

between 4PM and 4:30PM more often than expected.   Similarly, if the ICE Brent Crude Oil

futures price decreases from 6AM to 4PM, then it tends to increase between 4PM and 4:30PM

more often than expected.  This is what is meant by reversals or negative correlations.   The

following three graphs C.E. 7 through 9 also show negative correlations during the post-MOC

period.  These negative correlations indicate that Brent Crude Oil futures price changes in the

MOC Window (4PM to 4:30PM) tend to be reversed to some extent in the post-MOC Window

between 4:30PM and a later time in the evening.



[7] P-value corresponds to (1-confidence interval).  Hence, if a statistic has a p-value of 0.05 or smaller, that means it is statistically significant at a confidence interval of 95% or better.





C.E. 9:  Correlation, pre- and post-MOC returns with MOC returns, ICE Brent, (contract length in legend), 1/1/2010 - 3/25/2014

237.     The evidence in the three graphs above titled C.E. 7 through 9 clearly corroborates manipulation and is consistent with the evidence in the previous three graphs titled C.E. 4 through 6.   The first three graphs titled C.E. 4 through 6 showed that Defendants consistently suppressed Brent Crude Oil futures prices during the MOC Window.  The second three graphs titled C.E. 7 through 9 further indicate that price changes in the morning and early afternoon are typically reversed to some extent during the MOC window, leading to negative correlation coefficients.  Similarly, these graphs titled C.E. 7 through 9 also indicate that price changes in the MOC Window are typically reversed to some extent again during the post-MOC Window, again leading to negative correlation coefficients.   These double reversals are surprising and inconsistent with well-functioning competitive market conditions.  These double reversals indicate that the pricing during the MOC Window goes against the prevailing supply

71

and demand conditions during the morning and early afternoon hours as well as in the evening hours.  Coupled with the first three graphs titled C.E. 4 through 6, the overall statistical evidence so far indicates that Defendants indeed changed the course of Brent Crude Oil futures prices during the MOC Window when they did not like the prevailing market trends in order to benefit themselves.  If market prices were increasing such that it hurt their net positions in the market, Defendants pushed prices against market fundamentals.  Following the MOC Window, market fundamentals began to assert themselves once again, reversing at least some of the Defendants induced MOC price change.

238.    Plaintiffs' consulting experts' next set of correlation tests focus on the spread between ICE Brent Crude Oil futures (CO) and ICE WTI oil futures (WT), known as the arbitrage spread.  Manipulating the arbitrage spread is subject to less risk since by using the arbitrage spread, Defendants will have protected themselves from unforeseen shocks to the fundamentals in the crude oil markets generally.  Once again, the correlation of the arbitrage spread is computed from pre-MOC to MOC Window; as well as from MOC Window to post-MOC Window.

239.    These correlations are shown in the following three graphs titled C.E. 10 through 12, separately for 1-month, 2-month and 3-month futures maturities.  These graphs titled C.E. 10 through 12 indicate that the arbitrage spreads exhibit even stronger negative correlations before and after the MOC Window than the underlying flat prices.  These correlations are statistically significant at the traditional 95% confidence interval or better.  These negative correlations again mean that Brent Crude Oil price trends from morning and early afternoon are reversed to some extent during the MOC Window.  Similarly, oil price changes during the MOC Window are reversed to some extent during the post-MOC window.  Once again, this additional evidence

corroborates and strengthens the evidence of manipulation and the degree to which Defendants have manipulated Brent Crude Oil prices during the MOC Window.





**C.E. 11:  Correlation, pre- and post-MOC returns to MOC returns, ICE Brent - ICE WTI differential (futures month in legend), 1/1/2010 - 3/25/2014**



C.E. 12:  Correlation, pre- and post-MOC returns to MOC returns, ICE Brent - ICE WTI differential (futures month in legend), 1/1/2010 - 3/25/2014

240.   As an additional test of manipulation, Plaintiffs' consulting experts examined the simple frequency of reversals of price trends from morning and early afternoon to the MOC Window, as well as from the MOC Window to post-MOC periods.  These results are shown in the following graph titled C.E. 13.  As can be seen, reversals of price trends are more likely than would be expected under normal conditions based on random chance.  The frequency of oil price reversals typically exceeds 50% that would be expected under normal market conditions.  For most of the times, reversal proportions vary between 50% and 54%.  These differences from 50% are statistically significant at the traditional 95% confidence interval in many cases.  This evidence further corroborates the conclusion that Brent Crude Oil prices did not behave as one would have expected under typical supply-demand conditions in a competitive market.  Instead, evidence indicates that Defendants changed course of oil prices during the MOC Window when

they did not like the prevailing market trends in order to benefit themselves, thus leading to a greater frequency of reversals.



241.    Plaintiffs' consulting experts also computed the simple frequency of reversals using ICE Brent and ICE WTI spreads, shown in the following graph titled C.E. 14.  These reversals of the arbitrage spread are stronger, significantly more than a normal chance occurrence of 50%, now approach and even exceed 60%.  Once again, they are statistically significant at the usual 95% confidence intervals.  This evidence once again indicates that these arbitrage spread reversals cannot be attributed to chance occurrence and they are consistent with the manipulation of Brent Crude Oil futures prices during the MOC Window.



242.    As another test of manipulation, Plaintiffs' consulting experts examined whether

the late afternoon Brent Crude Oil price reversals during the post-MOC period were more likely

if the price trend from the morning and early afternoon up to 4PM did reverse during the MOC

Window.   These are called conditional reversals, since they are conditioned on a pre-MOC

Window price reversal.   To determine whether price trends reversed to some extent during the

pre-MOC period, Plaintiffs' consulting experts examined the returns from 9AM to 4PM.[8] If

these returns were opposite of those between 4PM and 4:30PM, these were called conditional

reversals.   These conditional reversals for post-MOC periods are shown in the following graph

titled C.E. 15 for Brent Crude Oil futures months 1-3 and the following second graph titled C.E.

---

[8] Plaintiffs' consulting experts repeated the tests for other morning windows as well.  In the interest of brevity all of these results are not shown.  Nevertheless, these extended results were very similar to the 9AM to 4PM window.

16 for the arbitrage spread ICE Brent Crude minus ICE WTI Crude, months 1-3.

**C.E. 15: Proportion of days with opposite post-MOC/MOC returns among days conditional on opposite pre-MOC/MOC returns; (contract length in legend); ICE Brent; 1/1/2010 - 3/25/2014**





C.E. 16:  Proportion of days with opposite MOC to post-MOC returns conditional on days with opposite pre-MOC to MOC returns; by post-MOC time and contract length (in legend); ICE Brent - ICE WTI

243.    Comparing the proportion of reversals in the first of the two graphs above titled C.E. 15 with those in the analogous one two earlier titled C.E. 13 clearly shows an increase in reversals.  Similarly, comparing the proportion of reversals in the second of the two graphs above titled C.E. 16 with the graph two earlier titled C.E. 14 also clearly shows an increase in reversals.  Once again, these conditional reversals are typically statistically significant at the traditional 95% confidence interval.  As can be seen from these graphs titled C.E. 15 and 16, conditioning on a pre-MOC reversal increased the likelihood of a post-MOC reversal. Conditional reversals exceed 60%-65% in many cases.  These finding once again corroborate Defendants' alleged manipulation.  When Defendants intervened and reversed the course of early price trends during the MOC window, market fundamentals were more likely to undo the Defendants actions and prices reversed course to some extent once again in the post-MOC

79

Window.

244.    While not shown in the interest of brevity, Plaintiffs' consulting experts also computed conditional correlations similar to the initial correlations titled C.E. 7 through 12. Once again, the condition was on a reversal from morning to 4PM.  Plaintiffs' consulting experts then computed the correlations of MOC returns to post-MOC returns.  As expected, conditioning on a pre-MOC reversal significantly increased the negative correlations between MOC returns and post-MOC returns once again.

245.    To demonstrate the most unusual nature of these price trend reversals, Plaintiffs' consulting experts also investigated the relation between pre-MOC to the beginning MOC returns with end of MOC to post-MOC returns.  These relations are shown in the following four charts titled C.E. 17 through 20.  The most striking feature of these relations is the fact that the correlations between pre-MOC returns and post-MOC returns are all positive.  These positive relations are also statistically significant at the traditional 95% confidence interval or better.  To illustrate the meaning of these correlations, take an example.  In the first graph titled C.E. 17, for 7AM start time[9] and 9:30PM ending time, the correlation is about 0.25, and highly statistically significant with a p-value near zero.[10]  This means that if the Brent Crude Oil futures prices rose from 7AM to 4PM, they were much more like to rise again between 4:30PM and 9:30PM.  Similarly, if the oil prices fell from 7AM to 4PM, they were much more like to fall again between 4:30PM and 9:30PM.  Thus, positive correlations mean that the morning Brent Crude Oil futures price trends in the pre-MOC period were reestablished during the post-MOC period.

_____

[9] Plaintiffs' consulting experts repeated the tests for all other starting time windows as well.  In the interest of brevity, all of these results are not shown.  Nevertheless, these extended results were very similar to the results that are shown.

[10] A p-value near zero means a more than 99% confidence that the observed correlation coefficients cannot be attributed to random chance.





C.E. 18: Correlations, 8AM to 4PM returns with post-MOC returns from 4:30PM to indicated times below, ICE Brent (contract length in legend), 1/1/2010 - 3/25/2014





246.    Another interesting feature of the pre-MOC correlation with post-MOC correlation is that the positive correlations start out at rather modest level of 5% around 5PM. By the time evening hours of 9PM to 9:30PM arrive, these correlations have more than tripled to between 15% and 25%.  These increasing patterns of correlations indicate that it takes about 4 or 5 hours after the MOC-window closes at 4:30PM for sufficient fundamentals-driven transactions to occur and to reestablish the dominant fundamentals-driven price trend of the day.

247.    Plaintiffs' consulting experts also examined the correlations of pre-MOC returns with post-MOC returns for the arbitrage spreads (ICE Brent Crude – ICE WTI Crude).  Once again, in the interest of brevity, these charts are not shown.  In general, the arbitrage spreads display a similar correlation structure as the ICE Brent Crude Oil futures.  There are typically positive correlations between pre-MOC and post-MOC returns to arbitrage spreads.  Similar to

84

the flat prices, these correlations start out near zero and get more strongly positive into the evening hours.  These positive correlations of the arbitrage spreads once again mean that the morning trends arbitrage spreads were reestablished in the same direction during the post-MOC period.

248.    The statistical and visual evidence in the previous 14 graphs titled C.E. 7 through 20 indicate that Defendants manipulated Brent Crude Oil futures prices down during the MOC Window.  More generally, when the Defendants did not like the prevailing price trends, they pushed the MOC prices against the market trends.  The evidence indicates the Brent Crude Oil futures prices as well as arbitrage spreads are affected by strong positively-correlated market fundamentals shocks.  These fundamental shocks cause the oil prices and arbitrage spreads go in a particular direction in a given day.  When these oil price movements cause economic losses for the Defendants in the morning and early afternoon, they intervened during the MOC Window and reversed the course of oil prices.  Post-MOC, prices are once again governed by the same fundamental market factors and thus oil prices as well as the arbitrage spreads reverted back to their pre-MOC patterns to some extent.  The fact that generally positive oil price trends can and do go negative and exhibit statistically significant reversals in the half-hour MOC Window indicates that the Defendants can and do exert massive influence on Brent Crude Oil futures prices by concentrating their manipulative efforts in this narrow half-hour window through the Platts price discovery mechanism.

249.    Overall, both visual and statistical evidence strongly confirms that the Defendants have manipulated the oil prices between at least 2010 and present.  Over this 4.3 year period, they have tended to push MOC Window prices down by 18.4%, while the oil prices have risen about 64.6% outside the MOC Window.  In particular, it appears that if the prevailing changes in

Brent Crude Oil futures prices during the morning and early afternoon hours hurt their net positions, taking into account their physical production, their refining needs, as well as their speculative positions and caused economic losses, Defendants intervened massively during the narrow MOC Window to reverse these price trends.  This intervention gave rise to the reversal of price trends, as evidenced by significantly negative correlation coefficients, and greater than expected reversals.   Following the MOC Window, market fundamentals began to assert themselves once again, reversing at least some of the Defendants-induced MOC price change once again, and Brent Crude Oil futures prices resumed the same trends established in the morning and early afternoon.

250.   Further corroborating Plaintiffs' consulting experts statistical studies described above, in the following paragraphs Plaintiffs provide descriptions of discrete manipulations of Brent Crude Oil at several different times over the last few years.   These descriptions are consonant with the statistical explanations provided above.   They are meant to serve only as examples, and Plaintiffs allege that this manipulative conduct occurred with regular frequency during the Class Period as shown by the statistical analysis.

### G.   The June 2010 Manipulation

251.   In June 2010, various Defendants including STASCO, BP, Vitol and Statoil, were responsible for suppressing the price of Dated Brent through manipulation of the MOC Window. This manipulation had its greatest impact during the settlement of the July ICE Brent futures.

252.   From June 1, 2010 STASCO had been a seller of CFDs in the MOC Window (thereby both establishing short CFD position while influencing the Dated Brent quotation) and from June 3, 2010 to June 8, 2010 had actively sold CFDs pricing in the period through June 25, 2010.  Success for STASCO in these positions was dependent upon a weak relative Forties price as expressed by the Forties differential to NSDS which was setting the daily Dated Brent

quotation.

253.    However, by June 8, 2010, the market began moving against STASCO, with Forties strengthening in price.  For this reason, STASCO began depressing (or holding constant) Forties prices in the MOC Window at this time.

254.    The manipulation began by at least June 8, 2010 when STASCO sold a cargo of Forties to Statoil at Dated Brent minus $0.25 for the dates June 29, 2010 to July 1, 2010 during the MOC Window.  The cargo was denominated F0625.  This was one of two Forties sales made by STASCO on this date the other being to Total for delivery dates June 23, 2010 to June 25, 2010 (a cargo denominated F0621) at Dated Brent minus $0.35.  On the June 8, 2010 Forties set the Dated Brent quotation at a discount of $0.33 to North Sea Dated Strip, having been set the previous day at a discount of $0.35.  As discussed below, Statoil would then use the same cargo it bought from STASCO on June 8, denominated F0615, to manipulate the MOC on June 15, 2010, the final expiry day of the ICE Brent futures contract for July.

255.    The next day, on June 9, 2010, BP and Vitol artificially lowered the Forties differential to North Sea Dated Strip and simultaneously (and as a consequence) the flat price Dated Brent quotation for that day.  Platts reported the following in its MOC recap for the day:

> After a day's absence, Vitol returned to offer a June 21-23 Forties on an August cash BFOE-related basis, reaching August cash BFOE minus $1.55 before being lifted by BP, who took parcel number F0620.

256.    Based on this price, Platts made only minor reaction in the Forties differential for that day being set at $0.33 the North Sea Dated Strip on June 8 and changing minimally to $0.34 for the June 9, 2010.  Note that Platts quoted the price of the trade at minus $1.55 based on cash BFOE, not the North Sea Dated Strip.

257.    The price for the cargo trading between Vitol and BP was artificial because it ran

against the flow of the market fundamentals at the time.  Platts reported that the Forties market was fundamentally strengthening and that the Forties differential to August Cash BFOE was rising.  On June 10, 2010 it stated:

> A series of supportive factors emerged in the North Sea market Wednesday, ensuring no let up in the bullish trend seen since the start of the week. With futures values pushing higher on supportive US economics, the Forties assessment also rose on a cash related basis, being assessed at August cash BFOE minus $1.41/b, a rise of $0.075/b on the day. The July loading programs emerged, showing persistently small numbers of cargoes in the North Sea over the coming month. "It's a pretty skinny program so far," said one trader, although that of Ekofisk had yet to be released. Brent/Ninian Blend and Oseberg production remained very near record lows, with Forties still set to put out under 600,000 b/d, at 561,290 b/d. Other factors supporting values were clear, as an outage on Total's Elgin field shut in another 50,000 b/d day, along with a large amount of natural gas, which will lead to a slowdown in Forties output, traders said. "At 50,000 b/d it is not insignificant," said one.

258.    STASCO's and others short CFD positions were trading precisely against these quotations.  Therefore, it was in the economic interest of STASCO and others to prevent Forties from moving upward.  The BP trade to Vitol aided in stemming the movement of Forties against this position.

259.    The sham nature of the Vitol's sale to BP on June 9 became all the more evident on June, 10, 2010 when BP sold the cargo back to Vitol at $0.19 lower than the previous day's price.  On that day, Platts reported the following in its MOC recap for the day:

> Forties remained assessed at Dated Brent minus $0.34/b despite more aggressive indications. These bids and offers were, however, sufficiently divergent to keep the assessment on the same track. In a fast change of value for a cargo, the Vitol equity Forties sold in Wednesday's MOC process to BP was quickly turned around by the British major, offering it $0.19/b lower than the August cash BFOE minus $1.55 it paid the trading house the day before. "It would appear that it's lost a fair bit of value overnight," said a trader.

260.    Platts reports the resale of the cargo from BP to Vitol in its MOC Window as having taken place (and therefore a consequent overnight loss to BP of some substance) but in fact this was a blatant attempt by BP and Vitol to artificially lower the Forties differential to North Sea Dated Strip and simultaneously (as a consequence) the flat price Dated Brent quotation for that day.  The comment by the trader 'it would appear that it's lost a fair bit of value overnight' is evidently sardonic.  Despite the loss of $0.19 as reported, Platts on this date for once seems to have ignored the manipulative behavior and maintained the Forties differential unchanged.

261.    The futures market was affected by these sham transactions in the MOC Window. On June 10, 2010, the futures markets during the MOC Window experienced price reversals from price trends before and after the MOC Window.  That is, prior to the MOC Window, futures were trading higher, as high as $75.502 at 4 PM for the nearby contract.  During the MOC Window, the trend reversed and futures fell to $75.040 at 4:30 PM.  Then after the MOC Window futures again resumed their move upward (although not to the same degree) to $75.270. This "double reversal" is direct evidence of the manipulation that occurred in the physical MOC Window.  The most plausible explanation for the futures price behavior is that the uneconomic prices reported in MOC Window disrupted the overall fundamental price trends that had otherwise been occurring and thereafter reoccurred in the futures markets.

262.    On June 11, 2010 Platts continued to report strength across the North Sea grades. In particular, Platts mentions bullish fundamentals for Forties but Platts maintained an unchanged differential for Forties on this date, even as all other North Sea grade differentials began to rise.  Remarkably this was because of a uneconomically priced cargo between BP and Litasco.

89

Sweet grades in the North Sea leapt in value Friday, as the demand seen at the back end of June for grades apart from Forties continued unabated. Statoil offered a raft of North Sea grades which were mostly snapped up near the offer levels, trading sources agreed. The July 3 Statfjord and the July 5 Oseberg were offered at Dated Brent plus $1.60 and plus $1.15/b respectively and were heard done near the offer level. Meanwhile BP offered two cargoes of Ekofisk off July 5 and July 11 dates, the latter at Dated Brent plus $1.05/b, and both were also sold in quick time. Expectation began to creep in that Forties, whose demand and value have lagged behind the other North Sea grades in recent days, might see some uptick in both as a result. "Sweets are roofing," said a trader. "With other sweet grades roofing, I think Forties could look OK as a sweet grade," he added. There was no immediate impact on the benchmark grade, as Litasco bought a BP offer in the Platts Market on Close assessment process at Dated Brent minus $0.37/b from BP.

263.    On June 11, 2010 Statoil had sold four cargoes of North Sea grades.  One of these was an Oseberg cargo which could have been traded inside the MOC.  Instead, like BP, Statoil sold the grades on a bilateral basis without revealing all of the details of the trades to Platts.

264.    The trading similarity of the strategies of Statoil and BP here is noteworthy.  Both companies were selling North Sea physical grades, other than Forties outside of the MOC Window.  As above on the June 11, 2010 BP sold two Ekofisk cargoes outside of the MOC at rising relative prices while still selling Forties inside the MOC, a sale which maintained the Forties differential at unchanged even as all other North Sea grades on that date improved in relative price even after BP's wash trade with Vitol.  Both Ekofisk cargoes could have been sold inside the MOC.

265.    The strategy was for BP and Statoil to sell physical grades at improving differentials and thereafter to hedge these sales with long positions in relatively cheap Forties differentials or relatively cheap ICE futures.  By transacting small volumes of Forties in the MOC or through collusive trading (such as wash trades) these traders managed to achieve strong

market effects in both the Platts MOC and in the futures trading coincident to the Platts MOC.

266.    On June 11, 2010 all North Sea grades rose in relative price other than the artificially depressed Forties.

267.    On Monday, June 14, 2010, immediately following the Friday surge in grade values relative to Forties, there were no cargo trades in the MOC.  Platts reported that both STASCO and Statoil continued to place offers in the MOC for Forties but do not provide details of the loading dates or of the facility of the offers.  Despite the efforts of STASCO and Statoil, Platts assessed the Forties differential higher by $0.17 although this was a pale reflection of the assessment relative to August Cash BFOE where the price rose by $0.475.  The CFD curve also moved prices higher.

> The trend seen at the back end of last week grew even stronger Monday, with North Sea grades seeing half dollar rises in their differentials on healthy demand. Statoil has already sold several cargoes of crude, the loading programs of which only came out on Thursday last week. Having offered the July 5 Oseberg cargo at Dated Brent plus $1.15/b on Friday and selling it not far from this offer, the company offered the July 9 cargo Monday at Dated Brent plus $1.50/b, also reportedly seeing a trade close to this level. Similarly a Statfjord cargo loading July 3 traded Friday around Dated Brent plus $1.60/b but today the July 7 stem traded near the new offer of Dated Brent plus $2.10/b. The carry-over of strength into the Forties market still did not appear with quite the same vigor, with no bids seen in the Market on Close assessment process. As it was, two offers—one from Shell and the other from Statoil—arrived and got as low at Dated Brent minus $0.10/b without trading. However, the upturn in paper values, where the CFD curve shifted up over $0.15/b on most weeks, with rolls tightening, revealed a stronger market. One trader explained the lack of bids as refiners being "too shell shocked to bid", as demand has risen so fast. The assessment of the Forties differential was made at forward Dated Brent minus $0.17/b, a rise of $0.17/b. Versus August cash, however, this was a rise of $0.475/b.

268.    The relative rise in values of Forties was hurting the traders' strategy.  Forties relative values had to remain depressed while the elements of the strategy were executed, i.e.,

Forties values had to remain weak relative to the other North Sea grades a) while short CFD positions were pricing in the nearby period and b) to execute both OTC and futures trades to hedge the superior relative values achieved for other North Sea grades.

269.    The manipulation of the MOC Window continued on June 15, 2010.  On this day, the expiry day July ICE Brent futures, there were two trades in Forties involving a staggered was trade from Statoil to STASCO at the front of the Platts assessment dates and a further trade from Hetco to MSCGI at the far dates of the assessment period.  These two trades combined achieved the collusive aim of weakening Forties (and thereby the Dated Brent quote) and at the coincident time the second and third month futures plunged in the MOC as the prompt month came close to expiry.

270.    Statoil's trade used the same cargo it bought from STASCO on June 8, denominated F0615.  On this date Platts reported as follows:

> The Forties differential lost some of its recent heat Tuesday as traders spoke of the benchmark grade "overperforming", even in light of the rampant North Sea grade values seen elsewhere. Statoil, a bidder for most of the previous week, continued to offer barrels and found a buyer in Shell at Dated Brent minus $0.20/barrel for a June 29-July 2 loader, parcel F0625. Shell, however, was also offering barrels and saw its own indication fall a further $0.10/b to Dated Brent minus $0.30/b for June 26-28 dates, although it did not attract any buying interest. Of more interest to those looking to shift volume was Morgan Stanley's bid at the very back end of the 10-21 day window, which represented dates of June 25 to July 6. The bank's bid of Dated Brent minus $0.30/b was taken out by Hetco, who provided the July 6-8 cargo, the very same stem it had kept from the chains earlier in the day, parcel number F0706.

271.    On June 15, 2010 the Dated Brent quotation was set by Forties at a discount of $0.31 to North Sea Dated Strip, a significant fall in the relative value of Forties of $0.14 from the prior day.  Using the exchange of Forties parcel F0625, STASCO and Statoil were thus able to

depress Dated Brent on June 15, 2010.   As recounted by Platts, Hetco also aided in the manipulation downward by selling on this expiration day at uneconomic levels.

272.    Statoil was also very active outside of MOC trades on dates around and including the futures expiry date of 15th June 2010.  Indeed, Statoil made a concerted effort to sell cargoes in the more deferred loading period in early- to mid-July 2010 during this period.  The following table illustrates Statoil's known activity in the physical oil markets as heard by Platts or reported to Platts:

| Statoil's Physical Oil Trading Activities | | | | | | |
|---|---|---|---|---|---|---|
| Report Date | Grade | Seller | Buyer | Loading Dates | Volume (KB) | Date Premium/ Disc |
| 6/11/2010 | Statfjord | Statoil | PC | 7/03/2010 | 855 | 1.60 |
| 6/11/2010 | Norne | Statoil | PC | 7/04/2010 | 855 | - |
| 6/11/2010 | Oseberg | Statoil | PC | 7/05/2010 | 855 | 1.15 |
| 6/11/2010 | Grane | Statoil | PC | 7/03/2010 | 855 | - |
| 6/14/2010 | Oseberg | Statoil | PC | 7/09/2010 | 600 | 1.45 |
| 6/14/2010 | Statfjord | Statoil | PC | 7/07/2010 | 855 | 2.00 |
| 6/14/2010 | Gullfaks A | Statoil | PC | 7/09/2010 | 855 | 3.00 |
| 6/14/2010 | Grane | Statoil | PC | 7/15/2010 | 855 | -2.10 |
| 6/16/2010 | Statfjord | Statoil | PC | 7/11/2010 | 855 | 2.50 |
| 6/16/2010 | Oseberg | Statoil | PC | 7/13/2010 | 600 | 1.70 |
| 6/16/2010 | Norne | Statoil | PC | 7/14/2010 | 855 | 4.65 |
| Total | | | | | 8,895 | |

273.    Statoil also bought significant amounts of short-term CFDs outside the MOC Window, but these amounts, as shown below, were not enough to offset the sales that it make for physical cargoes.   In addition, because these trades were accomplished outside the MOC Window, they did not impact Dated Brent.

| Statoil's CFD Purchases Outside the MOC | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Report Date | Seller | Buyer | Cargo Mo. | Spread Mo. | Cargo Load Range | Crude Grade | Reported Status | Diff. Grade/ Mo. | Outright Price ($/bbl) | Diff. Price ($/bbl) | Volume (KB) |
| 6/14/10 | Hetco | Statoil | June | Jul | 28-2 | Brent CFD | Reported | August | - | -1.00 | 500 |
| 6/14/10 | Lukoil | Statoil | June | Jul | 28-2 | Brent CFD | Reported | August | - | -1.00 | 200 |
| 6/15/10 | Mercuria | Statoil | July | | 12-23 | Brent CFD | Reported | September | - | -1.10 | 200 |
| 6/15/10 | Phibro | Statoil | July | | 1-31 | Brent CFD | Reported | September | - | -1.07 | 500 |
| 6/15/10 | Phibro | Statoil | July | | 1-31 | Brent CFD | Reported | September | - | -1.10 | 500 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/15/10 | Chevron | Statoil | July | | 1-31 | Brent CFD | Reported | September | - | -1.10 | 200 |
| 6/15/10 | Vitol | Statoil | July | | 1-31 | Brent CFD | Reported | September | - | -1.13 | 300 |
| 6/15/10 | STASCO | Statoil | July | | 1-31 | Brent CFD | Reported | September | - | -1.13 | 500 |
| 6/15/10 | Vitol | Statoil | July | | 1-31 | Brent CFD | Heard | September | - | -0.18 | 300 |
| 6/16/10 | Chevron | Statoil | June | Jul | 23-29 | Brent CFD | Reported | | -0.40 | | 400 |
| **Total** | | | | | | | | | | | **3,600** |

274.   According to Platts from the 11th to the 16th of June Statoil had sold approximately 9 million barrels of North Sea physical grades other than (the manipulated) Forties on a bilateral basis to a private and confidential buyer or buyers.  They had in this period also executed more than 3.5 million barrels of OTC CFD transactions which logically may be interpreted as hedges for the physical sales.  Given the nature of the trades above, it is highly plausible that Statoil either participated in or engineered the MOC period reversals in futures which further benefitted their positions.  The strategy was aided and abetted by, *inter alia*, STASCO, BP, Hetco and Vitol who manipulated Brent Crude Oil prices to their coincident interests.

275.   The concerted effort to suppress Forties prices through its trades during this period had a direct effect on Brent futures prices, particularly those on the expiry of July futures (on June 15).

276.   The manipulation is verifiable in the futures market on June 15 because the second and third futures contracts reversed their price action after the MOC ended.  (The spot month, however, did not follow this, because this contract expired on that day.)  This reversal occurred in the following way:   prior to the MOC Window, second month futures were increasing from $75.540 at 7 AM to $76.662 at 4 PM.  During the 30-minute MOC Window between 4PM and 4:30 PM, second month futures fell from $76.662 to $76.376.  Then, after the MOC Window, futures returned to their upward trend from $76.376 at 4:30 PM to $77.085 by

94

7:30 PM.  This incongruous market behavior is evidence of manipulation and contradicts how markets would have reacted had valid fundamental prices been reported during the MOC Window.

277.    The behavior of the second and third month futures on June 15, 2011 demonstrates that the MOC trading was uneconomic.  That is, the direction of MOC trades only remained static for the expiring futures contract.  As to the contracts that continued trading, the market for them returned to its pre-MOC levels and demonstrated that the MOC trades were not in line with trades elsewhere.

**H.    The January and February 2011 Manipulations**

**1.    January 2011**

278.    In January 2011, the MOC Window was manipulated in various ways.  In the context of an overall suppression starting mid-month, certain Defendants manipulated Dated Brent and Brent futures upward during the expiration of February futures.  Later in the month, Dated Brent continued to be manipulated downward in a preamble to a longer-term manipulation in February 2011.  The two particularly intense periods of manipulation were around the ICE Brent February contract final expiry on the January 14, 2011 and from the January 21 to 31, 2011.

279.    At the outset the failings of the MOC process were in full display on January 12, 2011.  On this day two cargoes had traded outside of the MOC Window (PetroCanada F0209 and Chevron F0221).  PetroCanada and Chevron sold these cargoes at considerably better price levels than in the MOC.  These prices call into question Platts's reported MOC prices.  It also begs the question why any seller would offer a cargo at the depressed MOC levels.  As noted by Platts:

> PetroCanada and Chevron were heard to have sold their respective
> F0209 and F0221 parcels, offered at Dated Brent plus $1/b and
> $0.95/b.

Yet despite reporting these strong trades, on that day Platts inexplicably fixed the differential at Forties plus $0.20 to the North Sea Dated Strip.

280.   Taking advantage of Platts's inability to root out manipulative behavior in the MOC, the following day STASCO and Mercuria engaged in a wash trade for Brent (BNB) in order manipulate prices downward.  The details are as follows, on January 13, 2011 STASCO sold to Mercuria a BNB cargo in the MOC at March Cash BFOE plus $0.65 FOB for delivery 23rd to 25th January 2011.  At the MOC Window close this would represent an outright price of $98.58 ($97.93 plus $0.65) which in turn was equivalent to North Sea Dated Strip plus $1.06 ($97.52 plus $1.06).

281.   This trade had the effect of lowering the BNB premium to North Sea Dated Strip by $0.28 (from $1.30 on January 12 to $1.02 on January 13) in a single day and marked the beginning of STASCO's efforts to pressure BNB, and BFOE, lower.  These efforts came to full fruition at the end of the month, at which time BNB moved lower than Forties and briefly dictated the Dated rent quotation.  This may be seen graphically in the chart below, which shows a general downward move for the BFOE differential.



282.   This BFOE trend downward was interrupted by a short, opportunistic manipulation upward around January 14, during February futures expiry.  These allegations of upward manipulation are corroborated by the "double reversal" in prices that occurred around the MOC Window.  This reversal of market fundamentals occurred in the following way:  prior to the MOC Window at 9 AM, one-month futures prices equaled $98.55.  During the course of the morning and early afternoon, the one-month futures declined to $97.62 at 3:30 PM and stood at $97.970 at 4 PM.  During the 30-minute MOC Window, futures rose from $97.970 to $98.511.  Then, after the MOC Window, futures returned to their downward trend from $98.511 to $97.89 by 8 PM.  This incongruous market behavior is evidence of manipulation and contradicts how markets would have reacted had valid fundamental prices been reported during the MOC Window.

97

283. As to the wash BNB trade on January 13, 2011, Mercuria was not an innocent party to this manipulation but actively engaged in a pre-arranged collusion with STASCO in its efforts to lower relative prices. At the same time that STASCO was acting in the MOC Window to depress prices it was also accumulating large volumes of physical oil (as may be seen in the table below), an accumulation which continued through February.

| Company | Buy | Sell | Net |
|---|---|---|---|
| STASCO | 12 | -1 | 11 |
| BP | 0 | 0 | 0 |
| Total | 0 | -1 | -1 |
| Trafigura | 1 | -4 | -3 |
| Litasco | 0 | 0 | 0 |
| Phibro Commodities | 0 | 0 | 0 |
| Vitol | 0 | -1 | -1 |
| MSCGI | 0 | -1 | -1 |
| Statoil | 4 | -1 | 3 |
| Mercuria | 1 | 0 | 1 |
| Hetco | 0 | -9 | -9 |
| **Total** | **18** | **-18** | **0** |

284. Mercuria's collusion is shown on the following day.   On January 13, 2011, immediately following MOC Window, Platts notes in its narrative that Mercuria had resold the same BNB cargo to STASCO on a delivered basis (including freight, insurance and other costs) at March Cash BFOE plus $0.75:

> Following from Thursday's MOC trade of a Brent cargo from Shell to Mercuria, Friday saw Mercuria resell the cargo back to the original seller at a lower overall value, crude traders at the company said. The original trade took place at March cash BFOE plus $0.65/barrel on a FOB basis. On Friday, crude traders at Mercuria confirmed that they had sold the cargo back to Shell— this time on a CFR basis—at March cash BFOE plus $0.75/b. A party close to the trade estimated Mercuria's loss as a result of the resale transaction at between 40-45 cents/barrel.

285. Platts did not use this transaction in its assessment for January 14, nor did it revise its quotation for January 13 when plainly these two transactions were not on normal commercial

terms.  If Platts knew of the washing of the MOC trade between STASCO and Mercuria on January 14, they were seriously remiss not to challenge the validity of the trade of January 13.

286.    It is implausible that Mercuria was simply absorbing losses of this magnitude on a single trade, in such a price setting transactions in the MOC Window.  Instead, these transactions more plausibly made commercial sense to both parties and were pre-arranged with the first leg sale from STASCO to Mercuria intentionally transacted in the MOC in order to pressure BNB prices.  The most plausible explanation for the overall transactions is that it was a freight transaction in which Mercuria had idle freight that it re-let to STASCO at below market rates (in the absence of any other possible voyage charter) in order to optimize the Mercuria freight position.  To convert a freight transaction into the purchase and re-delivery of a BNB cargo, with only one leg transacted in the MOC, is a blatant collusion to manipulate BNB prices in particular and the BFOE complex in general.

287.    The plausibility of this transaction being a freight transaction is shown by the fact that the cargo loading dates were at the very prompt end of the Platts MOC assessment period – time when it is difficult for other parties to find freight and interfere in the collusive transaction.  Platts itself remarked upon the unusual nature of BNB trading in the MOC.  It was not the only BNB trade in the MOC.  On January 14, 2011 Platts reported that, amongst other cargoes entering Dated Brent chains, Hetco was "adding to its sizable North Sea physical position" with a cargo for loading February 4-6.  This comment is a harbinger of Hetco's involvement in depressing prices in the  MOC Window toward the end of the month.

288.    From the 11th January 2011 to the 21st January 2011 inclusive there were no BFOE physical cargo trades in the Platts MOC with the exception of the bogus and collusive sale of BNB from STASCO to Mercuria on the 13th January 2011.  The unwinding of the sham trade

between Mercuria and STASCO outside of the MOC on January 14, 2011, the day of ICE Brent February futures contract expiry, made it possible to inflate futures at expiration with reported trades in the MOC.

289.    On January 14, 2011, Vitol, Hetco and Statoil all were purchasers of EFPs in a manner designed to inflate the Dated Brent and ICE Brent futures.  These Defendants reported six EFP transactions which Platts in the MOC Window as presented immediately here below:

| Seller | Buyer | # of Trades | BFOE Grade | Volume (KB) | Price |
|--------|-------|-------------|------------|-------------|-------|
| Phibro Commodities | Vitol | 1 | EFP | 600 | March + 0.15 |
| STASCO | Vitol | 1 | EFP | 600 | March + 0.15 |
| MSCGI | Vitol | 1 | EFP | 600 | March + 0.17 |
| Arcadia | Hetco | 1 | EFP | 600 | March + 0.17 |
| Arcadia | Hetco | 1 | EFP | 600 | March + 0.17 |
| Total | Statoil | 1 | EFP | 600 | March + 0.19 |
| | | | | Average | 0.17 |

290.    Platts makes no mention of these EFP trades in that day's MOC narrative recap, despite the fact that, as outlined below, these trades were the determining variable in deriving Dated Brent (and ICE Futures) on that day.  Rather, Platts notes that Hetco could have sold out of some of its long position, but chose not to on this day, presumably to make sure that on the day futures were manipulated upwards.  Platts reports as follows for 14th January 2011:

> Glencore, a rare sight in the public Forties market, bid for a cargo of grade, loading February 2-8, during the Platts Market on Close assessment process Friday.  While a short sale could have occurred, Hetco, who currently holds all the Forties cargoes loading over the dates Glencore was bidding for, did not hit the bid.    The assessment was made at a differential to Dated Brent of $0.37/barrel, reflecting the backwardated structure implied by the front CFD structure.  Other North Sea differentials were largely unchanged Friday, North Sea crude traders said, with many traders focusing on the expiry of the front-month ICE Brent crude futures contract.
>
> *       *       *       *
>
> Hetco kept [a] cargo, adding to its sizable North Sea physical position.

291.    On this February futures expiry date Platts calculated, as is usual, the Dated Brent quotation for the day from MOC trades for: (1) MOC BFOE cargo trade differentials to North Sea Dated Strip; (2) MOC Cash BFOE trades (the fixed price element of North Sea Dated Strip); and (3) the Brent CFDs (the forward curve element of North Sea Dated Strip).

292.    Although Platts reports that there was a bid for Forties in the MOC from Glencore and an offer from Hetco for Forties in the MOC it does not record the levels of these and rather estimates the Forties differential to North Sea Dated Strip at $0.37 for the day.

293.    The following trades during the MOC for March Cash BFOE took place during the MOC:

| MOC Cash BFOE Trades | | | | |
|---|---|---|---|---|
| Cargo Month | Spread Month | Price | Seller | Buyer |
| March | March | 98.40 | Sempra | Hetco |
| March | March | 98.40 | Hetco | STASCO |
| March | March | 98.42 | Total | STASCO |
| March | March | 98.42 | Hetco | STASCO |
| March | March | 98.44 | Total | STASCO |
| March | March | 98.42 | Vitol | STASCO |
| March | March | 98.44 | Vitol | STASCO |
| March | March | 98.44 | Hetco | STASCO |
| March | March | 97.45 | STASCO | Hetco |
| March | March | 97.45 | Phibro Commodities | Hetco |
| March | March | 97.77 | STASCO | Hetco |
| February | February | 98.35 | Hetco | Phibro Commodities |
| February | February | 98.33 | Hetco | Arcadia |

294.    From these trades Platts publishes the following quotes for Cash BFOE:

| Platts's BFOE Cash Published Quote | |
|---|---|
| Month | Quote |
| February | 99.02 |
| March | 98.42 |
| April | 98.30 |

295.    There are no CFD trades in the MOC reported by Platts, but they publish as follows:

| CFDs Published Quote:  Swaps Week 1 to 8 are differentials to Brent Mo02 (March) | | | | |
|---|---|---|---|---|
| CFD Week | Dates | Mid. Diff. | March Brent | Outright Mid. |
| 1 | January 17/21 | -0.150 | 98.42 | 98.270 |
| 2 | January 24/28 | -0.530 | 98.42 | 97.890 |
| 3 | January 31/04 | -0.530 | 98.42 | 97.890 |
| 4 | February 07/11 | -0.470 | 98.42 | 97.950 |
| 5 | February 14/18 | -0.470 | 98.42 | 97.950 |
| 6 | February 21/25 | -0.470 | 98.42 | 97.950 |
| 7 | February 28/04 | -0.470 | 98.42 | 97.950 |
| 8 | March 07/11 | -0.470 | 98.42 | 97.950 |

296.    The forward curve element of the NSDS is therefore estimated and the following NSDS quotation for the day is calculated as follows:

| North Sea Dated Strip. | | | |
|---|---|---|---|
| Feb. CFD | Days | Price | Input |
| 24 to 28 | 5 | 97.890 | 489.450 |
| 31 to 4 | 5 | 97.890 | 489.450 |
| Total | 10 | | 978.900 |
| Calculated North Sea Dated Strip. | | 97.890 | |
| Platts Mid. | | 97.910 | |

297.    Thus, from a Cash BFOE MOC session totally dominated by biased parties (particularly STASCO and Hetco) and from estimates of CFD levels and Forties differentials to North Sea Dated Strip, Platts produces the following calculation for Dated Brent on the 14th January 2011:

| Dated Brent – January 14, 2011 | | | | | |
|---|---|---|---|---|---|
| | Dated Brent | BNB | Forties | Oseberg | Ekofisk |
| Published | 98.280 | 98.960 | 98.280 | 99.710 | 99.510 |
| Calculated | | | | | |
| NSDS From Trade | 97.910 | 97.910 | 97.910 | 97.910 | 97.910 |
| Differential Estimated by Platts | 0.370 | 1.050 | 0.3700 | 1.800 | 1.600 |
| Dated Brent | 98.280 | 98.960 | 98.280 | 99.710 | 99.510 |

298.    In fact, however, the Dated Brent quotation for the day was forced by the EFP

activity in the MOC for that day.  To arrive at the Dated Brent quotation Platts had to force its

numbers to agree closely with the following calculation of the EFP values on an outright basis as

calculated from the 16:30 London time EFP futures levels as follows:

| 16:30 ICE | Futures Levels | 6 x EFP Average | Implied Dated Brent |
|-----------|----------------|-----------------|---------------------|
| February  | 99.09          |                 |                     |
| March     | 98.14          | 0.17            | 98.31               |
| April     | 97.97          |                 |                     |

299.    The impact of this manipulative MOC activity may be seen in the price behavior

of EFPs during the month of January.  EFPs show a remarkable jump during the ICE Brent

February futures expiration.

| MOC Date | Month | Dated Brent | EFP Diff. | Sample Correlation Coefficient (R) |
|----------|-------|-------------|-----------|-------------------------------------|
| 1/4/2011  | March | 93.695 | 0.130 |        |
| 1/5/2011  | March | 95.145 | 0.190 | 0.060  |
| 1/6/2011  | March | 95.045 | 0.170 | -0.020 |
| 1/7/2011  | March | 94.030 | 0.050 | -0.120 |
| 1/10/2011 | March | 95.035 | 0.030 | -0.020 |
| 1/11/2011 | March | 96.880 | 0.140 | 0.110  |
| 1/12/2011 | March | 97.805 | 0.030 | -0.110 |
| 1/13/2011 | March | 97.770 | 0.210 | 0.180  |
| 1/14/2011 | March | 98.280 | 0.400 | 0.190  |
| 1/17/2011 | March | 97.610 | 0.170 | -0.230 |
| 1/18/2011 | March | 97.800 | 0.120 | -0.050 |
| 1/19/2011 | March | 98.210 | 0.180 | 0.060  |
| 1/20/2011 | March | 96.030 | 0.260 | 0.080  |
| 1/21/2011 | March | 96.700 | 0.110 | -0.150 |
| 1/24/2011 | March | 96.835 | 0.020 | -0.090 |
| 1/25/2011 | March | 94.585 | 0.140 | 0.120  |
| 1/26/2011 | March | 96.080 | 0.040 | -0.100 |
| 1/27/2011 | March | 96.675 | 0.080 | 0.040  |
| 1/28/2011 | March | 97.435 | 0.190 | 0.110  |
| 1/31/2011 | March | 99.155 | 0.070 | -0.120 |

300.    Graphically, the EFPs show a large spike on the day of futures expiration:

103



301.    In addition, the manipulation of the Brent complex on January 14, 2011 can be seen in the fluctuations of the refining (cracking) margins during January.  Since the value of any grade of crude oil is best expressed by the refinery margin after processing, it is instructive to examine the relative refinery margins of the BFOE grades for the month of January 2011.  The following calculation for Brent, Forties and Ekofisk was performed. The relevant data was taken from Platts (where Platts market prices for crude oil and refined products are applied to a proprietary Turner Mason refinery model for yields specific to each crude oil grade) and represents the cracking margin at a typical Amsterdam/Rotterdam/Antwerp (ARA) refinery. (There is incomplete data for Oseberg which is omitted.)   Each individual calculation is an approximation, but the consistent methodology applied serves as a valid comparison of relative value.

302.    Margin Calculation: Gross Yield MINUS Freight = Net Yield.  Net Yield MINUS

Spot Price = Margin.

303.    Tabular and graphical presentation of the calculated cracking margins for the

month of January based on the margin calculation follows immediately below:

| Date | BNB | Ekofisk | Forties |
|------|-----|---------|---------|
| 1/04/2011 | 1.375 | 0.935 | 1.575 |
| 1/05/2011 | 1.490 | 1.060 | 1.575 |
| 1/06/2011 | 1.725 | 1.305 | 1.855 |
| 1/07/2011 | 2.490 | 2.090 | 2.640 |
| 1/10/2011 | 2.620 | 2.210 | 2.885 |
| 1/11/2011 | 2.060 | 1.640 | 2.380 |
| 1/12/2011 | 1.825 | 1.245 | 1.995 |
| 1/13/11 | 2.110 | 1.100 | 1.970 |
| 1/14/11 | 1.820 | 0.850 | 1.660 |
| 1/17/11 | 2.450 | 1.510 | 2.180 |
| 1/18/11 | 2.660 | 1.700 | 2.380 |
| 1/19/11 | 3.020 | 1.820 | 2.460 |
| 1/20/11 | 3.220 | 2.170 | 2.750 |
| 1/21/11 | 3.350 | 2.310 | 2.890 |
| 1/24/11 | 3.340 | 2.395 | 3.145 |
| 1/25/11 | 3.050 | 2.110 | 2.765 |
| 1/26/11 | 2.600 | 1.650 | 2.130 |
| 1/27/11 | 3.635 | 2.345 | 2.455 |
| 1/28/11 | 3.275 | 1.995 | 2.240 |
| 1/31/11 | 3.100 | 1.980 | 1.995 |



304.    There is, *ceteris paribus*, an inverse relationship between the price of the subject crude oil grade and its refinery margin.  In other words, where the price of the crude oil rises relative to the prices of the refined product outputs from that crude oil the margin will decline. Where the price of the crude oil falls relative to the prices of the refined product outputs the margin will improve.

305.    The above chart of refinery margins demonstrates the unnatural movement of the BFOE grades relative to their refined outputs.  This is very notably the case on January 14, 2011. As can be seen, the cracking margins decrease markedly for the three crude streams on this day of futures expiration.  The most plausible explanation for this severe dislocation in margins is that the price of crude was manipulated upward on this day, while the prices of the products were not.

306.    After the expiration of the ICE Brent February futures, the cracking margins gradually increased, particularly toward the end of the month.  This period involved one of continual suppression by STASCO and Hetco, in conjunction with the unwinding of the large Hetco long position.  The MOC cargo transactions were dominated by three players in this

period from January 21 to 31.

307.    Statoil purchased three cargoes of Forties from Hetco and one cargo of Forties from Vitol.  STASCO purchased six cargoes from Hetco – five Forties cargoes and the collusive BNB trade as described below on January 27.

308.    The trades over  kept BFOE differentials to North Sea Dated Strip historically low, with margins increasing as per the chart above, even while STASCO and Statoil accumulated large long positions in the physical BFOE market.

309.    During the same period Statoil followed STASCO in accumulating a large long nearby CFD position for pricing at the end of January, when trading in the MOC with STASCO accumulating 27 CFDs of 100KB each and Statoil accumulating 21 CFDs of 100KB each over the calendar month. Of Statoil's 21 CFD positions, 17 were accumulated in the period January 21 to 31, 2011.  The dominance of STASCO and Statoil in the MOC CFD market in January 2011 is demonstrated in the Table below.

| January 2011 MOC CFD Market Activity | | | |
|---|---|---|---|
| **Company** | **Buy** | **Sell** | **Net** |
| STASCO | 32 | -5 | 27 |
| BP | 0 | 0 | 0 |
| Statoil | 21 | 0 | 21 |
| Total | 13 | 0 | 13 |
| Chevron | 0 | -4 | -4 |
| Trafigura | 0 | -10 | -10 |
| Litasco | 0 | 0 | 0 |
| Phibro Commodities | 0 | -2 | -2 |
| Hetco | 2 | -7 | -5 |
| Arcadia | 0 | 0 | 0 |
| Vitol | 4 | -14 | -10 |
| Phillips 66 | 0 | 0 | 0 |
| Mercuria | 7 | -6 | 1 |
| M. Stanley | 5 | -31 | -26 |
| Koch | 0 | 0 | 0 |
| ConPhill. | 5 | -8 | -3 |
| Noble | 0 | -2 | -2 |
| *Control* | | | 0 |

310.    The most notable sham transaction in this later period occurred toward the end of the month.  On January 27, 2011 Platts reports that Hetco sold to STASCO a BNB cargo for dates 7th to 9th February at North Sea Dated Strip minus $0.40.  In effect Hetco replaced for STASCO (almost precisely) the cargo entered into the chains on January 14 and in the process lowered the BNB differential to NSDS by a remarkable $0.65 in one day, and $0.15 below the Forties differential.  In the process BNB became the cheapest of BFOE and thereby set the Dated Brent quote for January 27.  Platts noted how unusual this event is:

> Hetco offered a cargo of Brent crude at benchmark Dated Brent minus $0.40/barrel which Shell bought during the Platts Market on Close assessment process Thursday, weaker than Forties crude. Dated Brent comprises the weakest of the four grades in the Brent, Forties, Oseberg and Ekofisk streams. Forties crude was typically the weakest of the four, but for the first time since August 9, 2010, BNB set the Dated Brent assessment Thursday. The last time the Brent differential was assessed in negative territory was June 3, 2010, while the last time it was assessed at as weak as Thursday's traded level for the entire 10-21 day forward window was March 24, 2010. The Brent cargo was parcel B0209, a cargo added to the February Brent program after the original scheduling was released and loads February 7-9, on the front-end of the 10 to 21 day window. It was originally a BP equity, which Hetco received via the 21 day-nomination process, or Dated chains earlier in the month.

311.    One trade expressed incredulity at the level as quoted by Platts: "(A trader) questioned if there were 'any other Brent cargoes available at this number'."  This strong downward manipulation can be seen in the cracking margin chart which shows a severe increase in the margin on January 27, 2011, from the lowering of Dated Brent and BNB in particular.

312.    In sum, January 2011 was marked by considerable movement in the relative valuations of Brent, Forties, Oseberg and Ekofisk as expressed by their premia/discounts to North Sea Dated Strip over the course of the month.  The grade differentials are presented in

tabular form immediately below.

| Date | BNB Diff. | Forties Diff. | Oseberg Diff. | Ekofisk Diff. |
|------|-----------|---------------|---------------|---------------|
| 1/4/2011 | 1.250 | 0.530 | 1.900 | 1.250 |
| 1/5/2011 | 1.250 | 0.555 | 1.900 | 1.250 |
| 1/6/2011 | 1.280 | 0.510 | 1.920 | 1.270 |
| 1/7/2011 | 1.280 | 0.400 | 1.920 | 1.270 |
| 1/10/2011 | 1.300 | 0.215 | 1.950 | 1.300 |
| 1/11/2011 | 1.400 | 0.200 | 2.050 | 1.400 |
| 1/12/2011 | 1.300 | 0.200 | 1.800 | 1.450 |
| 1/13/2011 | 1.020 | 0.250 | 1.800 | 1.600 |
| 1/14/2011 | 1.050 | 0.370 | 1.800 | 1.600 |
| 1/17/2011 | 1.000 | 0.400 | 1.700 | 1.500 |
| 1/18/2011 | 0.950 | 0.380 | 1.650 | 1.450 |
| 1/19/2011 | 0.550 | 0.300 | 1.500 | 1.300 |
| 1/20/2011 | 0.400 | 0.050 | 1.250 | 1.000 |
| 1/21/2011 | 0.350 | -0.050 | 1.200 | 0.950 |
| 1/24/2011 | 0.295 | -0.400 | 1.150 | 0.800 |
| 1/25/2011 | 0.300 | -0.335 | 1.150 | 0.800 |
| 1/26/2011 | 0.300 | -0.250 | 1.150 | 0.800 |
| 1/27/2011 | -0.350 | -0.200 | 1.050 | 0.500 |
| 1/28/2011 | -0.350 | -0.335 | 1.050 | 0.500 |
| 1/31/2011 | -0.280 | -0.295 | 1.000 | 0.400 |

313.   The absolute/outright values are further presented below, along with the Dated Brent quotation for each date.  From these may be seen that Forties was the lowest price grade on 18 of 20 MOC days and, according to Platts methodology, set the price for Dated Brent and BNB was the lowest price grade on 2/20 MOC days and set the price for Dated Brent.

| Date | Dated Brent | BNB | Forties | Oseberg | Ekofisk |
|------|-------------|-----|---------|---------|---------|
| 1/4/2011 | 93.695 | 94.415 | 93.695 | 95.065 | 94.415 |
| 1/5/2011 | 95.145 | 95.840 | 95.145 | 96.490 | 95.840 |
| 1/6/2011 | 95.045 | 95.845 | 95.075 | 96.485 | 95.835 |
| 1/7/2011 | 94.030 | 94.910 | 94.030 | 95.550 | 94.900 |
| 1/10/2011 | 95.035 | 99.720 | 98.635 | 100.370 | 99.720 |
| 1/11/2011 | 96.880 | 100.080 | 98.880 | 100.730 | 100.080 |
| 1/12/2011 | 97.805 | 98.905 | 97.805 | 99.405 | 99.055 |
| 1/13/2011 | 97.770 | 98.540 | 97.770 | 99.320 | 99.120 |
| 1/14/2011 | 98.280 | 98.960 | 98.280 | 99.710 | 99.510 |
| 1/17/2011 | 97.610 | 98.210 | 97.610 | 98.910 | 98.710 |
| 1/18/2011 | 97.800 | 98.370 | 97.800 | 99.070 | 98.870 |
| 1/19/2011 | 98.210 | 98.460 | 98.210 | 99.410 | 99.210 |

| 1/20/2011 | 96.030 | 96.380 | 96.030 | 97.230 | 96.980 |
|-----------|--------|--------|--------|---------|--------|
| 1/21/2011 | 96.700 | 97.100 | 96.700 | 97.950 | 97.700 |
| 1/24/2011 | 96.835 | 97.530 | 96.835 | 98.385 | 98.035 |
| 1/25/2011 | 94.585 | 95.220 | 94.585 | 96.070 | 95.720 |
| 1/26/2011 | 93.080 | 93.630 | 93.080 | 94.480 | 94.130 |
| 1/27/2011 | 96.675 | 96.675 | 96.825 | 98.075 | 97.525 |
| 1/28/2011 | 97.435 | 97.435 | 97.450 | 98.835 | 98.285 |
| 1/31/2011 | 99.155 | 99.170 | 99.155 | 100.450 | 99.850 |

314.    In January 2011 there were 20 MOC days for Dated Brent and its related components.  On only 11 of those 20 MOC days did BFOE physical cargo transactions take place.  On those 11 days with transactions there were 18 concluded physical BFOE purchases and sales.

315.    Of these 18 physical BFOE transactions, 16 transactions were for the Forties grade and 2 transactions were for the BNB grade.  There is a notable transfer of what Platts reported as a highly infrequent and unusual accumulation of BFOE cargoes by Hetco to STASCO and to Statoil.

316.    On several of the days in late January 2011, the ICE Brent futures market experienced double reversals around the MOC Window.  On January 28, 2011, the pre-MOC period experienced increasing first calendar futures prices from \$97.800 to \$98.584; during the MOC Window, futures prices decreased from \$98.584 to \$98.421; and post-MOC Window, futures prices again increased from \$98.421 to \$99.367.  This incongruous market behavior is evidence of manipulation and contradicts how markets would have reacted had valid fundamental prices been reported during the MOC Window.

317.    The MOC process, far from being a competitive mechanism of price discovery and transparency as intended, became no more than a forum for a very few companies to participate in price manipulation while rotating physical cargoes through the MOC.

318.     One other point on this month, Platts on at least two occasions noted a new Statoil internal directive to curtail the use of Yahoo! Instant Messenger in its daily activities and that trading activity at this time was marked by a lack of the essential components of transparency and discovery.   Indeed, one trader noted to Platts on January 25, 2011: "It's hard to know because everything is done so quietly now."

### 2.     February 2011

319.     In February 2011, Defendant STASCO manipulated the CFD and Dated Brent Crude market in the MOC in order to advantage its trading positions, particularly nearby CFDs and forward month Cash BFOE.   STASCO suppressed nearby CFD and Dated Brent prices in order to advantage a large short position that it had in the CFD (pricing at the end of February) and likely also the futures markets.   By the end of the month, STASCO was able to do this by engaging in trades designed to manipulate prices during the short MOC Window, which set the prices for Dated Brent and related markets.   The artificiality of the prices at which STASCO traded is highlighted by observing that physical cargo trading outside the Platts MOC assessment period traded at significantly higher prices than those STASCO was reporting.

320.     The vagaries and manipulability of the Platts reporting system was evident early in the month.   On February 8, 2011, Platts assessed the Dated Brent quotation at $99.055.   This was derived from a calculated North Sea Dated Strip of $99.425 less a Forties discount (Forties, being the weakest grade of BFOE, set the assessment) of $0.37.   Platts raised the value of Forties, relative to North Sea Dated Strip, by $0.08 from February 7 to February 8, 2011.

321.     On this date, there were no Dated Brent cargo trades in the Platts MOC assessment period.   The assessment period for February 8, 2011, being 10 to 21 days forward from the record date, was February 18, 2011 to March 1, 2011, with a middle point of February 23 to February 24, 2011 at which dates the Dated Brent assessment should be made according to

the methodology.

322.    There was only one Dated Brent cargo bid in this MOC process, which was a bid by Vitol for Forties on loading dates of February 27 through March 1, 2011 at a price of Dated Brent minus a $0.35 per barrel discount.

323.    There was one Dated Brent cargo offer in this MOC process being an offer from Chevron for Forties on loading dates of February 23 through February 25, 2011 at a price of Dated Brent plus a $0.30 per barrel premium.

324.    In setting the Dated Brent assessment for this day, and in arriving at an assessment of a discount of $0.37, Platts took account only of the low nature of the bid from Vitol and further lowered its assessment by $0.02 to reflect a contango price structure existing between the middle of the Platts assessment period and the Vitol bid dates.

325.    Platts took no account in the assessment for the day of the Chevron offer at a premium of $0.30 despite the fact that this offer was for the dates precisely in the middle of the Platts assessment period.

326.    Platts further ignored trades that were made, at least in part, just outside the Platts Dated Brent 10 to 21 day period. These transactions were that PetroCanada sold the March 2-4 Forties cargo at a value of cargo around the North Sea Dated Strip plus $0.30/b.  This value was described by one source as "nothing to do with 10-21- day window value."  In addition, a March 1-3 cargo was sold by Nexen for reportedly a similar number to that of the PetroCanada March 2-4 cargo.  The reason that this value had "nothing to do with" the MOC process was because Platts refused to consider trades that might reflect fundamental values outside of the rarefied and artificial MOC bubble, which was easily manipulated.

112

327.    In these trades, which occurred just outside of the MOC Window, PetroCanada sold a Forties cargo for loading March 2 through March 4, 2011 at a premium of approximately $0.30 and Nexen sold a Forties cargo for loading 1st to 3rd March at a premium in the region of $0.30 (conservatively), verify that the Chevron offer, made inside the assessment period and in the MOC process, of a Forties cargo loading February 23 through February 25, 2011 at a premium of $0.30 was closer to fair market value than the assessment made on the Vitol bid.

328.    Platts produced an assessment on February 8, 2011 for Forties, which was at least $0.60 under the value of the more transparent and discoverable price.  In this way, Defendants, through the Platts MOC process, contributed to an artificially low price for Forties.

329.    Activity both inside and outside the MOC period suggested that the assessment for Forties relative to North Sea Dated Strip should have been (approximately) at a premium to North Sea Dated Strip of $0.30.   Pricing on this day evidences that Platts can be highly subjective and easily manipulated by anecdotal market values.

330.    STASCO and MSCGI's manipulation of the Brent Crude Oil market through the Platts MOC process occurred most directly in the latter half of February 2011.  Coming into the end of February 2011, STASCO had a large short CFD position in the very nearby dates.  This position would have been significantly benefitted by maintaining a low price in the Dated Brent and other markets on the pricing dates for those very nearby CFD positions.  Since as early as February 3, 2011, STASCO had sold about 2 million barrels in the end-of day OTC market and during the MOC assessment process combined.  STASCO also sold the nearby CFD and Dated Brent as spreads against purchases of BFOE Cash in later months, like April and May.  STASCO was also accumulating, in conjunction with MSCGI, a dominant position in Forties cargoes in more forward dated positions.

331.   STASCO's total nearby short position may well have been considerably larger than that known to market participants.  In addition, STASCO was either accumulating large quantities of prompt physical oil, or posturing to the market that it was accumulating large quantities of prompt physical oil, on Very Large Crude Carriers ("VLCCs"), which are a type of cargo ship that can hold 1 to 2 million barrels of crude.

332.   STASCO used these accumulations of floating physical oil as a threat hanging over the Brent Crude Oil market.  If the VLCCs were used as freight and traded away out of the region, then supply would be reduced and prices would rise.  If they were used as floating storage which delivers into the region, then supply would be increased and prices would fall.  These accumulations of oil, coupled with hugely dominant positions in all components of those markets used to set the Dated Brent prices, allowed STASCO to move the relative value of Dated Brent at its will, and confounded other market participants.

333.   STASCO at all times refused to publicly comment on its intentions.  For example, the February 3, 2011 Platts report notes that STASCO declined to comment on the ultimate destination of the Front Opalia it had fixed, a VLCC loading from Hound Point on February 5, 2011.  In another instance, the February 17, 2011 Platts report stated the Ondina, another VLCC, "was fixed by STASCO to load on end-February dates."  As to the offering dates and load specifications, those "details were not forthcoming."

334.   Given this overall trading position, STASCO stood to profit from depressed prices in nearby CFDs and Dated Brent, and relatively higher prices in 21 Day BFOE, Cash BFOE and other Brent related contracts in forward periods.  In the parlance of the trade, STASCO would benefit from a steeper contango.

335.   Throughout the month, MSCGI followed STASCO's trading and helped

STASCO set the price in the MOC window.  On February 15, 2011, STASCO bought a cargo for Forties from MSCGI at minus $0.05 per barrel to the North Sea Dated Strip, which set the price for Dated Brent on that day.  The price was inexplicable to traders at the time and was reported to be significantly above the market.  Such a trade is only logical if it was to benefit a very prompt pricing, requiring a temporarily single high price quote, by either STASCO or MSCGI.  STASCO would not publicly trade such a high price, given the large size of its known position, unless it were for purposes of a temporary price spike which STASCO knew it could reverse at the time its large short position began to price long.  The February 15, 2011 Platts report quoted a North Sea trader as saying "'I don't understand it . . . It eats more into the margin.'"

336.    STASCO's trade on February 15, 2011, was not economically sound and was a demonstration of both STASCO's exercising manipulative monopoly power and of its collusion with MSCGI.  Moreover such injections of violent price changes are of great detriment to unsuspecting traders in both the physical and derivatives markets.

337.    STASCO's short CFD position began pricing on February 21, 2011.  On that day STASCO put "spoof" orders into the market on close by offering four cargoes, that is, 2.4 million barrels of oil.  STASCO offered cargoes only for nearby dates in the Dated Brent 10 to 21 day window.  It was significantly more difficult for buyers to find freight for these nearby FOB positions so buyers were unable to execute trades on these offers.  STASCO offered cheap nearby dates only, at manipulatively low prices.

338.    STASCO offered these four Forties cargoes at minus $0.40.  MSCGIwas the only buyer for one of the cargoes.  Plaintiffs allege that the trade between MSCGI and STASCO was prearranged to set a low price for Dated Brent.  The plan was successful.  Although other traders were bidding for dated Bent at more aggressive levels at the back end of the 10 to 21 day

window, Platts assessed the Forties differential to the North Sea Dated Strip at minus $0.30. STASCO's trade to MSCGI successfully drove the Forties assessment lower than where it otherwise would have been, and allowed STASCO to obtain a very low (and presumably profitable) price for its short CFD position.

339.   If STASCO had truly wanted to sell four cargoes, it would have done so in large part outside of the MOC 30-minute period.  However, the purpose was not to trade the cargoes, but to pressure the market downward.  STASCO sold the one cargo only to MSCGI, a party to this collusion with coincident interests.  This cargo sale moved the market in favor of the large short CFD position STASCO maintained.  This manipulative activity was not detrimental to STASCO's floating physical position because the contango market structure mitigated the effect of the low nearby prices.

340.   STASCO's expertise allowed it to know the exact freight situation for its offered trading dates.  Therefore, STASCO could not have been surprised when a third party took advantage of STASCO's artificially low offers to sell.  The only possible buyer was MSCGI, which, in collusion with STASCO, had either real freight pre-arranged or had an agreement to transact, effectively, as a wash trade in either Dated Brent or another market (or "other markets").

341.   On February 21, 2011, STASCO held nine Forties cargoes for loading during the period between March 2 through March 16, 2011.  MSCGI held three cargoes for this period.  If STASCO truly had wanted to sell cargoes, it could have done so to bids from other market players at the back end of the Dated Brent 10 to 21 day window.  Instead, however, it chose to offer the cargoes for quick loading.  In this light, STASCO's trade to MSCGI is evidence of a manipulation of the Dated Brent and other MOC prices downward.

342.    STASCO was also able to manipulate the market downward by reporting to the market that it had contracted a VLCC (and according to reports may or may not have contracted more than one VLCC), which is a type of cargo ship that can hold 1 to 2 million barrels of crude. Throughout the latter part of February, STASCO was able to control the prices for Dated Brent by threatening to use crude on this ship to increase its capacity to load out cargo.  Other market participants were unable to anticipate whether STASCO, whose trading prices appeared uneconomic, would be using the cargo to pressure the market downward, through ship-to-ship loading in the Dated Brent window or through delivery locally, or to pressure the market upward by shipping the VLCC out of the North Sea.  In a backwardated market, in which prices nearby are higher than prices later on, it would have made economic sense for STASCO to load out the VLCC immediately.

343.    Notably, on February 21, 2011, the ICE Brent futures market experienced double reversals around the MOC Window that evidenced STASCO's manipulative conduct.  On that day, the pre-MOC period experienced increasing first calendar futures prices from $103.776 to $104.998; during the MOC Window, futures prices decreased from $104.998 to $104.937; and post-MOC Window, futures prices again increased from $104.937 to $107.658.   This incongruous market behavior is evidence of STASCO's downward manipulation and contradicts how markets would have reacted had valid fundamental prices been reported during the MOC Window.

344.    STASCO's plans to advantage this short CFD position were in part upset by events in Libya which the oil market interpreted as leading to restrictions in supply and thus higher Forties differentials to North Sea Dated Strip.  Thus, on February 23, 2011, Platts assessed the Forties differential relative to North Sea Dated Strip plus a premium of $0.16 per

barrel (this set the Dated Brent quotation for the day).

345.     However, despite the supportive geopolitical events occurring, STASCO strongly continued its manipulative conduct on February 24, 2011.  On that day STASCO controlled the pricing for the entire Platts reporting structure of Brent Crude Oil.

346.     On February 24, 2011, the Platts Dated Brent quotation was determined in the Platts MOC process as calculated from conforming activity in the Platts MOC.  The assessment period at this time was for activity with dates from the 10 to 21 day forward period from the MOC date (with recognition of weekends).

347.     Dated Brent is calculated as the lowest price of the North Sea Dated Strip quotation plus or minus the premium or discount for each grade of BFOE.

348.     North Sea Dated Strip is calculated from trades, or estimates of traded levels, during the Platts MOC for forward Cash BFOE contracts, which are then adjusted for MOC trades for CFDs, or estimates for MOC trades for CFDs, which will reflect the 10 to 21 day forward period that the Dated Brent quotation is supposed to reflect.

349.     Once North Sea Dated Strip is calculated it is then adjusted to reflect the premium or discount applicable peculiarly to each of the grades of BFOE. The lowest absolute price at this time sets the Dated Brent quotation for that day.

350.     On February 24, 2011, the Cash BFOE contract applicable to the calculation of North Sea Dated Strip was the April Cash BFOE contract.  The following trades took place in the MOC:

| Cash BFOE Trades | | | | |
|---|---|---|---|---|
| Month | Price | Seller | Buyer | Volume (KB) |
| April | 113.57 | Trafigura | Mercuria | 100 |
| April | 113.60 | Trafigura | STASCO | 100 |
| April | 113.63 | Trafigura | STASCO | 100 |
| April | 113.66 | Trafigura | STASCO | 100 |

| April | 113.72 | Trafigura | STASCO | 100 |
| May | 113.43 | STASCO | MSCGI | 100 |

351.   STASCO was the buyer in four out of five April Cash BFOE trades.  In each case the seller was Trafigura. The prices were "walked" higher over the period of the MOC, thereby increasing the contango to the prompt CFD pricing period of February 1 through February 25, 2011 where it was known STASCO had major pricing positions.  As shown above, STASCO set the Platts April Cash BFOE price at $113.72.

352.   On February 24, 2011, the following single trade took place for CFDs in the Platts MOC:

| CFD Trades | | | | | |
| --- | --- | --- | --- | --- | --- |
| Dates | Basis | Diff. | Seller | Buyer | Volume (KB) |
| 07-11 March | Brent (April) | -0.20 | STASCO | Phibro Commodities | 100 |

353.   From this single trade, the CFD adjustment to April Cash BFOE to determine the North Sea Dated Strip was calculated. Platts calculated the March 7 through March 11, 2011 CFD as April Cash BFOE minus $0.25 and the March 14 through March 18, 2011 CFD as April Cash BFOE minus $0.31.

354.   Thus STASCO set the CFD level adjustment to April Cash BFOE to determine the February 24, 2011 Platts quote for North Sea Dated Strip as follows:

| CFDs | |
| --- | --- |
| Date | Price |
| 07-March | 113.47 |
| 08-March | 113.47 |
| 09-March | 113.47 |
| 10-March | 113.47 |
| 11-March | 113.47 |
| 14-March | 113.41 |
| 15-March | 113.41 |
| 16-March | 113.41 |
| **Mean** | **113.45** |

355.     STASCO had thus set both Platts MOC components to determine North Sea Dated Strip price of $113.45.

356.     On February 24, 2011 the following trades took place for Dated Brent Cargoes in the Platts MOC:

| Dated Brent Cargo Trades | | | | | | |
|---|---|---|---|---|---|---|
| **Loading Date** | **Grade** | **Basis** | **Diff.** | **Seller** | **Buyer** | **Volume (KB)** |
| 15-17 March | Forties | Dated | 0.00 | STASCO | Glencore | 600 |
| 13-15 March | Forties | Dated | 0.00 | STASCO | ConPhill | 600 |

357.     Thus, STASCO set the Forties differential to North Sea Dated Strip which Platts determined from the two STASCO trades immediately above was at a discount of $0.11 once "normalized" for contango to the middle of the assessment period.

358.     In summary, Platts assessed Dated Brent on February 24, 2011 at $113.33 because:  (1) April Cash BFOE $113.72 set by trades by STASCO; (2) CFD adjustment to April cash BFOE $0.27 set by trades by STASCO; and (3) Forties discount $0.11 set by trades by STASCO.

359.     In addition, as discussed herein, a trade on February 24, 2011 occurred outside of the MOC process and showed the artificiality of STASCO's reporting.  On this date, STASCO was the exclusive setter of prices for the Brent complex in the Platts MOC process and again demonstrated the monopoly power that is both enjoyed and abused by STASCO when setting Brent prices in the Platts MOC.

360.     As discussed, STASCO had previously established a large short CFD position. This short CFD position was pricing long from February 21 through February 25, 2011. STASCO had already taken steps to maintain low Forties values in order to advantage this short position.  An example has been given of a trade between STASCO and MSCGI on February 21,

2011, which was expressly designed to occur in the Platts MOC and to depress Forties prices.

361.   Yet on February 24, 2011, a crude trader at PetroCanada confirmed the company had offered Forties parcel F0317—loading March 19-21 and therefore outside the 21-day nomination process—at North Sea Dated Strip plus $1 per barrel and that an unknown buyer purchased the cargo near that level.   A crude trader said that the cargo was not purchased by "one of the BFOE boys."   By BFOE boys, this trader was likely referring to the cabal of Defendants, including STASCO, which controlled the MOC process.

362.   As previously noted, the Platts MOC assessment period for February 24, 2011 was March 6 through March 17, 2011.   Despite the fact that the PetroCanada cargo sale fell only two days outside of this assessment period, Platts accepted the manipulative activity of STASCO inside of the MOC process and set a price for Forties relative to North Sea Dated Strip, which was at least $1.00 lower than the non MOC process trade, which was concluded and confirmed by PetroCanada.   This again demonstrates how STASCO manipulatively employed its monopoly pricing power, which was not scrutinized by Platts.

363.   Despite the real world sale at $1.00 over North Sea Dated Strip, in the MOC process STASCO sold two Forties Dated Brent cargoes – one to Glencore, the other to ConocoPhillips – at a level even to the North Sea Dated Strip.   Platts determined that Dated Brent should be priced even lower, at a negative $0.11 spread to the North Sea Dated Strip (perhaps because it incorporated a contango in the market for its calculations), based on an estimate that Forties were valued at negative $0.11.

364.   STASCO then purchased four April Cash BFOE cargoes from Trafigura at prices ranging from $113.60 to $113.72 (which is how the North Sea Dated Strip was priced, i.e. $113.45 equals the difference between $113.70 and $0.25), and also sold a May Cash BFOE

cargo to MSCGI at $113.43.

365.   With MSCGI's assistance, STASCO was able to pressure nearby CFD and Dated Brent prices to advantage its nearby CFD book.  STASCO behaved uneconomically throughout the latter half of February 2011 in order to suppress prices.   The overarching market fundamentals at this time had in fact turned bullish because there were concerns at the end of February that Libyan production would be disrupted because of unrest in that country.  These shortage concerns should have moved the nearby CFD and Dated Brent markets upward barring some change in the supply and demand fundamentals in the Brent Crude Oil markets, which were not present here.   Nevertheless, STASCO was able to force nearby prices downward through manipulation of the MOC process.

366.   But as discussed above, the artificiality of STASCO's trades, particularly its CFD and Dated Brent trades, can be shown by a reported trade that occurred just outside the MOC Brent window.  As recounted by a PetroCanada trader, a trade occurred in the loading window of March 19 through March 21, 2011, just beyond the Dated Brent window of March 7 through 16.  The PetroCanada trader reported that this trade was priced at a remarkable $1 per barrel above Dated Brent.  Other traders reported that this cargo would actually be loaded out (i.e., consumed) by the buyer, not cancelled out in part of a daisy chain of trades with various counterparties.

367.   Because this trade occurred outside the Dated Brent window, it was not incorporated into the Brent Crude Oil pricing system that Platts employs.  Nevertheless, this trade was a closer reflection of the market reality than that which was artificiality created by STASCO's pressure on the market CFD, where it offered $0.25 below Brent April (which Platts estimated at $113.72, STASCO's last purchase price).

368.     In summary, STASCO was able to artificially suppress the CFD and Dated Brent markets through manipulations of the MOC.  It did this to advantage its short CFD position and likely other derivatives positions, including futures positions.   The economic reality of the market's price was reflected by a real trade outside the Dated Brent window.   However, this real trade, which was substantially and materially higher than the levels reflected by the bogus trades reported by Platts, was never incorporated by Platts's rigid pricing methodology.   In this way, STASCO and MSCGI were able to game the Platts system and advantage themselves by creating artificial prices.

### I.      The September 2012 Manipulation

369.     In September 2012, Defendants STASCO, BP, Vitol, Phibro Commodities and Trafigura manipulated the Dated Brent Crude market and thereby harmed traders of on-exchange contracts tied to Brent Crude Oil, including Plaintiffs.   In the first part of the month, BP dominated the suppression of the Dated Brent market.  In the latter half, STASCO, Vitol, Phibro Commodities, and Trafigura suppressed the market through a combination of spoofing, wash trades and other artificial transactions in the MOC process.   In the middle of the month, Defendants manipulated Dated Brent upwards.  Also during the month, the spread between Brent and Forties was manipulated.  In part, these Defendants' suppression of Dated Brent at the end of the month was designed to allow for Brent Crude Oil to trade to Asia.

370.     On 19 of the 20 publication days in September 2012 Forties was the least expensive grade of the BFOE complex and thereby set the price of Dated Brent.  On 1 of the 20 publication days in September 2012, Forties was jointly the least expensive grade with the Brent Ninian Blend (referred to also as BNB or Brent and further being the 'B' in BFOE) and thereby set the price of Dated Brent.

371.   In September 2012 there were 20 Publication Days for Dated Brent.  On only eight of these publication days did Platts report cargo transactions in the Dated Brent MOC process.

372.   Participation for cargo transactions was as follows:

| Company | Buy | Sell | Net |
|---|---|---|---|
| STASCO | 2 | 2 | 0 |
| BP | 0 | 6 | -6 |
| Total | 2 | 0 | 2 |
| Trafigura | 3 | 0 | 3 |
| Litasco | 1 | 0 | 1 |
| Phibro Commodities | 1 | 0 | 1 |
| Vitol | 0 | 1 | -1 |
| **Total** | **9** | **9** | **0** |

373.   Of the 8 days when cargo transactions were reported, STASCO or BP was the seller of record on 7 days. On 2 of those days BP was a seller to STASCO.

374.   During the 20 Platts publication days, there were a total of 33 unfulfilled offers and 10 unfulfilled bids. Participation in these bids and offers was as follows:

| Company | Buy | Sell | Net |
|---|---|---|---|
| STASCO | 2 | 2 | 0 |
| BP | 0 | 6 | -6 |
| Total | 2 | 0 | 2 |
| Trafigura | 3 | 0 | 3 |
| Litasco | 1 | 0 | 1 |
| Phibro Commodities | 1 | 0 | 1 |
| Vitol | 0 | 1 | -1 |
| **Total** | **9** | **9** | **0** |

375.   Collectively BP and STASCO made 0 unfulfilled bids and 27 unfulfilled offers in the 20 Platts publication days.  That is, BP and STASCO made none of the bids and 82% of offers.

376.   The relative illiquidity of the MOC process is evidenced generally by the fact that single cargoes may enter daisy chains of more than 30 passes, each pass representing a

transaction related uniquely to a single set of cargo dates. Trades outside of the Platts MOC process are a very high multiple of trades inside the MOC process and are significantly leveraged by the practice of speculating on Dated Brent prices as evidenced by how cargo nominations are affected by daisy chains. Daisy chaining creates the possibility that one cargo could change hands many times.

377.    More specifically in this instance illiquidity in the MOC relative to the non-MOC market is illustrated by the fact that during the MOC throughout September 2012, STASCO had bought and sold net zero barrels in concluded cargo transactions and had made 6 further offers for Forties cargoes which remained unfulfilled. However, by the end of September 2012, STASCO had obtained a massively dominant long position in the Forties grade by September 27, 2012.

### 1.    Early Month Suppression

378.    Part of the Dated Brent manipulation commenced at the beginning of September 2012 with the involvement of BP. In addition to several trades, from September 3 to 13, 2012, BP made 21 unfulfilled offers for BFOE cargoes. Subsequently, BP executed a single MOC cargo trade with Phibro Commodities on September 17, 2012. Combined with the concluded transactions, BP deliberately pressured the market downward. BP had set a huge short position in OTC Brent CFDs.

379.    Starting on September 3, 2012, BP offered 3.6 million barrels of North Sea crude oil cargoes, which, according to Platts, "was the largest amount of North Sea crude offered by a single company in the MOC process in recent years." This amount of oil was equivalent to six cargoes – three Ekofisk, two Forties, and one Brent.

380.    Indeed, market participants had speculated that the reason for such large offers was that BP had a significant number of unsold cargoes. The September 3, 2012 Platts report

noted, "Traders did not appear too surprised, however, as they had been monitoring BP's many unsold cargoes for September loading in the last few weeks."  However, BP's conduct was not economically rational for a company that had a large number of unsold cargoes.  The reason why companies would not offer that amount of crude into the MOC process is because physical trading is relatively illiquid during the MOC process compared to the full trading day.  Fewer market players participate in the MOC process.  Thus, BP's offering 3.6 million barrels of oil in a short time frame, and in an illiquid and relatively thinly traded market would be counterproductive.  A company that held those cargoes would normally not want to impact price negatively and would therefore have offered the cargoes more gradually in the open market over the course of the day, not all at once during the short, thirty-minute MOC process.

381.    In fact, it was BP's design to drive the Dated Brent market lower with its offers of six cargoes in the MOC process.  This is because BP was short at least 5 million barrels of nearby CFDs.  These positions stood to benefit from the depression in the Dated Brent price.  As a consequence, BP was incentivized illicitly to depress the price of Dated Brent.  The size of BP's short position in CFDs was such that it was more than able to offset any losses that BP would experience in reduced sales price for its physical cargoes.

382.    BP continued its conduct to pressure the market on September 4, 2012, offering a "raft" of North Sea cargoes in an attempt to give the impression that there was a glut of oil in the nearby market.  BP's efforts to lower Dated Brent prices carried over into Ekofisk assessments. The September 4, 2012 Platts report states that "BP sold its Brent plus $0.10/b in the MOC process and kept offering September 19-21 and September 22-24 Ekofisk at Dated Brent plus $0.50/b at the close. Ekofisk was assessed at a premium to Dated Brent of $0.19/b, *its lowest level in almost two years, according to Platts data.*" (emphasis added).

126

383.   On September 5, 2012, BP pushed the front of the CFD curve down further by offering six more BFOE cargoes, two of which were Forties, two Ekofisk, one Brent and one Oseberg.  It sold one cargo to Defendant Trafigura.  This sale cemented the lower prices into the Platts MOC pricing methodology, ensuring that Platts would report prices at these low numbers. In the context of this conduct, a trader in the market remarked that "BP is on its own planet." Another trader commented that "A lot of the big Dated Brent players seem to think the structure should be lower and are shorting it. . . ."  Platts assessed Forties (and therefore Dated Brent) at minus $0.42 the North Sea Dated Strip.

384.   On September 6, 2012, Platts assessed Forties (and therefore Dated Brent) at minus $0.36 the North Sea Dated Strip.  No trades were executed for Forties.  Platts assessed Dated Brent at nearly the same price as on September 5 – minus $0.36 North Sea Dated Strip. Also on September 6, 2012, BP engaged in a sham trade with STASCO intended to bring the Brent stream in line with Forties.  This trade was priced for a Brent (not Forties) cargo loading on September 20-22 at Dated Brent minus $0.25 per barrel.  This price was simply out of whack with market prices.  However, because it had such a nearby time frame for loading it was difficult for buyers to find freight on short notice.  There were traders willing to buy cargoes at significantly higher prices, even in the MOC process, at slightly later dates when freight was more readily available.  Total Oil, for instance, bid for a cargo loading at the back end of the curve at a price that was significantly higher than BP's trade with STASCO.  But the BP/STASCO trade impacted Platts's Dated Brent pricing.  This sale convinced Platts to mark Brent between minus $0.25 and the Total bid.  Platts priced Brent at minus $0.125 per barrel. This price was artificial and based on a collusive and sham trade between BP and STASCO.

385.   Immediately following the sale of Brent from BP to STASCO on September 6,

2012, BP and STASCO constructed a trade in the MOC on September 7, 2012 which raised Forties to parity with Brent for the first time in almost 2 years.  On the same day, Brent was assessed at parity with Forties for the first time since January 2011.

386.    Although these trades were irregular, Platts was reluctant to exclude the trades because BP and STASCO are significant sources of revenue to Platts, as is the assessment of the BFOE complex itself.  BP's disruptive activities, however, were clearly on Platts radar as it began its Physical Market discussion in its September 7, 2012 report with the comment that "BP ended a week of steep price falls in the North Sea crude market with an additional offer for September-loading Forties crude…."  BP and STASCO held significant influence and power over Platts, and thus the entire market because, through their manipulative conduct, there are able to cause artificial price trends.  Platts had enormous financial incentives and pressure to ignore the implication of Defendants' manipulative trades.

387.    However, the trades were uneconomic.  The anomalous relationship between Brent and Forties prices demonstrates this.  The data for September 2012 of Platts outright quotations for Brent (BNB) minus Forties is presented as follows:

| MOC Date | Brent Minus Forties |
|---|---|
| 9/3/2012 | $0.540 |
| 9/4/2012 | $0.560 |
| 9/5/2012 | $0.520 |
| 9/6/2012 | $0.235 |
| 9/7/2012 | $0.000 |
| 9/10/2012 | $0.125 |
| 9/11/2012 | $0.125 |
| 9/12/2012 | $0.105 |
| 9/13/2012 | $0.070 |
| 9/14/2012 | $0.030 |
| 9/17/2012 | $0.035 |
| 9/18/2012 | $0.240 |
| 9/19/2012 | $0.265 |
| 9/20/2012 | $0.190 |
| 9/21/2012 | $0.100 |

| | |
|---|---|
| 9/24/2012 | $0.325 |
| 9/25/2012 | $0.335 |
| 9/26/2012 | $0.345 |
| 9/27/2012 | $0.335 |
| 9/28/2012 | $0.610 |



388.   BP and STASCO had a motivation to maintain Brent at an artificial parity with Forties starting September 7, 2012 – at a time when they had significant physical and derivative Brent Crude Oil positions.   Consequently, they created a very infrequent (once in two year) pricing situation.  The motivation to maintain the Brent/Forties at parity or near to parity appears to have ended on or around the September 17 or 18, 2013.  At this point, the market was further manipulated by BPs sale to Phibro Commodities, which is discussed below.

### 2.   Mid-month Inflation

389.   As part of its manipulation of the Brent/Forties relationship, and as part of an overall plan to inflate Dated Brent in the middle of this month, on September 7, 2012, BP and STASCO engaged in a trade for a Forties cargo during the MOC for plus $0.20 over North Sea Dated Strip – that is, $0.56 higher than the previous day's Dated Brent assessment.  This price was a high offer and therefore at a level that was unattractive to other market participants.  BP

sold STASCO a Forties parcel loading September 27, 2012 at this level just prior to the end of the MOC.  BP and STASCO's manipulation moved the Platts Dated Brent to minus $0.05 the North Sea Dated Strip, even though it had been assessed at minus $0.36 North Sea Dated Strip the day before.  Platts noted in its September 7, 2012 report that the trade between BP and STASCO at plus $0.20 was not in line with the market, stating, "it was estimated that BP's trade with STASCO was made on a high offer," and therefore Platts was forced in its assessment to discount to a degree the BP and STASCO trade because it was so out of line with other bids in the market, particularly one by Total Oil, Europe's third-largest oil company, at the latter part of the 10 to 21 day window.  The BP/STASCO trade nonetheless significantly artificially affected the price and price trends of Dated Brent.

390.     On September 10, 2012, STASCO confirmed that it had deferred a Forties cargo that it was supposed to load in September to an October loading period.  This move belied the pricing structure provided by Platts (based on manipulative conduct of STASCO and BP), which showed a backwardation – i.e., that prices nearby were more expensive than the deferred.  In a backwardated market, it would not have been in a trader's economic interest to postpone a cargo, because the nearby oil was more valuable.  And between September 11 and 17, 2012, several more cargoes were deferred from a nearby loading position to October.  Some of these deferrals were described as "forced", but reports of their existence, and STASCO's control of them, confounded the market and left it susceptible to manipulation.

391.     During this middle period of September 2012, STASCO manipulated the market upward in various ways.  In order to counteract the lowering of prices, STASCO and Statoil fixed two VLCCs which, purportedly, were going to transport Brent Crude Oil to the Far East, and Korea in particular in early- to mid-October.  These VLCC created upward pressure on

nearby prices because the market assumed that the cargoes would reduce supply in the nearby Brent Crude Oil market.  However, the booking of these cargoes really was for the purpose of adding upward pressure on market prices.  The September 13, 2012 Platts report quoted a trader as stating, "'Backwardation is picking up but it's all over the place… It's hard to know whether that's driven by physical market strength or not.'"  In fact, traders suggested that the "arbitrage" trade of North Sea Brent Crude Oil to Korea was not feasible given the pricing structure of oil and freight.  The booking of the VLCCs was used as a manipulative maneuver by STASCO and created great confusion in the market, especially because STASCO and Statoil refused to clarify their intentions.  This situation is one of many in which other market players are expected to believe that major traders are trading in the MOC in pursuit of clarity and discovery of price, without any factual support or indication of what is truly happening to the large, market-moving volumes of oil involved.

392.    STASCO and Statoil's conduct impacted prices and trends for Dated Brent and for Brent futures contracts.  On September 13, 2012, the Brent October futures contract expired at a $1.01 per barrel premium to November.  This backwardation was at levels much higher than earlier in the month and was the consequence of the booking of the VLCCs by both STASCO and Statoil.  That is, the reported bookings of these large tankers squeezed the nearby futures since the market interpreted the loading out of large amounts of Brent Crude from the North Sea in October to be a bullish pricing factor.

393.    Because of the perceived tightness in the market from the reported VLCC bookings, Dated Brent prices increased on September 13, 2012.  BP offered Forties at plus $0.17 over North Sea Dated Strip but withdrew the offer in the MOC.  Given this offer and other intangible factors, such as the VLCC cargoes and the effects on the futures markets, Platts raised

Forties by $0.135.

394.   On September 14, 2012, the market continued to climb based on these same intangible reports.  The Platts report issued on the same day noted that the "two VLCC arbitrage cargoes slated to head East over October provided a stronger tone to the market…."

395.   On September 17, 2012, STASCO and Statoil's reported VLCC bookings continued to cause inflation to the market.  Forties increased to plus $0.065 over the North Sea Dated Strip.  Contemporaneously, Defendant Phibro Commodities created upward pressure in the Forties when it purchased a Forties cargo for October 3 to October 5, 2012 for $0.05 plus North Sea Dated Strip.

### 3.   Late Month Suppression

396.   BP's sale of the cargo to Phibro Commodities on September 17, 2012, initiated a manipulation of the Dated Brent downward.   Defendants' collusive market manipulation continued to create artificial price trends for Dated Brent.

397.   The following day, September 18, 2012, Phibro Commodities, with the help of other market participants, drove the market downward by offering in the MOC the very same cargo that it bought the day before at minus $0.25 below North Sea Dated Strip, a full $0.30 below its purported purchase price 24-hours earlier.  At this price, there were no bids from others in the MOC process.  In response, Platts assessed Forties to minus $0.245 under the North Sea Dated Strip.  Phibro Commodities was not acting rationally by offering the cargo it had just bought.  Rather, Phibro Commodities deliberately was signaling to market participants that the market was heading lower.

398.   By the following week the Brent market was in a complete state of disruption, due, in substantial part, to STASCO's manipulative conduct.  On September 24, 2012, STASCO led a sell-off, in a market devoid of transparency.  As one trader described it, "It's hard to get an

opinion on the fundamentals . . . ."  Another trader described the market as full of "a lot of lies." In this informational vacuum, STASCO made sure that there were no buyers in the market.  The one bid in the MOC process on September 24, 2012 had been from Total Oil for an October 13 to October 17, 2012 loading period.  STASCO sold Total Oil the cargo and removed the only supporting price from the MOC.  After STASCO sold this cargo to Total Oil, there were no bidders to take the three Forties and two Ekofisk cargo offered in the market, many of which were offered by STASCO.  STASCO, offering the Forties cargoes, pushed Dated Brent down substantially.  Dated Brent, which priced off the Forties, fell an astounding $0.375 on that day to minus $0.325 under North Sea Dated Strip.  This was the largest one-day fall in the Forties crude prices since June 12, 2012.  Because of this move, Dated Brent fell to a $0.43 contango to second month [November] Cash BFOE, the widest since mid-July.

399.    On September 25, 2012, STASCO continued to use manipulation to depress the Dated Brent market.  On this day it engaged in a wash trade with Trafigura.  STASCO offered a Forties cargo (designated "F1005") for loading October 10 to October 12 at North Sea Dated Strip minus $0.30.  Trafigura reportedly purchased this parcel.  As a result of this trade, Platts assessed Dated Brent at North Sea Dated Strip minus $0.285.  The trade between Trafigura and STASCO was a wash trade intended solely to influence the MOC process and prices of Dated Brent.  The trade served no other economically justifiable or rational purpose.

400.    On the following day, September 26, 2012, STASCO offered the F1005 cargo for loading at October 10 to October 12.  It quickly withdrew this offer. The offer surprised the majority of North Sea crude traders, as STASCO had just sold that same cargo to Trafigura the previous day.  STASCO also kept a cargo that it held from another trader for loading October 21 to October 23.

401.    By September 26, 2012, STASCO held least 10 of the 16 Forties cargoes loading October and five of the seven Brent cargoes, making it the major stakeholder in October's BFOE market.   In other words, at the end of September 2012, STASCO had market power and a monopolistic position in the Brent market.   STASCO used its market power to depress prices. The reason STASCOl intended to depress prices, and the reason it had acquired a dominant position in the BFOE market, was to advantage its other trading positions in derivatives – *e.g.*, CFDs and futures.

402.    On September 26, 2012, the Brent futures markets displayed strength in the nearby futures to the point of backwardation.   The Platts report issued on the same day reported "[t]he backwardation of the ICE Brent curve steepened Wednesday, despite ongoing signs of weakness in the North Sea physical crude market. . . ."   For this reason, the Forties differential was assessed at North Sea Date Strip minus $0.24, up 4.5 cents on that day, in line with the futures backwardation and a steeper CFD market.   The Forties market did not necessarily manifest the same strength because of STASCO's and other defendants' conduct.   Indeed, the weakness in the Forties was considered illusory to some traders, who joked, "Forties traded lower so the Brent [futures] spread rallied."   In fact, STASCO had manipulated the Forties market (and BFOE market generally) in order to advantage itself in its related derivatives positions, including in the CFD and futures markets as well as in its arbitrage positions with Dubai Crude, discussed below.

403.    By September 27, 2012, STASCO had at least 12 of the 17 Forties cargoes loading in October stating, "[b]ackwardation in Brent steepened further in intraday trading as traders saw strong fundamentals over November when refineries return from maintenance, before coming down a little by end of play."   There were no bids or offers in the MOC

assessment process. Platts therefore assessed Dated Brent in line with the Brent futures structure. Platts noted that there was significant strength in the November Brent market relative to its weakness in October. Thus, as STASCO's position became known, Forties stabilized, and notably the physical arbitrage of Dated Brent relative to Dubai Crude was closing (as alleged more fully below).

404.   On Friday, September 28, 2012, despite the strength in the November Brent physical market, certain BFOE players continued their efforts to depress the October Brent market. STASCO spoofed the market by reoffering its same Forties cargo (F1005) for loading October 10 to October 12, then withdrawing it. In STASCO's place as the maker of artificial prices in the MOC process, Vitol sold Trafigura a cargo for loading October 11 to October 13 at North Sea Dated Strip minus $0.55. This price was a remarkable $0.34 below Platts's Thursday assessment for the same loading period. Vitol's trade was used as an overhang to the Brent market, even though, aside from these Forties offers, the Brent crude market was much more tightly priced. Because of this artificial trade Platts assessed Forties almost $0.30 below the previous day's figure, at North Sea Dated Strip minus $0.46.

405.   In sum, on September 28, 2012, STASCO attempted to bluff the re-offer of the October 10 to October 12 cargo (the object of the manipulative trade with Trafigura) to find no buyer but Vitol. Trafigura executed a trade which Plaintiffs believe was manufactured by those participating in the South Korean arbitrage (or those with synthetic arbitrage positions constructed from futures or other derivatives). At this time STASCO was lacking in credibility and coincident interests of Vitol manufactured a bogus trade.

406.   Notably, on several of the days in late September, the ICE Brent futures market experienced double reversals around the MOC Window while trending upward. On September

27, 2012, the pre-MOC period experienced increasing first calendar futures prices from $110.160 to $111.718; during the MOC Window, futures prices decreased from $111.718 to $111.600; and post-MOC Window, futures prices again increased from $111.600 to $112.068.  Likewise, on September 28, 2012, the pre-MOC period experienced increasing first calendar futures prices from $112.375 to $112.434; during the MOC Window, futures prices decreased from $112.434 to $111.598; and post-MOC Window, futures prices again increased from $111.598 to $112.295. This incongruous market behavior is evidence of manipulation and contradicts how markets would have reacted had valid fundamental prices been reported during the MOC Window.

407.    Overall, for the month of September 2012, out of 33 offers reported by Platts, 21 came from BP (in the first half of September), 6 came from STASCO (mostly in the last half of September) and two from Vitol on September 24, 2012.  These three companies made 88 percent of the offers in the market in this month, which saw an unreasonable and artificial suppression of the Dated Brent benchmark at the beginning and the end of the month.  Likewise, Vitol, STASCO and BP sold the vast majority of the cargoes reported as having traded in the MOC process for September.  And STASCO, BP and Vitol were responsible for the vast majority of the sales in the CFD MOC process for the month of September.

408.    The conduct of STASCO, BP, Statoil, Trafigura, Phibro Commodities and Vitol during this month impacted pricing trends of Dated Brent and the prices of contracts tied to Brent in substantial ways, including by affecting the differential between Brent futures and WTI futures.

409.    The activity of BP and STASCO and others in the Platts MOC process during September 2012 constitutes uneconomic and manipulative behavior.  The manipulation was designed to and did affect the relative BFOE prices in terms of time spreads (the forward curve)

and geographic arbitrage (shipments to Korea, the U.S., etc., and both physical and derivatives arbitrage).  This is evidenced by the large (at least 5 million barrel) short derivatives position BP established, which priced directly against the Platts quotations that were being manipulated.  It is further evidenced by the large physical cargo position accumulated by STASCO as it manipulated prices lower.

410.    Defendants manipulated time spreads in several ways.  For example, as discussed above, the manipulative activity caused the October-November ICE Brent spread to rise to 58 cents/barrel by 4:30 p.m. London time Wednesday, September 12, 2012.  This futures movement occurred at the same time that the CFD differentials increased in the MOC process.  Many oil traders expressed surprise at this strength.  One stated: "How on earth can the spread be so high," said one trader. "Someone is very bullish the paper but that doesn't make sense . . . the physical market continues to struggle." "It was all paper-driven," said a second trader, noting that Brent calendar spreads had lowered at the end of the day from their previous intraday highs.  Adding to this confusion was is the fact that at the same time Forties was experiencing cargo deferrals.  This was particularly confusing because BP, via the Forties pipeline system, was the scheduler of Forties cargoes, and BP did nothing to clarify the Forties scheduling.

### J.    The Dubai/Brent Manipulation

411.    Defendants also manipulated Dated Brent and price trends in order to affect geographic arbitrage of physical cargoes.   Regarding inter-regional physical arbitrage, Defendants joined together and agreed in September to either promote or discount the movement of BFOE oil out of the North Sea region.  On several occasions traders inquired as to whether Brent Crude Oil was priced to move to the Korean market.  Throughout the beginning of September traders discussed the possibility of this arbitrage, including the fixing of VLCCs by Statoil and STASCO to ship Brent Crude Oil to Korea.  The depression of prices in the early part

137

of the month created the opportunity for STASCO and Statoil to accumulate cargoes.

412.    Then, on September 13, 2012, the expiry of the October ICE Brent futures contract coincided with two VLCC exports from the North Sea to South Korea planned for October.  As a likely consequence, October futures expired at a $1.01 per barrel premium to November by 4:30 p.m. London time.  Demonstrating the artificiality of the pricing, traders commented that the level of backwardation in October and November was much higher than seen earlier this month even as the physical market had remained weak due to a lack of demand from European refiners amid the maintenance season. "Backwardation is picking up but it's all over the place," said one trader.  *See supra* ¶ 391 ("It's hard to know whether that's driven by physical market strength or not.").  A second trader said: "I can't read the physical at the moment . . . it looks a touch heavy if anything, even with the cargoes going East."  To effect this manipulation, STASCO fixed a VLCC, the Pu Tuo San, to leave Scotland between October 10 and 15.  Statoil's VLCC was set to sail from Norway between October 14 and 15.  Notably, trading sources at STASCO and Statoil declined to comment on the cargo movements.  STASCO and Statoil's manipulative use of the VLCC had artificially influenced the market.

413.    The activity of STASCO, BP and others during the month of September was overall designed to lower the Dated Brent premium relative to Dubai Crude and thereby force open the physical arbitrage.

414.    Dubai Crude is the primary crude oil benchmark against which other grades of crude oil are referenced in the Asian markets. Generally speaking, the Dated Brent benchmark in Northwest Europe ("NWE") trades at a premium to the Dubai benchmark.  Thus, the lower the Brent premium to Dubai is, the more possible is the physical arbitrage movement from NWE to South Korea.

138

415.   The relationship between Brent and Dubai crude oil is shown below, with the Brent manipulation downward at the beginning of September apparent along with the end of the manipulation at the end of the month.  The bogus trades of the September 25 and September 28 described above are particularly obvious here.



| Date | Brent/Dubai |
|---|---|
| 8/17/2012 | 3.20 |
| 8/21/2012 | 3.08 |
| 8/22/2012 | 2.96 |
| 8/23/2012 | 3.12 |
| 8/24/2012 | 3.32 |
| 8/27/2012 | 3.12 |
| 8/28/2012 | 2.94 |
| 8/29/2012 | 2.72 |
| 8/30/2012 | 2.77 |
| 8/31/2012 | 2.97 |
| 9/3/2012 | 2.22 |
| 9/4/2012 | 2.09 |
| 9/5/2012 | 2.11 |
| 9/6/2012 | 1.89 |
| 9/7/2012 | 1.77 |
| 9/10/2012 | 1.67 |
| 9/11/2012 | 1.48 |

| 9/12/2012 | 1.77 |
|---|---|
| 9/13/2012 | 1.54 |
| 9/14/2012 | 2.13 |
| 9/17/2012 | 1.99 |
| 9/18/2012 | 1.91 |
| 9/19/2012 | 2.04 |
| 9/20/2012 | 1.97 |
| 9/21/2012 | 2.21 |
| 9/24/2012 | 2.44 |
| 9/25/2012 | 2.01 |
| 9/26/2012 | 2.03 |
| 9/27/2012 | 2.39 |
| 9/28/2012 | 1.93 |
| 10/1/2012 | 1.70 |
| 10/2/2012 | 1.84 |
| 10/3/2012 | 1.92 |
| 10/4/2012 | 1.87 |
| 10/5/2012 | 2.41 |
| 10/8/2012 | 2.49 |
| 10/9/2012 | 2.81 |
| 10/10/2012 | 2.89 |
| 10/11/2012 | 3.16 |
| 10/12/2012 | 2.86 |
| 10/15/2012 | 3.04 |

416.   On October 1, 2012, the market finally recognized the fundamental situation with STASCO as the main owner in the Platts 10-25 day window.  The depressed market rebounded on this day.  "The prompt was clearly looking a bit distressed but I'm not sure you can say that anymore," said a trader after the Platts MOC assessment process.  "There is only one owner really and they clearly don't want to sell at these levels," another trader said of STASCO and its physical position in Forties.  STASCO held almost every cargo in the last two thirds of October.

### K.      The Urals Benchmark Manipulation

417.   The activity by STASCO in the Brent MOC was not its only activity designed to manipulate relative prices for crude oil grades in September 2012.  STASCO is also an active participant in the Platts MOC for Russian crude oil (known as Urals crude oil).  This Urals MOC is designed to fix relative values for Urals crude oil in both NWE and the Mediterranean.

140

STASCO attempted to manipulate the relative value of Urals crude oil in NWE which is the only other significant Northern European price benchmark. Urals crude oil is of comparative quality to Forties crude oil. The two blends are often viewed as substitutes for each other when comparative differentials and refinery margins permit. Urals crude oil in NWE has influence on inter-regional arbitrage pricing as do BFOE prices.

418. On September 13, 2012 in the Platts Urals MOC STASCO sold to Statoil a cargo (720MB) of Urals crude oil ex Primorsk or Ust Luga October 1 to October 5, 2012 at a differential to Dated Brent of $1.85. This trade was so out of line with market fundamentals that in this rare instance, Platts was not able to manufacture any purported legitimate reason to accommodate the trade with an exception and was forced to discard this "uncompetitive" trade by STASCO from the value calculation for the day.

419. Thus, while STASCO was intending to manipulate Dated Brent, it also was attempting to artificially influence the only other benchmark with similar characteristics to Brent.

**L.     Plaintiffs' Injuries**

**1.     Plaintiffs and Class Members Have Been Injured by Defendants'
Manipulation and Anticompetitive Conduct**

420. The manipulation of Platts MOC not only manipulated Brent Crude Oil prices and related markets, but also interfered demonstrably with the competitive, beneficial price discovery mechanism of the Brent Crude Oil derivatives and futures market. The manipulation of Brent Crude Oil prices caused Brent Crude Oil derives and futures prices, and options on futures prices, to not reflect the legitimate competitive forces of supply and demand. The manipulation disrupted the competitive supply and demand fundamentals for these contracts.

421. These injuries are a direct result of Defendants' anticompetitive conduct, because such conduct directly led to artificially higher or lower prices, causing Plaintiffs and the Class to

suffer financial losses and depriving Plaintiffs and Class Members of transacting in a lawful, non-manipulative competitive market.

422.    For example, during the Class Period, as Plaintiffs and other traders closed their positions at or prior to the time of the contract expiration when Defendants' artificial suppression of the price of Brent Crude Oil, Defendants directly and foreseeably caused market participants, like Plaintiffs, to trade Brent Crude Oil derivatives and futures contracts, and options on such contracts, at artificial prices levels, thereby harming Plaintiffs.

423.    Plaintiffs and Class Members purchased, sold, and/or held Brent Crude Oil futures contracts at prices manipulated by Defendants through their anticompetitive abuse of the MOC process.

424.    Plaintiffs and Class Members' injuries thus flow directly from Defendants' misconduct and fall squarely within the purview of what the Sherman Act was intended to prevent.

425.    There is no degree of separation between Defendants' behavior and Plaintiffs' and Class Members' injuries.  Defendants' conduct necessarily resulted in artificial price of the Brent futures contracts, directly and immediately causing Plaintiffs and Class Members' injuries.

426.    Defendants knowingly and purposely manipulated the MOC process used to set the Dated Brent, and consequently, the Brent futures prices, and manipulated the various pricing components inextricably intertwined with the Dated Brent price.

427.    Plaintiffs and Class Members' injuries thus flow directly, immediately and without interruption from Defendants' behavior.

428.    Plaintiffs and Class Members' injuries are non-speculative.   Defendants' anticompetitive behavior directly and predictably led to artificial price changes in Brent futures

and other derivatives.   Defendants' manipulation and its impact on the price and value of Plaintiffs and Class Members' transactions and positions are direct, clear, and ascertainable.   The precise impact of Defendants' manipulation on the price of Dated Brent and the Brent futures can be shown.   It is also possible to show what the price would have been without Defendants' manipulation.

> **2.    Defendants' Manipulative Conduct Suppressed the Price Received And/Or Inflated the Price Paid by Plaintiffs and Members of the Class for Brent Crude Oil Futures and Other Derivative Contracts**

429.    Throughout the Class Period, Plaintiffs purchased and sold hundreds of thousands of Brent Crude Oil futures and other derivatives contracts.   Plaintiffs have set forth above exemplary allegations of Defendants' collusive conduct and its impact on Dated Brent, Dated Brent, CFDs, Brent futures and other derivative contracts linked to Brent.   Plaintiffs' trading, strategy and profits from the purchase and sale of Brent Crude Oil futures and other derivatives contracts were adversely impacted by Defendants' manipulation and anticompetitive conduct throughout the Class Period and specifically during the exemplary periods of manipulation identified above.

430.    Plaintiff Kevin McDonnell traded Brent Crude Oil futures on NYMEX and ICE and in the NYMEX open outcry pits.   On numerous occasions during the Class Period, Defendants' manipulation of Dated Brent injured McDonnell and caused him financial losses on his trades.   For example, Defendants' manipulation of Brent Crude Oil prices and Dated Brent in June 2010 caused McDonnell injury.   Specifically, on June 11 and 14, 2010, McDonnell purchased 79 and 29, respectively, of the near-month July 2010 Brent Crude Oil futures on ICE and on June 14, 2010 sold 108 of the same contract and suffered losses in the amount of ($25,100.00).   Because Defendants' manipulated Brent Crude Oil prices and Dated Brent in the weeks leading up to the expiry of the July 2010 contract, the manipulation caused injury to

McDonnell on his trades of 231 Brent Crude Oil futures purchased and sold on June 14, 2010, which resulted in a loss of ($17,900.00).

431.   Also, Defendants' manipulation of Dated Brent in February 2011 caused McDonnell injury.  For example, on February 14, 2011, McDonnell purchased and sold 42 April 2011 Brent futures contracts on ICE and lost ($20,730.00).  Similarly, on February 15, 2011, McDonnell purchased and sold on ICE 257 April 2011 Brent Crude Oil futures contracts and suffered losses in the amount of ($79,110.00).

432.   Also, on February 11, 2011, McDonnell purchased and sold 36 April 2011 Brent Crude Oil futures contracts on ICE and also purchased on NYMEX and ICE the same number of April 2011 WTI crude oil futures contracts as part of an "Arb" strategy to trade the price spread between the Brent and WTI futures contracts.  Defendants' manipulation of Dated Brent before and during February 11-15, 2011, had the effect of lowering the Brent premium to WTI and adversely impacting McDonnell's trading strategy and profits.  McDonnell also sold short 144 June 2011 Brent Crude Oil futures on February 22, 2011 and purchased 112 of the same contracts, which caused him to be a net seller and suffer losses from Defendants' manipulation of Date Brent throughout the month of February and including on February 22, 2011.

433.   On numerous occasions during the Class Period, Defendants' manipulation of Dated Brent injured Plaintiff Aaron Schindler and caused him financial losses on his trades.  For example, Schindler's trades were adversely impacted by Defendants' manipulation of Dated Brent in February 2011.  On February 17, 2011, Schindler sold short 20 April 2011 Brent futures contracts on ICW at $103.68 to $103.716., around the time of the MOC Window, and when he closed these contracts on March 8, 2011 by purchasing 20 April 2011 Brent futures contracts on ICE at $114.04, he suffered losses in the amount of ($206,898.80).

144

434.    On numerous occasions during the Class Period, Defendants' manipulation of Dated Brent injured Plaintiff Robert Michiels and caused him financial losses on his trades. Michiels' trades were adversely impacted by Defendants' artificial suppression of Dated Brent in September 2012.  On September 13, 2012, Michiels purchased and sold 912 December '12 Brent Crude Oil futures on ICE and suffered losses in the amount of ($302,200.00).   During 2012, Michiels also traded Minute Marker contracts, which were directly impacted by Defendants' manipulation of the Platts MOC window for Brent Crude Oil.

435.    On numerous occasions during the Class Period, Defendants' manipulation of Dated Brent injured Plaintiff Anthony Insinga and caused him financial losses on his trades.  For example, on September 12, 2012, Insinga purchased and sold on ICE 1 December '12 Brent Crude Oil futures contract that he had purchased on September 7, 2012 and lost ($2,590.00). The same day, on September 12, 2012, Insinga also purchased and sold on ICE 1 December '12 Brent Crude Oil futures contract and lost ($240.00).   During 2012, Insinga also traded Minute Marker contracts, which were directly impacted by Defendants' manipulation of the Platts MOC window for Brent Crude Oil.

436.    On numerous occasions during the Class Period, Defendants' manipulation of Dated Brent injured Plaintiff Atlantic Trading and caused it financial losses on its trades. Atlantic engaged in a number of Brent futures, options and EFS transactions on NYMEX and ICE during months in which Defendants' manipulation adversely impacted Atlantic Trading's strategy and profits.  For example, on January 28, 2011, Atlantic Trading engaged in a series of trades for Brent Crude Oil futures, options and EFS derivative transactions and was harmed by Defendants' manipulation.

437.    On numerous occasions during the Class Period, Defendants' manipulation of

Dated Brent injured Plaintiff Port 22 and caused it financial losses on its trades.  For example, on June 14, 2010, Port 22 was trading the ICE Brent/WTI Arb, and Defendants' manipulation of Dated Brent before and during June 8-14, 2010, had the effect of lowering the Brent premium to WTI and adversely impacting Port 22's trading strategy and profits.  Similarly, on June 11, 2010, Port 22 purchased and sold a total of 400 Brent Crude Oil futures contracts on ICE for the months of September 2010, October 2010, November 2010 and December 2010 and suffered net aggregate losses on this spread trade in the amount of ($42,110.00).

438.     At the time that McDonnell, Schindler, Michiels, Insinga, Atlantic Trading and Port 22 purchased and sold Brent Crude Oil futures during June 2010, January 2011, February 2011 and September 2012, and as with other times throughout the Class Period, they were not aware and indeed had access to no information that would have put them on notice that Defendants had artificially suppressed Brent Crude Oil prices, or Dated Brent.

### 3.     Plaintiffs Incurred Irrevocable Liability in the U.S. in Connection With Their Trading

439.     Plaintiffs below have customer agreements with U.S. firms that are clearing members of and provide trading and clearing services on NYMEX and ICE.  Any liability that Plaintiffs incurred in connection with their trading, such as margin calls, was incurred in the U.S. and with these U.S. firms.

440.     Throughout the Class Period, Plaintiff McDonnell cleared and executed his Brent Crude Oil futures and derivatives trades through Pioneer Futures, Inc. ("Pioneer"), which has its principal place of business at One North End Avenue, New York, New York.  Pioneer was registered with the CFTC as a futures commission merchant ("FCM"), and at all times until November 2013 was a clearing member of the CME, NYMEX and ICE, among other exchanges, and provided clearing and execution services to futures clients.  In November 2013, Pioneer

changed its registration status to Introducing Broker and now offers clearing services that are guaranteed and executed by FCStone LLC, which is a registered FCM with the CFTC and has its principal place of business in Chicago, Illinois.

441.     Throughout the Class Period, Plaintiffs Michiels and Insinga cleared and executed their Brent Crude Oil futures and derivatives trades through MBF Clearing Corp ("MBF"), which is located at One North End Avenue, Suite 1201, New York, New York, and through Advantage Futures LLC ("Advantage"), which has its principal place of business at 141 W. Jackson Boulevard, Suite 2045, Chicago, Illinois.  At all relevant times, MBF and Advantage were registered FCMs and clearing members of NYMEX and ICE.

442.     Throughout the Class Period, Plaintiff Laurens cleared and executed his Brent Crude Oil futures and derivatives trades through Newedge USA, LLC ("Newedge"), which has its principal place of business at 550 W. Jackson Boulevard, Suite 400, Chicago, Illinois. Newedge is registered with the CFTC as an FCM and is a clearing member of NYMEX and ICE.

443.     Throughout the Class Period, Plaintiff Port 22 cleared and executed its Brent Crude Oil futures and derivatives trades through Newedge.

444.     Throughout the Class Period, Plaintiff Atlantic Trading cleared and executed its Brent Crude Oil futures and derivatives trades through Newedge.

445.     Throughout the Class Period, Plaintiff Schindler cleared and executed his Brent Crude Oil futures and derivatives trades through Interactive Brokers LLC ("Interactive"), which has its principal place of business at Two Pickwick Plaza, Greenwich, CT  06830.  Interactive is registered with the CFTC as an FCM and is a clearing member of NYMEX and ICE.

446.     Throughout the Class Period, Plaintiff Prime Int'l cleared and executed its Brent Crude Oil futures and derivatives trades through Rosenthal Collins Group ("Rosenthal Collins"),

which has its principal place of business at 216 West Jackson Boulevard, Chicago, Illinois. Rosenthal Collins is registered with the CFTC as an FCM and is a clearing member of NYMEX and ICE.

447.    Throughout the Class Period, Plaintiff White Oak cleared and executed its Brent Crude Oil futures and derivatives trades through Rosenthal Collins.

**M.    Regulatory and Enforcement Actions Involving Defendants**

448.    Shell, BP and Statoil have recently publicly stated that they have been raided by the EC in order to obtain documents relating to an investigation of, among other things, contrived reporting of crude oil prices to Platts.

449.    On May 17, 2013, the Chairman of the U.S. Senate's Energy Committee requested that the Department of Justice join the investigation into potential crude oil market manipulation, including the impact on the U.S. market.

450.    In addition, on June 24, 2013, the FTC opened a formal investigation into how prices of crude oil and petroleum-derived products are set. The FTC investigation reportedly mirrors the European Commission inquiry.

451.    The European Commission has stated publicly that it has:

[C]oncerns that the companies may have colluded in reporting distorted prices to a Price Reporting Agency to manipulate the published prices for a number of oil and biofuel products. Furthermore, the Commission has concerns that the companies may have prevented others from participating in the price assessment process, with a view to distorting published prices.[11]

452.    Collusively contrived reporting to Platts increases the odds that the false reports will be published because if two participants report the same number to Platts or otherwise support or confirm such number to Platts, it is more likely to be published.

---

[11]    *Commission confirms unannounced inspections in oil and biofuels sectors*, European Commission, http://europa.eu/rapid/press-release_MEMO-13-435_en.htm.

453.    Each Defendant simultaneously engaged in the parallel, highly unusual and unlawful act of restraining trade by submitting contrived reports to Platts and other PRAs in order to move these benchmark prices and, therefore, Brent futures and other derivatives contract prices. As a direct and foreseeable result, all such prices were repeatedly distorted and artificial.

454.    A recent article in the *Wall Street Journal* reports statements by various persons who declare or imply that contrived reports are in fact routinely submitted to various price reporting services in order to move energy prices related to Brent Crude Oil:

a.    A London-based oil trader asserted that he and others regularly try to profit by placing bets that a benchmark will fall, using futures contracts or swaps, then trying to drive prices down by selling cargoes at below-market prices and reporting the deals to Platts.

b.    In some fuel markets, according to traders, so few daily transactions occur that it is possible to sway a day's price with a single trade or series of bids.

c.    A Rotterdam-based bunker fuel trader stated that making deals in an effort to move prices is commonplace.

d.    Defendant BP's traders based in Singapore reportedly "began making high bids within the MOC Window, putting upward pressure on the benchmark that affected prices in Australia, according to [3 persons] knowledgeable about the situation. In some instances, the high bids never resulted in deals . . . . In others, the BP traders bought actual shipments at artificially high prices and moved them from Korea to Australia."

455.    The *Wall Street Journal* article further provides:

The Platts 50 ppm benchmark rose from about $70 in early January 2006 to nearly $100 in June. The increase boosted BP's income from diesel it refined and sold in Australia, along with the bonuses of some of BP's Singapore-based oil traders. . . .[12]

456.    Defendants' and others' ability to manipulate prices also has repeatedly been demonstrated through government investigations and private settlements of charges that they moved or manipulated energy prices unlawfully.  Defendants were in an excellent position to do

---

[12]    Traders Try to Game Platts Oil-Price Benchmarks, WALL STREET J. (Jun. 19, 2013), p. A12.

so with Brent Crude Oil as well, especially when colluding.  And they each had a far greater

motive to manipulate Brent Crude Oil prices than other prices.

457.  Shell: Shell or one of its subsidiaries has been charged in these relevant actions.

a.  U.S. Federal Energy Regulatory Commission's ("FERC's") Final Report on Price Manipulation in Western Markets, FERC Docket No. PA02-2-000 (March 2003), at III-22 (noting Shell's Coral Energy subsidiary "interviewed all employees who provided data to the [trade publication]" and "concluded that 'the information provided to the trade publication accurately reflected then current market information'" but "Coral does not seem to address the seemingly obvious problem with reporting prices and volumes of trades that traders had 'heard about' or 'seen on electronic trading platforms.'");[13]

b.  Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions, in *In the Matter of Coral Energy Resources, L.P.*, CFTC Docket No 04-21 (assessing civil monetary penalty of $30 million against Shell's Coral Energy subsidiary for manipulating natural gas prices by means of repeatedly making false reports to price index publications) (CFTC Jul. 28, 2004);

c.  *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004)(denying motion to dismiss by defendants, including Shell's Coral Energy subsidiary); Stipulation and Agreement of Settlement in *In re Natural Gas Commodity Litig.*, No. 03 Civ. 6186 (S.D.N.Y.) ($5,147,500 settlement by Shell's Coral Energy Resources, L.P. subsidiary), filed Feb. 16, 2007 (ECF No. 486);

d.  Consent Order of Permanent Injunction and Other Equitable Relief Against Defendants in *CFTC v. Denette Johnson, Courtney Cubbison Moore, John Tracy, Robert Harp, and Kelly Dyer*, Civil Action No. 05 Civ. 3322 (S.D. Tex.), filed Nov. 7, 2007 (ECF No. 137) (permanent injunction and assessment of $1 million penalty).

e.  European Commission Decision C (2006) 4090 Final, Case COMPIF/38.456 - Bitumen - Netherlands (Sept. 13, 2006) (fining 14 companies, including Shell, 266.7 million euros for fixing the price of bitumen, a petroleum byproduct used to make asphalt, over eight years on the Dutch market. The fine imposed on Shell, both a leader of the plan and a repeat offender, was increased for being a repeat offender, Shell received the biggest penalty); 2012/C 355/24T

---

[13]     http://www.fere.gov/legal/maj-ord-reg/land-docs/PART-1-3-26-03.pdf.

(Sept. 27, 2012) (reducing fine imposed on Shell from 108 million euros to 81 million euros).[14]

    f.    Consent Order Instituting Proceedings Pursuant to Sections 4c(a) and 6c(a), of the Commodity Exchange Act, and Commission Regulation 1.38(a), Making Findings and Imposing Remedial Sanctions, in In the Matter of Shell Trading US Company, Shell International Trading and Shipping Co., and Nigel Catterall (a STUSCO and former STASCO futures trader residing in Sugarland, Texas), CFTC Docket No. 06-02 (assessing civil money penalties of $300,000 for execution of non-competitive prearranged futures trades in crude oil on NYMEX by traders for STASCO and STUSCO).

    458.  <u>Defendant Vitol, Inc.</u>:  Vitol, Inc. and one of its affiliates have settled civil charges by the CFTC in this relevant action:

> CFTC Order Instituting Administrative Proceedings *In the Matter of Vitol Inc. and Vitol Capital Management Ltd.,* CFTC Dkt. No. 10-17 (Sept. 14, 2010) (alleging Vitol, Inc. and Vitol Capital Management concealed from NYMEX that the two companies shared market information that would have caused the NYMEX to count the two Vitol subsidiaries' trading positions together to assess compliance with speculative trading limits and issuing a civil monetary penalty in the amount of $6 million).

    459.  <u>Defendant BP</u>: Defendant BP or one of its subsidiaries has been charged in these relevant actions.

    a.    Criminal Information and Deferred Prosecution Agreement in *United States v. BP America, Inc.*, 07 CR 683 (N.D. Ill.), filed Oct. 25 and 30, 2007 (ECF Nos. 1, 6) (alleging BP Products North America, Inc., a wholly owned subsidiary of Defendants BP and BP America, and its subsidiaries and several employees inflated industry benchmark price of TEPPCO pipeline system propane; detailing terms of cooperation, assessing $100 million penalty and establishing restitution fund of $53.503 million);

    b.    United States v. Mark David Radley, James Warren Summers, Cody Dean Claborn and Carrie Kienenberger, 07 CR 689 (N.D. Ill.) (individual traders);

    c.    Final Order and Judgment in *In re BP Propane Direct Purchaser Antitrust Litig.*, No. 06 Civ. 3621 (N.D. Ill.), filed May 26, 2009 (ECF No. 182);

---

[14]    *See Shell Wins 25% Cut in Bitumen Cartel Fine, Total Loses Bid*, Bloomberg Business Week (Sept. 12, 2012), http://www.businessweek.com/news/2012-09-27/shell-wins-25-percent-cut-in-eu-bitumen-cartel-fine-as-total-loses-bid.

d.   Final Order and Judgment in *In re BP Propane Indirect Purchaser Litig.*, No. 06 Civ. 3541 (N.D. Ill.), filed Feb. 10, 2010 (ECF No. 207).

e.   In 2011, FERC pursued BP for "fraudulently trading physical natural gas" and for trading points in order to increase the value of its financial positions. *See* Staff Notice of Alleged Violations, FERC 1 (Aug. 12, 2011) [15] ("BP accomplished its fraud by using transportation capacity between the two markets [Houston Ship Channel and Katy] uneconomically. In doing so, BP contributed to lower HSC Gas Daily indices to increase the value of its financial positions by making early and repeated sales; using high market concentrations; and by trading relationally to its financial spread.").

f.   In the EC bitumen price-fixing matter, Defendant BP p.l.c. escaped a fine because it cooperated in the probe into the bitumen cartel.[16]

**N.   Defendants Compete in the Market for and Trade Brent Crude Oil Futures and Derivative Contracts**

460.   During the Class Period, Defendants and their U.S. affiliates actively traded Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts.   Defendants' manipulative actions provided concrete benefits to themselves and their affiliates in the form of trading for profit for their own accounts and acting as futures and derivative market competitors and counterparties to Plaintiffs and other Class members.   By acting together, Defendants could control where Brent prices would be set on certain days and could sustain artificial suppression or inflation of Brent prices to benefit their and their affiliates related futures and other derivatives positions.

**1.   BP**

461.   Defendant BP actively trades in the global commodity markets "in order to manage, transact and hedge the crude oil, refined products and natural gas that the group either

---

[15]   http://www.ferc.gov/enforcement/alleged-violation/notices/bp-america.pdf.

[16]   *See Shell Wins 25% Cut in Bitumen Cartel Fine, Total Loses Bid*, Bloomberg Business Week (Sept. 12, 2012), http://www.businessweek.com/news/2012-09-27/shell-wins-25-percent-cut-ineu-bitumen-cartel-fine-as-total-loses-bid.

produces or consumes in its manufacturing operations."[17]  As detailed in its 2012 Annual Report, BP trades Brent futures and other derivatives on exchanges including those listed on the ICE and NYMEX exchanges.[18]  BP is also a trade participant member of ICE Futures Europe.  Plaintiffs allege that Brent Crude futures and other derivatives are among the products traded by BP.

462.    BP's global affiliated trading arm overseeing BP's trading activity, the Integrated Supply & Trading ("IST") group, engages in broad-based strategic decisions on its futures, other derivatives and physical positions.  Defendant BP discloses in its 2013 Annual Report on Form 20-F filed with the SEC that its upstream and downstream segments both participate in global commodity trading markets and trade futures and options contracts on NYMEX and ICE, including contracts for Brent Crude Oil.  BP is vertically integrated, and its largest division is BP America.   In fact, BP's operations in the U.S. comprise almost one-third of its worldwide business operations.

463.    BP holds the IST group out as one of the largest traders of oil and gas in the world. BP IST manages the commodity flows of the BP Group, according to Paul Reed, the Chief Executive Officer of BP IST.  BP further segments its IST group into two divisions, with one strategic performance unit dedicated to global oil, which BP touts as "the preeminent global oil trading business".  BP operates this global oil trading business through regional offices located in Chicago, Houston, London and Singapore.

464.    Given that Brent Crude Oil pricing is the singular most important energy pricing structure in the world, traders working on behalf of BP and its global affiliates, which have significant exposure to Brent Crude oil and other crude oil benchmarked and priced to Brent, are

---

[17]     BP, Annual Report (Form 20-F) (Mar. 6, 2013), at 98.

[18]     *Id.*

informed about and participate in trading decisions on behalf of and for the benefit of Defendants BP and BP America and other global affiliates of BP. The IST group's traders in the U.S., London and other parts of the world are fully aware of the overall company's position and outlook on the volatility of Brent and other crude oil prices, including prices for cargoes and derivatives traded in the Platts MOC window. The IST group and its traders participate in decision making on BP's overall world-wide exposure to Brent Crude Oil prices.

### 2.    MSCGI

465.   As detailed in its 2012 Annual Report, Morgan Stanley "trades and is a market-maker in exchange-traded derivatives and futures and OTC derivatives and swaps on commodities, and offers counterparties hedging programs relating to production, consumption, reserve/inventory management and structured transactions, including energy-contract securitizations and monetization."[19]

466.   During the Class Period, MSCGI was the principal commodities trading arm of Morgan Stanley. MSCGI engaged in trading physical commodities and exchange-traded and OTC commodities derivative instruments. MSCGI sold its oil merchant business to OAO Roseneft in December 2013.

467.   Additionally, MSCGI's broker-dealer affiliates Morgan Stanley & Co. LLC and Morgan Stanley Smith Barney LLC are future commission merchants that are regulated by the CFTC and various commodity futures exchanges.[20] Morgan Stanley & Co. LLC and Morgan Stanley & Co. International plc are also clearing members of ICE Futures Europe. Plaintiffs allege that Brent Crude futures and other derivatives are among the products traded by MSCGI.

---

[19]    Morgan Stanley, Annual Report (Form 10-K) (Feb. 25, 2013), at 3.

[20]    *Id.* at 15.

### 3.   Phibro and Phibro Commodities

468.   In addition to operating as a physical trader, Defendant Phibro trades crude oil futures and other derivatives on NYMEX and ICE, the Dubai Mercantile Exchange (DME) and other exchanges, as well as in the over-the counter physical, swaps and options markets."[21]

469.   Additionally, Phibro's and Phibro Commodities' corporate parent, Occidental Petroleum routinely trades "derivative instruments, including a combination of short-term futures, forwards, options and swaps, to establish, as of the date of production, the price it receives and to improve realized prices for oil and gas."[22]   Phibro's affiliate, Phibro Limited, is also a clearing member of ICE Futures Europe.   Plaintiffs allege that Brent Crude futures and other derivatives are among the products traded by Phibro and its affiliates.

### 4.   STASCO and STUSCO

470.   Shell Trading US Company (previously defined herein as "STUSCO") and Shell Energy North America (US), L.P. ("Shell Energy") together are the North American commodity trading arm of Shell known as "Shell Trading".   STUSCO and Shell Energy are part of the Shell Trading global network.   Shell Trading actively participates in the U.S. energy futures, options and broader derivatives markets.   STUSCO's affiliate Shell International Trading and Shipping Company Limited (previously defined herein as "STASCO") is also a clearing member of ICE Futures Europe.

471.   STUSCO is a Delaware corporation with its principal place of business in Houston, Texas.   STUSCO's ultimate parent company is Shell.   STUSCO is a member of NYMEX and conducts a substantial trading-for-profit business, which includes the buying,

---

[21]   http://www.phibro.com/2a-energy.htm.

[22]   Occidental Petroleum Corporation, Annual Report (Form 10-K), at 34 (Feb. 26, 2013).

selling and transport of various grades of crude oil as well as trading oil futures contracts. STUSCO executes and makes markets for crude oil product derivatives, including futures, swaps and options through futures markets, OTC markets and electronic trading platforms in the U.S. and in the international marketplace.  STUSCO also serves as the supply and trading unit for Shell's affiliates, Shell Oil Products US and Motiva Enterprises LLC.

472.    Defendant STASCO and its global affiliated U.S.-based trading entity, STUSCO, engage in broad-based strategic decisions on STASCO's and its affiliates' futures, other derivatives and physical positions.  Given that Brent Crude Oil pricing is the singular most important energy pricing structure in the world, traders working on behalf of STASCO and STUSCO and their global affiliates, which have significant exposure to Brent Crude oil and other crude oil benchmarked and priced to Brent, are informed about and participate in trading decisions on behalf of and for the benefit of Defendants STASCO and STUSCO, and other global affiliates of the Shell conglomerate.  STUSCO and its traders in the U.S. and other parts of the world are fully aware of the overall company's position and outlook on the volatility of Brent and other crude oil prices, including prices for cargoes and derivatives traded in the Platts MOC window.  STUSCO and its traders participate in decision making on the overall world-wide exposure to Brent Crude Oil prices.

473.    STUSCO's trading desks managed Shell's overall risk to its physical and financial positions as a whole and engaged in trading as a hedger, speculator and swap or OTC dealer.  Brent Crude futures and other derivatives are among the products traded by STASCO, Shell Trading and their affiliates.

### 5.    Statoil

474.    Defendant Statoil actively participates in trading Brent Crude Oil products.

Statoil maintains a global trading presence that enables it to trade around the clock from its offices in Stavanger, Norway, London, Stamford, Connecticut and Singapore. According to Statoil's latest Annual Report, to manage short-term commodity risk, Statoil enters into commodity-based derivative contracts, including futures, options, over-the-counter (OTC) forward contracts, market swaps and contracts for differences related to crude oil, petroleum products, natural gas and electricity. Statoil also acknowledges that it trades crude oil and refined oil derivatives on ICE and NYMEX, the OTC Brent market, and throughout the crude and refined products swap markets. Additionally, affiliate Statoil Gas Trading Ltd. is a trade participant member of the ICE Futures Europe market.

475. Statoil Marketing & Trading (US) Inc. ("Statoil Trading (US)") and Statoil Natural Gas LLC ("Statoil Natural Gas") are the Delaware-registered, Stamford, Connecticut-based affiliates of Defendant Statoil that are responsible for Defendant Statoil's oil and natural gas activities in North America. According to Statoil's website, Statoil North America, Inc., the company's US holding company, also provides corporate services out the Stamford, Connecticut office. Collectively, approximately 170 Statoil employees are based in Stamford, Connecticut.

476. Statoil Trading (US) is an extensive trader of crude oil including physical Brent Crude Oil and crude oil benchmarked and priced as a differential to Brent. Statoil Trading (US) has been an importer of record in the U.S. for crude oil benchmarked and priced as a differential to Brent during the Class Period. This U.S.-based trading entity engages in broad-based strategic decisions on its futures, other derivatives and physical positions. Given that Brent Crude Oil pricing is the singular most important energy pricing structure in the world, traders working on behalf of Statoil Trading (US) and its global affiliates, which have significant exposure to Brent Crude oil and other crude oil benchmarked and priced to Brent, are informed about and

participate in trading decisions on behalf of and for the benefit of Defendant Statoil.  Statoil

Trading (US) and its traders in the U.S. and other parts of the world are fully aware of the overall

company's position and outlook on the volatility of Brent and other crude oil prices, including

prices for cargoes and derivatives traded in the Platts MOC window. Statoil Trading (US) and its

traders participate in decision making on the overall world-wide exposure to Brent Crude Oil

prices.

477.    Moreover as detailed below, Statoil Trading (US) imported millions of barrels of

Dated Brent priced oil cargoes into the U.S. during the Class Period.

### 6.    Trafigura

478.    Trafigura's trading operations are integrated with its local storage, shipping, and

chartering departments which enables the company "to react quickly to shifting demand

patterns."[23]  Trafigura's affiliates and subsidiaries in the U.S. are active in the financial

derivatives markets, employing futures, forwards, options and OTC instruments to manage

Trafigura's physical positions and hedge exposure to related risks.  Plaintiffs allege that Brent

Crude futures and other derivatives are among the products traded by Trafigura and its affiliates.

479.    Defendant Trafigura AG is a U.S.-based wholly-owned subsidiary of Defendant

Trafigura Beheer, one of the world's leading international commodity traders, specializing in

crude oil and other markets and maintaining with 81 offices in 54 countries in six continents.

Trafigura's primary trading business is the supply and transport of crude oil, petroleum products,

renewable energies, coal, and other products.  Trafigura holds itself out as the world's second-

largest privately-owned oil trading company and reports that, in the crude oil market, Trafigura

uses its global presence, market knowledge and logistics capabilities to balance supply and

---

[23]       "Infrastructure," http://www.trafigura.com/trading/oil-and-petroleum/crude/.

demand.   Trafigura manages its price risks through Trafigura AG and other affiliates as active participants in both financial and physical markets with a worldwide network of traders, using in-house market intelligence along with internal and external software platforms to predict fluctuations in international crude oil flows.   In the financial derivatives markets, Defendants Trafigura AG employs futures, forwards, options and OTC instruments to manage global positions and hedge Trafigura's exposure to absolute, basis, and index price risks.   Trafigura AG has been an importer of record in the U.S. for crude oil benchmarked and priced as a differential to Brent during the Class Period.

### 7.    Vitol

480.    According to Vitol's website, the company "is a significant participant in global crude oil markets and crude oil is the largest part of Vitol's total energy portfolio," and trades "around 2.4 m barrels per day."[24]

481.    An affiliate of Defendant Vitol S.A., its affiliate, Defendant Vitol, Inc., is a U.S. company that is incorporated in Delaware and has its principal place of business in Houston, Texas.   As described by a 2010 CFTC enforcement order, Vitol, Inc. is in the business of trading energy commodities and hedging physical positions with NYMEX energy futures and options on futures markets.   Another affiliate of Defendant Vitol, Inc., a Bermuda-based affiliate, Vitol Capital Management Ltd. ("VCM") with an office in the U.S., trades financially-settled energy derivatives and NYMEX futures and options on futures contracts.   News reports surrounding the CFTC's enforcement action against Vitol, Inc. and VCM reveal the action resulted from a request for data by the CFTC, which revealed that Vitol, Inc. was more of a speculator, holding oil futures contracts as a profit-making investment, rather than a means of delivering oil.   Vitol,

---

[24]    *See* http://www.vitol.com/crude-oil.html.

Inc. held massive positions, including in July 2008 holding 11 percent of all the oil contracts on NYMEX and the previous month Vitol had acquired a huge holding in oil contracts equal to 57.7 million barrels of oil, which was approximately three times the amount the U.S. consumes daily. Prior to the finding, the CFTC had classified Vitol, Inc. as a trader that primarily assisted industrial firms that needed oil to run their businesses.  The CFTC fined Vitol, Inc. and VCM for concealing from the CFTC the true relationship and information sharing that allowed Vitol, Inc. and VCM to amass speculative positions in violation of CFTC regulations.

482.    Vitol S.A. Inc. is an international energy trading and refining company with offices in Houston, Texas.  Vitol S.A. Inc. imports into the U.S. crude oil benchmarked and priced to Brent Crude Oil.  Moreover as detailed below, Vitol, Inc. and Vitol, S.A. are extensive traders of crude oil including physical Brent Crude Oil and crude oil benchmarked and priced as a differential to Brent.  Vitol, Inc. and Vitol S.A. Inc. each has been an importer of record in the U.S. for crude oil benchmarked and priced as a differential to Brent during the Class Period.

483.    Vitol S.A.'s and its global affiliated U.S.-based trading entity, Vitol, Inc., engage in broad-based strategic decisions on its futures, other derivatives and physical positions.  Given that Brent Crude Oil pricing is the singular most important energy pricing structure in the world, traders working on behalf of Vitol, Inc. and its global affiliates, which have significant exposure to Brent Crude Oil and other crude oil benchmarked and priced to Brent, are informed about and participate in trading decisions on behalf of and for the benefit of Defendants Vitol, S.A. and Vitol, Inc., and other global affiliates of the Vitol Group.  Vitol, Inc. and its traders in the U.S. and other parts of the world are fully aware of the overall company's position and outlook on the volatility of Brent and other crude oil prices, including prices for cargoes and derivatives traded in the Platts MOC window.  Vitol, Inc. and its traders participate in decision making on the

overall world-wide exposure to Brent Crude Oil prices.

484.    Plaintiffs allege that Brent Crude futures and options are among the products traded by Vitol.  Indeed, in February 2011, Vitol's CEO Ian Taylor suggested that "the more reliable Brent futures contract will take center stage."[25]

### 8.    HETCO

485.    HETCO is a major participant in the Brent Crude Oil derivatives markets. HETCO trades futures, swaps and options across the energy spectrum and self reports that it is a large participant on the ICE and NYMEX Exchanges.  In addition to generating earnings through various strategies trading energy-related physical commodities, HETCO also generates significant earnings through trading energy-related securities and other derivatives contracts.

486.    HETCO's owner, Hess also engages in substantial production activities that require Hess to utilize derivative financial markets to hedge its operations.  For example, in 2012, according to the Form 10-K that Hess filed with the U.S. Securities and Exchange Commission, Hess used Brent Crude futures and swaps to fix the selling price of over 24,000 barrels-per-day. Similarly, Hess reported in its 2013 Form 10-K filed with the SEC that in 2013, Hess engaged in futures, swaps or option strategies "to hedge 90,000 barrels of [Brent crude] oil per day (bopd) of crude oil sales volumes at an average price of approximately $109.70 per barrel."  Moreover as detailed below, Hess Corp. imported hundreds of thousands of barrels of Dated Brent priced oil cargoes into the U.S. during the Class Period.

487.    With Global trading operations, it is reasonable to believe that Defendants and their affiliates traded Brent Crude Oil futures, among all other grades of crude, futures and

---

[25]    *See* Grant Smith, "Vitol's Taylor Expects More OPEC Oil, Brent to Slide to $90-$100," Bloomberg (Feb. 22, 2011),  http://www.bloomberg.com/news/2011-02-22/vitol-s-taylor-expects-more-opec-oil-brent-to-slide-to-90-100.html.

forwards in major trading hubs, including in the U.S., U.K., Singapore, Switzerland and other locations.  Some of the Defendants and their affiliates also trade in Brent Crude Oil physicals and derivatives in the name of an offshore company, rather than a company registered to the office where the trader actually orchestrating the deal was located. These offshore companies shield Defendants and their affiliates from regulation and also are usually tax havens.

### 9.    Mercuria

488.    Defendant Mercuria is one of the world's largest independent traders of crude oil, including Brent Crude Oil.   Mercuria is part of the Mercuria Energy Group Ltd., with headquarters located in Geneva, Switzerland.   Mercuria currently is positioned as the world's fourth-largest commodity trader.    A central part of Mercuria's core business is trading derivatives using insights gained from its physical trading.   Defendant Mercuria Energy is a U.S.-based affiliate of Defendant Mercuria with its principal place of business in Chicago, Illinois.   Mercuria Energy operates as a subsidiary of Mercuria Energy Group Holding S.A. Mercuria and its affiliates specialize crude oil and other markets. Mercuria uses its global presence, market knowledge and logistics capabilities to balance supply and demand.   Mercuria manages its price risks through Mercuria Energy, which is an active participants in both financial and physical markets with a worldwide network of traders. Mercuria Energy has been an importer of record in the U.S. for crude oil benchmarked and priced as a differential to Brent during the Class Period.

## V.    DEFENDANTS' MANIPULATIONS OF IMPORT COMMERCE

489.    The U.S. regularly imports large quantities of crude oil.  The Platts's Dated Brent benchmark serves as the market's price guide for Dated Brent contracts and thus for most of the world's crude oil.

490.    As described throughout this complaint, Defendants purposefully manipulated the prices of Brent Crude Oil through the deliberate submission of misleading pricing and trading information to Platts during the MOC process, which Platts then incorporated into the Dated Brent benchmark.  Thus, by manipulating the Dated Brent price of crude oil, Defendants directly manipulated the price of crude oil into the U.S.

491.    During the Class Period, Defendants imported significant amounts of crude oil, the price of which was directly and inextricably tied to the Dated Brent.  The following charts show the amount of crude oil priced to Dated Brent that certain Defendants and their affiliates imported into the U.S.

| Defendants STASCO and STUSCO (and affiliates) Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Importing Co. Name | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Shell Chem. LP | 15,881 | 21,309 | 18,476 | 16,186 | 18,349 | 14,513 | 12,644 | 10,246 | 2,240 | - |
| Shell Chem. Yabucoa Inc | 9,562 | 16,452 | 24,415 | 26,689 | 13,362 | - | - | - | - | - |
| Shell Oil Co. | 111,979 | 112,707 | 13,791 | 14,011 | 9,528 | 917 | - | - | - | - |
| Shell Oil Co. Deer Park | - | - | 103,610 | 103,920 | 99,848 | 96,291 | 100,108 | 86,746 | 82,537 | 68,018 |
| Shell Oil Products Puget Sound | - | - | 1,021 | - | - | - | - | - | - | - |
| Shell Oil Products US | - | - | - | - | - | 1,113 | 1,644 | 3,360 | 1,571 | - |
| Shell US Trading Co. | 32,616 | 19,688 | 15,302 | 27,999 | 19,963 | 31,270 | 15,291 | 10,017 | 318 | 702 |
| Motiva Enterprises LLC* | 41,598 | 42,644 | 42,098 | 48,776 | 44,125 | 22,772 | 16,615 | 17,688 | 12,704 | 10,156 |
| *Total* | 211,636 | 212,800 | 218,713 | 237,581 | 205,175 | 166,876 | 146,302 | 128,057 | 99,370 | 78,876 |
| Source:  U.S. Energy Information Administration; Expert | | | | | | | | | | |
| * Motiva Enterprises, LLC is a 50-50 joint venture between Shell Oil Co. and Saudi Refining. | | | | | | | | | | |

| Defendant BP (and affiliates) Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Importing Co. Name | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| BP Products. North America Inc. | 70,715 | 75,265 | 52,048 | 76,410 | 64,049 | 58,555 | 67,478 | 40,817 | 37,045 | 21,459 |
| BP West Coast Prods. LLC | 2,077 | 8,523 | 4,638 | - | 22,773 | 18,160 | 19,320 | 14,690 | 26,311 | 16,923 |
| *Total* | 72,792 | 83,788 | 56,686 | 76,410 | 86,822 | 76,715 | 86,798 | 55,507 | 63,356 | 38,382 |
| Source:  U.S. Energy Information Administration; Expert | | | | | | | | | | |

| Defendant Hetco (and affiliates) Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Importing Co. Name | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Hess Corp. | - | - | - | - | - | - | 422 | - | - | - |
| *Total* | - | - | - | - | - | - | 422 | - | - | - |

Source:  U.S. Energy Information Administration; Expert

| Defendant Mercuria (and affiliates) Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Importing Co. Name | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Mercuria Energy Trading Inc. | - | - | - | - | - | 910 | - | - | - | - |
| Total | - | - | - | - | - | 910 | - | - | - | - |

Source:  U.S. Energy Information Administration; Expert

| Defendant Statoil (and affiliates) Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Importing Co. Name | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Statoil Mktg. & Trdg. (US) Inc. | 1,373 | - | 2,164 | 3,659 | 8,230 | 4,911 | 6,156 | 4,600 | 713 | 1,036 |
| Total | 1,373 | - | 2,164 | 3,659 | 8,230 | 4,911 | 6,156 | 4,600 | 713 | 1,036 |

Source:  U.S. Energy Information Administration; Expert

| Defendant Trafigura (and affiliates) Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Importing Co. Name | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Trafigura AG | - | 1,394 | - | - | 1,756 | 10,588 | 7,897 | 2,481 | - | 1,208 |
| Total | - | 1,394 | - | - | 1,756 | 10,588 | 7,897 | 2,481 | - | 1,208 |

Source:  U.S. Energy Information Administration; Expert

| Defendant Vitol (and affiliates) Dated-Brent Priced Oil Imports into the United States (in thousands of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Importing Co. Name | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Vitol Inc. | - | - | - | - | - | - | - | - | - | 25 |
| Vitol SA Inc. | 2,707 | 8,787 | 2,481 | 12,492 | 2,148 | 8,367 | 3,501 | 471 | 80 | 581 |
| Total | 2,707 | 8,787 | 2,481 | 12,492 | 2,148 | 8,367 | 3,501 | 471 | 80 | 606 |

Source:  U.S. Energy Information Administration; Expert

492.    Significantly, from 2004 through 2013, approximately 667.9 million barrels of oil were imported into the U.S. from the U.K. and Norway, i.e., North Sea origins.  A substantial portion of these imports derived from the assets controlled by Statoil, BP and STASCO.

| Dated-Brent Priced Oil Imports from the United Kingdom and Norway into the United States (in millions of barrels) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Country of Origin | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Norway | 76.6 | 54.6 | 37.5 | 20.2 | 10.7 | 20.4 | 8.9 | 19.5 | 9.1 | 6.1 |
| United Kingdom | 93.6 | 87.0 | 48.5 | 36.9 | 28.0 | 38.6 | 44.9 | 13.3 | 6.4 | 7.7 |
| Total | 170.2 | 141.6 | 86.0 | 57.1 | 38.7 | 59.0 | 53.8 | 32.8 | 15.5 | 13.8 |

Source:  U.S. Energy Information Administration; Expert

493.    In addition, below Plaintiffs provide imports of cargoes of crude oil priced to Brent by Defendant and country during the periods of alleged manipulation and the months just following, when cargoes shipped during the manipulation would have been most likely to arrive in the U.S.

164

494.    Defendants imported the following Dated Brent priced cargoes during the months

of June 2010 and in the months immediately thereafter.

| Defendant BP (and affiliates) Dated-Brent Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Jun-10 | Jul-10 | Aug-10 | Sep-10 | |
| *BP Products North America Inc.* | *5,948* | *5,787* | *6,308* | *4,803* | *22,846* |
| Angola | 1,492 | - | 465 | - | 1,957 |
| Australia | - | 692 | - | - | 692 |
| Cameroon | - | 599 | - | - | 599 |
| Cote D'Ivoire | - | - | - | 300 | 300 |
| Equatorial Guinea | - | 500 | 2,175 | 1,545 | 4,220 |
| Libya | 659 | - | - | - | 659 |
| Mexico | 500 | 250 | 750 | - | 1,500 |
| Nigeria | 3,297 | 3,746 | 2,426 | 2,472 | 11,941 |
| Russia | - | - | 492 | 486 | 978 |
| *BP West Coast Products LLC* | *2,236* | *1,977* | *2,937* | *2,440* | *9,590* |
| Angola | 1,916 | 1,977 | 2,937 | 1,496 | 8,326 |
| Russia | 320 | - | - | 944 | 1,264 |
| Source:  U.S. Energy Information Administration; Expert | | | | | |

| Defendants STASCO and STUSCO (and affiliates) Dated-Brent Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Jun-10 | Jul-10 | Aug-10 | Sep-10 | |
| *Motiva Enterprises LLC* | *1,048* | *2,459* | *1,482* | *2,930* | *7,919* |
| Angola | - | - | - | 481 | 481 |
| Canada | - | 538 | - | - | 538 |
| Egypt | - | - | - | 501 | 501 |
| Nigeria | 1,048 | 949 | 475 | 1,948 | 4,420 |
| Russia | - | - | 525 | - | 525 |
| United Kingdom | - | 972 | 482 | - | 1,454 |
| *Shell Chemical LP* | *1,733* | *1,682* | *576* | *1,129* | *5,120* |
| Algeria | 1,142 | 526 | 576 | 545 | 2,789 |
| Azerbaijan | 591 | 550 | - | 584 | 1,725 |
| Libya | - | 606 | - | - | 606 |
| *Shell Oil Co Deer Park* | *8,390* | *8,284* | *8,577* | *8,125* | *33,376* |
| Algeria | - | - | 474 | - | 474 |
| Mexico | 6,413 | 6,289 | 6,628 | 6,112 | 25,442 |
| Nigeria | 1,977 | 1,995 | 1,475 | 2,013 | 7,460 |
| *Shell Oil Co Products US* | *334* | *-* | *349* | *-* | *683* |
| Peru | 334 | - | 349 | - | 683 |
| *Shell US Trading Co* | *199* | *3,171* | *3,957* | *2,567* | *9,894* |
| Algeria | - | 547 | 522 | - | 1,069 |
| Angola | - | 480 | 2,280 | - | 2,760 |
| Canada | 199 | - | - | 200 | 399 |
| Nigeria | - | 2,144 | 1,155 | 2,367 | 5,666 |

| Source:  U.S. Energy Information Administration; Expert |
|---|
| * Motiva Enterprises, LLC is a 50-50 joint venture between Shell Oil Co. and Saudi Refining. |

| Defendant Statoil (and affiliates) Dated-Brent Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Jun-10 | Jul-10 | Aug-10 | Sep-10 | |
| *Statoil Mktg & Trdg US Inc* | *393* | - | - | - | *393* |
| Angola | 393 | - | - | - | 393 |
| Source:  U.S. Energy Information Administration; Expert | | | | | |

| Defendant Trafigura (and affiliates) Dated-Brent Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Jun-10 | Jul-10 | Aug-10 | Sep-10 | |
| *Trafigura AG* | *1,000* | *1,913* | *563* | *313* | *3,789* |
| Algeria | - | 475 | - | - | 475 |
| Angola | 165 | 750 | 25 | 25 | 965 |
| Canada | 369 | 536 | 384 | 210 | 1,499 |
| Nigeria | 466 | 152 | 154 | 78 | 850 |
| Source:  U.S. Energy Information Administration; Expert | | | | | |

| Defendant Vitol (and affiliates) Dated-Brent Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Jun-10 | Jul-10 | Aug-10 | Sep-10 | |
| *Vitol SA Inc.* | *110* | - | - | - | *110* |
| Nigeria | 110 | - | - | - | 110 |
| Source:  U.S. Energy Information Administration; Expert | | | | | |

495.   Defendants imported the following Dated Brent priced cargoes during January and February 2011 and in the months immediately thereafter.

| Defendant BP (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | | |
|---|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | | Total Imports |
| | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | |
| *BP Products North America Inc.* | *5,802* | *2,399* | *694* | *2,669* | *2,412* | *13,976* |
| Angola | - | 453 | - | - | - | 453 |
| Canada | 675 | - | - | - | - | 675 |
| Mexico | 501 | 995 | 245 | 254 | - | 1,995 |
| Nigeria | 4,626 | 951 | 449 | 2,415 | 2,273 | 10,714 |
| United Kingdom | - | - | - | - | 139 | 139 |
| *BP West Coast Products LLC* | *718* | *1,590* | *882* | - | - | *4,267* |
| Angola | - | 986 | - | - | - | 986 |
| Nigeria | - | - | - | - | 387 | 387 |
| Russia | 718 | 604 | 882 | - | 690 | 2,894 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | | |

| Defendants STASCO and STUSCO (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | | |
|---|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | | Total Imports |
| | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | |
| *Motiva Enterprises LLC* | *523* | *1,017* | *1,541* | *922* | *508* | *4,511* |
| Angola | 523 | - | - | - | 508 | 1,031 |
| Mexico | - | 499 | 491 | - | - | 990 |
| Nigeria | - | 518 | 1,050 | 922 | - | 2,490 |
| *Shell Chemical LP* | *562* | *582* | *971* | *1,385* | *1,076* | *4,576* |
| Algeria | 562 | - | - | 632 | 550 | 1,744 |
| Azerbaijan | - | - | - | - | 526 | 526 |
| Nigeria | - | - | 398 | 208 | - | 606 |
| Norway | - | 582 | 573 | 545 | - | 1,700 |
| *Shell Oil Co Deer Park* | *9,467* | *4,315* | *7,082* | *2,873* | *5,423* | *29,160* |
| Angola | - | - | - | - | 539 | 539 |
| Mexico | 7,971 | 2,831 | 5,095 | 1,100 | 3,937 | 20,934 |
| Nigeria | 1,496 | 1,484 | 1,987 | 1,773 | 947 | 7,687 |
| *Shell Oil Co Products US* | - | - | *927* | - | - | *927* |
| Angola | - | - | 927 | - | - | 927 |
| *Shell US Trading Co* | *901* | - | *2,220* | *2,948* | *421* | *6,490* |
| Canada | - | - | 347 | - | - | 347 |
| Nigeria | 901 | - | 903 | 2,948 | 421 | 5,173 |
| Norway | - | - | 461 | - | - | 461 |
| United Kingdom | - | - | 509 | - | - | 509 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | | |
| * Motiva Enterprises, LLC is a 50-50 joint venture between Shell Oil Co. and Saudi Refining. | | | | | | |

| Defendant Statoil (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | | |
|---|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | | Total Imports |
| | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | |
| *Statoil Mktg & Trdg US Inc* | *340* | *542* | *500* | *974* | *331* | *2,687* |
| Algeria | 340 | 542 | 500 | 974 | 331 | 2,687 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | | |

| Defendant Trafigura (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | | |
|---|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | | Total Imports |
| | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | |
| *Trafigura AG* | - | - | *518* | - | *948* | *1,466* |
| Angola | - | - | - | - | 948 | 948 |
| Nigeria | - | - | 518 | - | - | 518 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | | |

| Defendant Vitol (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | | |
|---|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | | Total Imports |
| | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | |
| *Vitol SA Inc.* | *471* | - | - | - | - | *471* |
| Angola | 471 | - | - | - | - | 471 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | | |

496.    Defendants imported the following Dated Brent price cargoes during September 2012 and in the months immediately thereafter.

| Defendant BP (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Sept-12 | Oct-12 | Nov-12 | Dec-12 | |
| *BP Products North America Inc.* | *3,426* | *2,842* | *5,300* | *5,983* | *17,551* |
| Angola | - | 701 | 1,491 | 2,948 | 5,140 |
| Mexico | 412 | 203 | 409 | 199 | 1,223 |
| Nigeria | 3,014 | 1,938 | 3,400 | 2,836 | 11,188 |
| *BP West Coast Products LLC* | *3,740* | *3,640* | *2,226* | *2,743* | *12,349* |
| Angola | 494 | 417 | 8 | - | 919 |
| Angola | 1,823 | 1,571 | 1,426 | 1,822 | 6,642 |
| Congo (Brazzaville) | 333 | 5 | 3 | - | 341 |
| Equitorial Guinea | 486 | 523 | 17 | - | 1,026 |
| Libya | 3 | 1 | 1 | - | 5 |
| Nigeria | 601 | 379 | 771 | 921 | 2,672 |
| Russia | - | 744 | - | - | 744 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | |

| Defendants STASCO and STUSCO (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Sept-12 | Oct-12 | Nov-12 | Dec-12 | |
| *Motiva Enterprises LLC* | *947* | *-* | *1,450* | *1,008* | *3,405* |
| Egypt | - | - | - | 508 | 508 |
| Mexico | - | - | 498 | 500 | 998 |
| Nigeria | 947 | - | 952 | - | 1,899 |
| *Shell Chemical LP* | *597* | *-* | *-* | *-* | *597* |
| Algeria | 597 | - | - | - | 597 |
| *Shell Oil Co Deer Park* | *8,210* | *7,166* | *6,890* | *5,822* | *28,088* |
| Mexico | 7,209 | 6,167 | 5,893 | 5,340 | 23,609 |
| Nigeria | 1,001 | 999 | 997 | 482 | 3,479 |
| *Shell Oil Co Products US* | *-* | *-* | *380* | *-* | *380* |
| Angola | - | - | 380 | - | 380 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | |
| * Motiva Enterprises, LLC is a 50-50 joint venture between Shell Oil Co. and Saudi Refining. | | | | | |

| Defendant Vitol (and affiliates) Brent Crude-Priced Imports into the United States (in thousands of barrels) | | | | | |
|---|---|---|---|---|---|
| Importing Company (by country of origin) | Reporting Period | | | | Total Imports |
| | Sept-12 | Oct-12 | Nov-12 | Dec-12 | |
| *Vitol SA Inc.* | *-* | *9* | *37* | *34* | *80* |
| Canada | - | 9 | 37 | 34 | 80 |
| Source:  Source:  U.S. Energy Information Administration; Expert | | | | | |

## VI.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

497.    Defendants concealed their wrongdoing in the Brent Crude Oil market.  Plaintiffs could not in the exercise of due diligence have discovered Defendants' wrongdoing as alleged herein.  Because Defendants manipulative behavior was self-concealing and they took further active steps to conceal their behavior, Plaintiffs and Class Members remained unaware of the violation during the limitations period.

498.    This continuing ignorance was due to no fault of Plaintiffs, as Defendants' entire scheme was dependent on keeping the Plaintiffs, Class Members, the public, and regulators in the dark, and their methods were calculated accordingly.  Due diligence would not have revealed Defendants' manipulation.

### A.    An Ordinary Person Would Not Have Known that Brent had Probably Been Manipulated

499.    Prior to the public revelations that the European Commission had raided three major players in the North Sea Brent Crude Oil market, an ordinary person would not have known of their injury from the manipulation of Brent Crude Oil.  Reasons why a person of ordinary intelligence would not have known of the manipulations include:

- The highly specialized and esoteric nature of the crude oil physical and derivative markets;

- The general opacity of the market because of the small numbers of players who trade the Brent Crude Oil physical markets;

- The difficulty of identifying uneconomic trades because so many trades in the physical market were unreported private transactions;

- The self-concealing aspects of manipulation and conspiracies as discussed more fully below; and

- The apparent ratification of the competitiveness of the MOC trades by Platts, exemplified by Platts's president's representations that "Platts carefully analyses transactional data to determine its fitness for an assessment of market value. Yes, Platts applies judgment to the data it gathers, but that judgment is tied strictly to the

169

underlying market[.]"

500.    The very techniques used by Defendants to manipulate were chosen to best hide the manipulations from regulators and market participants.

501.    For example, spoofing, a technique used by Defendants, allows an MOC participant to submit a bid or an offer with the intent to cancel the bid prior to cancel the bid prior to executing the trade.  By its nature, a spoof trade is not immediately or readily identifiable as a spoof trade to good faith market participants such as Plaintiffs and Class Members.

502.    Similarly, wash trading, a technique used by Defendants, allows MOC participants to enter into offsetting transactions, designed to give the appearance that bona fide purchases and sales were made.  Such transactions are not immediately or readily identifiable as a wash trade to good faith market participants such as Plaintiffs and Class Members.

503.    Significantly, Plaintiffs did not have access to the MOC trades that Platts reported as they were only available at significant cost with licensing restrictions to certain market participants.  In other words, while Plaintiffs absolutely relied upon the *results* of the MOC process, they did not have access to information regarding specific manipulative transactions that went into deriving those results, and thus could not have known about or evaluated those manipulative trades.

504.    Furthermore, Defendants' manipulation could only succeed if such manipulation was concealed from Plaintiffs, Class Members, and the public at large.

505.    Indeed, Defendants conduct was so well hidden that it kept regulators unaware for years until the European Commission carried out unannounced inspections in May 14, 2013.

506.    Information about Defendants' positions – potentially key to evaluating and identifying their manipulative conduct – was also not known to Plaintiffs, Class Members, or the public.

507. Thus, as a result of the self-concealing nature of Defendants' conduct, no person, Plaintiff, or Class Member discovered, or, with reasonable diligence, could have discovered before May 14, 2013 facts suggesting that Defendants were manipulating Dated Brent and Brent futures and other derivatives.

508. In addition, Defendants also took active steps to conceal evidence of their misconduct from Plaintiffs, Class Members, regulators, and the public.

509. For example, on January 12, 2011, the Platts Market Wire made note of an internal Statoil directive to curtail the use of Yahoo! Instant Messenger – recognized by Platts as a standard industry communications vehicle, and one of the ways Platts collects bids, offers, and transactions from MOC participants.

510. Alf-Kristian Aune, trading manager of crude for Statoil at the time, explained that Statoil's new policy for 2011 was to "work less on Yahoo! And more basis-telephone."

511. Approximately a week later, on January 20, 2011, Platts reported that traders were having difficulty gauging market sentiment because of inactivity during the day.   Traders specifically noted that Statoil had not been particularly active in sending out indications from its Stavenger office.

512. On January 20, 2011, Platts quoted a North Sea trader as saying that it's hard to know when crude differentials would bottom out because "everything is done so quietly now."

513. Plaintiffs and Class Members anticipate further discovery will reveal the extent to which all Defendants went to actively hide their conduct from regulators, Plaintiffs, and Class Members.

514. Furthermore, all Defendants at all times remained silent about their intentions in making their manipulative transactions.

171

**B.** **Plaintiffs Could Not have Known or Reasonably Discovered Facts Suggesting Defendants' Manipulation of Dated Brent**

515. Plaintiffs and Class Members had no reason to suspect –until the May 14, 2013 raids by the European Commission – that there was *actual* manipulation taking place, and that Defendants were at the forefront of such manipulation.  No facts arose before these raids to put Plaintiffs and Class Members on notice of Defendants' manipulations. Plaintiffs and Class Members thus remained unaware of the violations during the Class Period.

516. As described above, Defendants' chosen methods of manipulation were inherently self-concealing and calculated to conceal the existence of the illegal conduct.  Defendants, among other things, conspired and engaged in secret activities in order to manipulate, through contrived reports to PRAs, Brent Crude Oil prices and the prices of Brent Crude Oil futures and derivatives contracts traded on the ICE and NYMEX.

517. Defendants also took active steps to conceal their conduct.  Plaintiffs and Class Members were thereby prevented from discovering this conduct through the exercise of reasonable diligence.

518. As a result, any statute of limitations affecting or limiting the rights of action by Plaintiffs and Class Members was tolled, at least until May 14, 2013.  Indeed, even now no governmental agency has provided specific evidence of manipulative trades by any of the Defendants.

519. Defendants should be equitably estopped from asserting that any otherwise applicable period of limitations has run.

520. Application of the doctrine of fraudulent concealment tolled the statute of limitations as to the claims asserted by Plaintiffs and members of the Class.  Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of

any facts that could or would have led to the discovery thereof.

521.    Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the members of the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in May 2013.

522.    For these reasons, among others including those alleged herein and presently unknown to Plaintiffs and members of the Class, the statute of limitations applicable to Plaintiffs and the Class' claims was tolled and did not begin to run until May 2013.

## VII.    RELEVANT MARKET

523.    The relevant market in this case is the Brent Crude Oil Market, which comprises: (1) the Brent Crude Oil physical cargo market, including all cargoes priced as a differential to Brent Crude Oil; (2) NYMEX Brent Futures, ICE Brent Futures and other Brent Crude Oil derivatives; and (3) the Platts MOC market for various types of Brent Crude Oil physical cargoes and derivatives thereon.

524.    Additional markets that may have been affected by the manipulations alleged herein include: the WTI market and Crude Oil downstream products markets such as home heating oil and RBOB gasoline.

## VIII.   CLASS ALLEGATIONS

525.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). The Class consists of:

> All persons, corporations and other legal entities that transacted in and/or held (a) ICE derivatives contracts tied to Brent Crude Oil (such as Brent futures) and/or (b) NYMEX derivatives contracts tied to Brent Crude Oil (such as Brent futures) during the Class Period (i.e., 2002 through the present).  Excluded from the Class

are Defendants and any parent, subsidiary, affiliate, employee or agent of any Defendant.

526.   <u>FRCP Rule 23(a)(1)</u>. Class members number in the hundreds or, perhaps, thousands, and are geographically dispersed such that joinder is impractical.

527.   <u>FRCP Rule 23(a)(2)</u>. Common issues of fact and law include but are not limited to:

a.   Whether Defendants manipulated Dated Brent prices and price trends and manipulated ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts in violation of the CEA;

b.   Whether Defendants are liable under the CEA for such manipulation;

c.   Whether Defendants are vicariously liable for such manipulation, or liable for aiding and abetting such manipulation;

d.   Whether Defendants' unlawful actions violate Sections 1 and 2 of the Sherman Antitrust Act;

e.   Whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

f.   Whether Defendants unjustly enriched themselves or are otherwise responsible for disgorgement/restitution under the common law;

g.   The operative time period and extent of Defendants' violations; and

h.   The appropriate relief.

528.   <u>Rule 23(a)(3)</u>. Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

529.   <u>Rule 23(a)(4)</u>. Plaintiffs are not antagonistic to the Class, is an adequate class representative, and has retained adequate counsel.

530.   <u>Rule 23(b)(3)</u>. Common issues predominate over individual issues (if any). A class action is superior to other methods (if any) for a fair and efficient adjudication of this case. Indeed, a class action is the only method by which Plaintiffs and the Class can efficiently seek

174

redress because of "negative value" claims. The records of commodity futures traders are required to be maintained by FCMs (futures commission merchants). Plaintiffs do not anticipate any difficulties in the identification of Class members, notice to Class members or other aspects of the management of this action as a class action.

## IX.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Manipulation In Violation of the
Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)
Against All Defendants**

531.   Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

532.   As alleged herein, Defendants traded substantial volumes of Brent Crude Oil futures and other exchange-based derivatives tied to Brent Crude Oil.  Defendants knew that this false trade information was used by Platts in calculating and publishing its Brent Crude Oil prices.   Defendants knew, as sophisticated market participants, that the information they provided to Platts directly impacted the prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the U.S. and elsewhere. Through the conduct alleged herein, Defendants intentionally and recklessly caused prices of Brent Crude Oil and Brent Crude Oil futures contracts to trade at artificial levels.  This manipulation had the effect of benefitting Defendants' positions in the Brent Crude Oil futures.

533.   As major oil market participants, Defendants have the motive and financial incentive to manipulate Brent Crude Oil prices through contrived reports to Platts and other PRAs. Such manipulation: (a) enhances the value of Defendants' financial or derivative or physical positions, and (b) improves the price of purchase or sale obligations.  Each Defendant's production, sales, trading and other participation in the financial, derivative or physical crude oil

market are connected with or based on prices of Brent Crude oil.

534.     BP's, Shell's, and Statoil's key positions in the sales points for three of the four physical markets allow them individually and even more so collectively to enjoy privileged positions along the supply chain which gives them access to critical and valuable nonpublic information.  They are better informed about current and future supply and demand balances and flows that are not available to the markets at large.  Defendants can exploit this asymmetry of information to the disadvantage of other market participants, including traders in futures and other derivatives contracts.

535.     As holders of this advantageous non-public information, Defendants are well positioned to influence the market.  Market participants will follow Defendants' lead from their conduct in the market.  Defendants have used this power, coupled with their ability to influence the MOC process, to manipulate Dated Brent and Brent futures and other derivatives contracts.

536.     Each Defendant trades substantial volumes of physical crude oil.  They provide information of these trades to Platts.  This includes reports of significant physical, financial or derivative transactions, including transactions with one another and other firms they know. Defendants and other market participants are under no legal or regulatory obligation to provide their deals to Platts, but the industry heavily relies upon Platts and other PRAs to interpret and publish prices.  IOSCO conducted a study and concluded in October 2012 that price assessments could be vulnerable to manipulation because traders participate voluntarily, meaning they may selectively submit only trades that benefit their positions, in violation of the Platts rules.

537.     Factors motivating Defendants' manipulation varied among Defendants and may have changed at times during the Class Period.   A net exporter of crude oil, for example like Statoil, may often generally prefer higher prices, but on certain days of a trading cycle, however,

it will be in a position necessary to hedge existing short positions with long positions that are priced lower.  The reverse situation with regard to market direction can also occur as physical and trading positions dictate.  For Defendants operating as middle-men and traders, such as Vitol, Mercuria, Phibro, Phibro Commodities, and Trafigura, their motivation as to where they require absolute or relative prices to move is much more opportunistic.  These Defendants will attempt to force prices to the benefit of their trading books.  Therefore, trading book positions can change dramatically from day to day and will influence their required market direction on both an absolute and relative basis.

538.    For the refiners such as Shell and BP the motivation is based on their structural business.  Aside from STASCO's trading activities, Shell produces approximately 1.5 million barrels per day but refines approximately 2.8 millions of barrels per day.  Shell has a natural short position, accumulating every single day, of 1.3 millions of barrels per day, which STASCO must cover in the export market.  BP has a similar, although significantly smaller, structural shortfall between proprietary production and proprietary trading at approximately 300,000 barrels per day.[26]

539.    With competing interest, the Defendants must coordinate and compromise with each other on a daily basis to control and manipulate macro Brent Crude Oil prices via the Platts MOC process.  When interests regarding market direction coincide, or when one party or another party is disinterested, then action in the MOC is more easily dominated than when their interests conflict.

540.    By their intentional misconduct, Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of Brent Crude Oil and Brent Crude Oil futures and

---

[26] http://www.hydrocarbons-technology.com/features/feature-the-10-biggest-oil-and-gas-companies-in-the-world

other derivatives contracts to be artificial during the Class Period. Defendants, through their acts alleged herein, that occurred between 2002 and the present, specifically intended to and did cause unlawful and artificial prices of Brent Crude Oil, ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts in violation of CEA, 7 U.S.C. §§ 1, *et seq.*

541.   Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of Brent Crude Oil futures and other derivatives contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

542.   Defendants' foregoing extensive manipulative conduct deprived Plaintiffs and others of a lawfully operating market during the Class Period.

543.   Defendants acted for one another, including as alleged herein. In all the circumstances previously alleged, each Defendant had the ability to cause and did cause artificial prices.

544.   Plaintiffs and others who transacted in crude oil futures and other derivatives, including, Brent Crude Oil futures and other derivatives contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. § 1, et seq., and as a direct result thereof were injured and suffered damages.

545.   Plaintiffs and the Class are each entitled to damages for the violations of the CEA alleged herein.

546.   Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

547.   Plaintiffs and members of the Class who purchased or sold crude oil futures and

other derivatives contracts, including Brent Crude Oil futures and other derivatives contracts on NYMEX or ICE during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

**SECOND CLAIM FOR RELIEF**
**(Manipulation by False Reporting and Fraud and Deceit In Violation**
**of the Commodity Exchange Act, as Amended,**
**7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))**
**Against All Defendants**

548.    Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

549.    By their intentional and reckless misconduct, Defendants each violated Section 6(c)(1) of the CEA, as amended, 7 U.S.C. § 9, and caused prices of Brent Crude Oil futures and other derivatives contracts and derivatives to be artificial during the Class Period.  Defendants delivered and caused to be delivered for transmission through the mails and interstate commerce, by multiple means of communication, including communications to Platts, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of Brent Crude Oil and Brent Crude Oil futures and other derivatives, which are commodities in interstate commerce, knowing, or acting in reckless disregard of the fact that such report was false, misleading or inaccurate.

550.    Under Section 6(c)(1)  of the CEA, as amended, codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC, which shall promulgate by not later than 1 year after July 21, 2010.

179

551.     In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a) (2011), which provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud, make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading.

552.     Unlawful manipulation under the CEA, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

553.     During the Class Period, Defendants used or employed manipulative or deceptive devices or contrivances, in connection with a contract of sale of Brent Crude Oil in interstate commerce, including, but not limited to, making untrue or misleading statements of material facts, or omitting material facts necessary to make the statements made not misleading, including:

a.     Making untrue or misleading statements to Platts during the MOC window regarding their BFOE transactions;

b.     Failing to disclose, and omitting, that they entered wash transactions;

c.     Failing to disclose, and omitting, that they were unlawfully conspiring between and among themselves to manipulate Brent Crude Oil prices;

d.     Failing to disclose, and omitting, that they were reporting bids, offers and transactions to Platts during the MOC process to move Brent Crude Oil prices uneconomically to benefit their derivative positions;

e.      Issuing statements and directly engaging in the acts alleged herein knowingly or with reckless disregard for the truth;

f.      employing other deceptive devices as described above.

554.    Defendants' conduct proximately caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

555.    Plaintiffs and the Class are each entitled to damages for the violations of the CEA alleged herein.

**THIRD CLAIM FOR RELIEF**
**(Principal-Agent Liability In Violation of the**
**Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq*.)**
**Against all Defendants**

556.    Plaintiffs re-allege and incorporate all allegations with the same force and effect as if fully restated herein.

557.    Defendants were each an agent and/or other person acting on behalf of the other Defendants.  Because they acted pursuant to and were members of a conspiracy and unlawful agreement, Defendants acted as one another's agents during the Class Period.

558.    This included when Defendants, through their employees, agents and/or others directed, developed, executed and otherwise acted with respect the scheme alleged herein. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), each of the Defendants is liable for the acts of its employees, agents and/or another person acting for it in the scope of their employment.

559.    Plaintiffs and Class members are each entitled to damages for the violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**(Aiding and Abetting Liability In Violation of the**
**Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**
**Against All Defendants**

560.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

561.    All Defendants are also liable for aiding and abetting manipulation.

562.    Each and every Defendant had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

563.    Each Defendant made and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

564.    Each Defendant supervised the making of and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

565.    Each Defendant, by and through their respective partners, agents, employees and/or other persons, benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the other Defendants.

566.    Each Defendant participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative acts. Each Defendant also benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the commission of violations of the CEA by the others.

567.    Defendants each played their component role and each knowingly aided, abetted, counseled, induced, and/or procured the violations alleged herein.  Defendants did so knowing of

182

each other's manipulation of Brent Crude Oil market prices, and willfully intended to assist these manipulations, which resulted in Brent Crude Oil futures and other derivatives contracts to reach artificial levels during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(l).

568.    Plaintiffs and Class members are each entitled to actual damages for the violations of the CEA alleged herein.

### FIFTH CLAIM FOR RELIEF
#### (Contract Combination or Conspiracy to Manipulate Prices in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)
#### Against All Defendants

569.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

570.    Defendants constituted and/or entered into a contract, combination or conspiracy in restraint of trade, i.e., to manipulate or fix prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts during the Class Period in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

571.    During the Class Period, Defendants possessed market power in the setting of Brent Crude Oil prices and the prices of Brent Crude Oil futures and other derivatives contracts.

572.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Brent Crude Oil market prices and the prices of Brent Crude Oil futures and other derivatives contracts. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

573.    Each of the Defendants acted with full awareness of the anticompetitive purpose

183

of the conduct they were entering into and the manner thereof. Defendants exercised their independent judgment and skill to effectuate the purposes of the unlawful restraint of trade, i.e., to manipulate and set the prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts during the Class Period.

574.    Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

575.    ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts are traded throughout the U.S. in interstate commerce.  During the Class Period, Plaintiffs and members of the Class transacted in and/or held ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts at prices that were set and otherwise made artificial as a result of Defendants' unlawful acts.

576.    During the Class Period, Defendants acted in interstate commerce within the U.S.

577.    Defendants' contract, combination, and conspiracy unreasonably restrained trade and commerce, made artificial the prices of ICE Brent Crude Oil contracts and/or NYMEX Brent Crude Oil contracts, and caused misleading signals to be sent to market participants.

578.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property.  Plaintiffs and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

579.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**SIXTH CLAIM FOR RELIEF**
**(Violation of Section 2 of the Sherman Act,**
**15 U.S.C. § 2)**
**Against All Defendants**

580.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restate herein.

581.    In violation of Section 2 of the Sherman Act and Section 4 of the Clayton Act, Defendants entered monopolized and conspired to monopolize the Brent Crude Oil Market.

582.    During the Class Period, as major producers and market participants and contributors to Platts pricing assessments for Brent Crude Oil, Defendants attempted to monopolize and did monopolize the Brent Crude Oil Market, including the MOC process.

583.    During the Class Period, Defendants controlled the delivery points and the trading in the MOC process.  They therefore also controlled prices in the market for Brent Crude Oil-based derivative contracts, including futures and other derivatives contracts.  Defendants' unlawful price control of the Brent Crude Oil Market during the Class Period reflects monopoly power.  The conduct consisted of a concerted effort between and among Defendants and their co-conspirators and in furtherance of which they created artificial prices for Brent Crude Oil-based derivative contracts, including futures and other derivatives contracts.

584.    During the Class Period, Defendants provided Platts during the MOC process with physical or derivative transaction data based on false, inaccurate or misleading information for the purpose of affecting Brent Crude Oil prices.

585.    Defendants' conduct and its resulting impact on the Brent Crude Oil Market occurred in or affected interstate and international commerce.

586.    The anticompetitive effects of Defendants' conduct far outweigh any ostensible competitive benefits or justifications.

587.    Plaintiffs and members of the Class have been injured in their business or property by Defendants' attempted monopolization and monopolization of the Brent Crude Oil Market.

588.    Defendants' anticompetitive conduct had severe adverse consequences on competition and price discovery.  Plaintiffs and other members of the Class that traded Brent Crude Oil futures and other derivatives linked to the price of Dated Brent during the Class Period were deprived of normal, competitive trading patterns and, instead, were subjected to artificially determined prices as a result of Defendants' unlawful and manipulative conduct.  As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

589.    Plaintiffs and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment And Restitution/Disgorgement)**
**Against All Defendants**

</div>

590.    Plaintiffs re-allege and incorporate all allegations of this Complaint with the same force and effect as if fully restated herein.

591.    Defendants financially benefited from their unlawful acts, and it is unjust and inequitable for Defendants to have enriched themselves in this manner.

592.    These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact Brent Crude Oil futures and other derivatives contracts at artificial prices.

593.    Commodity futures and other derivatives contract trading is a zero sum game.  To the extent that Defendants benefited from their extensive unlawful acts, they necessarily did so by forcing Plaintiffs and members of the Class to lose.

594.    All traders enter the same standardized contract subject to the same rule set.  This prominently includes rules and laws prohibiting manipulation.

595.    It would be inequitable for Defendants to be permitted to violate that rule set and still retain the benefit that Defendants obtained from such violation at the expense of Plaintiffs and members of the Class.

596.    Equity and good conscience require restitution by Defendants.

597.    Each Defendant should pay restitution or its own unjust enrichment to Plaintiffs and members of the Class.

598.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiffs as Class Representatives and their counsel as Interim Lead Counsel for the Class;

B.    For judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment and post-judgment interest at the maximum rate allowable by law;

C.    For a judgment awarding Plaintiffs and the Class treble damages against Defendants as a result of their unlawful, anticompetitive conduct alleged herein under applicable federal antitrust law;

D.    For a judgment enjoining Defendants from continued unlawful, anticompetitive conduct alleged herein;

187

E.      For a judgment awarding Plaintiffs and the Class the amount of Defendants' unjust enrichment;

F.      For an award to Plaintiffs and the Class, plus pre- and post-judgment interest, plus their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

G.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated:  February 27, 2015

**KIRBY McINERNEY LLP**

By:   /s/ David E. Kovel
David E. Kovel
Alice McInerney, Of Counsel
Lauren Wagner Pederson, Of Counsel
Andrew M. McNeela
Thomas W. Elrod
dkovel@kmllp.com
amcinerney@kmllp.com
lpederson@kmllp.com
amcneela@kmllp.com
telrod@kmllp.com
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone:  (212) 371-6600
Facsimile:  (212) 751-2540

*Interim Lead Counsel for Plaintiffs and the Proposed Class*

**BERGER & MONTAGUE, P.C**
Merrill G Davidoff
Michael Dell'Angelo
Candice J. Enders
mdavidoff@bm.net
mdellangelo@bm.net
cenders@bm.net
1622 Locust Street
Philadelphia , PA  19103
Telephone:  (215) 875-3084

*Additional Counsel for Plaintiffs*

**MOTLEY RICE LLC**
Michael M. Buchman
John Andrew Ioannou
David P. Abel
jioannou@motleyrice.com
mbuchman@motleyrice.com
dabel@motleyrice.com
600 Third Avenue, 21st Floor
New York , NY  10016
Telephone:  (212) 577-0051

*Additional Counsel for Plaintiffs*

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN,LLP**
Douglas Ian Cuthbertson
Steven E. Fineman
sfineman@lchb.com
dcuthbertson@lchb.com
250 Hudson Street, 8th Floor
New York , NY  10013
Telephone: (212) 355-9500

Eric B. Fastiff
Brendan P. Glackin
efastiff@lchb.com
bglackin@lchb.com
275 Battery Street 29th Floor
San Francisco , CA  94111-3339
Telephone:  (415) 956-1000
*Additional Counsel for Plaintiff*

**GLANCY BINKOW & GOLDBERG LLP**
Brian Philip Murray
Lee Albert
Lionel Z. Glancy
bmurray@glancylaw.com
lalbert@glancylaw.com
lglancy@glancylaw.com
122 East 42nd Street, Suite 2920
New York , NY  10168
Telephone:  (212) 682-5340

*Additional Counsel for Plaintiffs*

189

**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
Bryan L. Clobes
bclobes@caffertyclobes.com
1101 Market Street, Suite 2650
Philadelphia, PA 19107
Telephone: (215) 864-2800
Facsimile: (215) 864-2810

Anthony F. Fata
Daniel O. Herrera
afata@caffertyclobes.com
dherrera@caffertyclobes.com
30 N. LaSalle, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Facsimile: (312) 782-4485

*Additional Counsel for Plaintiffs*

**LOWEY DANNENBERG COHEN & HART, P.C.**
Geoffrey Milbank Horn
Peter D. St. Phillip, Jr.
Raymond Peter Girnys
Vincent Briganti
ghorn@lowey.com
pstphillip@lowey.com
rgirnys@lowey.com
vbriganti@lowey.com
One North Broadway
White Plains, NY  10601
Telephone:  (914) 733-7251
Facsimile:  (914) 997-0035

*Counsel for Prime International Trading, Ltd.*