# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: NORTH SEA BRENT CRUDE OIL FUTURES LITIGATION<br><br>This document applies to:<br><br>Case Nos. 13-cv-03473-ALC, 13-cv-03587-ALC, 13-cv-03944-ALC, 13-cv-04142-ALC, 13-cv-04553-ALC, 13-cv-04872-ALC, 13-cv-04938-ALC, 13-cv-05577-ALC, 13-cv-07089-ALC, 13-cv-08030-ALC, 13-cv-08151-ALC, 13-cv-08179-ALC, 13-cv-08240-ALC and 13-cv-08270-ALC. | 1:13-md-02475-ALC |

**PLAINTIFFS' OPPOSITON TO DEFENDANT PHIBRO COMMODITIES LIMITED'S MOTION TO DIMISS FOR LACK OF PERSONAL JURISDICTION**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   STATEMENT OF FACTS ...................................................................................... 1

      A.    Nature of the Action ........................................................................................ 1

      B.    Background of Phibro Commodities. ............................................................... 2

      C.    Phibro Commodities' Conduct had a Direct and Foreseeable
            Effect in the U.S. ............................................................................................ 3

      D.    Phibro Commodities' Additional Contacts With the U.S. ................................ 4

III.  ARGUMENT ........................................................................................................ 6

      A.    Standards of Review Support Personal Jurisdiction. ....................................... 6

      B.    The Assertion of Personal Jurisdiction Over Phibro Commodities
            Comports with Due Process. ........................................................................... 7

      C.    The Court Has Specific Jurisdiction Over Phibro Commodities. ..................... 8

      D.    The Court Has General Jurisdiction Over Phibro Commodities. ................... 10

IV.   CONCLUSION .................................................................................................... 10

## <u>TABLE OF AUTHORITIES</u>

*In re Amaranth Natural Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008)................................................................. 7, 8

*Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*,
    956 F. Supp. 427 (S.D.N.Y. 1996)...................................................................... 8

*Asahi Metal Indus. Co. v. Superior Court of Cal., Solano County*,
    480 U.S. 102 (1987)............................................................................................. 7

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002)........................................................................... 7, 8

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)............................................................................................. 7

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)............................................................................... 8

*CutCo Indus., Inc. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986)............................................................................... 6

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014).............................................................................. 7, 9, 10

*Donogue v. Dicut*,
    No. 01 Civ. 10194, 2002 WL 1728539 (S.D.N.Y. July 24, 2002) ..................... 7

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
    872 F. Supp. 81 (S.D.N.Y. 1995)....................................................................... 8

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)............................................................................... 8

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003)............................................................................. 10

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)................................................................................. 7

*Norvel Ltd. v. Ulstein Propeller As*,
    161 F. Supp. 2d 190 (S.D.N.Y. 2001)............................................................... 8

*NYKCool A.B. v. Pac. Int'l. Servs., Inc.*,
    No. 12 Civ. 5754 (LAK), 2014 WL 3605632 (S.D.N.Y. Jul. 15, 2014).......... 10

*S. New England Tel. Co. v. Global NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010)............................................................................................ 10

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
  48 F. Supp. 3d 675 (S.D.N.Y. 2014)............................................................................... 9

*S.E.C. v. Unifund SAL*,
  910 F.2d 1028 (2d Cir. 1990).......................................................................................... 8

*In re Term Commodities Cotton Futures Litig.*,
  No. 12 Civ. 6126 (ALC), 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013)......... 6, 7, 8, 9, 10

*UHS of Delaware, Inc. v. United Health Servs., Inc.*,
  12 Civ. 485, 2015 WL 539736 (M.D. Pa. Feb. 10, 2015) ............................................... 10

## I.   PRELIMINARY STATEMENT

Phibro Commodities Limited ("Phibro Commodities") and Phibro Trading LLC ("Phibro Trading") are named defendants in this action due to their extensive roles in the Commodity Exchange Act ("CEA") and Sherman Act violations that the Brent Derivative Trader Plaintiffs ("Plaintiffs") allege in the Complaint.[1]   Phibro Commodities defies this Court's jurisdiction, erroneously claiming that it cannot be compelled to answer for its conduct in the United States. Plaintiffs submit this supplemental brief in opposition to Phibro Commodities' motion to dismiss Plaintiffs' Complaint under Fed. R. Civ. Pro. 12(b)(2) and supporting memorandum of law ("Phibro Br.") [ECF Nos. 329, 330].[2]

## II.   STATEMENT OF FACTS

### A.   Nature of the Action.

Defendant Phibro Commodities manipulated the prices of physical Brent crude futures contracts traded on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE") by reporting false and artificial trades concerning physical Brent to Platts, the price reporting agency ("PRA") designated to disseminate Brent Crude Oil prices.  ¶¶453, 516.

Platts' physical Brent price assessments during the Market on Close ("MOC") process directly affect the price of NYMEX and ICE Brent futures contracts.  ¶¶121, 126, 233-50.  In particular, ICE and NYMEX utilize Platts' and other PRAs' assessments when deriving the price of Brent futures contracts, ¶¶121, 123, and these futures are "inseparably linked" to Platts prices by the "futures contracts' terms."  ¶¶123, 128, 129-132.

---

[1] "Complaint" herein refers to the Second Amended Consolidated Class Action Complaint.  [ECF No. 308].  All citations to the Complaint are denoted as "¶."

[2] *See* Order dated April 10, 2015, lifting the discovery stay to allow Plaintiffs to engage in jurisdictional discovery and depose Roger Plaisted. [ECF No. 347].  Mr. Plaisted provided a declaration ("Plaisted Decl.") in support of Phibro Commodities motion to dismiss for lack of personal jurisdiction. [ECF No. 330].  On April 29, 2015, Plaintiffs deposed Mr. Plaisted, and the transcript of his deposition ("Plaisted Tr.") and exhibits thereto collectively are attached to the Declaration of Lauren W. Pederson ("Pederson Decl.") as Exhibit "A".

### B.      Background of Phibro Commodities.

Phibro Commodities, which is based and incorporated in the United Kingdom (¶45), is an affiliate of a long-standing U.S.-based commodities trading house, headquartered in New York in the early 1900s.[3]  With a storied history of control and ownership including prominent names such as Marc Rich, Salomon Brothers and Citigroup, Inc., the Phibro trading house has at times "controlled the oil world."  *Id.* ("There was no price dissemination, so we used to tell people what the price was.").

In 2009, Phibro Trading became a wholly-owned subsidiary of Occidental Petroleum Corporation ("Oxy"), after Citigroup, Inc. sold Phibro to avoid a scandal arising from a $100 million bonus earned and requested in 2009 by Phibro's star crude oil trader, Andrew "Andy" Hall.[4]  Mr. Hall's bonus inconveniently coincided with Citigroup's $45 billion bailout by the U.S. government (and taxpayers).  *Id.*  Citigroup promptly divested itself of Phibro and Mr. Hall and his infamous bonus.[5]  Oxy then formed Phibro Commodities to carry on Phibro's legacy crude oil commodities trading business.  Plaisted Tr. 91:18-25, 92:2-6.  Phibro Commodities was formed as a wholly-owned subsidiary of Phibro Trading, a Delaware limited liability company, with its principal place of business in Westport, Connecticut.  ¶45; Plaisted Decl. ¶3.

In 2010, Phibro informed Platts that an entity known as Phibro Commodities would become the Phibro entity participating in the MOC process.  ¶85; Plaisted Tr. Ex 7.  Participation in the MOC was critically important to Phibro's business operations, as Phibro Commodities' traders could not have traded "unless Phibro Commodities was able to participate in Platts London MOC window."  Plaisted Tr. at 91- 93.  Phibro Commodities entered into MOC Brent

---

[3] *See* Pederson Decl. Ex. B, *Rise and fall of a commodities powerhouse*, Fin. Times, (Feb. 2, 2015).

[4] *See* Pederson Decl. Ex. C, M. Siconolfi & A. Davis, *Citi in $100 Million Pay Clash*, Wall St. J. (July 25, 2009).

[5] *See also* Pederson Decl. Ex. D, *How Occidental Scored Citi Unit Cheaply*, Wall St. J. (Oct. 12, 2009).

Crude Oil trades with counterparties in New York, including Defendants HETCO and MSCGI. *Id.* 96-98; Plaisted Tr. Exhibit 4 (reflecting 49 separate MOC Brent cargo trades between Phibro Commodities and HETCO or MSCGI).

### C.   Phibro Commodities' Conduct had a Direct and Foreseeable Effect in the U.S.

The Complaint alleges, and Phibro Commodities' motion does not dispute, that its manipulation of the Platts MOC process had a direct and foreseeable effect in the United States. For example, in January 2011, defendants, including Phibro Commodities, conspired to manipulate Brent futures prices through transactions reported in the Platts MOC window. ¶¶278-318.  In September 2012, Phibro Commodities and other defendants also manipulated the Dated Brent Crude market.  ¶¶369, 378, 395-397.  Phibro Commodities' conduct "impacted pricing trends of Dated Brent and the prices of contracts tied to Brent in substantial ways, including by affecting the differential between Brent futures and WTI futures." ¶408.

In addition, Phibro Commodities distorted prices of Brent futures contracts traded by Plaintiffs in the United States and physical oil imported into and traded in the United States. ¶¶491-495, 575.  NYMEX is headquartered in New York and is owned by the CME Group, Inc, which is headquartered in Chicago.  ¶¶133-34.  Trades on ICE are made on "electronic trading systems in the U.S." or through CFTC-regulated futures commissions merchants.  ¶¶141, 143. Phibro Commodities knew that by reporting "false trade information . . . used by Platts in calculating and publishing its Brent Crude Oil prices," it would "directly impact[] the prices of Brent Crude Oil futures contracts . . . traded in the U.S." and "benefit[] [its] positions in the Brent Crude Oil futures." ¶¶491, 532-33.  A "direct and foreseeable result" of its conduct was the "repeatedly distorted and artificial" prices in Brent futures, ¶¶453, 535, including on NYMEX and ICE, ¶575 and prices of millions of barrels of physical Brent that are imported into the United States each year.  ¶489.

D.      **Phibro Commodities' Additional Contacts With the U.S.**

In addition to trading physical Brent Crude Oil in the MOC, Phibro Commodities traded Brent derivative and futures contracts on NYMEX and ICE that related to their physical Brent Crude Oil trading activity.  Plaisted Tr. at 63-66, 69-70.  But these derivative and futures trades were not entered on Phibro Commodities' books and trading records, and instead ***Phibro Commodities' traders*** executed their Brent futures and derivative contract trades on behalf of ***Phibro Trading*** in the United States.  Plaisted Tr. at 63-70.  Phibro Commodities and Phibro Trading had a "motivation" to "force prices to the benefit of their trading books," which is why they engaged in the manipulative price reporting to Platts and other PRAs.  ¶537.

In his Declaration, Mr. Plaisted explained that Phibro Commodities "manage[s] a book of trades that includes the indirect benefit of futures contracts and other derivatives" on, *e.g.*, NYMEX and ICE.  Plaisted Decl. ¶5.  The "same persons" who conduct its physical Brent trades "manages [this] book of trades."  *Id.*  Phibro Commodities uses NYMEX and ICE futures contracts "for price discovery, to hedge price exposure of physical commodities, and to trade for profit," *id.*, and "to take advantage of opportunities [it has] perceived in the market."  *Id.* ¶6.  During his deposition, Mr. Plaisted explained the common enterprise between Phibro Commodities and Phibro Trading as follows:

Q. So the London [Phibro Commodities] traders would establish trades on Phibro Trading LLC's books that were to trade for profit?

A. Yes.
***

Q. Why they were put on Phibro Trading LLC's books?

A. Well, yes, I mean because Phibro – the activity of Phibro Commodities was restricted to acting as a principal only for physical oil transactions.
***

A. As I mentioned earlier, the books are traded on an overall basis. So some of the, if you like, the paper or derivative activity would have been entered into on a non-specific basis, but as part of a kind of collective overall hedge. So, coming back to the example I gave

4

earlier, you may be short on the physical, which is Phibro Commodities, and that might be hedged through length taken in one of the paper or derivative markets.

***

A. Well, typically, if a trader wanted to enter into a WTI-based transaction or a WTI transaction for NYMEX, he could do that either directly or, alternatively, what he is more likely to do is to get hold of a local brokerage, UK brokerage company, and say he wants to do a trade on NYMEX. That local brokerage company will contact its US based operation, or whichever entity is registered as a trader on NYMEX, and would execute through that route.

Q. And so this is a Phibro Commodities trader that is making a call to a UK broker?

A. The Phibro Commodities trader – the London based trader, who is a Phibro Commodities employee, would be making that call, but the transaction would always be intended to be a Phibro Trading LLC transaction.

Q. So would you agree that the Phibro Commodities trader is acting as an agent of Phibro Trading in these transactions?

A. Yes.

Plaisted Tr. 66-70.   Sometimes Phibro Trading – through an intercompany transfer – recorded the profit or loss from the Brent futures trade to Phibro Commodities if the trade was an "identifiable" hedge to a physical crude oil trade. *Id.* 71-73; Plaisted Decl. ¶¶5-6.

Although physical Brent Crude Oil trading generated substantially all of Pribro Commodities' profits and losses, Phibro Commodities' traders shared in an aggregate profit-related bonus with traders at Phibro Trading in the United States.  Plaisted Tr. at 19-21, 23, 29:3-12, 41.  Bonuses were assessed on a "global basis" by looking at Phibro's overall profitability, and then within the contributions that individual or groups of traders (such as the London traders at Phibro Commodities) made to the "overall . . . profits of Phibro." *Id.*  Phibro Commodities' London-based traders communicated with their U.S.-based Phibro Trading coworkers via frequent telephone calls, instant messaging and e-mail.  In addition, Phibro Commodities and Phibro Trading shared a common proprietary data system that generated trading reports from Phibro Trading's office in Westport, Connecticut headquarters. *Id.*

Although Phibro Commodities' head traders were located in London, they reported

directly to Andy Hall in Westport, Connecticut. Plaisted Tr. 104:2-10. Mr. Plaisted also reported to a supervisor at Phibro Trading in Westport. Plaisted Tr. 105:2-4. Andy Hall, as the CEO and President of Phibro Trading and the "wider Phibro" operations, had the authority to tell Phibro Commodities traders that they could or could not enter into or exit certain trading strategies if Mr. Hall felt that the positions were inappropriate. *Id.* 101-02. Likewise, the trading limits for Phibro Commodities' traders were imposed from the United States by both Phibro Trading and Oxy. *Id.* at 46-48. In fact, allocations (including for Phibro Commodities) were calculated on a daily basis by a risk management group located in the Westport, Connecticut office of Phibro Trading. *Id.* 50:2-22. Another Phibro affiliate known as Phibro Services LLC ("Phibro Services") employed this risk management group. *Id.* 50:23-25, 51:2-4. *See also* Plaisted Decl. ¶8. Phibro Services is a Delaware limited liability company that is registered to do business in Connecticut. Plaisted Tr. 134 and Tr. Exhibit 8. There also is an overlap of executive personnel between the affiliated Phibro entities, *Id.* 149-50, and Phibro Commodities board of directors did not hold meetings. Plaisted Tr. 143:23-25, 144:2-4.

## III.   ARGUMENT

### A.    Standards of Review Support Personal Jurisdiction.

On a motion to dismiss under Rule 12(b)(2), the court "must construe the pleadings and supporting affidavits in the light most favorable to the plaintiff" and resolve all doubts in Plaintiffs' favor. *In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 6126 (ALC), 2013 WL 9815198, at *28 (S.D.N.Y. Dec. 20, 2013); *see also CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Where, as here, a federal statute confers jurisdiction, courts may exercise personal jurisdiction over a defendant if the exercise of jurisdiction comports with due process requirements of the Fifth Amendment. *Cotton,* 2013 WL 9815198, at *29. Under the Fifth Amendment, a plaintiff need only establish defendants' "certain minimum contacts [with

the United States] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at *29 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). As Phibro Commodities acknowledges, the Court must examine defendant's contacts throughout the United States as a whole to determine whether the exercise of personal jurisdiction is appropriate. Phibro Br. at n.1.

### B.    The Assertion of Personal Jurisdiction Over Phibro Commodities Comports with Due Process.

Plaintiffs have demonstrated more than sufficient minimum contacts with the United States for this Court to exercise specific or general jurisdiction over Phibro Commodities.[6] Here, the limited record at this stage of the litigation establishes that Phibro Commodities "purposely availed itself" of the United States by negotiating and entering into Brent Crude Oil MOC trades with U.S. counterparties in this District; executing futures and derivative contracts on behalf of Phibro Trading on U.S. exchanges; manipulating the price of Brent Crude Oil futures and derivative contracts traded on U.S. exchanges; manipulating the price of crude oil imported into the U.S.; and using affiliated employees in the U.S. to perform risk management and other daily functions to support its commodities trading operations. The exercise of jurisdiction over Phibro Commodities also is reasonable.[7]

---

[6]  Specific jurisdiction exists when, as here, personal jurisdiction over a defendant arises out of or is related to the defendants' contacts with the United States. *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008). By contrast, general jurisdiction allows a court to exercise power over a defendant in a case in which the subject matter of the suit is unrelated to those contacts and is based on a defendant's general business contacts throughout the United States. *Daimler AG v. Bauman*, 134 S. Ct. 746, 755 (2014).

[7]  When plaintiff has made a threshold showing of minimum contacts, the burden shifts to defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)); *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano County*, 480 U.S. 102, 116 (1987) (Brennan, J., concurring) (finding that only in "rare cases" will inconvenience defeat the reasonableness of jurisdiction). Phibro Commodities does not argue that any circumstances render it unreasonable to exercise jurisdiction over it. The United States has a strong interest in adjudicating matters brought under the CEA and protecting the United States commodities markets, especially where there is "no evidence of any competing foreign forum for this controversy." *Donogue v. Dicut*, 2002 WL 1728539, at *3 (S.D.N.Y. July 24, 2002).

**C.   The Court Has Specific Jurisdiction Over Phibro Commodities.**

Phibro Commodities' aggregate contacts throughout the United States all "relate" to Plaintiffs' claims and easily satisfy the minimum contacts required for specific jurisdiction.  *See Bank Brussels*, 305 F.3d at 128.[8]  In *Amaranth*, Judge Scheindlin held that a Canadian trader's alleged manipulative transactions "presented unmistakably foreseeable effects within the United States" when he instructed another defendant to hold voluminous natural gas futures trades until the last minutes of the settlement period, and on a different occasion instructed another trader to "smash" the settlement price of specific natural gas futures contracts.  587 F. Supp. 2d at 536. Based on these transactions, the court rejected the trader's assertion of lack of his requisite minimum contacts with the forum.  *Id.*  The same result should be obtained here where Phibro Commodities' (and Phibro Trading's) manipulation knowingly created artificial trading and settlement prices for Brent Crude Oil futures and derivative contracts.[9]

Phibro Commodities also meets all three of the Second Circuit's factors which set the standards for minimum contacts by a foreign corporation:  "(1) transacting business in the United States, (2) doing an act in the United States, or (3) having an effect in the United States by an act done elsewhere."  *Cotton* at *29 (citing *Norvel Ltd. v. Ulstein Propeller As*, 161 F. Supp. 2d 190, 206 (S.D.N.Y. 2001)).[10]  In *Cotton*, this Court examined a Netherlands-based corporate

---

[8]  *See also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 167 (2d Cir. 2010) ("[T]he nexus requirement . . . merely requires the cause of action to 'relate to' defendant's minimum contacts with the forum."); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("*the totality of all defendant's contacts* with the forum state must indicate the exercise of jurisdiction would be proper.") (internal quotation marks omitted).

[9]  A foreign defendant is subject to personal jurisdiction, where, as here, it "know[s] or [has] good reason to know, that [its] conduct will have effects in the [forum] seeking to assert jurisdiction over [it]."  *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 87 n.8 (S.D.N.Y. 1995); *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (worldwide service of process permits the exercise of personal jurisdiction when a defendant's activities had "an unmistakably foreseeable effect within the United States").

[10]  Phibro Commodities strains to apply a more restrictive test based on the New York long-arm statute, but that statute cannot be imported here to set a "higher threshold for minimum contacts than is constitutionally required." *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 956 F. Supp. 427, 440-41 (S.D.N.Y. 1996) (rejecting application of New York long-arm).

defendant's nationwide activities in a CEA case and found "the requisite minimum contacts through [the defendant's] business transactions and [acts committed inside] the United States that made suit in this country reasonably foreseeable."  2013 WL 9815198, at *29.  Like the defendant in *Cotton*, Phibro Commodities works through entities set up in the United States "to carry out various functions" of its crude oil trading business.  *Id.* at *29.  There is no doubt that it transacted business and undertook acts that had an effect in the United States.   Phibro Commodities' relevant minimal contacts in the United States also include not only the specific manipulation of Brent Crude Oil prices, which Defendants knew would impact the price of Brent futures and derivatives traded on the CME, NYMEX and ICE, but also manipulative transactions conducted through their common enterprise with Phibro Trading and U.S.-based brokers involving Brent futures and derivatives entered into in the United States.

Indeed, Phibro Trading caused Phibro Commodities to act as the agent or alter ego of Phibro Trading to execute an essential part of its trading operations in the United States, as expressly admitted by Mr. Plaisted. Plaisted Tr. 70:14-17.  The law is well established that a "corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there" and thus subject itself to personal jurisdiction.  *Daimler*, 134 S. Ct. at 759 n.13.  In order to show that jurisdiction is proper due to the principal-agent relationship between a defendant and its agent, a plaintiff must show that the domestic agent – here Phibro Trading and Phibro Services – engaged in purposeful activities in the United States for the benefit of and with the knowledge and consent of the foreign defendant – here Phibro Commodities – and that the foreign defendant exercised some control over those actions.  *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 686-687 (S.D.N.Y. 2014) (allegations of control must sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a primary actor). Here, Phibro Trading and Phibro Commodities engaged in a unified scheme to manipulate the

Brent markets, and both entities were critical to the scheme's success.

**D.      The Court Has General Jurisdiction Over Phibro Commodities.**

As an alternative to specific jurisdiction, minimum contacts can be established through general jurisdiction. *Cotton* at *29 n. 21; *Daimler*, 134 S. Ct. 753.   Phibro Trading exerted extensive control over Phibro Commodities "to the degree that" Phibro Trading's numerous contacts with the United States should be imputed to Phibro Commodities for purposes of general jurisdiction.  *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003). Jurisdiction over a foreign entity is proper under an alter ego theory when "one person or entity truly dominates another so that the two are indistinguishable for practical purposes."  *NYKCool A.B. v. Pac. Int'l. Servs., Inc.*, No. 12 Civ. 5754 (LAK), 2014 WL 3605632, at *5 (S.D.N.Y. Jul. 15, 2014) (recognizing continuing validity of alter ego theory of personal jurisdiction following *Daimler*).[11]   The pervasive disregard of corporate formalities allows the continuous and systematic acts of Phibro Services and Phibro Trading in the United States to be attributable to Phibro Commodities.  General jurisdiction over Phibro here is, therefore, acceptable and fully within the grasp of due process requirements.

**IV.    <u>CONCLUSION</u>**

Plaintiffs have amply carried their burden to plead legally sufficient facts to support personal jurisdiction over Phibro Commodities.  This Court should deny Phibro Commodities' motion to dismiss for lack of personal jurisdiction.

---

[11]    In stark contrast to the *Daimler* case, plaintiffs here are residents of the United States. Some of Phibro Commodities trading activity occurred in the United States, all of it was directed at the United States, and all of resulting harm at issue in this case occurred in the United States on the NYMEX and ICE Brent futures markets.  "It is also well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process." *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *UHS of Delaware, Inc. v. United Health Servs., Inc.,* 12 Civ. 485, 2015 WL 539736, at *3 (M.D. Pa. Feb. 10, 2015) ("The truest manifestations of an alter ego relationship are invasive control by a parent corporation over a subsidiary and disregard for traditional corporate boundaries.").

Dated:  May 8, 2015

**KIRBY McINERNEY LLP**

 /s/ *David E. Kovel*
David E. Kovel
Lauren Wagner Pederson, Of Counsel
Thomas W. Elrod
dkovel@kmllp.com
lpederson@kmllp.com
telrod@kmllp.com
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone:  (212) 371-6600
Facsimile:  (212) 751-2540

*Interim Lead Counsel for the Brent Derivative Trader Plaintiffs and Proposed Class*

**BERGER & MONTAGUE, P.C**
Merrill G Davidoff
Michael Dell'Angelo
Candice J. Enders
mdavidoff@bm.net
mdellangelo@bm.net
cenders@bm.net
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3084
Facsimile:  (215) 875-4604

**GLANCY BINKOW & GOLDBERG LLP**
Brian Philip Murray
Lee Albert
Lionel Z. Glancy
bmurray@glancylaw.com
lalbert@glancylaw.com
lglancy@glancylaw.com
122 East 42nd Street, Suite 2920
New York, NY  10168
Telephone:  (212) 682-5340
Facsimile:  (212) 884-0988

**LIEFF, CABRASER, HEIMANN &
BERNSTEIN,LLP**
Steven E. Fineman
Douglas Ian Cuthbertson
sfineman@lchb.com
dcuthbertson@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500

Eric B. Fastiff
Brendan P. Glackin
efastiff@lchb.com
bglackin@lchb.com
275 Battery Street 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000

**MOTLEY RICE LLC**
Michael M. Buchman
John Andrew Ioannou
David P. Abel
jioannou@motleyrice.com
mbuchman@motleyrice.com
dabel@motleyrice.com
600 Third Avenue, 21st Floor
New York, NY  10016
Telephone:  (212) 577-0051
Facsimile: (212) 577-0054

**LOWEY DANNENBERG COHEN
&HART**
Vincent Briganti
Geoffrey M. Horn
vbriganti@lowey.com
ghorn@lowey.com
One North Broadway
White Plains, NY 10601
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

**CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP**
Bryan L. Clobes
bclobes@caffertyclobes.com
1101 Market Street, Suite 2650
Philadelphia, PA 19107
Telephone: (215) 864-2800
Facsimile: (215) 864-2810

Anthony F. Fata
Daniel O. Herrera
afata@caffertyclobes.com
dherrera@caffertyclobes.com
30 N. LaSalle, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Facsimile: (312) 782-4485

*Additional Counsel for Plaintiffs and Proposed Class*

12